## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ARDELYX, INC.,**
400 Fifth Avenue, Suite 210
Waltham, MA 02451

**AMERICAN ASSOCIATION OF KIDNEY
PATIENTS**, and
14440 Bruce B. Downs Blvd.
Tampa, FL 33613

**NATIONAL MINORITY QUALITY
FORUM,**
1201 15th Street NW # 340
Washington, DC 20005

                         **Plaintiffs,**
         **v.**

**XAVIER BECERRA,**
***Secretary of Health and Human Services***
200 Independence Avenue, SW
Washington, DC 20201

**U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,**
200 Independence Avenue, SW
Washington, DC 20201

**CHIQUITA BROOKS-LASURE, and**
***Administrator of Centers for Medicare and
Medicaid Services***
7500 Security Boulevard
Baltimore, MD 21244

**CENTERS FOR MEDICARE AND
MEDICAID SERVICES,**
7500 Security Boulevard
Baltimore, MD 21244,

                         **Defendants.**

Case No. 1:24-cv-02095

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs Ardelyx, Inc. ("Ardelyx"), American Association of Kidney Patients ("AAKP"), and National Minority Quality Forum ("NMQF"), (collectively, "Plaintiffs") bring this suit against Defendants Xavier Becerra, in his official capacity as Secretary of Health and Human Services; the U.S. Department of Health and Human Services ("DHHS"); Chiquita Brooks-LaSure, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; and the Centers for Medicare and Medicaid Services ("CMS"), and allege as follows:

**PRELIMINARY STATEMENT**

1.      This action challenges CMS's decision to, as of January 1, 2025, prohibit payment under Medicare Part D for Plaintiff Ardelyx's oral-only phosphate-lowering therapy (PLT) tenapanor (XPHOZAH) for chronic kidney disease (CKD) patients on dialysis, in favor of mandating the addition of this therapy to an inadequate bundled payment system that will sharply deter the utilization of XPHOZAH.

2.      XPHOZAH is an important innovation for patients with CKD on dialysis and the first new mechanism approved to lower serum phosphorus in more than two decades.  XPHOZAH offers a needed alternative to phosphate binders, an existing class of therapies that has proven insufficient for the majority of patients to achieve and maintain serum phosphorus at target levels. CMS's plan will seriously jeopardize the health of CKD patients on dialysis and is opposed by major end stage renal disease ("ESRD") patient groups, leading nephrologist organizations, dialysis facilities, and drug manufacturers—in short, by the broad community of ESRD patients, those who treat them, and those who work to develop life-saving therapies for them.

3.      CMS's plan to cease payment under Medicare Part D for XPHOZAH is not only bad policy; it is legal error.  CMS proposes to require dialysis facilities to purchase and dispense XPHOZAH using funds from a single "bundled" payment that CMS makes to dialysis facilities to

cover certain "renal dialysis services."  But CMS's plan contradicts statutory provisions that exclude drugs like XPHOZAH with only an oral form of administration ("oral-only drugs") from that "bundled" payment mechanism.  It also ignores that XPHOZAH, a hyperphosphatemia drug that is not administered during dialysis, is not a "renal dialysis service" at all.  CMS's plan likewise conflicts with CMS's own regulations—which limit its bundled payment mechanism to drugs "essential for *the delivery of maintenance dialysis*"[1]—because XPHOZAH is not administered by dialysis facilities.  42 C.F.R. § 413.171(5).  Indeed, XPHOZAH  is not even taken during the delivery of maintenance dialysis, and thus can hardly be considered "necessary" for the delivery of those services.  CMS's misplaced plan can and should be enjoined.

4.      Approximately 550,000 people in the United States suffer from ESRD, a life-threatening condition in which the kidneys can no longer function on their own.  ESRD is the final stage of CKD, which is characterized by progressive damage and loss of function in the kidneys.

5.      Kidney failure cannot be reversed.  Unless a patient suffering from ESRD is able to obtain a kidney transplant, they must undergo regular dialysis treatment in order to survive due to the critically important role the kidneys play in filtering waste from the bloodstream.  Dialysis is a procedure to remove waste products and excess fluid from the blood when the kidneys stop functioning properly.  In hemodialysis, which is the form of dialysis used by greater than 85% of patients receiving dialysis, the patient's blood is removed from the body and filtered through a

---

[1] "Maintenance dialysis" refers to the long-term dialysis treatment received by patients with ESRD, as opposed to short-term dialysis treatments undergone by patients whose kidneys are temporarily damaged by injury or acute infection.

dialyzer and the filtered blood is returned to the body.[2]  ESRD patients typically undergo dialysis 3 times a week for 3-5 hours at a dialysis center that specializes in this treatment.

6.      Recognizing the high costs and repetitive nature of dialysis necessary for ESRD patients, among other reasons, Congress over 50 years ago provided that ESRD patients shall receive Medicare coverage, regardless of age.

7.      In 2008, Congress passed the Medicare Improvements for Patients and Providers Act (MIPPA), which, among other things, created a bundled payment system for "renal dialysis services" under which a single payment under Medicare Part B is made to dialysis facilities for certain items, drugs, and tests in lieu of any other separate payment for such items or services.  42 U.S.C. § 1395rr(b)(14)(A)-(B).  Under the bundled payment system, known as the ESRD Prospective Payment System ("ESRD PPS bundle"), Medicare uses a single bundled payment to reimburse dialysis facilities for each dialysis treatment.

8.      The ESRD PPS bundle was intended to incentivize dialysis facilities to more efficiently deliver maintenance dialysis by allowing them to retain the difference if Medicare's payment exceeded the costs incurred to provide renal dialysis services.  In particular, the bundled payment was intended to discourage dialysis facilities from *overusing* certain then-available drugs, "particularly EPO [epoetin injection]," a drug administered by dialysis facilities during dialysis for anemia management.  74 Fed. Reg. 49,922, 49,924 (Sept. 29, 2009).

---

[2] Most other dialysis patients utilize peritoneal dialysis, in which blood is filtered inside of the body instead of using a dialysis machine.  *See* Nat'l Kidney Found., *Dialysis*, https://www.kidney.org/atoz/content/dialysisinfo (last visited July 16, 2024).  In the United States, the majority of dialysis patients rely on hemodialysis as opposed to peritoneal dialysis.  *See, e.g.*, Juri Bassuner et al., *Why Peritoneal Dialysis is Underutilized in the United States: A Review of Inequities*, 39 Seminars in Interventional Radiology 47 (Feb. 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8856784/.

9.      Over time, however, CMS has come to set the bundled payment at an amount which barely covers the cost to dialysis facilities of providing renal dialysis services.  In fact, CMS has admittedly failed to increase the amount of its bundled payment in keeping with actual increases in the cost of providing dialysis.  *See* 88 Fed. Reg. 76344, 76358.  As a result, the Medicare Payment Advisory Commission ("MedPAC") estimated in 2023 that dialysis facilities had *negative margins* when treating Medicare patients during that calendar year, meaning dialysis facilities spent more money to treat Medicare patients than they received from Medicare for those renal dialysis services.  *See* Medicare Payment Advisory Comm'n, *2023 Report to the Congress – Medicare Payment Policy,* at 194 (Mar. 2023), https://www.medpac.gov/wp-content/uploads/2023/03/Mar23_MedPAC_Report_To_Congress_v2_SEC.pdf.   In 2024, MedPAC likewise estimated that dialysis facilities would do no better than a "0 percent" margin from treating Medicare patients.  Medicare Payment Advisory Comm'n, *Report to the Congress – Medicare Payment Policy*, at 152 (Mar. 2024), https://www.medpac.gov/wp-content/uploads/2024/03/Mar24_Ch5_MedPAC_Report_To_Congress_SEC.pdf.

10.      Notably, CMS has also failed to adjust the bundled payment in a manner that allows dialysis facilities to purchase and provide patients access to novel therapies that promote better outcomes for ESRD patients.  The bipartisan leaders of the Congressional Kidney Caucus and the Congressional Health Care Innovation Caucus recently expressed skepticism that CMS "sufficiently reimburse[s] for new, innovative products," causing facilities to "hesitate to adopt new products" and diminishing patients' long-term access to needed medical care.  *See* Congressional Kidney and Health Care Innovation Caucuses, Letter to Chiquita Brooks-LaSure (Oct. 2, 2023), https://kidneycarepartners.org/wp-content/uploads/2023/10/CY24-ESRD-Innovation-Letter-Final.pdf.

11.     For example, CMS recently responded to the introduction of a novel treatment for ESRD patients with a mere *nine-cent* add-on payment—an amount dwarfed by the actual cost to a provider of acquiring and providing that treatment to patients.  Remarkably, even that inadequate nine-cent add-on payment is scheduled to be temporary—expiring after three years.  As the Kidney and Health Care Innovation Caucus congressional leaders warned, "such a low add-on payment, paired with low or negative Medicare margins, may not support access to new drugs." *See id.*

12.     When Congress created the ESRD PPS for "renal dialysis services" in MIPPA, it limited the reach of the bundled payment to only specific categories of drugs and services furnished to patients for the treatment of ESRD.

13.     At the time MIPPA was enacted, drugs or biologics furnished to patients by dialysis facilities for the treatment of ESRD were generally administered intravenously or by injection during dialysis.  Congress directed that Medicare provide reimbursement for such drugs and biologicals, "and any oral equivalent form of such drug or biological" through the ESRD PPS single bundled payment.  42 U.S.C. § 1395rr(b)(14)(B)(iii).

14.     Congress did not provide that all drugs taken orally by ESRD patients would be included within the bundle, however—only drugs or biologicals "furnished to individuals for the treatment of end stage renal disease . . . and any oral equivalent form of such drug or biological." *Id.*  These limitations make sense, because many oral drugs taken by ESRD patients are not administered during dialysis, let alone by or through dialysis facilities paid under the ESRD PPS bundle.  In addition, although many ESRD patients suffer comorbidities or complications requiring oral drugs to treat conditions from hypertension to gout, such oral drugs are not furnished for the treatment of ESRD and, therefore, are not considered "renal dialysis services."

15.     Because the bundled payment system is focused on renal dialysis services provided by dialysis facilities, Congress only specified that orally administered drugs be included within the bundled payment system when they are "the oral equivalent form" of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iii).  That definition of "renal dialysis services" thereby excludes oral drugs that are *not* the "oral equivalent form" of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease," i.e., oral-only drugs.  *Id.*

16.     Notwithstanding MIPPA's text, and over the strong objections of numerous commenters including NMQF, CMS in 2011 sought to distort the ESRD PPS bundle to encompass not only the "oral equivalent form" of injectable drugs or biologicals, but also any other drugs and biologicals furnished to individuals for the treatment of ESRD, including "drugs and biologicals *with only* an oral form."  42 C.F.R. § 413.171(3).

17.     That plan threatened to seriously disrupt patient access to oral-only drugs, which Medicare historically has covered under Medicare Part D.  Medicare Part D reimburses pharmacies for Medicare beneficiaries' use of self-administered prescription drugs.  Under Medicare Part D, physicians can prescribe the treatments most appropriate for their patients, and Medicare reimburses pharmacies in relation to the cost of each prescription filled.  Medicare Part D has generally been sufficient to provide reimbursement for, and thus afford patients access to, innovative new drugs like XPHOZAH.

18.     If XPHOZAH is moved into the ESRD PPS bundle, however, dialysis facilities will be forced to pay for oral-only drugs using the already inadequate bundled payment that they receive from CMS.  Because the ESRD PPS bundle already does not adequately over the cost of the renal dialysis services that dialysis facilities themselves provide to patients, dialysis facilities

will have little wherewithal or incentive to facilitate patients' access to novel drugs like XPHOZAH, and patients will inevitably lose access.

19.     Countless organizations representing a broad spectrum of stakeholders from across the kidney care community, including the largest ESRD patient and nephrologist associations, as well as drug developers and dialysis facilities, have repeatedly expressed their opposition to the inclusion of oral-only drugs in the ESRD PPS bundle.  Plaintiff NMQF, for example, is a health care research, education and advocacy organization whose mission is to reduce patient risk and advance health equity by assuring optimal care for all.  NMQF has repeatedly argued that oral-only drugs should not be placed into the ESRD PPS bundle due to the disproportionate harm this move would impose on minority patient populations, who already experience health inequities.  Likewise, Plaintiff AAKP is an independent kidney patient advocacy organization, dedicated to improving the lives and healthcare outcomes of kidney patients.  AAKP has also repeatedly argued that oral-only drugs should not be placed into the ESRD PPS bundle due to the harms it will cause to patients, including by reducing patients' ability to work with their physicians to choose (and obtain) the best and most appropriate treatment for their health needs.

20.     To date, despite adopting regulations to include oral-only drugs in the ESRD PPS bundle, CMS has never been permitted to put this controversial policy into effect.  Instead, on three separate occasions, Congress prevented CMS from implementing its policy to remove oral-only drugs from Medicare Part D and place them into the bundled payment system.  In the interim, Medicare has continued to provide reimbursement for such drugs via Medicare Part D, the Medicare benefit designed to provide coverage for self-administered drugs dispensed by pharmacy providers.  Under CMS's current plan, however, oral-only drugs will be removed from Medicare Part D and redirected into the ESRD PPS bundle on January 1, 2025.

21.     Ardelyx is a biopharmaceutical company founded with a mission to discover, develop, and commercialize innovative, first-in-class medicines that meet significant unmet medical needs.

22.     Over the last decade, Ardelyx developed tenapanor, a novel therapy that inhibits the sodium hydrogen exchanger 3 (NHE3) in the gastrointestinal tract.  That action offers therapeutic benefits for patients with a variety of medical conditions.

23.     In 2022, Ardelyx launched ISBRELA (tenapanor) as a treatment for irritable bowel syndrome with constipation (IBS-C).  By inhibiting NHE3, ISBRELA blocks dietary sodium absorption, facilitates softer stool, and reduces abdominal pain, offering important benefits to IBS-C patients.

24.     Tenapanor also offers important benefits for patients with kidney disease.  Many ESRD patients suffer from hyperphosphatemia, a condition in which there is too much phosphate in the blood.  Serum phosphorus plays a vital role in many physiological processes and affects almost all organ systems.  Hyperphosphatemia is associated with increased risk of cardiovascular complications, stroke, and mortality in patients with CKD on dialysis, and also leads to weak and brittle bones, amongst other complications.

25.     The first-line treatment for hyperphosphatemia involves use of phosphate binders, oral medications taken with meals that function by attaching to phosphate in the gastrointestinal tract, thereby preventing phosphate from entering the bloodstream.  While phosphate binders can be effective for patients suffering from hyperphosphatemia, the majority of patients with hyperphosphatemia receiving dialysis are unable to consistently lower and maintain their phosphate levels to target serum phosphate concentrations, despite treatment with phosphate binders.

26.     Tenapanor reduces serum phosphate levels through a different and unique mechanism of action.  By inhibiting NHE3, tenapanor reduces phosphate absorption through the paracellular pathway, the primary pathway of phosphate absorption.

27.     In 2023, the United States Food & Drug Administration ("FDA") approved XPHOZAH (tenapanor) to reduce serum phosphorus in adults with CKD on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy.  XPHOZAH is the first and only phosphate absorption inhibitor approved by the FDA.

28.     XPHOZAH is offered as a tablet taken orally two times a day.  It is offered only orally because its mechanism of action involves the gastrointestinal tract; there is no injectable version of tenapanor or its equivalent.

29.     Like other oral phosphate lowering therapies (PLTs), such as phosphate binders, XPHOZAH is prescribed by nephrologists for ESRD patients and distributed through pharmacy providers.  It has never been administered or distributed by dialysis facilities or with dialysis services.

30.     In fact, XPHOZAH is not and should not be taken during dialysis.  XPHOZAH is instead taken by patients just prior to the first and last meals of the day.  As the FDA-approved Prescribing Information for XPHOZAH underscores, patients are specifically instructed not to take XPHOZAH right before a hemodialysis session.

31.     And, as noted, XPHOZAH is taken twice daily, whereas ESRD patients typically undergo dialysis 3 times a week.  XPHOZAH is not taken during dialysis and there is no connection between the administration of XPHOZAH and the timing of a dialysis session, except

that XPHOZAH users are cautioned to *avoid* taking XPHOZAH right before a hemodialysis session.

32.     Although XPHOZAH is not currently distributed by dialysis facilities, nor administered during dialysis, CMS communicated to Ardelyx on May 13, 2024 that "CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171, because it is furnished to individuals to treat a condition associated with ESRD and is essential to the delivery of maintenance dialysis." Ex. 1 at 1.  CMS further indicated that it had "determined that XPHOZAH meets the current regulatory definition of an oral-only drug at section 413.234(a), with no injectable equivalent or non-oral form of administration, and thus is not included in the ESRD PPS bundled payment until January 1, 2025." *Id.*  CMS made clear, moreover, that "beginning January 1, 2025 … no separate payment under Medicare Part D will be made for … XPHOZAH." *Id.*

33.     CMS's recent determination that XPHOZAH is a renal dialysis service, to be included in the ESRD PPS bundled payment as of January 1, 2025, violates the Administrative Procedure Act and should be set aside and enjoined for multiple, independent reasons.

34.     First, CMS's determination conflicts with the statutory requirements of MIPPA, which excludes oral-only drugs from the ESRD PPS payment bundle.  Clause (iii) of the relevant provision of MIPPA provides that renal dialysis services include "other drugs and biologicals that are furnished to individuals for the treatment of [ESRD] and for which payment was (before the application of this paragraph) made separately under this subchapter, and *any oral equivalent form of such drug or biological*."  42 U.S.C. § 1395rr(b)(14)(B)(iii) (emphasis added).

35.     By its express terms, then, clause (iii) defines "renal dialysis services" to include only drugs and biologics that are furnished for the treatment of ESRD, and their oral equivalents.

36.     A plain reading of clause (iii) further demonstrates that oral drugs that are *not* the "oral equivalent form" of injectable drugs or biologics furnished to individuals for the treatment of ESRD may *not* be included in the bundle.  As CMS has acknowledged, XPHOZAH is an oral-only drug with no injectable equivalent or non-oral form.  As a result, it does not meet Congress's definition of a "renal dialysis service" under § 1395rr(b)(14)(B)(iii).

37.     XPHOZAH also does not qualify as a "renal dialysis service" under any other category identified in MIPPA.  It was not amongst those "items and services included in the composite rate for renal dialysis services as of December 31, 2010," § 1395rr(b)(14)(B)(i), nor is it an "erythropoiesis stimulating agent[]" or "any oral form of such agents," § 1395rr(b)(14)(B)(ii).  Finally, it does not qualify under § 1395rr(b)(14)(B)(iv), which encompasses "diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of ESRD."  As a result, XPHOZAH does not qualify as a "renal dialysis service" within the meaning of MIPPA.

38.     Second, and separately, XPHOZAH is not a drug furnished "for the treatment of [ESRD]"—a necessary requirement to be included in the ESRD PPS bundle under the statute.  XPHOZAH is an oral-only drug indicated to reduce serum phosphorus.  It is *not* approved by FDA for the treatment of ESRD.  While hyperphosphatemia is a common comorbidity among patients with ESRD, and XPHOZAH is approved for use with patients with CKD on dialysis, XPHOZAH is just approved as an add-on therapy for hyperphosphatemia.

39.     Determining XPHOZAH is not a renal dialysis service would accord with CMS's treatment of other drugs that treat other comorbidities of ESRD, which are not considered medications "for the treatment of [ESRD]" by CMS.  *See* 75 Fed. Reg. 49,030, 49,047 ("Drugs and biologicals that are generally not ESRD-related (for example drugs and biologicals used to

treat diabetes, cardiac conditions and hypertension) would not be renal dialysis services and would be excluded from the ESRD bundled base rate.").   Simply put, XPHOZAH only treats hyperphosphatemia, and the treatment of hyperphosphatemia is not "the treatment of ESRD."

40.   Moreover, CMS recognized in 2010 that drugs and biologicals should be categorized "to determine those that would be expected to be utilized for ESRD-related conditions *in a dialysis unit* (and therefore would be a renal dialysis service)."   *Id.* (emphasis added). XPHOZAH, however, has never been distributed, utilized, or administered in a dialysis unit.  Nor is it a medicine administered intravenously or by injection during the course of a dialysis treatment. The drug *cannot* be used that way.  It, therefore, cannot qualify as a "renal dialysis service."

41.   Finally, XPHOZAH does not qualify as a "renal dialysis service" under CMS's own definition of that term.  Under 42 C.F.R. § 413.171(5), "[r]enal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis."

42.   XPHOZAH is an oral medicine that, among other things, reduces phosphate absorption in the blood.  As a result, it offers therapeutic benefits for only those ESRD patients that have elevated serum phosphate levels.  CMS cannot show the drug is "essential for the delivery of maintenance dialysis," since it is not even approved for use in the hundreds of thousands of patients who require maintenance dialysis but who do not have elevated serum phosphate levels.

43.   In addition, dialysis is delivered several times a week using intravenous (IV) delivery.  XPHOZAH, on the other hand, is a tablet taken orally, and has no injectable or IV form of delivery.  XPHOZAH must be taken several times each day with food, making a dosing regimen consistent with dialysis administration sessions impossible.  XPHOZAH is not taken during dialysis, nor provided or distributed by dialysis facilities, nor essential to delivering dialysis

services.  As a result, it does not qualify as a renal dialysis service even under CMS's own regulations.

44.     For all of these reasons, CMS's action placing XPHOZAH into the ESRD PPS bundle was arbitrary, capricious, contrary to law, in excess of statutory authority, and short of statutory right, and must therefore be set aside.  *See* 5 U.S.C. § 706.

## PARTIES

45.     Plaintiff Ardelyx, Inc. is a biopharmaceutical company incorporated in Delaware, with its principal place of business in Waltham, Massachusetts.

46.     Plaintiff National Minority Quality Forum ("NMQF") is a nonprofit healthcare research, education and advocacy organization both incorporated and with its principal place of business in Washington, D.C.  NMQF works to reduce negative health outcomes and promote high-quality, long lives, particularly for the most vulnerable, by using data and research to support and mobilize healthcare organizations, leaders, policymakers, and patients in advocating for optimal care for every individual.

47.     Plaintiff American Association of Kidney Patients ("AAKP") is a nonprofit organization that is the oldest and largest fully independent kidney patient organization in the United States.  AAKP is dedicated to improving the lives and long-term outcomes of kidney patients through education, advocacy, patient engagement and the fostering of patient communities.  Its 100,000 members fight for the protection of the patient/physician relationship, the promotion of innovation, and the elimination of barriers for patient access to available treatment options.

48.     Xavier Becerra is the Secretary of Health and Human Services and the head of DHHS.  In this capacity, Secretary Becerra has ultimate responsibility for activities at DHHS, including the actions complained of herein.  His governmental activities occur nationwide.

14

49.     DHHS is a department of the United States.  Its headquarters and principal place of business are at 200 Independence Avenue, S.W., Washington, D.C. 20201.  Its governmental activities occur nationwide.

50.     Chiquita Brooks-LaSure is the Administrator of the Centers for Medicare and Medicaid Services.  Her governmental activities occur nationwide.

51.     CMS is an agency of the United States and a division of DHHS.  CMS's headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244.  Its governmental activities occur nationwide.

## JURISDICTION, VENUE, AND FINAL AGENCY ACTION

52.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the APA, 5 U.S.C. §§ 701-06.  Plaintiffs' prayers for a declaratory judgment and permanent injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the APA, 5 U.S.C. §§ 701-06; and 28 U.S.C. § 1361.

53.     Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Defendant is an officer or agency of the United States and resides in this District.

54.     CMS determined in a letter decision issued on May 13, 2024 that "CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171" and will be included in the ESRD PPS bundled payment system effective January 1, 2025.  Ex. 1.

## BACKGROUND

### A.      End Stage Renal Disease and The Origins Of Medicare Coverage

55.     Approximately 550,000 people in the United States suffer from end-stage renal disease (ESRD), a life-threatening condition in which the kidneys can no longer function on their own.  ESRD is the final, permanent stage of CKD, a condition in which the kidneys become progressively more damaged over time and eventually lose the ability to function properly.  *See*

Nat'l Kidney Found., *Chronic Kidney Disease*, https://www.kidney.org/atoz/content/about-chronic-kidney-disease (last visited July 16, 2024).

56.     ESRD offers one of the starkest examples of racial and ethnic disparities in health. A disproportionate share of patients suffering from ESRD are racial and ethnic minorities, with African Americans in the United States impacted more than any other racial group.   African Americans are almost four times more likely, and Hispanics or Latinos are 1.3 times more likely, to have ESRD as compared to white Americans.   While African Americans make up 13.5% of the population, they represent more than 35% of dialysis patients.  *See, e.g.*, Nat'l Kidney Found., *Health Disparities*, https://www.kidney.org/advocacy/legislative-priorities/health-disparities (last visited July 16, 2024).

57.     Unless a patient suffering from ESRD is able to obtain a kidney transplant, he or she must undergo routine dialysis treatment in order to survive, due to the critically important role the kidneys play in filtering waste from the bloodstream.  *See* Johns Hopkins Med., *End Stage Renal Disease*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/end-stage-renal-failure (last visited July 16, 2024).

58.     ESRD patients typically undergo dialysis—in which a machine manually filters waste in place of the kidneys—3 times a week for 3-5 hours, at a dialysis center which specializes in this treatment.   *See* Nat'l Kidney Found., *About Dialysis for Kidney Failure*, https://www.kidney.org/patients/peers/dialysis (last visited July 16, 2024).

59.     Even with dialysis, ESRD patients experience frighteningly high mortality rates, and 20-50% of ESRD patients on dialysis die within 24 months of diagnosis.  The  five-year survival rate for dialysis patients is under 50%.  M. Hashmi, et al., *End-Stage Renal Disease* (2023), available at https://www.ncbi.nlm.nih.gov/books/NBK499861/.  In addition to accounting

for a disproportionate share of ESRD patients, African Americans are more prone to death due to ESRD than white Americans.  *See id.*  Total Medicare expenditures for ESRD patients, meanwhile, exceed $50 million.  Yet despite the overwhelming medical need for innovation to treat ESRD patients, CMS's policies sharply frustrate and deter innovation for ESRD patients.

60.     The Social Security Amendments of 1972 first extended Medicare coverage to individuals suffering from kidney disease who required dialysis or a kidney transplant.  *See* An Act to Amend the Social Security Act, and for Other Purposes, Pub. L. No. 92-603, 86 Stat. 1329 (Oct. 30, 1972).

61.     Congress extended Medicare eligibility to ESRD patients in response to, among other reasons, growth in the numbers of dialysis patients and treatment centers and the high costs of life-saving dialysis treatment.  *See* Richard A. Rettig, *Origins of the Medicare Kidney Disease Entitlement: The Social Security Amendments of 1972*, in Biomedical Politics 176 (Kathy E. Hanna ed., 1991), https://www.ncbi.nlm.nih.gov/books/NBK234191/.

62.     As a result of the 1972 Social Security Amendments, individuals suffering from ESRD are eligible for Medicare coverage without regard to their age or disability status.  *See* 42 U.S.C. § 426-1(a).

63.     Beginning in the 1980s, Medicare began paying for dialysis services using the "composite rate" system, a blended prospective payment and fee-for-service system.  Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2145, 95 Stat. 357, 799-800 (1981).

64.     Under the composite rate system, dialysis facilities received a single, prospectively determined payment amount per treatment to cover a defined set of regularly provided tests and supplies, as well as a narrow set of injectable drugs associated with dialysis services.  Dialysis facilities billed Medicare separately for other non-routine drugs not included in the composite rate.

*See* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2145, 95 Stat. 357 (1981); U.S. Gov't Accountability Off.*, (GAO-07-77), End-Stage Renal Disease: Bundling Medicare's Payment for Drugs with Payment for all ESRD Services Would Promote Efficiency and Clinical Flexibility* 1 (2006), , https://www.gao.gov/assets/gao-07-77.pdf  [hereinafter "GAO 2006 Report"].

65.     Under the composite rate system, injectable ESRD drugs were reimbursed under Medicare Part B with payments to dialysis facilities, while orally administered ESRD drugs were generally covered separately under Medicare Part D with payments to pharmacies after Medicare Part D became available in 2006.   *See* U.S. Gov't Accountability Off., (GAO-11-36), *End-Stage Renal Disease: CMS Should Assess Adequacy of Payment When Certain Oral Drugs are Included and Ensure Availability of Quality Monitoring Data* 2 (2011), , https://www.gao.gov/assets/gao-11-365.pdf.

66.     For example, Epogen, an injectable Erythropoiesis-Stimulating Agent (ESA)[3] that treats anemia in ESRD patients, was a separately billable injectable drug reimbursed under Medicare Part B under the composite rate system.  *See* GAO 2006 Report at 1, 5.

67.     In short, since the 1980s and the early days of the composite rate system, oral drugs have been treated differently from injectable drugs in terms of Medicare payments for ESRD treatments.

**B.     Creation of the Modern ESRD PPS "Bundle"**

68.     In 2008, Congress enacted the Medicare Improvements for Patients and Providers Act (MIPPA), codified at 42 U.S.C. § 1395rr .

---

[3] A drug that stimulates the production of red-blood cells.

69. MIPPA directs and authorizes CMS to implement a bundled payment system for "renal dialysis services" under which a single payment is made to dialysis facilities for certain items, drugs, and tests, including ESAs, in lieu of any other separate payment. *Id.* § 1395rr(b)(14)(A)-(B).

70. Congress's expectation for the bundled payment was that it would include composite rate services and certain separately billable drugs for the treatment of ESRD, leading dialysis facilities to operate more efficiently because the provider would "retain the difference if Medicare's payment exceeds the costs they incur to provide the services." GAO 2006 Report at 22.

71. The statutory provision establishing the ESRD prospective payment system defines "renal dialysis services" subject to the PPS bundle as follows:

(B) For purposes of this paragraph, the term "renal dialysis services" includes—

  (i)   items and services included in the composite rate for renal dialysis services as of December 31, 2010;

  (ii)  erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;

  (iii) other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and

  (iv)  diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease.

42 U.S.C. § 1395rr(b)(14)(B).

72. The statutory provision is clear that the only drugs meant to be swept into the ESRD PPS bundle are drugs "for the treatment of end stage renal disease." *Id.*

19

73.     It also provides that the only oral drugs meant to be included in the bundle are oral forms of ESAs, *see* clause (ii), and "any oral equivalent form" of "other drugs and biologicals that are furnished to individuals for the treatment of [ESRD] and for which payment was (before the application of this paragraph) made separately under this subchapter," clause (iii).

### C.     Ardelyx's XPHOZAH

74.     This action concerns XPHOZAH, a new innovative therapy developed over the last decade and recently approved by the FDA in October 2023 for hyperphosphatemia that CMS, as discussed below, has determined is a renal dialysis service that will be swept into the ESRD PPS bundle on January 1, 2025.

75.     Many people suffer from hyperphosphatemia, the condition of having too much phosphate in the blood, including many ESRD patients.  Hyperphosphatemia is associated with a higher risk of cardiovascular mortality.  It can also lead to the progression of bone disorders, which can cause bone pain, fractures, and skeletal deformities in patients.  Managing phosphate levels  is therefore necessary to avoid these negative and potentially deadly health outcomes.  *See, e.g.*, Dominik G. Haider et al., *Hyperphosphatemia is an Independent Risk Factor for Morality in Critically Ill Patients: Results from a Cross-Sectional Study*, 10 PLOS ONE (Aug. 7, 2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0133426.

76.     To treat hyperphosphatemia, many ESRD patients take phosphate-binding drugs, which lower phosphate levels in the body by binding to excess phosphate molecules in the gut and preventing them from reaching the bloodstream.

77.     But not all patients have an adequate response to phosphate binders alone, meaning their blood phosphate levels are still too high even with treatment, and 70% of ESRD patients are unable to maintain target phosphate levels despite treatment with phosphate binders.

78.     XPHOZAH is intended to help patients in this condition.  XPHOZAH is an orally administered tablet that is "indicated to reduce serum phosphorus in adults with [CKD] on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  U.S. Food & Drug Admin., XPHOZAH Label 2 (Oct. 2023),  https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/213931s000lbl.pdf; Ardelyx, *XPHOZAH*, http://xphozah-hcp.com/ (last visited July 16, 2024).

79.     XPHOZAH first became available to patients in October 2023 following approval by the FDA.

80.     XPHOZAH is not a phosphate binder.  It is a phosphate absorption inhibitor used as an add-on therapy for patients with inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy.  XPHOZAH offers a different mechanism of action that blocks phosphate absorption at the primary pathway, and is the first new mechanism of action of treating phosphate in over two decades.  *See id.*

81.     All currently available phosphate-lowering therapies, including all phosphate binders and  XPHOZAH, due to their mechanism of action, must be ingested through the digestive system and achieve their therapeutic effect in the gastrointestinal ("GI") tract without absorption into the blood.  As such, they do not and cannot have injectable equivalents.

82.     Specifically, XPHOZAH must be delivered through the GI tract to prevent absorption of dietary phosphorus into the bloodstream.

83.     As such, no injectable or IV form of XPHOZAH is currently available, and the development of any such form cannot reasonably be expected in the future.

84.     Additionally, XPHOZAH must be taken twice a day. This dosing regimen does not follow the regimen of dialysis administration sessions, which typically occur once per day, for two or three days per week.

85.     XPHOZAH is not distributed or administered by dialysis facilities, is not taken during dialysis, and is not prescribed to be taken as part of dialysis.

86.     XPHOZAH is currently available to ESRD patients when it is prescribed by their treating physician and distributed by specialty pharmacy facilities.  It is covered under Medicare Part D, in the same way all other self-administered drugs are covered under Medicare Part D.

**D.     CMS Acts To Include Oral-Only Drugs In The ESRD PPS Bundle**

87.     In 2009, CMS issued a proposed rule to implement the bundled payment system created by MIPPA beginning in 2011.  74 Fed. Reg. 49,922.

88.     Despite Congress's clear direction, CMS proposed to interpret 42 U.S.C. § 1395rr(b)(14)(B) in a manner that did not limit oral drugs included in the definition of "renal dialysis services" to the "oral form" of ESAs or the oral equivalent form of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease."

89.     Instead, CMS proposed to include in the bundle oral drugs with no injectable equivalent, reasoning that "the exclusion of oral drugs and biologicals for which there is no injectable equivalent (or other non-oral form of administration) from the ESRD PPS would defeat one of the very *purposes* of the new system—the inclusion of all renal dialysis services furnished to ESRD patients in a comprehensive payment bundle to which a reasonable payment amount can be attached empirically."  74 Fed. Reg. 49,922, 49,928 (emphasis added).

90.     Specifically, CMS reasoned that "[g]iven the reference to 'this title,'" it believed clause (iii) of MIPPA "require[ed] the inclusion in the ESRD PPS payment bundle *all* drugs and biologicals that were separately billable prior to the implementation of MIPPA under title XVIII

of the Act." *Id.* (emphasis added).  Therefore, CMS's proposed rule "would include all drugs and biologicals formerly separately payable under Medicare Part B and Part D" in the ESRD PPS bundle.  *Id.*

91.     CMS recognized that "an alternative reading of the last part of clause (iii) with respect to the phrase 'and any oral equivalent form of such drug or biological' could be interpreted to limit the scope of the drugs and biologicals included in the bundle to *only oral versions of injectables* (or other non-oral routes of administration)." *Id.* (emphasis added).  Nonetheless, it proposed a rule with much broader scope, which included all drugs and biologicals for the treatment of ESRD that were formerly separately payable, including oral-only drugs.  *Id.*

92.     Most comments on the proposed rule opposed the inclusion of oral-only drugs and biologicals in the bundle, and many focused on CMS's improper expansion of the statutory provision to include these oral-only drugs.

93.     CMS admitted that "many comments" argued that its proposal to include oral-only drugs "represent[ed] a misreading of statutory intent and violate[d] principles of statutory construction." 75 Fed. Reg. 49,030, 49,038.

94.     Many commenters also noted CMS's proposed rule undermined the purpose of the statute, explaining that "dialysis facilities would keep the difference if Medicare payments exceeded costs for the bundles services, and *would be liable for the difference* if costs exceeded Medicare payments." *Id.* at 49,032 (emphasis added).

95.     As a result, commenters warned that including oral-only drugs in the bundle would result in "unintended clinical consequences for patients as ESRD facilities seek to maximize profits by resorting to cheaper but less effective alternatives." *Id.* at 49,040.

96.     That risk is particularly acute when (as is the case today) CMS fails to ensure that the bundled payment adequately accounts for the cost of providing renal dialysis services to Medicare patients, let alone the cost of novel therapies.  CMS admitted that including these drugs in the bundle could, indeed, result in "underutilization."  *Id.* at 49,041.

97.     Despite the commenters' clear warnings and concerns, however, CMS implemented the ESRD PPS in the CY 2011 ESRD PPS final rule (75 Fed. Reg. 49,030) and promulgated its own regulatory definition of "renal dialysis services" at 42 C.F.R. § 413.171.

98.     Recognizing these potential concerns, CMS decided to delay its implementation of including oral-only drugs in the ESRD PPS until 2014, pending an evaluation of the "potential impact on dialysis facilities, particularly small dialysis facilities who may not be able to obtain drugs and biologicals at prices similar to those of the larger chains with greater purchasing power." 75 Fed. Reg. 49,030, 49,043.  CMS explained:  "Given that oral drugs with an injectable version are included in the payment bundle as of January 1, 2011, [the delay will] provide CMS an opportunity to assess potential problems which may arise in connection with the provision of oral drugs prior to the system's expansion to include oral-only ESRD drugs beginning January 1, 2014." *Id.* at 49,044.

99.     CMS's final regulatory definition altered the statutory definition of renal dialysis services.  In addition to former composite rate items and services and ESAs, CMS defined renal dialysis services as including "other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was [prior to January 1, 2011] made separately under this subchapter (including drugs and biologicals with only an oral form), instead of limiting coverage to "any oral equivalent form of such drug or biological."

100.    The full relevant portion of CMS's regulation states:

Renal dialysis services. Effective January 1, 2011, the following items and services are considered "renal dialysis services," and paid under the ESRD prospective payment system under section 1881(b)(14) of the Act:

> (1) Items and services included in the composite rate for renal dialysis services as of December 31, 2010;
>
> (2) Erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of ESRD;
>
> (3) Other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was [prior to January 1, 2011] made separately under Title XVIII of the Act (including drugs and biologicals with *only an oral form*),
>
> (4) Diagnostic laboratory tests and other items and services not described in paragraph (1) of this definition that are furnished to individuals for the treatment of ESRD.
>
> (5) Renal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis.

42 C.F.R. § 413.171 (emphasis added).

101.   To justify its approach, CMS took the position that the statute defining renal dialysis services encompassed, under clause (iii) of the statute, *all* non-injectable (including oral) drugs furnished under Title XVIII of the Act.  75 Fed. Reg. 49,030, 49,039.

102.   CMS's position is incompatible with the statutory language.  Under CMS's reading, *all* drugs furnished for the treatment of ESRD qualify as renal dialysis services under 42 U.S.C. § 1395rr(b)(14)(B)(iii).

103.   But Congress did not so provide.   Rather, Congress adopted a much more nuanced definition of clause (iii) that directed the inclusion in the ESRD PPS of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological."  *Id.*

104.    If Congress had intended to include all drugs furnished to individuals for the treatment of end stage renal disease, including oral drugs that are *not* the "oral equivalent form" of (injectable) drugs and biologicals, it would have said so.  CMS's reading is incompatible with the specific language adopted by Congress.

105.    CMS's interpretation of clause (iv) of the statute is also untenable.  That clause provides that "renal dialysis services" encompasses "diagnostic tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease."

106.    In its 2011 rulemaking, CMS suggested that this language "can be interpreted as a residual or catch all category for drugs which do not fall under the scope of those renal dialysis services identified in clauses (ii) and (iii)," including oral-only drugs. 75 Fed. Reg. 49,030, 49,039.

107.    That reading of clause (iv), however, would negate Congress's choice to enumerate specific categories of ESRD drugs and biologicals as falling within the definition of "renal dialysis services."  If Congress intended *all* drugs and biologicals furnished to individuals for the treatment of ESRD to qualify as "renal dialysis services" under clause (iv), there would have been no need to more narrowly define other certain drugs, biologicals, and oral equivalent forms of such drugs and biologicals in clauses (ii) and (iii).

108.    CMS has acknowledged that clause (iv) should not be interpreted to "violate[] a principle of statutory construction, by making clauses (ii) and (iii) otherwise redundant." 75 Fed. Reg. 49,030, 49,039.  But CMS's construction of clause (iv) would do just that, because—under CMS's interpretation—any drug, biological, or oral equivalent form that falls within clauses (ii) and (iii) necessarily would also qualify as "diagnostic laboratory tests and other items and ["medical care or services and items, … drugs and biologicals] not described in clause (i)."  *Id.* at

49,036 (emphasis added).  CMS's interpretation of clause (iv) thus renders clauses (ii) and (iii) superfluous.

109.     CMS has acknowledged that XPHOZAH meets the regulatory definition of an oral-only drug because it lacks any injectable equivalent or non-oral form of administration.  Ex. 1 at 1.

110.     Had CMS faithfully interpreted MIPPA, oral-only drugs like XPHOZAH would be excluded from the bundled payment system.  CMS's construction of MIPPA to permit the inclusion of oral-only drugs is flatly inconsistent with MIPPA's plain language and should be rejected.

**E.     Congress Delays Implementation of Inclusion of Oral-Only Drugs Into the PPS Bundle Until 2025**

111.     Congress has repeatedly delayed CMS's plan to place oral-only drugs into the bundled payment system.

112.     In 2012, Congress prevented CMS from including oral-only drugs in the ESRD PPS bundle until January 1, 2016.  *See* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 632(b), 126 Stat. 2313 (2012).

113.     In 2014, Congress again delayed the implementation of the oral-only drug inclusion in the Protecting Access to Medicare Act (PAMA), preventing CMS from including oral-only drugs until 2024.  Pub. L. No. 113-93 § 217(a)(1), 129 Stat. 1040 (2014).  The same year, Congress delayed the implementation for one more year, until 2025.  Achieving a Better Life Experience Act of 2014, Pub. L. No. 113-295, § 204, 128 Stat. 1040 (2014).

114.     Therefore, despite CMS's 2011 rulemaking, stakeholders have not had to contend with the effects of CMS's rule until very recently, as the 2025 deadline approached and CMS

began to take action to implement its decision to place oral-only drugs into the bundled payment system.

**F.    CMS Action Regarding XPHOZAH**

115.    On April 29, 2024, CMS issued guidance entitled "Including Oral-Only Drugs in the ESRD PPS Bundled Payment," with an effective date and implementation date of January 1, 2025.  Ex. 2.

116.    CMS explained that "[u]nder 42 C.F.R. § 413.174(f)(6), effective January 1, 2025, payment to an ESRD facility for renal dialysis service drugs and biologicals with only an oral form furnished to ESRD patients is incorporated within the prospective payment system rates established by CMS in § 413.230 and separate payment will no longer be provided."  *Id.* at 1.

117.    On May 13, 2024, CMS sent a letter to Laura Williams, M.D., Chief Medical Officer of Ardelyx.  Ex. 1.

118.    In its letter, CMS set forth that "CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171, because it is furnished to individuals to treat a condition associated with ESRD and is essential to the delivery of maintenance dialysis. Specifically, it is used as an add-on therapy in patients with chronic kidney disease who are on dialysis who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  *Id.* at 1.

119.    CMS also explained that "beginning January 1, 2025, all renal dialysis services, including oral-only drugs, will be incorporated into the ESRD PPS, and no separate payment under Medicare Part D will be made for any oral-only renal dialysis drugs.  This will include XPHOZAH."  *Id.*

120.    CMS's position that XPHOZAH must be included in the PPS payment bundle is wrong for three reasons: XPHOZAH is excluded as a matter of law from MIPPA based on the

statutory language, is not a "renal dialysis service" under the statute, and is not essential for the delivery of maintenance dialysis.

**G.     MIPPA Excludes Oral-Only Drugs, Including XPHOZAH, From the ESRD PPS Bundle as a Matter of Law**

121.     First, the plain language of MIPPA, as drafted by Congress, excludes oral-only drugs such as XPHOZAH from the ESRD PPS bundle as a matter of law.

122.     Neither oral-only drugs, nor XPHOZAH in particular, fall within clause (i) or (ii).

123.     Clause (i) is limited to items and services covered by Medicare as of December 31, 2010, and clearly excludes XPHOZAH, which did not become available until 2023.

124.     Clause (ii) is limited to erythropoiesis stimulating agents, which also excludes XPHOZAH.

125.     Clause (iii), which provides that renal dialysis services shall include "other drugs and biologicals that are furnished to individuals for the treatment of [ESRD] and for payment which was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological," also excludes oral-only drugs such as XPHOZAH.  42 U.S.C. § 1395rr(b)(14)(B)(iii).

126.     By its express terms, clause (iii) does not define "renal dialysis services" to include all oral drugs.  It includes only a particular subset of oral drugs not applicable to XPHOZAH: "other drugs and biologicals" furnished for the treatment of ESRD—i.e., "other" drugs not included in clauses (i) or (ii)—for which payment was made separately under this title, as well as any oral equivalent form *of such drug or biological*.

127.     Because XPHOZAH is not equivalent to any separately billable drug "for the treatment of [ESRD] and for which payment was (before the application of this paragraph) made separately under this title," XPHOZAH is not included in the bundle under clause (iii).

128.   Interpreting clause (iii) to encompass all oral drugs, regardless of whether they are the "oral equivalent form" of drugs and biologicals for which payment was previously made separately, would render nugatory Congress's decision to carefully prescribe the types of drugs that fall within its definition of "renal dialysis services."

129.   Congress's decision to exclude oral-only drugs also makes good sense.  At the time MIPPA was enacted, few (if any) oral-only drugs existed for the treatment of end stage renal disease.  Oral-only drugs were neither provided during dialysis, nor were the equivalent of injectable drugs that were.  The inclusion of oral-only drugs would have done little, therefore, to advance Congress's goals of deterring *dialysis facilities* from overusing then-profitable, separately billable drugs—particularly ESAs—or promoting operational efficiency at such facilities.  *See, e.g.*, 75 Fed. Reg. 49,030, 49,032.

130.   Interpreting clause (iii) to exclude oral-only drugs accords with Congress's choice in clause (ii) to specifically instruct that ESAs, and any oral form of such agents furnished to individuals for the treatment of ESRD, are encompassed within the definition of renal dialysis services.

131.   Had Congress intended for *all* injectable and oral treatments provided to ESRD patients to fall within the scope of "renal dialysis services," there would have been no need to specify that renal dialysis services extend to "erythropoiesis stimulating agents and any oral form of *such agents*."  42 U.S.C. § 1395rr(b)(14)(B)(iii) (emphasis added).  To give effect to Congress's decision to separately identify ESAs and other drugs and biologicals, and then to specifically include only oral equivalent forms of *such* agents, drugs, or biologicals, the statute can only be interpreted to exclude oral-only drugs for which there is no equivalent, non-oral agent, drug, or biological.

132.    This conclusion is bolstered by the fact that Congress contemplated and elected *not to adopt* legislation that would have amended clause (iii) to specifically expand the definition of "renal dialysis services" to include all oral-only drugs, including oral-only PLTs.

133.    One year after the enactment of MIPPA, the House of Representatives introduced a bill that would have amended clause (iii) to read as follows (*italicized text* would have been added):

> (iii)    Other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological *including oral drugs that are not the oral equivalent of an intravenous drug (such as oral phosphate binders and calcimimetics)*.

America's Affordable Health Choices Act of 2009, H.R. 3200, 111th Leg., 1st sess., https://www.congress.gov/bill/111th-congress/house-bill/3200/text (emphasis added to highlight language the bill would have introduced).

134.    Had Congress adopted this measure to expand the definition of renal dialysis services, CMS would have been authorized by Congress to include oral-only drugs as part of the ESRD PPS bundle.  But Congress did not choose to amend the statute in this manner to give CMS such authorization.

135.    The fact that Congress considered, *but did not adopt*, a proposal to specifically include oral-only drugs in the ESRD PPS bundle further underscores that MIPPA's language does not authorize CMS to do so.  That CMS nonetheless rewrote the statute to include oral-only drugs in clause (iii) is clearly contrary to the statute as adopted by Congress.

136.    CMS also stated that clause (iv) of MIPPA acts as a "catch-all" provision which also supports including oral-only drugs in the ESRD PPS bundle.  This too goes against the plain meaning of the statute.

137.    Clause (iv) directs CMS to include in the bundle "diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iv).

138.    As discussed, in its 2011 rulemaking, CMS suggested that this language "can be interpreted as a residual or catch all category for drugs which do not fall under the scope of those renal dialysis services identified in clauses (ii) and (iii)," including oral-only drugs that "do not fall under the scope of those specified renal dialysis services identified in clauses (ii) and (iii)."  75 Fed. Reg. 49,030, 49,039.

139.    This reading of clause (iv) negates Congress's choice to enumerate specific categories of drugs for the treatment of ESRD as falling within the definition of "renal dialysis services."  If Congress intended *all* drugs and biologicals furnished to individuals for the treatment of ESRD to qualify as "renal dialysis services," there would have been no need to more narrowly define other drugs, biologicals, and oral equivalent forms of such drugs and biologicals in clauses (ii) and (iii).

140.    CMS's interpretation is also difficult to square with the fact Congress defined clause (iv) to encompass "diagnostic laboratory tests and other items and services *not described in clause (i)*," rather than items and services not described in clauses (ii) and (iii)—the two clauses that directly speak to drugs.

141.    CMS proposed to interpret "services" in a manner consistent with how services are defined in Medicare regulation under § 400.202, so as to mean "medical care or services and items,

. . . drugs and biologicals." *Id.* But interpreting "services" in that expansive manner cannot be reconciled with the statute's structure or text.

142.    Most obviously, if clause (iv) was interpreted to encompass *all* drugs and biologics for the treatment of end stage renal diseases, it would render clauses (ii) and (iii) redundant and superfluous, because any drug, biological, or oral equivalent form that falls within clauses (ii) and (iii) necessarily would qualify as "[medical care or services and items, . . . *drugs and biologicals*] not described *in clause (i).*" *Id.* at 49,040 (emphasis added).

143.    CMS itself recognized that clause (iv) should not be interpreted to "violate[] a principle of statutory construction, by making clauses (ii) and (iii) otherwise redundant." *Id.* at 49,039. But CMS's current interpretation of the statute does just that. If Congress had intended for section (iv) to have such a broad sweep, there would be no need for clauses (ii) or (iii) at all.

144.    The best interpretation of the statute would not render two clauses superfluous, nor fail to give effect to Congress's choice to enumerate only certain drugs and biologicals as falling within the scope of "renal dialysis services."

145.    CMS's inclusion of oral-only drugs, including XPHOZAH, into the bundled payment system is therefore arbitrary, capricious, contrary to law, and in excess of statutory jurisdiction.

### H.    XPHOZAH is Not a Drug For The Treatment of ESRD

146.    XPHOZAH does not qualify as a renal dialysis service and does not belong in the ESRD PPS bundle for the additional reason that it cannot be considered a drug furnished "for the treatment of end stage renal disease." 42 U.S.C. § 13955rr(b)(14)(B)(i), (ii)-(iv).

147.    This is because oral-only phosphate-limiting treatments such as XPHOZAH are intended for the treatment of hyperphosphatemia—not ESRD.

148.    While hyperphosphatemia is a common comorbidity among patients with ESRD, treatments furnished for the treatment of hyperphosphatemia do not treat the patient's ESRD.

149.    Indeed, many oral medications are commonly prescribed to ESRD patients for other complications or comorbidities but are not considered "renal dialysis services."

150.    For instance, the prevalence of hypertension in ESRD patients on dialysis is about 84 percent, *see, e.g.*, Adarsh Raja et al., *Temporal Trends in Hypertension Related End Stage Renal Disease Mortality Rates*, 3 Frontiers in Nephrology (Jan. 2024) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10823365; by comparison, hyperphosphatemia occurs in approximately 70 percent of ESRD patients on dialysis.  *See, e.g.*, Arbor Research Collaborative for Health, *The Dialysis Outcomes and Practice Patterns Study (DOPPS) Practice Monitor*, https://www.dopps.org/DPM-HD/ (last accessed July 16, 2024); Michael Copland et al., *Intensive Hemodialysis, Mineral and Bone Disorder, and Phosphate Binder Use*, 68 Am. Journal of Kidney Diseases 24 (Nov. 2016) https://www.ajkd.org/article/S0272-6386(16)30262-1/fulltext; *see also* Nat'l Institutes of Health, *Phosphorus: Fact Sheet*, https://ods.od.nih.gov/factsheets/Phosphorus-HealthProfessional/ (last accessed July 16, 2024) (noting phosphorus levels in excess of 4.5 mg/dL indicate hyperphosphatemia).  In spite of the similar correlation between hypertension and ESRD and hyperphosphatemia and ESRD, CMS does not classify hypertension drugs as renal dialysis services.

151.    Additionally, there are many conditions that are associated with ESRD that are not ESRD themselves.  For example, possible complications from ESRD include conditions such as muscle pain, changes in blood sugar, liver damage, stroke, seizures, dementia, malnutrition, and restless legs syndrome.  *See* Penn Med., *End-Stage Kidney Disease*, https://www.pennmedicine.org/for-patients-and-visitors/patient-information/conditions-treated-a-

to-z/end-stage-kidney-disease (last visited July 16, 2024).  While these are possible common complications caused by ESRD, drugs that treat these complications are not considered medications "for the treatment of end stage renal disease" by CMS.

152.   When implementing MIPPA in its CY 2011 ESRD PPS rulemaking, CMS indicated that oral-only drugs would qualify as "renal dialysis services," but also stated:  "Drugs and biologicals that are generally not ESRD-related (for example drugs and biologicals used to treat diabetes, cardiac conditions and hypertension), *would not be renal dialysis services and would be excluded from the ESRD bundled base rate.*"  75 Fed. Reg. 49,030, 49,047 (emphasis added).

153.   CMS itself recognized that the statute should be understood to limit "renal dialysis services" to drugs that are related to ESRD itself—not merely any service that treats a condition related to ESRD.  *Id.*

154.   Moreover, CMS resolved that drugs and biologicals should be categorized "on the basis of drug action" to determine "those that would be expected to be utilized for ESRD-related conditions *in a dialysis unit* (and therefore would be a renal dialysis service)."  *Id.* (emphasis added).

155.   XPHOZAH is not utilized in a dialysis unit at all.  Nor is it administered by dialysis facilities, or as part of dialysis.  XPHOZAH should therefore not be included in the ESRD PPS bundle.

156.   CMS must treat XPHOZAH in a manner similar to other oral-only drugs that are not intended to treat ESRD but rather complications or comorbidities common among ESRD patients.  Accordingly, it does not qualify for the bundled payment system.

157.   CMS's contrary conclusion is therefore arbitrary, capricious, contrary to law, and in excess of statutory authority.

## I.     XPHOZAH is Not Essential For The Treatment of Maintenance Dialysis

158.    Finally, XPHOZAH does not belong in the ESRD PPS bundle because CMS's own regulations exclude "services that are not essential for the delivery of maintenance dialysis."  42 C.F.R. § 413.171(5).

159.    As explained, *supra*, CMS has interpreted "services" in 42 U.S.C. § 13955rr(b)(14)(B)(iv) to broadly include drugs and biologics.

160.    As a result, CMS's own regulations exclude from the definition of "renal dialysis services" drugs or biologics that "are not essential for the delivery of maintenance dialysis."  42 C.F.R. § 413.171(5).

161.    "'Essential' means 'absolutely necessary' or 'indispensably requisite.'"  *Grange Mut. Cas. Co. v. Woodward*, 861 F.3d 1224, 1232 (11th Cir. 2017) (quoting Oxford English Dictionary, available at http://www.oed.com/view/Entry/64503?redirectedFrom=essential#eid); *see also Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am.*, 791 F.2d 1074, 1088 (3d Cir. 1986) (treating "essential" as synonymous with "necessary").

162.    CMS cannot show that XPHOZAH is essential for the *delivery of maintenance dialysis*.  XPHOZAH is not provided during the delivery of maintenance dialysis.

163.    Rather, XPHOZAH must be taken two times a day with food, making a dosing regimen consistent with dialysis administration sessions impossible, as these sessions generally occur 3 times each week.

164.    Indeed, patients cannot take XPHOZAH immediately prior to or during the delivery of maintenance dialysis.

165.    In addition,  maintenance dialysis was provided for decades before XPHOZAH was approved.  To say that XPHOZAH is essential or necessary for the delivery of maintenance dialysis therefore makes little sense.

166.     XPHOZAH is not even approved for use in all ESRD patients, but only for the subset of patients with elevated serum phosphate levels, as an add-on therapy for those of that group for whom phosphate binders are inadequate.  CMS cannot, therefore, show that XPHOZAH is "essential for the delivery of maintenance dialysis."

167.     Finally, CMS has explained that by excluding drugs that are "not essential for the delivery of maintenance dialysis," CMS's definition of renal dialysis services excludes "[d]rugs and biologicals that are generally not ESRD-related (for example drugs and biologicals used to treat diabetes, cardiac conditions and hypertension)."  75 Fed. Reg. 49,030, 49,047.

168.     For the reasons explained *supra*, CMS's May 13, 2024 letter nonetheless sweeping XPHOZAH into the ESRD PPS bundle is therefore arbitrary, capricious, and contrary to law.

**J.     Placing XPHOZAH and Other Oral-Only Drugs Into the PPS Bundle Will Harm Patients and Disincentivize Innovative Treatment for Patients**

169.     As explained above, oral-only PLTs like XPHOZAH are critically important for managing hyperphosphatemia.  Absent access to effective treatment, unmanaged or insufficiently managed hyperphosphatemia increases patients' risk of serious disease and death.

170.     PLTs like XPHOZAH are currently covered by Medicare Part D, a federal reimbursement program which plays a pivotal role in ensuring that Medicare patients have access to a broad range of medications tailored to their individual needs and prescribed by their own healthcare providers.

171.     Under Medicare Part D, Medicare provides prescription drug coverage for a wide variety of self-administered drugs, which ensures that people with different medical needs can get the prescription drugs that they require.  Under Medicare Part D, when a treating healthcare provider prescribes a particular PLT, patients obtain needed drugs from a pharmacy and the patient's Medicare Part D plan generally covers the cost of that prescription, subject to any

deductible or coinsurance requirements. Medicare Part D plans have historically provided sufficient compensation to pharmacies responsible for dispensing Part D drugs to facilitate patient access to innovative, effective treatments.

172.    Placing a prescription drug into the ESRD PPS Bundled Payment rate disrupts the process above in a number of important respects. In a bundled payment system, CMS provides a single bundled payment to dialysis facilities that is effectively intended to cover the average cost of providing renal dialysis services to an ESRD patient. Because CMS has admittedly failed, however, to increase the amount of its bundled payment in keeping with actual increases in the cost of providing dialysis, the Medicare Payment Advisory Commission estimated in 2023 that dialysis facilities had *negative margins* for Medicare patients, and anticipated no better than a 0% margin for those patients in 2024.

173.    Making dialysis facilities financially responsible for still more drugs previously outside the bundled payment system will exacerbate financial pressure on dialysis facilities— forcing them to bear financial responsibility for purchasing and dispensing new drugs despite the inadequacy of the existing bundled payment. Although CMS makes temporarily available certain additional funds to cover new drugs upon their entry to the bundle, such additional payments— even when made available—do not cover the full cost to the dialysis facility of providing such prescription drugs.

174.    As a result, the addition of prescription drugs to the bundled payment system necessarily imposes overwhelming financial pressure on dialysis facilities to limit their financial exposure to additional drug costs in order to preserve sufficient resources to pay staff and maintain existing levels of care. This, in turn, depresses utilization of such drugs and frustrates shared nephrologist-patient decision making when the dialysis facility is responsible for purchasing and

dispensing drugs for dialysis patients.   All of these factors significantly discourage the development and adoption of innovative prescription drug therapies for ESRD patients.

175.   This dangerous cycle dramatically curtails ESRD patients' short-term and long-term access to lifesaving treatments and incentivizes a standardized resource-minimizing approach to treatment that does not account for the diverse needs of individual patients.

176.   Real world experience amply documents this dangerous cycle.   For example, in 2017, the FDA approved Parsabiv (etelcalcetide), an intravenous calcimimetic that offered the first new treatment for secondary hyperparathyroidism in ESRD patients in more than a decade.[4]   In 2018, 2019, and 2020, Parsabiv was utilized by 7.1%, 10.4%, and 9.7% of dialysis patients, respectively.   *See* U.S. Renal Data Sys., 2023 Annual Report ch. 3, https://usrds-adr.niddk.nih.gov/2023/end-stage-renal-disease/3-clinical-indicators-and-preventive-care. During this period, dialysis facilities received Medicare reimbursement for Parsabiv through the Transitional Drug Add-on Payment (TDAPA), a CMS program used to transition new drugs into the ESRD PPS bundled payment.   After the temporary TDAPA period ended, Parsabiv was moved into the bundle, with no additional reimbursement available to ESRD facilities that administered this drug beyond the base bundled payment rate.   Beneficiary utilization promptly and precipitously dropped to just 3% in 2021, and to less than 1% in 2023—illustrating how Medicare payment policies impede patient access to novel drugs.   *See id.*

---

[4] Secondary hyperparathyroidism is a condition in which too much calcium is produced in the body, and is a common comorbidity with ESRD.   *See Nat'l Kidney Found.*, *Secondary Hyperparathyroidism*, https://www.kidney.org/atoz/content/secondary-hyperparathyroidism (last visited July 16, 2024).   Secondary hyperparathyroidism is treated with calcimimetics, novel drugs which increase the sensitivity of the parathyroid gland to calcium which has the effect of lowering calcium levels in the body.

177.    Approximately one third (32.3%) of ESRD patients used a calcimimetic in 2021. After Parsabiv was added to the bundle, most of that use was directed to Sensipar, a much older drug that is less effective than the newer, more innovative Parsabiv.  *See id.*; *see also* Carol Moore et al., *Change in Payment Method and the Use of Etelcalcetide and PTH Values Among Dialysis Patients in Two Dialysis Organizations*, American Society of Nephrology (Poster FR-PO535) (Nov.        2022),        https://www.asn-online.org/education/kidneyweek/2022/program-abstract.aspx?controlId=3768383.

178.    In other words, when Parsabiv entered the ESRD PPS bundle, patient access was severely limited, with utilization generally forced to a cheaper but less effective drug.

179.    The drop in Parsabiv usage is particularly noteworthy, and worrisome, for the African American population.  In 2020, Parsabiv was utilized by 14.3% of African Americans treated with calcimimetics.  *See* U.S. Renal Data Sys., 2023 Annual Report ch. 3, https://usrds-adr.niddk.nih.gov/2023/end-stage-renal-disease/3-clinical-indicators-and-preventive-care.      In 2021, this number decreased to a mere 4.5%.  *Id.*  This reduction in African Americans' access to a more potent, effective therapy is concerning, considering the greater severity of ESRD in this patient population.  *See* Aarti Mathur et al., *Increasing Rates of Parathyroidectomy to Treat Secondary Hyperparathyroidism in Dialysis Patients With Medicare Coverage*, 172 Surgery 118 (July 2022), https://doi.org/10.1016/j.surg.2022.02.005.

180.    Indeed, from July 2020 to July 2021, after Parsabiv entered the ESRD PPS bundle, the prevalence of parathyroid levels above the threshold for hyperparathyroidism among ESRD patients who discontinued Parsabiv increased from 28% to 43% overall, and from 32% to 50% among African American patients.  *See* Angelo Karaboyas et al., *Calcimimetic Reimbursement Changes in 2021:  Impact of Etelcalcetide Discontinuation on Parathyroid Hormone (PTH) Levels*

*in US Hemodialysis Patients*, American Society of Nephrology (Poster No. TH-PO149) (Nov. 2023), (https://www.asn-online.org/education/kidneyweek/2023/program-abstract.aspx?controlId=3931328).

181.    In short, real world experience highlights the inaccuracy of CMS's claims that "the incorporation of oral-only drugs in the ESRD PPS will increase access to these drugs for beneficiaries," and create "significant positive health equity impacts."  89 Fed. Reg. 55760, 55797 .  Such pronouncements, which ignore the consistent and contrary experience of stakeholders from the entire spectrum of the kidney care community, ignore the real world limits and drawbacks of the ESRD PPS Bundle.  In other cases, pharmaceutical companies simply cease to further develop therapies that would be slated to go into the bundle, depriving ESRD patients of access to the newest therapies.  For example, Cara Therapeutics terminated its Phase 3 clinical program for an oral form of Korsuva, which treats pruritis (itchiness of the skin) in ESRD patients, after the injectable form of the same drug was moved into the ESRD PPS bundle.  Cara Therapeutics explained in an SEC filing that "[t]he unfavorable CMS reimbursement codified in the final CY 2024 rule has resulted in a lack of sequential revenues growth for KORSUVA injection since its launch . . . . [w]e expect no meaningful revenue contribution from KORSUVA injection following the TDAPA period expiration."  *See* Cara Therapeutics, Inc., Q. Rep. (Form 10-Q) 33 (Mar. 31, 2024),    https://www.sec.gov/ix?doc=/Archives/edgar/data/1346830/000155837024007964/cara-20240331x10q.htm.  The same year, Cara Therapeutics decided to focus its oral Korsuva trials on a different therapeutic indication with greater "commercial potential."  *Press Release*, Cara Therapeutics    (Jan.    22,    2024),    https://ir.caratherapeutics.com/news-releases/news-release-details/cara-therapeutics-prioritizes-late-stage-notalgia-paresthetica.

182.     If XPHOZAH is no longer eligible for Medicare Part D reimbursement and is instead moved into the ESRD PPS bundle, dialysis facilities will have to cover the cost of purchasing the drug from their single bundled payment, along with the costs of dispensing and managing the patients' utilization.  The ESRD PPS bundled payment has already been stretched so thin that it is inadequate to cover all of the existing treatments it is intended to cover, let alone the costs of additional drugs and services.

183.     Moving XPHOZAH into the already overstuffed and underpaid bundle will result in fewer providers being willing to shoulder the additional cost of dispensing XPHOZAH, and fewer patients having access to XPHOZAH.  Over decades of use of phosphate binders, ESRD patients continue to suffer from high rates of hyperphosphatemia.  Yet, just when Ardelyx has introduced an add-on therapy to finally better manage patients' serum phosphorus, CMS is planning to eliminate payment for that therapy under Medicare Part D, instead consigning XPHOZAH to a reimbursement pathway already demonstrated to restrict (if not eliminate) patient access to innovative therapies.

184.     The burden of CMS's unlawful classification decision will fall heaviest on patients from minority, rural, and low-income backgrounds, who represent a disproportionate share of patients suffering from hyperphosphatemia.  *See* Orlando M. Gutierrez et al., *Low Socioeconomic Status Associates With Higher Serum Phosphate Irrespective of Race*, 21 Journal of the American Society of Nephrology 1953 (Nov. 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3014009 ("Large cohort studies have shown that hyperphosphatemia is more common and more severe in blacks than in whites, both among patients with CKD and among individuals with normal kidney function.").  As stated above, ESRD imposes outsized burdens on minority groups.  African Americans are almost 4 times more likely,

and Hispanic and Latino Americans are almost 1.3 times more likely, to suffer from ESRD than White Americans.

185.    CMS's classification of XPHOZAH and other oral-only PLTs does not prevent patients with sufficient independent financial resources or alternative sources of drug coverage to access XPHOZAH.  Rather, as a result of CMS's approach, it will be principally Medicare-enrolled minority patients, from rural and/or low-income backgrounds, who will be deprived of access to XPHOZAH.

186.    This burden will fall disproportionately on African American and Hispanic and Latino ESRD patients, who represent a disproportionate share of ESRD patients.  Minority patients, especially those who rely on Medicare alone for healthcare coverage, will struggle to get access to the latest treatments like XPHOZAH after it is moved into the ESRD PPS bundle.  *See, e.g.*, Nat'l Institutes of Health, *Healthcare Disparities, in 2023 United States Renal Data System Annual Data Report* ch. 14, https://usrds-adr.niddk.nih.gov/2023/supplements-covid-19-disparities/14-healthcare-disparities (discussing higher incidence of ESRD and Medicare reliance among African American and Hispanic American populations); Henry J. Kaiser Fam. Found., *Medicare and Minority Americans Fact Sheet*, at 4, https://www.kff.org/wp-content/uploads/2013/01/medicare-and-minority-americans-fact-sheet.pdf  (last visited July 16, 2024) (noting minority Medicare beneficiaries are less likely than white Americans to rely on supplemental health insurance in addition to Medicare);  Georgetown Univ. Health Policy Inst., *Older Hispanic Americans*, https://hpi.georgetown.edu/hispanics/ (last visited July 16, 2024) (noting larger proportions of the Hispanic population rely solely on Medicare and Medicaid).

187.    Many patients living in minority, rural, and low-income backgrounds are also more likely to live in so-called "food deserts," places with a lower ability to source nutritious, high-

quality food.  *See, e.g.*, Jonathan Suarez et al., *Food Access, Chronic Kidney Disease, and Hypertension in the U.S.*, 49 Am. Journal of Preventative Med. 912 (Dec. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4656149/.   Proper diet is a key factor in managing phosphorus levels in patients.  *See, e.g.*, Nat'l Kidney Found., *Phosphorus and Your Diet*, https://www.kidney.org/atoz/content/phosphorus (last accessed July 16, 2024).  For patients living in food deserts, access to PLTs like XPHOZAH is even more critical because these patients lack the means to modulate phosphorus levels through diet.

188.    Restrictions on access to PLTs will therefore only exacerbate existing healthcare disparities among patients from minority, rural, and low-income backgrounds.

189.    This is especially true because there are already substantial operational obstacles for rural, small, and independent urban dialysis organizations to purchase and distribute oral-only PLTs.  Even during the temporary TDAPA period, Medicare reimbursement for new drugs added to the ESRD PPS bundle is generally set at the drug's average sales price (ASP).[5]  ASP is a market-based price that reflects the weighted average of all manufacturer sales prices, including all rebates and discounts that are privately negotiated between manufacturers and purchasers (with the exception of Medicaid and certain federal discounts and rebates). By reimbursing providers at ASP-based rates, Medicare insufficiently reimburses any dialysis facility that is unable to purchase the drug at or near the "average" price, taking account of all discounts. This disproportionately challenges small, independent dialysis organizations, who do not generate sufficient volume to

---

[5] At times, CMS has reimbursed dialysis facilities for such drugs during the TDAPA period at a rate of ASP + a small additional percentage, like 6%.  For CY 2025, CMS solicits "comment on the extent to which 100 percent of ASP is appropriate for TDAPA payment amount for phosphate binders and whether there are any costs associated with the inclusion of phosphate binders into the ESRD PPS bundled payment that may not be accounted for by 100 percent of ASP."  89 Fed. Reg. 55,760, 55,797 (July 5, 2024).

negotiate the discounts on drugs offered to large dialysis organizations.   Forcing oral-only PLTs like XPHOZAH into the bundle will further disincentivize these independent providers from making these treatments available at all, thereby further decreasing patient access to lifesaving treatments.

190.    CMS's unlawful classification decision will impede innovation in medical treatment for those patients who are at highest risk.  Even if new and more effective medications like XPHOZAH are developed, rural, minority, and low-income patients' access to these options will be limited by CMS's unlawful misclassification of drugs.

191.    This in turn will disincentivize pharmaceutical companies from developing new ESRD-adjacent treatments, because the prospect of new drugs immediately being moved into the bundle will prevent uptake.

192.    Indeed, as discussed above, Cara Therapeutics recently discontinued Phase 3 trials for an oral form of Korsuva for CKD patients, instead shifting focus to trials for notalgia paresthetica (NP), an alternative path which, compared to ESRD, had the "greatest commercial potential."    *Press    Release*,    Cara    Therapeutics    (Jan.    22,    2024), https://ir.caratherapeutics.com/news-releases/news-release-details/cara-therapeutics-prioritizes-late-stage-notalgia-paresthetica.

193.    CMS's decision will directly undermine health outcomes and quality of life for countless patients but particularly those that are already disadvantaged.

194.    As a result of CMS's unlawful decision, patients who rely on PLTs to manage phosphorus levels are likely face interruptions in treatment, unnecessary burdens on their finances, and increased stress during an already difficult time.

**CLAIMS FOR RELIEF**

**CLAIM I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AN ABUSE OF**
**DISCRETION, AND NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF**
**STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY**
**Violation of 5 U.S.C. § 706; 42 U.S.C. § 1396r-8(k)(7)(A)**

195.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

196.    The APA prohibits Defendants from acting in any way that is arbitrary and capricious or an abuse of discretion, or that is not in accordance with law, or that is in excess of statutory jurisdiction or authority or short of statutory right.  5 U.S.C. § 706(2)(A), (C).

197.    By statute, only oral drugs that are a form of ESAs or the "oral equivalent form" of "drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was . . . made separately under this title" are "renal dialysis services" subject to inclusion in the ESRD PPS bundle.  *See* 42 U.S.C. § 1395rr(b)(14)(B)(ii)-(iii).

198.    XPHOZAH, an oral-only phosphate-limiting treatment with no injectable equivalent, is not a "renal dialysis service" as defined by MIPPA such that it should be included in the ESRD PPS bundle.  *See* 42 U.S.C. § 1395rr(b)(14)(B)(i)-(iv).

199.    XPHOZAH does not qualify as a renal dialysis service and does not belong in the ESRD PPS bundle for the additional reason that it cannot be considered a drug furnished "for the treatment of end state renal disease."  42 U.S.C. § 13955rr(b)(14)(B)(i), (ii)-(iv).

200.    Defendants lack any statutory authority to nonetheless sweep XPHOZAH into the bundle.

201.    CMS must treat XPHOZAH in a manner similar to other oral-only drugs that are not intended to treat ESRD but rather complications or comorbidities common among ESRD patients.  Accordingly, it does not qualify for the bundled payment system.

202.   Defendants' May 13, 2024 determination that XPHOZAH is a "renal dialysis service" that shall be added to the bundled payment system as of January 1, 2025 is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction and authority, and short of statutory right.

**CLAIM II: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AN ABUSE OF
DISCRETION, AND NOT IN ACCORDANCE WITH LAW
Violation of 5 U.S.C. § 706; 42 U.S.C. § 1396r-8(k)(7)(A)**

203.   The foregoing paragraphs are incorporated by reference as if set forth in full herein.

204.   The APA prohibits Defendants from acting in any way that is arbitrary and capricious or an abuse of discretion, or that is not in accordance with law, or that is in excess of statutory jurisdiction or authority or short of statutory right.  5 U.S.C. § 706(2)(A), (C).

205.   Under CMS's own regulation, "renal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis."  42 C.F.R. § 413.171(5).

206.   XPHOZAH is an oral medicine that reduces phosphate absorption from the gut.  It offers therapeutic benefits for certain ESRD patients, but is not "essential for the delivery of maintenance dialysis."  *Id.*

207.   XPHOZAH is not delivered and should not be delivered prior to or during maintenance dialysis sessions, nor is it distributed by dialysis facilities.

208.   XPHOZAH does not qualify under CMS's own regulation as a "renal dialysis service."  *Id.*

209.   Defendants thus lacked authority under their own regulation to sweep XPHOZAH into the bundle.

210.    CMS must treat XPHOZAH in a manner similar to other oral-only drugs that are not "essential for the delivery of maintenance dialysis."   Accordingly, it does not qualify for the bundled payment system.

211.    Defendants' May 13, 2024 determination that XPHOZAH is a "renal dialysis service" that shall be added to the bundled payment system as of January 1, 2025 is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**CLAIM III: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY**
**Violation of 5 U.S.C. § 706; 42 U.S.C. § 1396r-8(k)(7)(A)**

212.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

213.    The APA prohibits Defendants from acting in any way that is arbitrary and capricious or an abuse of discretion, or that is not in accordance with law, or that is in excess of statutory jurisdiction or authority or short of statutory right.  5 U.S.C. § 706(2)(A), (C).

214.    By statute, only oral drugs that are a form of ESAs or the "oral equivalent form" of "drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was . . . made separately under this title" are "renal dialysis services" subject to inclusion in the ESRD PPS bundle.  *See* 42 U.S.C. § 1395rr(b)(14)(B)(ii)-(iii).

215.    Defendants' determination that any new oral-only drug is a "renal dialysis service," (*see* definition of "Renal dialysis services" at 42 CFR 413.171(3)), that shall be added to the bundled payment system as of January 1, 2025 (*see* 89 Fed. Reg. 55760,  55795-96) is arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory jurisdiction and authority, and short of statutory right.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

1.    A declaration pursuant to 28 U.S.C. § 2201 stating that:

    a.    XPHOZAH is not a "renal dialysis service" as defined in MIPPA, 42 U.S.C. § 1395rr(b)(14)(B); and

    b.    XPHOZAH is not "essential to the delivery of maintenance dialysis" under 42 C.F.R. § 413.171(5); and

    c.    XPHOZAH is not subject to inclusion in the ESRD PPS bundle and instead is a separately coverable drug under Medicare Part D; and

    d.    Oral-only drugs are not subject to inclusion in the ESRD PPS bundle and are instead separately coverable drugs under Medicare Part D because they are not "renal dialysis services" as defined in MIPPA, 42 U.S.C. § 1395rr(b)(14)(B).

2.    An order:

    a.    vacating and setting aside Defendants' determinations that XPHOZAH is a "renal dialysis service" subject to inclusion in the ESRD PPS bundle rather than a separate drug covered under Medicare Part D; and

    b.    enjoining Defendants from treating XPHOZAH as a "renal dialysis service;" from placing XPHOZAH into the ESRD PPS bundled payment system effective January 1, 2025; or from ceasing reimbursement for XPHOZAH under Medicare Part D as of January 1, 2025.

3.    An order:

a.     vacating and setting aside Defendants' determinations, *see* 42 C.F.R. § 413.171(3), that oral-only drugs are a "renal dialysis service" subject to inclusion in the ESRD PPS bundle rather than separate drugs covered under Medicare Part D; and

b.     enjoining Defendants from treating oral-only drugs as a "renal dialysis service;" placing oral-only drugs into the ESRD PPS bundled payment system effective January 1, 2025; or ceasing reimbursement for any oral-only drug under Medicare Part D as of January 1, 2025.

4.     An order awarding Plaintiffs their costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

5.     Such other and further relief as the Court deems just and proper.

Dated:  July 17, 2024                 Respectfully submitted,

*/s/ Michael E. Bern*
Michael E. Bern  (DC Bar No. 994791)
Alexander G. Siemers (DC Bar No. 90006765)
Delia Tasky (DC Bar No. 1724285)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   michael.bern@lw.com
           alex.siemers@lw.com
           delia.tasky@lw.com

Nicholas L. Schlossman (DC Bar No. 1029362)
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email:   nicholas.schlossman@lw.com

*Attorneys for Plaintiffs Ardelyx, Inc., American Association of Kidney Patients, and National Minority Quality Forum*