## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARDELYX, INC.,**<br>400 Fifth Avenue, Suite 210<br>Waltham, MA 02451<br><br>**AMERICAN ASSOCIATION OF KIDNEY PATIENTS,**<br>14440 Bruce B. Downs Boulevard<br>Tampa, FL 33613<br><br>**NATIONAL MINORITY QUALITY FORUM**,<br>1201 15th Street NW #340<br>Washington, DC 20005<br><br>        **Plaintiffs,**<br><br>  **v.**<br><br>**XAVIER BECERRA,**<br>*Secretary of Health and Human Services*<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,**<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>**CHIQUITA BROOKS-LASURE, AND**<br>*Administrator of Centers for Medicare and Medicaid Services*<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>**CENTERS FOR MEDICARE AND MEDICAID SERVICES,**<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>        **Defendants.** | Case No. 1:24-cv-02095-BAH<br><br>**Oral Argument Requested** |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and 65 and Local Rule 56.1 and 65.1, Plaintiffs Ardelyx, Inc., American Association of Kidney Patients, and National Minority Quality Forum (collectively, "Plaintiffs"), respectfully move to preliminarily enjoin Defendants Xavier Becerra, Secretary of Health and Human Services, U.S. Department of Health and Human Services, Chiquita Brooks-LaSure, Administrator of Centers for Medicare and Medicaid Services, and Centers for Medicare and Medicaid Services ("CMS," and collectively, "Defendants"), from including oral-only drugs, including Plaintiff Ardelyx's drug XPHOZAH, in the End Stage Renal Disease Prospective Payment System ("ESRD PPS") bundle.

More specifically, Defendants have issued a regulation, at 42 C.F.R. § 413.171, that purports to redefine the statutory term "renal dialysis services" in 42 U.S.C. § 1395rr(b)(14)(B) to include oral-only drugs.   That regulation in § 413.171 is unlawful—both on its face and in its application to Plaintiffs—because the regulation rewrites the statutory term "renal dialysis services" to include oral-only drugs, contrary to the statute's express text.  Plaintiffs therefore seek an order preliminarily enjoining Defendants from enforcing their regulation in 42 C.F.R. § 413.171 unlawfully including oral-only drugs within the regulatory definition a "renal dialysis service"; from placing oral-only drugs into the ESRD PPS bundled payment system effective January 1, 2025 pursuant to 42 C.F.R. §§ 413.171, 413.174(f)(6); or from ceasing reimbursement for any oral-only drug under Medicare Part D as of that date.

Moreover, on May 13, 2024, CMS sent a letter-decision to Ardelyx, setting forth that "CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171." Dkt. 1-1 ("XPHOZAH Decision").  CMS's application of its contra-statutory and unlawful regulation in 42 C.F.R. § 413.171 to Ardelyx through the XPHOZAH Decision is also unlawful. Defendants seek an order preliminarily enjoining Defendants from classifying XPHOZAH as a "renal dialysis

service" pursuant to the XPHOZAH Decision applying 42 C.F.R. § 413.171 and § 413.174(f)(6); from placing XPHOZAH into the ESRD PPS bundled payment system effective January 1, 2025; or from ceasing reimbursement for XPHOZAH under Medicare Part D as of January 1, 2025.

As demonstrated in the accompanying Memorandum of Points and Authorities, Plaintiffs are entitled to preliminary relief because the inclusion of oral-only drugs in the ESRD PPS bundle, including XPHOZAH, violates the Administrative Procedure Act ("APA") and will cause Plaintiffs irreparable harm absent this preliminary relief.

Alternatively, if the Court finds that the merits favor Plaintiffs but that the equities do not favor preliminary relief, Plaintiffs respectfully request expedited summary judgment in their favor. Specifically, Plaintiffs request the same injunctive relief specified above, on a permanent basis. Plaintiffs further request that the Court vacate and set aside Defendants' regulation in 42 C.F.R. §§ 413.171, 413.174(f)(6), providing that oral-only drugs are a "renal dialysis service" subject to inclusion in the ESRD PPS bundle rather than separate drugs covered under Medicare Part D. And Plaintiffs further request that the Court vacate and set aside Defendants' XPHOZAH Decision.

This motion is accompanied by a Memorandum of Points and Authorities; the Declarations of Laura Williams, Diana Clynes, and Gary Puckrein; and a proposed Order. Plaintiffs have conferred with Defendants, who state that they oppose the issuance of a preliminary injunction. Oral argument is requested on this motion because of the substantial importance of the issues and the multiple legal arguments presented in this case.

Dated:  September 19, 2024

Respectfully submitted,

*/s/ Michael E. Bern*
Michael E. Bern  (DC Bar No. 994791)
Delia Tasky (DC Bar No. 1724285)
Alexander G. Siemers (DC Bar No. 90006765)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   michael.bern@lw.com
         delia.tasky@lw.com
         alex.siemers@lw.com

Nicholas L. Schlossman
(DC Bar No. 1029362)
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email:   nicholas.schlossman@lw.com

*Attorneys for Plaintiffs Ardelyx, Inc. and American Association of Kidney Patients*

James E. McCollum, Jr. (DC Bar. No. 398117)
Amit K. Sharma (D.C. Bar No. 503604)
The McCollum Firm, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
Tel: (301) 537-0661
Fax: (301) 864-4351
Email:   jmccollum@jmlaw.net
         asharma@jmlaw.net

*Attorneys for Plaintiff National Minority Quality Forum*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ARDELYX, INC.,**<br>400 Fifth Avenue, Suite 210<br>Waltham, MA 02451<br><br>**AMERICAN ASSOCIATION OF KIDNEY PATIENTS,**<br>14440 Bruce B. Downs Boulevard<br>Tampa, FL 33613<br><br>**NATIONAL MINORITY QUALITY FORUM**,<br>1201 15th Street NW #340<br>Washington, DC 20005<br><br>        **Plaintiffs,**<br><br>  v.<br><br>**XAVIER BECERRA,**<br>*Secretary of Health and Human Services*<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,**<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>**CHIQUITA BROOKS-LASURE, AND**<br>*Administrator of Centers for Medicare and Medicaid Services*<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>**CENTERS FOR MEDICARE AND MEDICAID SERVICES,**<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>        **Defendants.** | Case No. 1:24-cv-02095-BAH<br><br>**Oral Argument Requested** |

<u>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................5

    A.    End Stage Renal Disease ....................................................................5

    B.    Medicare Coverage For End Stage Renal Disease ..............................7

    C.    The Creation Of The Modern ESRD PPS "Bundle" ...................................8

    D.    CMS Acts To Add Oral-Only Drugs Into The ESRD PPS Bundle ...........10

    E.    Congress Repeatedly Prevents CMS From Implementing The Inclusion Of Oral-Only Drugs Into The ESRD PPS Bundle ..........................................14

    F.    Ardelyx's XPHOZAH ..............................................................15

    G.    CMS Plans To Add Oral-Only Drugs To The ESRD PPS Bundle, Including XPHOZAH ..................................................................17

ARGUMENT ....................................................................................................................18

I.    DEFENDANTS' PLACEMENT OF ORAL-ONLY DRUGS INTO THE ESRD PPS BUNDLE IS UNLAWFUL......................................................................20

    A.    The Placement Of Oral-Only Drugs Into The ESRD PPS Bundle Conflicts With The Statutory Definition Of "Renal Dialysis Services" ..................20

    B.    At Minimum, XPHOZAH Does Not Qualify As A Renal Dialysis Service ..............................................................................30

        1.    XPHOZAH Is Not A Drug Furnished For The Treatment Of End Stage Renal Disease....................................................30

        2.    XPHOZAH Is Not Essential For The Treatment Of Maintenance Dialysis ..........................................................................35

II.    THE REMAINING EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF INJUNCTIVE RELIEF..............................................................37

    A.    Plaintiffs Will Suffer Irreparable Harm Absent Judicial Relief................37

    B.    The Balance Of The Equities And The Public Interest Also Favor Injunctive Relief..................................................................44

CONCLUSION................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Air Transp. Ass'n of Am., Inc. v. United States Dep't of Agric.*,
    37 F.4th 667 (D.C. Cir. 2022) ...................................................................................27

*Amgen Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) .................................................................................19

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) .................................................................................37

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
    509 F. Supp. 3d 482 (D. Md. 2020) .........................................................................42

*Bayer HealthCare, LLC v. FDA*,
    942 F. Supp. 2d 17 (D.D.C. 2013) ...........................................................................43

*Bissonnette v. LePage Bakeries Park St., LLC*,
    601 U.S. 246 (2024) .................................................................................................29

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001) .................................................................................................29

*Citrus HMA, LLC v. Becerra*,
    597 F. Supp. 3d 450 (D.D.C. 2022) .........................................................................21

*Collagenex Pharms. v. Thompson*,
    No. 03-cv-1405, 2003 WL 21697344 (D.D.C. July 22, 2003) ................................44

*Council for Urological Interests v. Burwell*,
    790 F.3d 212 (D.C. Cir. 2015) .................................................................................24

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    67 F.4th 1027 (9th Cir. 2023) ..................................................................................35

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) .................................................................................................34

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ...........................................................................................33, 34

*Feinerman v. Berardi*,
  558 F. Supp. 2d 36 (D.D.C. 2008) ........................................................................43

*Fischer v. United States*,
  144 S. Ct. 2176 (2024) ........................................................................28, 29, 30

*Gen. Motors Corp. v. Ruckelshaus*,
  742 F.2d 1561 (D.C. Cir. 1984) ........................................................................26

*Grange Mut. Cas. Co. v. Woodward*,
  861 F.3d 1224 (11th Cir. 2017) ........................................................................35

*Grayscale Invs., LLC v. SEC*,
  82 F.4th 1239 (D.C. Cir. 2023) ........................................................................34

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................................27

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) ........................................................................44

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................................44

*Lone Mountain Processing, Inc. v. Sec'y of Lab.*,
  709 F.3d 1161 (D.C. Cir. 2013) ........................................................................33

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ........................................................................3, 21, 25

*Luokung Tech. Corp. v. Dep't of Def.*,
  538 F. Supp. 3d 174 (D.D.C. 2021) ........................................................................43

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
  752 F.3d 999 (D.C. Cir. 2014) ........................................................................35

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................44

*Obduskey v. McCarthy & Holthus LLP*,
  586 U.S. 466 (2019) ........................................................................27

*Peri & Sons Farms, Inc. v. Acosta*,
  374 F. Supp. 3d 63 (D.D.C. 2019) ........................................................................19

*Scan Health Plan v. HHS*,
  No. 1:23-cv-03910, 2024 WL 2815789 (D.D.C. June 3, 2024) ........................................................................35

*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (D.C. Cir. 2021) ........................................................................................44

*Tex. Children's Hosp. v. Burwell*,
  76 F. Supp. 3d 224 (D.D.C. 2014) ................................................................................42

*Utility Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ......................................................................................................24

*Westar Energy, Inc. v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007) ....................................................................................34

*Wilson v. Grp. Hospitalization & Med. Servs., Inc.*,
  791 F. Supp. 309 (D.D.C. 1992) ...................................................................................42

*Wint v. Yeutter*,
  902 F.2d 76 (D.C. Cir. 1990) ........................................................................................25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................................18, 37

*Wis. Cent. Ltd. v. United States*,
  585 U.S. 274 (2018) ......................................................................................................21

## STATUTES

42 U.S.C.
  § 1395 ............................................................................................................................43
  § 1395rr .................................................................................................................. *passim*

## REGULATIONS

42 C.F.R.
  § 400.202 .......................................................................................................................35
  § 413.171 ................................................................................................................ *passim*
  § 413.174 ................................................................................................................ *passim*
  § 413.234 .......................................................................................................................39
  § 413.237 .........................................................................................................................9

## FEDERAL REGISTER NOTICES

74 Fed. Reg. 49,922 (2009) ...........................................................11, 12, 22, 23, 24, 26

75 Fed. Reg. 49,030 (2010) ..................................................................................... *passim*

80 Fed. Reg. 69,027 (2015) ...........................................................................................14

88 Fed. Reg. 76,344 (2023) .............................................................................................9

88 Fed. Reg. 55,760 (2024) ...............................................................................................10, 18, 24

## INTRODUCTION

Approximately 550,000 people in the United States suffer from end stage renal disease ("ESRD"), a life-threatening condition in which the kidneys can no longer function on their own. ESRD patients must receive either a kidney transplant or regular dialysis treatment—through which waste is removed from an individual's blood—in order to survive. ESRD patients face staggeringly high health risks from ESRD and its comorbidities and complications—20 to 50% of patients on dialysis die within 24 months, and less than 50% survive more than five years. ESRD also disproportionately affects low-income, minority, and rural populations.

Because of demonstrable patient need and high coverage costs, Congress over 50 years ago provided that ESRD patients shall receive federal Medicare coverage, regardless of age. In 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"), which, among other things, created a bundled payment system for "renal dialysis services" under which a single payment under Medicare Part B is made to dialysis facilities for certain items, drugs, and tests in lieu of any other separate payment. 42 U.S.C. § 1395rr(b)(14)(A)-(B) (establishing the ESRD Prospective Payment System bundle or "ESRD PPS bundle"). Under that system, dialysis providers generally receive the same reimbursement per dialysis treatment irrespective of the actual cost incurred to treat that patient, or the actual services provided. Over time, however, CMS has set the bundled payment at an amount that barely covers the cost to dialysis facilities of providing renal dialysis services and discourages dialysis facilities from promoting access to novel therapies that would increase the long-term cost of care beyond that which CMS is willing to pay.

This action challenges CMS's decision under its regulation in 42 C.F.R. § 413.171 to, as of January 1, 2025, cease payment under Medicare Part D for Ardelyx's novel oral-only phosphate-lowering therapy ("PLT"), XPHOZAH, and other oral-only drugs, in favor of including

those therapies within the ESRD PPS bundled payment system.  As a wide cross-section of the kidney-care community, including  physicians, nurses, patients, dialysis providers, and drug manufacturers have repeatedly warned, CMS's plan to add oral-only drugs to a bundled payment system that is already financially stretched will reduce access to life-saving drugs, harm patients, and stifle innovation—all while imposing added costs on patients who can ill afford to bear it.

CMS's decision is not just bad policy, it is unlawful—contradicting Congress's statutory directives in violation of the Administrative Procedure Act.  For multiple reasons, CMS's decision to place oral-only drugs, including XPHOZAH, into the ESRD PPS bundle is both contrary to law and arbitrary and capricious.  And because CMS's decision will impose irreparable harm on the patients whom Plaintiffs American Association of Kidney Patients and National Minority Quality Forum ("NMQF") represent and whom Ardelyx serves, as well as Ardelyx itself, this Court should preliminarily enjoin Defendants from enforcing their regulation in 42 C.F.R. § 413.171, unlawfully including oral-only drugs within the regulatory definition of a "renal dialysis service," and from placing oral-only drugs, including XPHOZAH, into the ESRD PPS bundled payment system effective January 1, 2025, or alternatively grant expedited relief on the merits.

To start, CMS's plan to add XPHOZAH and other oral-only drugs to the bundle violates the APA.  Congress enacted MIPPA in order to promote the cost-efficient provision of renal dialysis services by dialysis providers.  But XPHOZAH, like other oral-only phosphate-lowering therapies, is not administered during dialysis, nor by dialysis providers.  It is no wonder, therefore, that CMS's plan to place such drugs into the ESRD PPS bundle is contrary to Congress' operative statute.  At the time MIPPA was enacted, drugs or biologics furnished to patients by dialysis facilities for the treatment of ESRD were generally administered intravenously or by injection during dialysis treatments.  Accordingly, Congress expressly defined the "renal dialysis services"

subject to the bundle to include orally administered drugs only when they were the "oral equivalent form" of "drugs and biologicals furnished to individuals for the treatment of end stage renal disease"—*i.e.*, when the oral drug was equivalent to a drug or biological actually used by a dialysis facility during dialysis.  42 U.S.C. § 1395rr(b)(14)(B)(iii).  By its express terms, then, oral drugs that are *not* the "oral equivalent form" of injectable drugs or biologics furnished to individuals for ESRD treatment may *not* be included in the bundle.  *See id.*

Notwithstanding MIPPA's plain text, and over the strong objections of numerous commenters including Plaintiff NMQF, CMS decided to interpret Congress's operative statute to include *all* drugs and biologicals furnished to individuals for the treatment of ESRD, including "drugs and biologicals *with only* an oral form."  42 C.F.R. § 413.171(3) (emphasis added).  Many commenters warned that that regulation "represent[ed] a misreading of statutory intent," "violate[d] principles of statutory construction," and would suppress access to and utilization of oral-only drugs.  75 Fed. Reg. 49,030, 49,032, 49,038, 49,040 (2010).  CMS disagreed with those arguments as a matter of public policy.  But CMS had no right to adopt an untenable reading of the statute in order to further its policy goals.  Because CMS's decision to place oral-only drugs into the bundle pursuant to 42 C.F.R. § 413.171 is incompatible with the "best reading" of the statute, *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024), it should be rejected.

XPHOZAH also does not qualify as a "renal dialysis service" for additional reasons.  First, XPHOZAH is not a drug furnished "for the treatment of end stage renal disease"—a necessary requirement to be included in the ESRD PPS bundle under the statute and CMS's parallel regulation.  42 U.S.C. § 1395rr(b)(14)(B); 42 C.F.R. § 413.171.  XPHOZAH is indicated to treat hyperphosphatemia (excessive phosphorus in the body), not ESRD.  While XPHOZAH is approved for use with *patients* with chronic kidney disease on dialysis, it is only approved for

lowering serum phosphorus by limiting the absorption of phosphorus into the bloodstream—it does not treat end stage renal disease.  Nor is CMS's categorization of XPHOZAH and other oral-only drugs consistent with CMS's past guidance that whether a drug is "for the treatment of [ESRD]" depends on whether it "would be expected to be utilized for ESRD-related conditions in a dialysis unit (and therefore would be a renal dialysis service)."  75 Fed. Reg. at 49,036-47.  Nor does it match CMS's treatment of other oral-only drugs that treat causes, complications, or comorbidities of ESRD like hypertension and diabetes.

Finally, XPHOZAH does not qualify as a "renal dialysis service" under CMS's own definition of that term.  Under 42 C.F.R. § 413.171(5), "[r]enal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis."  XPHOZAH is not even approved for *use* during dialysis, let alone essential to it.  To the contrary, its label expressly warns *against* usage right before the delivery of maintenance dialysis.  As a result, XPHOZAH does not qualify as a renal dialysis service under CMS's own regulations.  For all of these reasons, CMS's placement of XPHOZAH into the ESRD PPS bundle is unlawful.

The other equitable factors strongly favor preliminary relief.  Congress three times delayed CMS from executing its decision to remove oral-only drugs from Medicare Part D and place them into the bundled payment system.  Absent court action, however, oral-only drugs will be removed from Medicare Part D and redirected into the ESRD PPS bundle on January 1, 2025.  The addition of oral-only drugs like XPHOZAH into the bundle that are not part of dialysis and have never been administered by dialysis providers will limit access to oral-only drugs, undermine health outcomes, discourage innovation, and further stretch an already inadequate bundled payment system—precisely the harms about which the kidney-care community has repeatedly warned.  And those

harms will fall disproportionately on minority, low-income, and rural patients—who are represented in outsized numbers among ESRD patients.

For all of these reasons, this Court should preliminarily enjoin Defendants from enforcing their regulations in 42 C.F.R. §§ 413.171, 413.174(f)(6) unlawfully including oral-only drugs within the regulatory definition a "renal dialysis service"; from classifying XPHOZAH as a "renal dialysis service" pursuant to § 413.171; from placing oral-only drugs, including XPHOZAH, into the ESRD PPS bundled payment system pursuant to § 413.171 effective January 1, 2025; and from ceasing reimbursement for any oral-only drug under Medicare Part D as of that date.  Alternatively, if the Court finds the equities do not favor preliminary relief, Plaintiffs respectfully request expedited summary judgment in their favor, granting the same injunctive relief on a permanent basis.  In that regard, Plaintiffs further request that the Court vacate and set aside (1) Defendants' regulations in 42 C.F.R. §§ 413.171, 413.174(f)(6) to the extent they provide that oral-only drugs are "renal dialysis services" subject to inclusion in the ESRD PPS bundle and (2) Defendants' XPHOZAH Decision.  As set forth below, preliminary, or at least expedited, relief is urgently warranted in these circumstances.[1]

## BACKGROUND

### A.    End Stage Renal Disease

Approximately 550,000 people in the United States suffer from ESRD, a life-threatening condition in which the kidneys can no longer function on their own.  Compl. ¶ 4; Williams Decl. ¶ 4.  ESRD is the final, permanent stage of chronic kidney disease, a condition in which the kidneys

---

[1]  After filing this action, Plaintiffs sought several times to negotiate a schedule for expedited cross-motions for summary judgment that would have made it unnecessary to seek a preliminary injunction.  Instead of agreeing to such a schedule, Defendants filed a motion to dismiss on September 17, 2025.  Because Defendants did not commit to a merits schedule that would permit consideration of the issues presented before CMS's plan takes effect on January 1, 2025, it became necessary for Plaintiffs to file this motion for a preliminary injunction.

become progressively damaged over time and eventually lose the ability to function.  Williams Decl. ¶ 5.  Because of the essential role the kidneys play in filtering waste products and toxins from the body, ESRD will result in certain death if left untreated.  *Id.* ¶ 6.

Unless a patient suffering from ESRD is able to obtain a kidney transplant, he or she must undergo routine dialysis treatment in order to survive.[2]  ESRD patients therefore typically undergo dialysis—in which a machine manually filters waste and excess fluid in place of the kidneys—3 times a week for 3 to 5 hours each session, at a dialysis center which specializes in this treatment.[3] Even with dialysis, ESRD patients experience frighteningly high mortality rates.  20 to 50% of ESRD patients on dialysis die within 24 months of diagnosis, and a recent study of patients with kidney failure showed a five-year survival rate of approximately 31% to 36%.[4]

ESRD offers a particularly stark example of the racial, ethnic, and socioeconomic disparities in American healthcare.  Puckrein Decl. ¶ 7.  African Americans are almost 4 times more likely, and Hispanics or Latinos are 1.3 times more likely, to have ESRD than white Americans.  *Id.* ¶ 9.  While African Americans make up 13.5% of the population, they represent more than 35% of dialysis patients, and are more likely to die from ESRD than white patients.[5]  In addition, low income and lack of health insurance are risk factors associated with a 50% or greater risk of developing ESRD.[6]  ESRD is often caused by other underlying, uncontrolled health

---

[2]  Williams Decl. ¶ 7; *see also* Johns Hopkins Med., *End Stage Renal Disease*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/end-stage-renal-failure

[3]  Williams Decl. ¶ 8; *see also* Nat'l Kidney Found., *About Dialysis for Kidney Failure*, https://www.kidney.org/patients/peers/dialysis

[4]  Williams Decl. ¶ 9; *see also* Muhammad F. Hashmi et al., *End-Stage Renal Disease* (2023), https://www.ncbi.nlm.nih.gov/books/NBK499861/.

[5]  Puckrein Decl. ¶ 10; *see also, e.g.*, Nat'l Kidney Found., *Health Disparities*, https://www.kidney.org/advocacy/legislative-priorities/health-disparities

[6]  Puckrein Decl. ¶ 12; Susanne B. Nicholas et al., *Socioeconomic Disparities in Chronic Kidney Disease* (Jan 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4291541/.

conditions, like high blood pressure and diabetes.  Puckrein Decl. ¶ 12.  As a result, underlying disparities in healthcare treatment impacting minorities and low-income individuals exacerbate disparities in who develops and dies from ESRD.  *See id.* ¶ 11-13.

**B.    Medicare Coverage For End Stage Renal Disease**

The Social Security Amendments of 1972 first extended Medicare coverage to individuals suffering from kidney disease who required dialysis or a kidney transplant, without regard to their age or disability status.  *See* An Act to Amend the Social Security Act, and for Other Purposes, Pub. L. No. 92-603, 86 Stat. 1329  (1972); 42 U.S.C. § 426-1(a).   Congress extended Medicare eligibility to ESRD patients in response to growing numbers of dialysis patients and treatment centers, as well as the high cost of life-saving dialysis treatment.  Clynes Decl. ¶ 6.[7]

Beginning in the 1980s, Medicare began paying for dialysis services using the "composite rate" system, a blended prospective payment and fee-for-service system.   Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2145, 95 Stat. 357, 799-800 (1981).   Under the composite rate system, dialysis facilities received a single, prospectively determined payment amount per treatment to cover costs including a defined set of regularly provided tests and supplies, as well as a narrow set of injectable drugs associated with dialysis services.  *See id.*

In addition to the composite rate, dialysis facilities were separately reimbursed for each use of injectable ESRD drugs with payments under Medicare Part B, which generally covers drugs that patients would not administer themselves.[8]   For example, Epogen, an injectable

---

[7] *See also* Richard A. Rettig, *Origins of the Medicare Kidney Disease Entitlement: The Social Security Amendments of 1972*, Biomedical Politics 176 (Kathy E. Hanna ed., 1991), https://www.ncbi.nlm.nih.gov/books/NBK234191/.

[8] Williams Decl. ¶ 42; *see* U.S. Gov't Accountability Off., (GAO-11-36), *End-Stage Renal Disease: CMS Should Assess Adequacy of Payment When Certain Oral Drugs are Included and Ensure Availability of Quality Monitoring Data* 2 n.6 (2011), https://www.gao.gov/assets/gao-11-365.pdf.

Erythropoiesis-Stimulating Agent ("ESA")[9] that treats anemia in ESRD patients, was a separately billable injectable drug for which dialysis facilities received reimbursement under Medicare Part B outside of the composite rate.  *See* U.S. Gov't Accountability Off.*, (GAO-07-77), *End-Stage Renal Disease: Bundling Medicare's Payment for Drugs with Payment for all ESRD Services Would Promote Efficiency and Clinical Flexibility* 1, 5 (2006), https://www.gao.gov/assets/gao-07-77.pdf [hereinafter "GAO 2006 Report"].  Orally administered drugs, by contrast, are covered separately under Medicare Part D, which offers prescription drug coverage for self-administered drugs. 75 Fed. Reg. at 49,040 (referring to "oral equivalent forms of injectable drugs, which are currently furnished by pharmacies under Part D"); Williams Decl. ¶ 42.

### C.     The Creation Of The Modern ESRD PPS "Bundle"

In 2003, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 "required CMS to design a system that would no longer pay for each injectable ESRD drug under a separate rate but would bundle payment for these drugs together with other ESRD items and services under a single rate."  GAO 2006 Report 6.  CMS, however, failed to meet benchmarks set by Congress in relation to the development and testing of such a system.  *See id.*

In 2008, Congress took action itself by enacting MIPPA, codified today at 42 U.S.C. § 1395rr.  MIPPA directs CMS to implement a bundled payment system for "renal dialysis services" under which a single payment is made to dialysis facilities for certain items, drugs, and tests, in lieu of any other separate payment for these materials.  *Id.* § 1395rr(b)(14)(A)-(B).  Under the ESRD PPS bundle system, dialysis facilities receive—in general—the same amount per dialysis treatment per patient,[10] regardless of the specific individual costs incurred to treat that

---

[9] A drug that stimulates the production of red-blood cells.

[10] Pursuant to a combination of statutory and regulatory criteria, this base rate paid to a given

patient.[11]  Although dialysis facilities may be eligible for an "outlier payment" when they incur

unusually high costs for treating particular patients, those payments do not come close to fully

reimbursing dialysis facilities for that additional cost of care.  *See* 42 C.F.R. § 413.237.  In fact,

outlier payments represent less than 1% of total Medicare payments for ESRD patients.  88 Fed.

Reg. 76,344, 76,345-46 (Nov. 6, 2023).

Congress's expectation for the bundled payment was that it would lead dialysis facilities

to operate more efficiently because the provider would "retain the difference if Medicare's

payment exceeds the costs they incur to provide the services."  GAO 2006 Report at 22.  In

practice, however, CMS has come to set the bundled payment rate at an amount which barely

covers a dialysis facility's cost of care.  Compl. ¶ 9; Williams Decl. ¶ 66.  In 2023, the Medicare

Payment Advisory Commission, a nonpartisan legislative-branch agency, even calculated that the

bundled payment and the rising cost of care resulted in dialysis facilities experiencing *negative*

*margins* when treating Medicare patients.  Compl. ¶ 172; Clynes Decl. ¶ 19.[12]

CMS also has been criticized for failing to "sufficiently reimburse for new, innovative

products."  Compl. ¶ 10.[13]  Following a short period in which CMS may temporarily provide

additional reimbursement to dialysis facilities in relation to their use of new drugs, CMS withdraws

---

[11] Center for Medicare Services, End Stage Renal Disease (ESRD) Prospective Payment System (PPS), available at https://www.cms.gov/medicare/payment/prospective-payment-systems/end-stage-renal-disease-esrd.

facility may be adjusted to account for certain geographic differences in wages, whether the facility serves a rural area, and other similar considerations.  *See* 42 U.S.C. § 1395rr(b)(14)(D) (listing payment adjustments); 42 C.F.R. § 413.20 (similar).

[12] *See also* Medicare Payment Advisory Comm'n, 2023 Report to the Congress – Medicare Payment Policy, at 194 (Mar. 2023), https://www.medpac.gov/wp-content/uploads/2023/03/Mar23_MedPAC_Report_To_Congress_v2_SEC.pdf.

[13] *See* Congressional Kidney and Health Care Innovation Caucuses, Letter to Chiquita Brooks-LaSure (Oct. 2, 2023), https://kidneycarepartners.org/wp-content/uploads/2023/10/CY24-ESRD-Innovation-Letter-Final.pdf.

that reimbursement in favor of small adjustments to the bundled rate—adjustments that need not support the full cost to a dialysis facility of acquiring and administering that treatment.[14] As a consequence, dialysis facilities are disincentivized from adopting treatment approaches—and novel drugs in particular—that would increase their cost of treatment beyond the bundled payment amount.   As Congressional leaders have recognized, this financial challenge causes dialysis facilities to "hesitate to adopt new products" and diminishes patients' long-term access to needed medical care.  *Id.* ¶ 10.[15]

**D.    CMS Acts To Add Oral-Only Drugs Into The ESRD PPS Bundle**

The ESRD PPS bundled "single payment is made . . . for renal dialysis services (as defined in subparagraph (B))."  42 U.S.C. § 1395rr(b)(14)(A).  Congress defined the set of "renal dialysis services" for which dialysis providers receive a bundled payment as follows:

(B) For purposes of this paragraph, the term "renal dialysis services" includes—

(i)    items and services included in the composite rate for renal dialysis services as of December 31, 2010;

(ii)   erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;

(iii)  other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and

---

[14] *See* Compl. ¶¶ 9-10; 89 Fed. Reg. 55,760, 55,797 (July 5, 2024); Congressional Kidney and Health Care Innovation Caucuses, Letter to Chiquita Brooks-LaSure (Oct. 2, 2023), https://kidneycarepartners.org/wp-content/uploads/2023/10/CY24-ESRD-Innovation-Letter-Final.pdf.

[15] *See* Congressional Kidney and Health Care Innovation Caucuses, Letter to Chiquita Brooks-LaSure (Oct. 2, 2023), https://kidneycarepartners.org/wp-content/uploads/2023/10/CY24-ESRD-Innovation-Letter-Final.pdf.

(iv)  diagnostic laboratory tests and other items and services not
described in clause (i) that are furnished to individuals for the
treatment of end stage renal disease.

42 U.S.C. § 1395rr(b)(14)(B).

Under the statute's express terms, orally-administered drugs qualify as "renal dialysis services" only when they are (1) oral forms of ESAs under clause (ii); or (2) "oral equivalent forms" of "other drugs and biologicals that are furnished to individuals for the treatment of [ESRD]" under clause (iii).  That accords with the fact that dialysis facilities have not historically administered "oral-only" drugs to ESRD patients, let alone as part of dialysis.  Williams Decl. ¶¶ 42, 45, 47-49.  As a result, there would have been little need to account for the cost of such drugs in the single bundled payment made *to dialysis facilities* for each *dialysis treatment*.  *See id.*  And unless such oral-only drugs were equivalent to injectable drugs that would otherwise be administered by dialysis facilities, inclusion of such drugs within the bundled payment would not promote the efficient use of resources by dialysis facilities when providing renal dialysis services.

In 2009, CMS issued a proposed rule to implement the bundled payment system created by MIPPA beginning in 2011.  74 Fed. Reg. 49,922, 49,922 (Sept. 29, 2009).  Despite the fact that Congress only directed that a subset of orally administered drugs be included within the bundle, CMS proposed to interpret 42 U.S.C. § 1395rr(b)(14)(B) so as not to limit the oral drugs qualifying as "renal dialysis services" to the "oral form" of ESAs or the "oral equivalent form" of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease." 74 Fed. Reg. at 49,928.  Instead, CMS proposed to include in the ESRD PPS *all* drugs and biologicals furnished to individuals for ESRD treatment, including those with only an oral form.

CMS justified the inclusion of oral-only drugs in the regulatory definition of "renal dialysis services" in 42 C.F.R. § 413.171 on policy grounds.  It reasoned that "the exclusion of oral drugs

. . . for which there is no injectable equivalent (or other non-oral form of administration) from the ESRD PPS would defeat one of the very *purposes* of the new system—the inclusion of all renal dialysis services furnished to ESRD patients in a comprehensive payment bundle to which a reasonable payment amount can be attached empirically."  74 Fed. Reg. at 49,928 (emphasis added).  CMS also rationalized that "the exclusion of oral drugs and biologicals for which there is no injectable (or other non-oral) version does not make sense from a payment-policy perspective," as it could over time result in the growth of services excluded from its bundled payment.  *Id.*

CMS also sought to square its newly proposed regulation in § 413.171 with the statute.  It posited that 42 U.S.C. § 1395rr(b)(14)(B)(iii) defines "renal dialysis services" to include "other drugs and biologicals … for which payment was (before the application of this [paragraph]) made separately under this title and any oral equivalent form of such drug or biological."  *Id.* at 49,927-28.  CMS found the reference to "this title" to "requir[e] the inclusion in the ESRD PPS payment bundle" of any drug that would have been payable under Medicare Part B and D, including oral-only drugs.  CMS acknowledged that "an alternative reading of the last part of clause (iii) with respect to the phrase 'and any oral equivalent form of such drug or biological' could be interpreted to limit the scope of the drugs and biologicals included in the bundle to *only oral versions of injectables* (or other non-oral routes of administration)."  *Id.* at 49,928 (emphasis added).  CMS rejected that reading, however, as "unduly constrained."  *Id.*  Instead, it interpreted clause (iii) to "include all drugs and biologicals" used to treat ESRD that would have been separately payable under either Medicare Part B or Part D, "regardless of the route of administration."  *Id.*  CMS finally suggested that clause (iv), which addressed "other items and services not covered in clause (i)," also provided "sufficient authority to include all drugs and biologicals, including oral-only drugs and biologicals, used to treat ESRD in the ESRD PPS payment bundle."  *Id.*

Most comments on the proposed regulation opposed the inclusion of oral-only drugs in the bundle, and "many" focused on CMS's improper expansion of the statutory definition to include these oral-only drugs. *See* 75 Fed. Reg. at 49,038 (criticizing CMS reading as "a misreading of statutory intent and violat[ing] principles of statutory construction").  In questioning CMS's proposal, various commentors also noted that the statute "focuses on payments to ESRD facilities," and argued "that the four categories of renal dialysis services specified in [§ 1395rr(b)(14)(B)] only pertain to services furnished for which payment is made to ESRD facilities." *Id.*

Commentors also criticized CMS's construction of clause (iv) to encompass any drugs for the treatment of ESRD not included in clause (i), noting that such a construction "violates a principle of statutory construction, by making clauses (ii) and (iii) otherwise redundant." *Id.* at 49,039.  CMS acknowledged that under its reading, "several of the clauses of the definition could be viewed as superfluous." *Id.* at 49,040.  Although it acknowledged its overall reading of the statute rendered parts of the definition of "renal dialysis services" "overlapping or redundant," it suggested that the statute should be read broadly to "wrap[] in all items and services related to outpatient renal dialysis that are furnished to individuals for the treatment of ESRD." *Id.*

Many commenters expressed concern that CMS's proposed regulation would undermine the statute's purpose and harm patients, explaining that because dialysis providers "would be liable for the difference if costs exceeded Medicare payments," adding oral-only drugs into the bundle would result in "unintended clinical consequences for patients as ESRD facilities seek to maximize profits by resorting to cheaper but less effective alternatives" to oral-only drugs. *Id.* at 49,032, 49,040.  CMS admitted that including oral-only drugs in the bundle could indeed result in "underutilization." *Id.* at 49,041.  CMS nonetheless implemented the ESRD PPS in the CY 2011 ESRD PPS final rule (75 Fed. Reg. 49,030) and adopted its own regulatory definition of "renal

dialysis services" at 42 C.F.R. § 413.171.   But, perhaps recognizing its rule could engender a radical impact on dialysis facilities and patients, CMS decided to delay the inclusion of oral-only drugs in the ESRD PPS bundle until 2014, pending an evaluation of the "potential impact on dialysis facilities, particularly small dialysis facilities" which would "assess potential problems which may arise in connection with the provision of oral drugs."  *Id.* at 49,043-44.

###### E. Congress Repeatedly Prevents CMS From Implementing The Inclusion Of Oral-Only Drugs Into The ESRD PPS Bundle

Congress has repeatedly delayed CMS's plan to place oral-only drugs into the bundled payment system.  In 2012, Congress prevented CMS from including oral-only drugs in the ESRD PPS bundle until January 1, 2016.  *See* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 632(b), 126 Stat. 2313 (2012).  In 2014, Congress again delayed the implementation of the oral-only drug inclusion in the Protecting Access to Medicare Act of 2014 (PAMA), preventing CMS from including oral-only drugs until 2024.  Pub. L. No. 113-93 § 217(a)(1), 128 Stat. 1040, 1061 (2014).  Later that same year, Congress delayed the implementation until 2025.  Achieving a Better Life Experience Act of 2014, Pub. L. No. 113-295, § 401, 128 Stat. 4010, 4056 (2014).

In response to this legislation, CMS updated its regulations to state that "[e]ffective January 1, 2025, payment to an ESRD facility for renal dialysis service drugs and biologicals with only an oral form furnished to ESRD patients is incorporated within the prospective payment system rates established by CMS . . . and separate payment will no longer be provided."  42 C.F.R. § 413.174(f)(6); *see also* 80 Fed. Reg. 68,968, 69,027-28 (Nov. 6, 2015) (finalizing this language).

Therefore, despite CMS's initial 2011 rulemaking and promulgation of 42 C.F.R. § 413.171, stakeholders have not had to contend with the potential impact of CMS's regulation until very recently, as the 2025 deadline approached and CMS began to take action to apply its regulations and place oral-only drugs into the bundled payment system, as detailed below.

F.        Ardelyx's XPHOZAH

Many ESRD patients suffer from a variety of comorbidities, including hypertension, diabetes, cardiovascular disease ("CVD"), and hyperphosphatemia—the condition of having too much phosphate in the body.  Williams Decl. ¶¶ 12-14, 18.  Hyperphosphatemia is associated with a higher risk of cardiovascular mortality, and it can also lead to the progression of bone disorders. *Id.* ¶ 19.  Managing phosphate levels is therefore important for patients with hyperphosphatemia.[16]

Approximately 80% of ESRD patients on maintenance dialysis have hyperphosphatemia. Williams Decl. ¶ 18.   A substantial number of ESRD patients do not have hyperphosphatemia, however.  *Id*.  And some patients have hyperphosphatemia, but not ESRD.  Indeed, one study found hyperphosphatemia in roughly one out of eight patients admitted to a hospital—*excluding* patients with ESRD.[17]   In this way, hyperphosphatemia is much like hypertension and diabetes: Many patients with ESRD also have these conditions; some patients with ESRD do not have these conditions; and some patients without ESRD do have these conditions.  *See id.* ¶ 13.

Nephrologists generally manage hyperphosphatemia by prescribing a range of phosphate lowering therapies.  As first-line therapies, many patients are prescribed phosphate binders, which lower phosphate levels in the body by binding to excess phosphate molecules in the gastrointestinal tract and preventing them from reaching the bloodstream.  *Id.* ¶ 22.  But not all patients have an adequate response to phosphate binders alone, meaning their blood phosphate levels are still too

---

[16] *Id.* ¶ 20; *see also, e.g.*, Dominik G. Haider et al., *Hyperphosphatemia is an Independent Risk Factor for Morality in Critically Ill Patients: Results from a Cross-Sectional Study*, 10 PLOS ONE (Aug. 7, 2015), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0133426.

[17] Charat Thongprayoon, et al., *Admission hyperphosphatemia increases the risk of acute kidney injury in hospitalized patients*, 2 J. Nephrology 241-47 (Apr. 31, 2018), https://pubmed.ncbi.nlm.nih.gov/28975589/; *see also* Merck Manual, Hyperphosphatemia, https://www.merckmanuals.com/professional/endocrine-and-metabolic-disorders/electrolyte-disorders/hyperphosphatemia (noting causes other than ESRD).

high even with treatment. *Id.* ¶ 24. Indeed, approximately 70% of ESRD patients are unable to maintain target phosphate levels despite treatment with phosphate binders.[18]

Enter XPHOZAH, a novel therapy developed by Ardelyx that reduces serum phosphorus levels. XPHOZAH first became available to patients in October 2023 following approval by the FDA. Williams Decl. ¶ 28. XPHOZAH is a first-in-class phosphate absorption inhibitor. Unlike phosphate binders, which bind to phosphate, XPHOZAH *blocks* phosphate absorption at the primary cellular pathway. Williams Decl. ¶ 30. XPHOZAH provides the first new mechanism of action to reduce phosphate in over five decades. *Id*. XPHOZAH is "indicated to reduce serum phosphorus in adults with chronic kidney disease (CKD) on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."[19] It is therefore indicated to treat patients for whom phosphate binders have proven insufficient or are otherwise not a treatment option. Ex. 1, XPHOZAH Label at 1.

XPHOZAH is not distributed or administered by dialysis facilities, nor is it taken during dialysis. Williams Decl. ¶ 39. Instead, like other phosphate-lowering therapies, XPHOZAH is prescribed by nephrologists and distributed through pharmacy providers. *Id*. While dialysis is typically performed three times a week, XPHOZAH is taken twice daily, just prior to the first and last meals of the day. *Id.* ¶ 37. Like all other current phosphate-lowering therapies, XPHOZAH must be orally ingested to achieve its therapeutic effect, which targets the gastrointestinal tract. *Id.* ¶ 33; Ex. 2 at 16. XPHOZAH is not administered as part of the delivery of maintenance

---

[18] *Id.* ¶ 25; Pablo E. Pergola, *Phosphate Frustration: Treatment Options to Complement Current Therapies*, Int'l J. Nephrology (Aug. 22, 2022), www.ncbi.nlm.nih.gov/pmc/articles/PMC9424003/.

[19] Ex. 1, U.S. Food & Drug Admin., XPHOZAH Label 2 (Oct. 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/213931s000lbl.pdf; Ardelyx, *XPHOZAH*, http://xphozah-hcp.com/

dialysis.  Williams Decl. ¶¶ 36-39.[20]  In fact, XPHOZAH's label makes clear "[p]atients should be counseled not to take XPHOZAH right before a hemodialysis session."  Williams Decl. ¶ 37. XPHOZAH is currently covered under Medicare Part D, like other self-administered drugs.  *Id.* ¶ 54; Ex. 8 (XPHOZAH Decision) at 1-2; Ex. 3 (Comment to ESRD PPS Proposed Rule) at 3-4.

### G.    CMS Plans To Add Oral-Only Drugs To The ESRD PPS Bundle, Including XPHOZAH

On April 29, 2024, CMS issued guidance entitled "Including Oral-Only Drugs in the ESRD PPS Bundled Payment," with an effective date and implementation date of January 1, 2025.  Ex. 7.  CMS explained that "[u]nder 42 C.F.R. § 413.174(f)(6), effective January 1, 2025, payment to an ESRD facility for renal dialysis service drugs and biologicals with only an oral form furnished to ESRD patients is incorporated within the prospective payment system rates established by CMS in § 413.230 and separate payment will no longer be provided."  *Id.* at 1.

Additionally, on May 13, 2024, CMS sent a letter to Laura Williams, M.D., Chief Medical Officer of Ardelyx.  Ex. 8 (XPHOZAH Decision).  In its XPHOZAH Decision, CMS set forth that "CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171, because it is furnished to individuals to treat a condition associated with ESRD and is essential to the delivery of maintenance dialysis. Specifically, it is used as an add-on therapy in patients with chronic kidney disease who are on dialysis who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  *Id.* at 1.  CMS also explained that "beginning January 1, 2025, all renal dialysis services, including oral-only drugs, will be incorporated into the ESRD PPS, and no separate payment under Medicare Part D will be made

---

[20] XPHOZAH is also not taken during dialysis because its side effects could lead to dehydration and low sodium levels, which are dangerous during a dialysis session.  *See* Ex. 1, XPHOZAH Label at 2.

for any oral-only renal dialysis drugs.  This will include XPHOZAH." *Id.*

CMS reiterated that it would begin to apply its regulations to oral-only drugs effective January 1, 2025, in a further Notice issued July 5, 2024.  89 Fed. Reg. 55,760, 55,796-97 (2024).

On July 17, 2024, Plaintiffs filed their Complaint, asserting that CMS's regulations, which purport to dictate that oral-only drugs are to be included in the ESRD PPS bundle, as well as CMS's XPHOZAH Decision itself, are contrary to law and arbitrary and capricious.  ECF No. 1.

## ARGUMENT

The factors for evaluating motions for preliminary injunction weigh strongly in favor of Plaintiffs' motion.  In particular, (1) Plaintiffs are "likely to succeed on the merits," (2) Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, *Inc.*, 555 U.S. 7, 20 (2008).   Accordingly, preliminary relief is warranted. Alternatively, because there is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law, expedited summary judgment is merited.  *See* Fed. R. Civ. P. 56.

Defendants' challenged regulation at 42 C.F.R. § 413.171 and the XPHOZAH Decision applying that regulation are unlawful.  In creating a bundled payment scheme to promote the efficient delivery of "renal dialysis services" by dialysis providers, Congress adopted a definition of "renal dialysis services" that excluded oral-only therapies—which were not delivered by dialysis providers during dialysis.  CMS's determination to treat oral-only drugs, including XPHOZAH, as "renal dialysis services" pursuant to its regulations is therefore contrary to law.

CMS's XPHOZAH Decision independently violates the APA for two additional reasons. To qualify as a "renal dialysis service" eligible for the ESRD PPS bundle under the operative regulations, a drug must be "a treatment for end stage renal disease" and "essential for the delivery

18

of maintenance dialysis." 42 C.F.R. § 413.171. XPHOZAH is neither. XPHOZAH reduces absorption of phosphorus into the bloodstream; it does not treat end stage renal disease. And it is not even indicated for *use* during maintenance dialysis; it certainly is not essential to its delivery.

The other factors likewise favor preliminary or at least expedited relief. A broad cross-section of kidney-care stakeholders has warned that the movement of oral-only therapies, like XPHOZAH, into the ESRD PPS bundle will frustrate utilization, discourage innovation, and harm patients in the short and long term. Plaintiffs will face immediate and irreparable harm beginning January 1, 2025 absent court action, while complying with governing law will not harm Defendants. The equitable factors therefore likewise weigh in Plaintiffs' favor.

Because the issues here are legal in nature, Plaintiffs request consolidation of preliminary relief with an ultimate determination on the merits under Fed. R. Civ. P. 65(a)(2). *See, e.g.*, *Peri & Sons Farms, Inc. v. Acosta*, 374 F. Supp. 3d 63, 70 (D.D.C. 2019). In the alternative, if the Court agrees with Plaintiffs on the merits but disagrees that the equitable factors weigh in their favor, Plaintiffs respectfully request this Court grant expedited summary judgment in their favor.[21]

---

[21] On September 17, 2024, Defendants filed a motion to dismiss the Complaint on the sole ground that this Court purportedly lacks jurisdiction. Defendants are wrong. Relying on 42 U.S.C. § 1395rr(b)(14)(G), which precludes judicial review of "the identification of renal dialysis services included in the bundled payment," Defendants argue that this Court lacks jurisdiction to consider "CMS['s] recent[] identifi[cation of] the drug XPHOZAH as a 'renal dialysis service.'" Dkt. 11-1 at 2. To begin with, 42 U.S.C. § 1395rr(b)(14)(G) addresses only the identification of particular renal dialysis services included in the bundled payment. It does not preclude a challenge—such as Plaintiffs make in part here—to CMS's promulgation of a *regulation* expanding the definition of "renal dialysis services" beyond that which Congress authorized. As the D.C. Circuit has made clear, moreover, provisions like § 1395rr(b)(14)(G) will "prevent review only of those [determinations] that the Medicare Act authorizes the Secretary to make; in other words, the preclusion on review of [determinations] extends no further than the Secretary's statutory authority to make them." *Amgen Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004). Because Defendants lack statutory authority to designate oral-only drugs as renal dialysis services, § 1395rr(b)(14)(G) does not strip this court of authority to consider Plaintiffs' challenge to Defendants' contrary regulation. Even with respect to Plaintiffs' challenge to Defendants' XPHOZAH Decision in

I.   **DEFENDANTS' PLACEMENT OF ORAL-ONLY DRUGS INTO THE ESRD PPS BUNDLE IS UNLAWFUL**

In enacting MIPPA, Congress directed CMS to make a single bundled payment to dialysis providers for the provision of "renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(A).  In so doing, Congress sought to promote efficiency in the provision of renal dialysis services by dialysis providers.  Accordingly, Congress defined "renal dialysis services" to reach defined categories of services administered by dialysis providers in the course of providing dialysis.  And CMS itself interpreted Congress's directive to exclude services "that are not essential for the delivery of maintenance dialysis."  42 C.F.R. § 413.171(5).

Notwithstanding the above, CMS has decided to now treat as "renal dialysis services" oral-only drugs—like XPHOZAH—that are not administered by dialysis providers, nor even *provided* in the course of renal dialysis, let alone essential for the delivery of maintenance dialysis.  CMS's action conflicts with the operative statute and its own regulations, and is entirely unlawful.

A.   **The Placement Of Oral-Only Drugs Into The ESRD PPS Bundle Conflicts With The Statutory Definition Of "Renal Dialysis Services"**

Pursuant to MIPPA, Congress defined "renal dialysis services" to include four categories of services provided by dialysis facilities in the course of providing dialysis.  42 U.S.C. § 1395rr(b)(14)(B).  In so doing, Congress provided that only two categories of oral drugs be included within the bundled payment: the "oral form" of an erythropoiesis stimulating agent, and the "oral equivalent form" of a "drug[] or biological[] . . . furnished to individuals for the treatment of end stage renal disease."  *Id.* at 1395rr(b)(14)(B)(ii)-(iii).  Because an oral-only drug falls within

---

particular, however, *infra* at 31-37, § 1395rr(b)(14)(G) is inapplicable to Plaintiffs' specific challenges.  Plaintiffs will respond to Defendants' jurisdictional argument in more detail in their forthcoming opposition to Defendants' motion to dismiss, as well as in reply to Defendants' opposition to this motion, should they raise their jurisdictional argument in response to this motion.

neither category, CMS's inclusion of such drugs within the bundle pursuant to its regulation in 42 C.F.R. § 413.171 is contrary to law and in excess of statutory authority.  5 U.S.C. § 706.

It is a "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Citrus HMA, LLC v. Becerra*, 597 F. Supp. 3d 450, 459 (D.D.C. 2022); *see also Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) ("[[W]ords generally should be interpreted as taking their ordinary, contemporary, common meaning . . . ."). As the Supreme Court recently clarified in overruling *Chevron*, courts are obligated to exercise their independent judgment in determining the "best reading" of the statute, *i.e.*, the "reading the court would have reached if no agency were involved." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).  At base, a court must exercise "independent judgment in deciding whether an agency has acted within its statutory authority."  *Id.* at 2273.

Here, the statutory provision establishing the ESRD PPS bundle generally provides that the bundled payment is made "to a provider of services or a renal dialysis facility *for renal dialysis services (as defined in subparagraph (B))*."  42 U.S.C. § 1395rr(b)(14)(A) (emphasis added). Congress's definition of "renal dialysis services" consists of four subparts:

> (i)   items and services included in the composite rate for renal dialysis services as of December 31, 2010;
>
> (ii)  erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;
>
> (iii) other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and
>
> (iv)  diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease.

42 U.S.C. § 1395rr(b)(14)(B).  Oral-only drugs come within none of these subparts.

*Clauses (i) and (ii).*  It is undisputed that neither oral-only drugs in general, nor XPHOZAH in particular, fall within the scope of clause (i) or (ii):  CMS has never argued otherwise.  *See* 74 Fed. Reg. at 49,922; 75 Fed. Reg. at 49,030.  Clause (i) is limited to "items and services" already included in the "composite rate for renal dialysis services," as of December 31, 2010.  *Id.* at 49,036.  As of December 31, 2010, there were no-oral-only drugs included in the composite rate for renal dialysis services, nor did dialysis facilities administer such drugs.  *Supra* at 7-14.  XPHOZAH, of course, also was not approved by the FDA until over a decade later, in 2023.  Williams Decl. ¶ 28.[22]  Likewise, clause (ii) is limited to "erythropoiesis stimulating agents" (drugs that stimulate the production of red-blood cells) and "any oral form of such agents," thereby excluding XPHOZAH and other oral-only drugs that are not ESAs.  *See* 75 Fed. Reg. at 49,036.

*Clause (iii).*  In proposing to incorporate oral-only drugs into the ESRD bundle under 42 C.F.R. § 413.171, CMS principally relied on clause (iii), which encompasses "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this [paragraph]) made separately under this title"—*i.e.,* outside the composite rate system—"and any oral equivalent form of such drug or biological." Despite that nuanced definition, CMS interpreted this provision "to include *all* drugs and biologicals formerly payable under either Medicare Part B or Part D used to treat ESRD, *regardless of the route of administration.*" 74 Fed. Reg. at 49,927-28 (emphasis added); 75 Fed. Reg. at 49,038 (same).  CMS thus redefined "renal dialysis services" to include "drugs . . . with only an

---

[22] *See also* Ex. 3 (Ardelyx Comment to CY 2024 ESRD PPS Proposed Rule (Aug. 21, 2023)); *see also* Ardelyx Press Release, FDA Approves XPHOZAH® (tenapanor), a First-in-Class Phosphate Absorption Inhibitor (Oct. 17, 2023), https://ir.ardelyx.com/news-releases/news-release-details/fda-approves-xphozahr-tenapanor-first-class-phosphate-absorption (stating FDA approved XPHOZAH in October 2023).

oral form," 42 C.F.R. § 413.171(3), and applied that new regulation in the XPHOZAH Decision, Ex. 8 at 1 ("CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171").

All of that is untenable.  By its express terms, clause (iii) does not define "renal dialysis services" to include *all* drugs.  Rather, it includes only a particular subset of drugs: "other drugs" furnished "for the treatment of end stage renal disease"—*i.e.*, "other" drugs not included in clauses (i) or (ii)—for which payment was made separately under this title, as well as "any oral *equivalent* form *of such drug or biological*."  42 U.S.C. § 1395rr(b)(14)(B)(iii) (emphasis added).  Clause (iii) thus reaches only "oral" drugs that are the "*equivalent*" of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease" and for which payment had been made by Medicare under a separate Medicare provision (like Medicare Part B).  *Id.*

That text accords with MIPPA's purpose.  MIPPA was designed to promote cost-effective provision of renal dialysis services.  When MIPPA was enacted, however, drugs and biologics furnished to patients by dialysis facilities for the treatment of ESRD were generally administered intravenously or by injection during dialysis, not orally.  *Supra* at 7-8, 10-11.  The inclusion of oral-only drugs would have done little, therefore, to advance Congress's goals of deterring *dialysis facilities* from overusing then-profitable, separately billable drugs or promoting operational efficiency at such facilities.  *See* 75 Fed. Reg. at 49,032 (ESRD bundle was intended to "reduc[e] incentives to overuse profitable separately billable drugs" and promote "operational efficiency").  So it would have made little sense to define "renal dialysis services" to encompass oral-only drugs neither provided by dialysis facilities, nor administered as part of renal dialysis services.[23]

---

[23] By contrast, extending the bundled payment to encompass the "oral equivalent form" of an injectable drug or biological administered by a dialysis facility during renal dialysis serves MIPPA's purpose by facilitating the use of generally less expensive oral equivalents to drugs that a dialysis facility would otherwise administer during dialysis.

CMS itself recognized that "an alternative reading of the last part of clause (iii) with respect to the phrase 'and any oral equivalent form of such drug or biological' could be interpreted to limit the scope of the drugs and biologicals included in the bundle to only oral versions of injectables." 74 Fed. Reg. at 49,928 (emphasis added).  CMS disagreed with that outcome as a matter of *policy*.[24] *Id.*  It therefore dismissed that construction as "unduly constrained."  *Id.*  But in implementing the statute, CMS was not free to "rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see also Council for Urological Interests v. Burwell*, 790 F.3d 212, 228 (D.C. Cir. 2015) ("An agency crosses an impermissible line when it moves from interpreting a statute to *rewriting* it.").

That is exactly what CMS did.  42 U.S.C. § 1395rr(b)(14)(B)(iii) defines "renal dialysis services" to include "other drugs and biologicals . . .  for the treatment of end stage renal disease . . . and any oral equivalent form of such drug or biological."  But CMS altered that language when interpreting that provision in 42 C.F.R. § 413.171, effectively removing the struck through language below from the statute and replacing it with the bolded regulatory text.

> (3) Other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was (prior to January 1, 2011) made separately under Title XVIII of the Act (~~and any oral equivalent form of such drug or biological~~ **including drugs and biologicals with only an oral form**) . . .

*See* 42 C.F.R. § 413.171.  In effect, CMS rewrote clause (iii) of the statute to cover "*all* other drugs

---

[24] Ironically, CMS's policy concerns were backwards.  Numerous stakeholders, from patient groups to physicians to drug manufacturers to dialysis providers, have repeatedly warned CMS that the inclusion of oral-only drugs into the bundle is bad policy that will undermine health outcomes and harm patients.  Clynes Decl. ¶ 35; Puckrein Decl. ¶ 38; Williams Decl. ¶¶ 77-78.  Not only that, placing oral-only drugs into the bundle will increase the cost to patients who are ill-suited to pay it; indeed, CMS itself admits that placing oral phosphate binders into the bundle alone will impose $130 *million* in additional costs on ESRD patients who are disproportionately low income and unemployed.  *See* 89 Fed. Reg. 55,760, 55,827 (July 5, 2024).

and biologicals" that treat ESRD and would otherwise have been paid for outside the composite rate system.  Had Congress intended clause (iii) to cover "all drugs and biologicals that treat ESRD," it could easily have said so, using far fewer and simpler words.  *See Wint v. Yeutter*, 902 F.2d 76, 82 (D.C. Cir. 1990) (agency properly eschewed "all-inclusive definition" because "Congress could have said simply 'all plaints' if Congress had indeed meant just that").  It did not. It should be unsurprising, therefore, that "many comment[er]s" criticized CMS's interpretation of clause (iii) as "a misreading of statutory intent" that "violates principles of statutory construction." 75 Fed. Reg. at 49,038.  Fundamentally, the "best reading" of clause (iii) excludes oral-only drugs, *Loper Bright*, 144 S. Ct. at 2266.[25]  CMS's contrary regulatory construction should be rejected.

Notably, Congress expressly considered and *rejected* legislation that would have amended clause (iii) to expand the definition of "renal dialysis services" to include oral-only drugs.  One year after the enactment of MIPPA, the House of Representatives introduced a bill that would have amended clause (iii) to read as follows (*italicized text* would have been added):

> (iii) Other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this title, and any oral equivalent form of such drug or biological *including oral drugs that are not the oral equivalent of an intravenous drug (such as oral phosphate binders and calcimimetics).*

---

[25] CMS's regulatory interpretation would negate Congress's decision to carefully prescribe the types of drugs that fall within its definition of "renal dialysis services."  Interpreting clause (iii) to exclude oral-only drugs accords with Congress's choice in clause (ii) to specifically instruct that ESAs, and any oral form of such agents, are encompassed within the definition of renal dialysis services.  Had Congress intended for *all* injectable and oral treatments provided to ESRD patients to fall within the scope of "renal dialysis services," there would have been no need to specify that renal dialysis services extend to "erythropoiesis stimulating agents and any oral form of *such agents.*"  42 U.S.C. § 1395rr(b)(14)(B)(iii).  To give effect to Congress's decision to separately identify ESAs and other drugs and biologicals, and then to specifically include only oral *equivalent* forms of *such* agents, drugs, or biologicals, the statute is best read to exclude oral-only drugs for which there is no equivalent, non-oral agent, drug, or biological.

H.R. 3200, 11th Cong. § 1232 (2009), America's Affordable Health Choices Act of 2009 (emphasis added).  But Congress chose not to adopt this statutory language, which would have adopted CMS's preferred construction of clause (iii) and extended that definition to "oral drugs that are not the oral equivalent of an intravenous drug."  The fact that Congress considered but did not adopt a proposal to specifically include oral-only drugs in the ESRD PPS further underscores that CMS's contrary construction is inconsistent with MIPPA's language.  *See, e.g.*, *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1578 (D.C. Cir. 1984) ("Where Congress has so explicitly and deliberately considered, and then rejected, a more expansive requirement than that ultimately enacted, it is not for the agency to exceed the statutory limits under the guise of 'interpretation.'").

*Clause (iv).*  Perhaps recognizing the tenuous nature of its interpretation of clause (iii), CMS also suggested that "if oral-only drugs are not considered to fall within clause (iii) of the statutory definition . . . [it] believe[d] that such drugs would appropriately fall under clause (iv)." 75 Fed. Reg. at 49,040; *see also* 74 Fed. Reg. at 49,928 (asserting the inclusion of oral-only drugs is "supportable under clause (iv)").  Clause (iv) directs CMS to include in the bundle "diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iv).  In its 2011 rulemaking, CMS suggested clause (iv) "can be interpreted as a residual or catch all category for drugs which do not fall under the scope of those renal dialysis services identified in clauses (ii) and (iii)," including oral-only drugs that "do not fall under the scope of those specified renal dialysis services identified in clauses (ii) and (iii)."  75 Fed. Reg. at 49,039.

CMS's "catch-all" reading of clause (iv) is impermissible because it negates Congress's choice to enumerate specific categories of drugs as falling within the definition of "renal dialysis services."  Congress chose to reference particular "oral" or "oral equivalent" forms of "*such*" drugs

or agents—which means that these are the *only* oral drugs covered.  *See, e.g.*, A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*  107 (2012) ("Negative-Implication Canon[:] The expression of one thing implies the exclusion of others."); *see also Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) (same).  If Congress intended *all* drugs (or even all *oral* drugs) furnished to individuals for the treatment of ESRD to qualify as "renal dialysis services," there would have been no need to more narrowly define other drugs, biologicals, and oral equivalent forms of such drugs and biologicals in clauses (ii) and (iii).

Put another way, if clause (iv) was interpreted, as CMS has suggested, to encompass *all* drugs for the treatment of ESRD not incorporated by clause (i), it would render clauses (ii) and (iii) superfluous:  Any drug, biological, or oral equivalent form that falls within clauses (ii) and (iii) necessarily would qualify as "items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iv); *see also Air Transp. Ass'n of Am., Inc. v. United States Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022) ("It is a familiar canon of statutory construction that, if possible, we are to construe a statute so as to give effect to every clause and word.") (citations omitted); *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019) (courts "presum[e]" that laws do not contain "surplusage").

CMS appeared to recognize, in response to comments, that it would "violate[] a principle of statutory construction [to] mak[e] clauses (ii) and (iii) otherwise redundant."  75 Fed. Reg. at 49,039.  To that end, it conceded that clause (iv) "does not mean all drugs currently available to Medicare beneficiaries for the treatment of ESRD."  *Id.*  But it believed that clause (iv) "can be interpreted as a residual or catch all category for drugs which do not fall under the scope of those specified renal dialysis services identified in clauses (ii) and (iii)."  *Id.*  That ignores clause (iv)'s actual language, which speaks to "laboratory tests and other items and services not described in

clause (i)," not to drugs which are not described in *clause* (*ii*) and *clause* (*iii*). *Id.* at 49,040. Clause (iv) therefore cannot be interpreted to encompass all drugs not encompassed in clause (i) (including oral-only drugs) without rendering clause (ii) and (iii) utterly redundant and superfluous.

In *Fischer v. United States*, 144 S. Ct. 2176 (2024), the Supreme Court recently confronted a similar "surplusage problem." *Id.* at 2188. At issue were two subsections—one that described "particular types" of conduct in "specific terms," with another "broader" provision going beyond the first. *Id.* at 2183; *see* 18 U.S.C. § 1512(c)(1)-(2). The question was whether the second subsection was best read as linked with (and limited by) the first subsection. *See Fischer,* 144 S. Ct. at 2183. The Court's answer was "yes." It found that though the latter, "all-encompassing interpretation *may be literally permissible*, it defie[d] the most plausible understanding of why [the relevant subsections] are conjoined, and it render[ed] an unnerving amount of statutory text mere surplusage." *Id.* at 2190 (emphasis added). After all, because "Congress would not go to the trouble of spelling out the list in (c)(1) if a neighboring term swallowed it up, the most sensible inference is that the scope of (c)(2) is defined by reference to (c)(1)." *Id.* at 2185.

The question, therefore, is not whether clause (iv)'s reference to "other items and services" could literally be read to encompass drugs, a construction that would override the more focused, limited categories of drugs that Congress saw fit to include in clauses (ii) and (iii). 42 U.S.C. § 1395rr(b)(14)(B)(iv). Instead, such a "general phrase can be given a more focused meaning by the terms linked to it. That principle ensures—regardless of how complicated a sentence might appear—that none of its specific parts are made redundant by a clause literally broad enough to include them." *Fischer*, 144 S. Ct. at 2184.

So too here. If CMS's reading is right, "there would have been scant reason for Congress to provide any specific examples at all" in clauses (ii) and (iii). *Id.* at 2185. The "sweep" of clause

(iv) "would consume" clauses (ii) and (iii), "leaving th[ose] narrower provision[s] with no work to do." *Id.* Instead, clauses (ii) and (iii) would be an "elaborate pumpfake," *id.*—two clauses specifically referencing oral forms of particular drugs would be immediately superseded in the very next clause (in the very same sentence) by a category that covers all drugs, including all oral-only ones. But construing clause (iv) that way gets standard statutory analysis "'exactly backwards,' eliminating specific terms because of broad language that follows them, rather than limiting the broad language in light of narrower terms that precede it." *Id.* (quoting *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252, 255 (2024)).

CMS's expansive alternative reading of clause (iv) also contradicts the canon of *ejusdem generis*, the principle that "'a general or collective term' at the end of a list of specific items' is typically 'controlled and defined by reference to the specific classes . . . that precede it." *Fischer*, 144 S.Ct. at 2184. Here, Congress signaled the narrower scope of clause (iv) by addressing it to cover "*diagnostic laboratory tests* and other items and services not [covered by] clause (i)." 42 U.S.C. § 1395rr(b)(14)(B) (emphasis added). Particularly in light of a statutory scheme in which clause (ii) and (iii) carefully specify only certain categories of drugs, clause (iv) is best read to encompass "objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)); *see also* 75 Fed. Reg. at 49,064 (indicating that "other items and services" could be read more narrowly to mean "[o]ther items and services separately billed by ESRD facilities that are used *in conjunction* with injectable medications or laboratory tests, such as blood products, syringes, and other dialysis supplies that are billed on Medicare outpatient institutional claims") (emphasis added). Instead embracing a broad reading of clause (iv) in the event that its principal construction of clause (iii) was found lacking, CMS

ignored the "common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer*, 144 S. Ct. at 2184.   This Court should not endorse that reading, which *CMS itself* recognized would render its statutory definition "overlapping or redundant." 75 Fed. Reg. at 49,040.

For all of these reasons, CMS's regulations purporting to include oral-only drugs in the ESRD PPS bundle, contrary to Congress's chosen statutory text, are contrary to law and in excess of statutory authority.  42 C.F.R. §§ 413.171, 413.174.  Because there is no dispute phosphate-lowering therapies, including XPHOZAH, are oral-only drugs, Williams Decl. ¶¶ 33-35; Ex. 8 at 1, CMS's decision to cease payment for them under Medicare Part D and treat those drugs as part of the ESRD PPS bundle starting on January 1, 2025, pursuant to CMS's regulations (and the XPHOZAH Decision) is likewise contrary to law and in excess of statutory authority.

### B.    At Minimum, XPHOZAH Does Not Qualify As A Renal Dialysis Service

If the Court agrees with Plaintiffs on the preceding question of statutory interpretation, the Court's inquiry is at an end:  Oral-only drugs would not qualify as "renal dialysis services" eligible for inclusion in the ESRD PPS bundle, notwithstanding CMS's contrary regulations.   But XPHOZAH also falls outside the ESRD PPS bundle for two additional reasons.  First, XPHOZAH is not a drug "furnished to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iii)-(iv); 42 C.F.R. § 413.171(3)-(4).  Second, XPHOZAH is "not essential for the delivery of maintenance dialysis."  42 C.F.R. § 413.171(5).  For either or both of those reasons, CMS's plan to place XPHOZAH into the ESRD PPS bundle and cease Medicare Part D reimbursement starting January 1, 2025 is unlawful.

### 1.    XPHOZAH Is Not A Drug Furnished For The Treatment Of End Stage Renal Disease

To begin with, XPHOZAH falls outside the bundle because it treats hyperphosphatemia,

not end stage renal disease.  As relevant here, clauses (iii) and (iv) of the operative statute, like clauses (iii) and (iv) of CMS's implementing regulation, impose the same, overlapping requirement:  For a drug to qualify as a "renal dialysis service," the drug must be "furnished to individuals for the treatment of end stage renal disease."  42 C.F.R. § 413.171(3)-(4); 42 U.S.C. § 1395rr(b)(14)(B)(iii)-(iv).  But XPHOZAH is not a drug "furnished to individuals for the treatment of end stage renal disease."  *Id.*  While XPHOZAH is available to patients with chronic kidney disease on dialysis, XPHOZAH itself is indicated only for treating high phosphate levels (i.e., hyperphosphatemia).  Williams Decl. ¶ 32.  Specifically, according to its FDA-approved label, "XPHOZAH is indicated to reduce serum phosphorus in adults with chronic kidney disease," and the key functionality of XPHOZAH is to "manage serum phosphorus levels" "as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  Ex. 1, XPHOZAH Label at 1-2.  As a result, XPHOZAH does not meet the statutory or regulatory requirements for inclusion in the bundle.

As explained, *supra* at 15, hyperphosphatemia is a condition that occurs in many patients with ESRD.  But individuals may have ESRD without hyperphosphatemia, just as individuals may have hyperphosphatemia without ESRD.  *See supra* at 15.  And although XPHOZAH is taken before meals to reduce the absorption of phosphate from the gut into the bloodstream, it does not treat the patient's end stage renal disease.  *Supra* at 16.

CMS recognizes that many other oral medications that treat causes of, complications from, or comorbidities of ESRD are *not* "renal dialysis services."  For instance, 84 percent of ESRD patients on dialysis also suffer from hypertension[26]—a greater number than the percentage of

---

[26] *See, e.g.*, Williams Decl. ¶ 13; Adarsh Raja et al., *Temporal trends in hypertension related end stage renal disease mortality rates*, 3 Frontiers in Nephrology (Jan. 15, 2024)

ESRD patients with hyperphosphatemia.[27]   But CMS does not classify drugs treating hypertension—like beta blockers—as "renal dialysis services."  *See* Ex. 2 at 14; *see also* 75 Fed Reg. at 49,039.   And although ESRD can cause complications ranging from diabetes and hypertension, to stroke, hepatitis, and cardiovascular disease ("CVD"),[28] CMS does not consider drugs that treat these complications to be drugs "for the treatment of end stage renal disease" either. *See* 75 Fed Reg. at 49,047.  The drugs used to treat common comorbidities of ESRD, like diabetes, hypertension, and CVD, are covered by Medicare Part D.  *See id.*; Williams Decl. ¶ 16.

CMS's decision to consider XPHOZAH as for the treatment of ESRD is at odds with CMS's statute, regulation, and Federal Register notices.   To begin, CMS's interpretation, promulgated through the Federal Register and the XPHOZAH Decision, appears not to ask whether a drug is "for the treatment of end stage renal disease," 42 C.F.R. § 413.171(3)-(4), but rather whether a drug is "ESRD-*related*."  75 Fed. Reg. at 49,039; *see also* Ex. 8 (XPHOZAH Decision) (discussing whether the drug treats a "condition associated with ESRD").   That impermissibly expands the statutory *and* regulatory definition of "renal dialysis services" by sidestepping whether a drug is for "the treatment of end stage renal disease."   42 C.F.R. § 413.171(3)-(4); 42 U.S.C. § 1395rr(b)(14)(B)(iii)-(iv).  That is contrary to law and in excess of statutory authority.

Even under CMS's interpretation, CMS has expressly stated that "[d]rugs and biologicals that are generally not ESRD-related (for example drugs and biologicals used to treat diabetes,

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10823365 (hypertension occurs 84.1% of stage 4-5 CKD patients).

[27] *See, e.g.*, Williams Decl. ¶ 18 (Hyperphosphatemia occurs in approximately 80% of patients with ESRD on maintenance dialysis).

[28] *See* Williams Decl. ¶ 14; Penn Medicine, *End-Stage Kidney Disease*, https://www.pennmedicine.org/for-patients-and-visitors/patient-information/conditions-treated-a-to-z/end-stage-kidney-disease

cardiac conditions, and hypertension), would not be renal dialysis services and would be excluded

from the ESRD bundled base rate." *Id.* at 49,047.  In order to gauge which drugs should qualify,

CMS explained:

> We believe that categorizing drugs and biologicals on the basis of
> drug action would allow us to determine which categories (and
> therefore, the drugs and biologicals within the categories) would be
> ESRD-related. We evaluated each drug and biological to identify its
> category by indication or mode of action. We then analyzed the
> categories to determine those that would be expected to be utilized
> for ESRD-related conditions *in a dialysis unit* (*and therefore would
> be a renal dialysis service*).

*Id.* (emphasis added).  But XPHOZAH is not "utilized for ESRD-related conditions in a dialysis

unit." *Id.*  Rather, XPHOZAH's instructions specifically counsel patients *not* to take XPHOZAH

before or during a dialysis session.  *See* Ex. 2 at 11, 13; Williams Decl. ¶ 37; *see also* Ex. 1

(XPHOZAH Label) at 2 ("Recommended dosage: 30 mg orally twice daily before the morning

and evening meals . . . Instruct patients not to take right before hemodialysis session, and instead

take right before the next meal following dialysis").  As such, XPHOZAH is not administered by

dialysis providers, nor is it utilized within a dialysis unit.  *Id.*  Its label makes clear it should not

be so utilized.  *Id.*  XPHOZAH should therefore, per CMS's own prior statements, not be included

in the ESRD PPS bundle.  In the XPHOZAH Decision, CMS, again, has simply disregarded its

own statements purporting to define "renal dialysis services."  Previously, CMS appeared to

recognize (in the Federal Register, no less) that "renal dialysis services" are limited to treatments

utilized "in a dialysis unit." 75 Fed. Reg. at 49,047.  Now, CMS has decided to treat as a "renal

dialysis service" XPHOZAH, even though it is not utilized in a dialysis unit as part of renal

dialysis.  *See* Ex. 8, XPHOZAH Decision at 1.  (Indeed, the XPHOZAH Decision does not even

conclude that the drug is used in a dialysis unit.  *Id.*).  That is impermissible.

On top of all of that, in order to change position from prior agency guidance, an agency must "display awareness that it is changing position" and provide a "reasoned explanation" for its action; it must not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books;" and it must show "there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Lone Mountain Processing, Inc. v. Sec'y of Lab.*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) (similar). Further, a "more detailed justification" for the change is required when an agency's "prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515. And an "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). CMS did not comply with any of those requirements in its XPHOZAH Decision. CMS failed to admit that it was changing position, much less justify its reversal. *See generally* Ex. 8.

Finally, CMS's inclusion of XPHOZAH also runs afoul of the administrative law principle that agencies must treat like cases alike. *See Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023) ("It is a fundamental principle of administrative law that agencies must treat like cases alike."); *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) (same). Hypertension is the second leading cause of end-stage renal disease in the United States and present in up to 90% of ESRD patients (diabetes is the leading cause).[29] Yet, despite that relationship, CMS has determined that oral-only "drugs and biologicals used to treat *diabetes*,

---

[29] *See, e.g.*, Peter N. Van Buren & Jula K. Inrig, Hypertension and hemodialysis: pathophysiology and outcomes in adult and pediatric populations, Pediatic Nephrology (Mar. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3204338/; CDC, *Kidney Failure and Diabetes* (May 15, 2024), https://www.cdc.gov/diabetes/data-research/research/kidney-failure-diabetes.html#:~:text=Since%20the%20main%20causes%20of,are%20successful%20in%20preventing%20ESKD; Williams Decl. ¶ 12

cardiac conditions and *hypertension*"—all of which are administered outside a dialysis unit—should not be treated as "renal dialysis services." 75 Fed. Reg. at 49,047 (emphasis added); *supra* at 31-32. CMS has not provided any reasoned explanation for treating XPHOZAH as a renal dialysis service when CMS does not treat similarly situated drugs in the same way.

### 2.     XPHOZAH Is Not Essential For The Treatment Of Maintenance Dialysis

Even more obviously, XPHOZAH should be excluded from the bundle because CMS has made clear that "services that are not essential for the delivery of maintenance dialysis" should be excluded from the definition of "renal dialysis services." 42 C.F.R. § 413.171(5).[30] XPHOZAH is not even administered during dialysis, let alone "essential for the delivery of maintenance dialysis." *Id.* CMS should therefore have excluded it from the scope of the bundled payment.

It is a fundamental principle of administrative law that "an agency is bound by its own regulations." *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014); *see also Scan Health Plan v. HHS*, No. 1:23-cv-03910, 2024 WL 2815789, at *4 (D.D.C. June 3, 2024) (same). Here, CMS's regulation is unambiguous and unequivocal: drugs that are not "essential for the delivery of maintenance dialysis" are excluded from the regulatory definition of renal dialysis services. 42 C.F.R. § 413.171(5). "'Essential' means '[a]bsolutely necessary' or 'indispensably requisite.'" *Grange Mut. Cas. Co. v. Woodward*, 861 F.3d 1224, 1232 (11th Cir. 2017) (citing Essential, Oxford English Dictionary); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 67 F.4th 1027, 1036-37 (9th Cir. 2023) ("[T]he ordinary meaning of 'essential' . . . refers to something that is indispensable or necessary," not merely "beneficial").

---

[30] CMS considers "services" to include drugs. *See* 75 Fed. Reg. at 49,030 ("Services means medical care or services and items, such as medical diagnosis and treatment, drugs and biologicals." (quoting 42 C.F.R. § 400.202)).

XPHOZAH is not "absolutely necessary" or "indispensably requisite" for "the delivery of maintenance dialysis." XPHOZAH is not even *indicated* for use during the delivery of maintenance dialysis. *See* Ex. 1, XPHOZAH Label. Rather, patients are directed *not* to take XPHOZAH prior to the delivery of maintenance dialysis. *Id.* That is because XPHOZAH must be taken just prior to a meal, and meals are not permitted during a dialysis session. *Id.*; Williams Decl. ¶ 37. And XPHOZAH has never been administered or distributed by dialysis facilities or in connection with the delivery of dialysis services. Williams Decl. ¶ 38. (Among other reasons, XPHOZAH's side effects could lead to dehydration and low sodium levels, which are dangerous during dialysis. *See* Ex. 1 at 2.). To say XPHOZAH is "essential for the delivery of maintenance dialysis" would deprive those words of any meaning.

Although XPHOZAH offers a critically important tool for nephrologists to the manage phosphate levels of ESRD patients, it would go too far to suggest it is "essential for the delivery of maintenance dialysis." XPHOZAH is only approved as a second-line treatment for reduction of serum phosphorus in those who are not sufficiently managed or are intolerant of phosphate binders. Ex. 1, XPHOZAH Label at 1 ("XPHOZAH is indicated to reduce serum phosphorus in adults with chronic kidney disease (CKD) on dialysis as *add-on therapy* in patients who have an *inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy*.") (emphasis added). But (i) not all ESRD patients have hyperphosphatemia; (ii) some of those who do have hyperphosphatemia will be able to manage their serum phosphorus through dietary intervention and/or phosphate binders; (iii) only some fraction of the remaining population will use XPHOZAH; and (iv) even those who do take XPHOZAH will not take the drug in a dialysis unit, or during the delivery of dialysis services. *Supra* at 15-17. That is far afield from being "essential for the delivery of maintenance dialysis." 42 C.F.R. § 413.171(5).

For the foregoing reasons, CMS's XPHOZAH Decision sweeping XPHOZAH into the ESRD PPS bundle is arbitrary, capricious, contrary to law, and in excess of statutory authority.

## II.    THE REMAINING EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF INJUNCTIVE RELIEF

Plaintiffs satisfy the three remaining equitable factors:  Plaintiffs are "likely to suffer irreparable harm" in the absence of preliminary relief; "the balance of equities tips in [their] favor"; and "an injunction is in the public interest."  *Winter*, 555 U.S. at 20; *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018).  Here, all of these factors favor preliminary injunctive relief enjoining CMS from moving oral-only drugs, including XPHOZAH, into the ESRD PPS bundle, prior to CMS doing so effective January 1, 2025.

### A.  Plaintiffs Will Suffer Irreparable Harm Absent Judicial Relief

Here, CMS's decision to sweep oral-only drugs, including XPHOZAH, into the ESRD PPS bundle will cause Plaintiffs irreparable harm beginning on January 1, 2025—by harming the patients whom Plaintiffs represent and frustrating utilization of Ardelyx's novel drug.

The improper placement of oral-only drugs into the ESRD PPS bundle will materially diminish ESRD patients' access to essential therapies and precipitate worse health outcomes. Oral-only drugs, including XPHOZAH, are currently covered by Medicare Part D, which provides prescription drug coverage for self-administered drugs.  Compl. ¶ 171; Williams Decl. ¶¶ 49-50. Under Medicare Part D, physicians prescribe the prescription drugs that they determine best serve their patients; the patient's Medicare Part D plan covers the cost of that prescription, subject to any deductible or coinsurance requirements; and the government compensates pharmacies for dispensing Part D drugs on a fee-for-service basis.  *See* Clynes Decl. ¶ 26.  For oral-only drugs like XPHOZAH, dialysis facilities currently play no role in treatment decisions, do not administer the drugs, and receive no remuneration. *See* Clynes Decl. ¶¶ 26-28.  And because Medicare Part

D plans compensate pharmacies based on the particular kind and amount of drugs they dispense, they are not a barrier to facilitating patient access to innovative, effective treatments. *See* Clynes Decl. ¶¶ 22, 34; Williams Decl. ¶ 79.

As numerous commentators from across the kidney-care spectrum have repeatedly explained, placing oral-only drugs into the ESRD PPS bundle will disrupt this status quo, diminish access to critical oral-only treatments, degrade health outcomes, alter the critical decision making relationship between patients and their physicians, and discourage innovation. *See* Clynes Decl. ¶¶ 22-25, 29, 34-35; Williams Decl. ¶¶ 69, 74, 76-79, 81. CMS has admittedly failed to increase the amount of its bundled payment in keeping with actual increases in the cost of providing dialysis. *See* Williams Decl. ¶¶ 66-67; Clynes Decl. ¶¶ 18-20. As a result, the Medicare Payment Advisory Commission estimated in 2023 that dialysis facilities had *negative margins* for Medicare patients, and anticipated no better than a 0 percent margin for those patients in 2024.[31] Making dialysis facilities financially responsible for still more drugs that were previously outside the bundled payment system will exacerbate financial pressure on dialysis facilities—forcing them to bear financial responsibility for purchasing and dispensing new drugs despite the inadequacy of the existing bundled payment to cover existing levels of care. *See* Clynes Decl. ¶¶ 19-24; Williams Decl. ¶¶ 66-68, 72, 76.

Because CMS effectively pays the same amount for each dialysis treatment, regardless of the actual cost to dialysis providers of treating a particular patient, dialysis providers are penalized financially for treating patients using novel drugs for which they are not fully reimbursed. *See* Williams Decl. ¶ 74. CMS itself has acknowledged that this could result in "underutilization" of

---

[31] *See* Medicare Payment Advisory Comm'n, 2023 Report to the Congress – Medicare Payment Policy, at 194 (Mar. 2023), https://www.medpac.gov/wp-content/uploads/2023/03/Mar23_MedPAC_Report_To_Congress_v2_SEC.pdf

novel therapies.  75 Fed. Reg. at 49,041.  Although CMS makes available certain temporary additional funds to cover certain new drugs upon their entry to the bundle,[32] the expiring nature of such payments discourages dialysis facilities from promoting uptake of such treatments.  Clynes Decl. ¶¶ 21-22.  For instance, the bipartisan Kidney and Health Care Innovation Caucus recently warned that under CMS's approach, CMS would increase its bundled payment by only *nine cents* following the expiry of a novel drug's TDAPA period—an amount dwarfed by the cost to the provider of providing that treatment.[33]  As the Caucus warned, "such a low add-on payment, paired with low or negative Medicare margins, may not support access to new drugs."  *Id.*

Absent court action before January 1, 2025, CMS's plan to cease payment under Medicare Part D for oral-only drugs, and instead incorporate reimbursement for oral-only drugs into its bundled payment, will result in the development of protocols by the dialysis organizations severely restricting access to oral-only drugs—particularly novel ones—to the immediate detriment of patients.  Williams Decl. ¶¶ 69, 74, 78-81; Clynes Decl. ¶¶ 22, 24, 26-28, 34.  For instance, on January 1, 2025, patients who have always obtained their phosphate lowering medication prescribed by their physicians from their local pharmacy will be turned away and told that they must now switch to the phosphate lowering medication being provided by their dialysis organization.  *See* Clynes Decl. ¶¶ 22, 24, 26-28, 34.  Physicians who have over the course of treatment of their patients identified the best therapy that is tolerated by and effective for each individual patient will no longer be able to obtain that therapy for their patient.  *See id.*  This limited

---

[32] During this period, dialysis facilities receive Medicare reimbursement for new drugs through the Transitional Drug Add-on Payment (TDAPA), a CMS program used to transition new drugs into the ESRD PPS bundled payment.  *See* 42 C.F.R. § 413.234.

[33] *See* Compl. ¶ 11; Congressional Kidney and Health Care Innovation Caucuses, Letter to Chiquita Brooks-LaSure (Oct. 2, 2023), https://kidneycarepartners.org/wp-content/uploads/2023/10/CY24-ESRD-Innovation-Letter-Final.pdf.

and restricted access to treatment, controlled by dialysis centers, will frustrate individualized care for patients and discourage the development and adoption of innovative prescription drug therapies for ESRD patients. *Id.*

Real-world experience confirms that patients will experience these harms absent urgent injunctive relief. In 2017, FDA approved Parsabiv (etelcalcetide), an intravenous calcimimetic (a drug that increases the sensitivity of the body to calcium) that offered the first new treatment for secondary hyperparathyroidism in ESRD patients in more than a decade.[34] In 2018, 2019, and 2020—during which dialysis facilities received additional reimbursement for Parsabiv through the TDAPA program—Parsabiv was utilized by approximately 7.1%, 10.4%, and 9.7% of dialysis patients, respectively.[35] Williams Decl. ¶ 75. After the temporary TDAPA period ended, Parsabiv was moved into the ESRD PPS bundle, with no additional reimbursement available to ESRD facilities that administered this drug beyond the base bundled payment rate.[36] Utilization promptly and precipitously dropped to just about 3% in 2021, and to less than 1% in 2023.[37] Williams Decl. ¶ 75. Approximately one third (32.3%) of ESRD patients used a calcimimetic in 2021.[38] After Parsabiv was added to the ESRD PPS bundle, most patients were funneled to use Sensipar, an

---

[34] Secondary hyperparathyroidism is a condition in which too much calcium is produced in the body, and is a common comorbidity with ESRD. *See Nat'l Kidney Found.*, *Secondary Hyperparathyroidism*, https://www.kidney.org/atoz/content/secondary-hyperparathyroidism. Secondary hyperparathyroidism is treated with calcimimetics, novel drugs which increase the sensitivity of the parathyroid gland to calcium which has the effect of lowering calcium levels in the body.

[35] *See* U.S. Renal Data Sys., 2023 Annual Report ch. 3, Figure 3.14b, https://usrds-adr.niddk.nih.gov/2023/end-stage-renal-disease/3-clinical-indicators-and-preventive-care.

[36] *See* Parsabiv, Understanding ESRD Reimbursement To Enhance Planning For Patient Care, https://www.parsabivhcp.com/reimbursement ("Reimbursement for Parsabiv®, and other dialysis costs, is adjusted annually by a market basket increase to the ESRD bundle rate").

[37] *See* U.S. Renal Data Sys., 2023 Annual Report ch. 3, Figure 3.14b, https://usrds-adr.niddk.nih.gov/2023/end-stage-renal-disease/3-clinical-indicators-and-preventive-care.

[38] *See id.*

older and less effective, albeit cheaper, drug relative to Parsabiv.  *See id.*; Williams Decl. ¶ 75.[39] As a result, patient outcomes have declined.  From July 2020 to July 2021, after Parsabiv entered the ESRD PPS bundle, the prevalence of parathyroid levels above the threshold for hyperparathyroidism among ESRD patients who discontinued Parsabiv increased from 28% to 43% overall, and from 32% to 50% among African Americans.[40]

Similarly, other manufacturers have ceased development of innovative therapies because of a drug's likely placement into the bundle.  For example, Cara Therapeutics terminated its Phase 3 clinical program for an oral form of Korsuva, which treats pruritis (itchiness of the skin) in ESRD patients, after the injectable form of the same drug was moved into the ESRD PPS bundle.[41] Williams Decl. ¶ 80.  Cara Therapeutics explained in an SEC filing that "[t]he unfavorable CMS reimbursement codified in the final CY 2024 rule [by including the drug in the bundle] has resulted in a lack of sequential revenues growth for KORSUVA injection since its launch . . . . [W]e expect no meaningful revenue contribution from KORSUVA injection following the TDAPA period expiration."[42]  The same year, Cara Therapeutics decided to focus its oral Korsuva trials on a

---

[39] *See also* Carol Moore et al., *Change in Payment Method and the Use of Etelcalcetide and PTH Values Among Dialysis Patients in Two Dialysis Organizations*, Am. Soc'y of Nephrology (Poster FR-PO535) (Nov. 4, 2022), https://www.asn-online.org/education/kidneyweek/2022/program-abstract.aspx?controlId=3768383.

[40] Compl. ¶ 180; *See* Angelo Karaboyas et al., *Calcimimetic Reimbursement Changes in 2021: Impact of Etelcalcetide Discontinuation on Parathyroid Hormone (PTH) Levels in US Hemodialysis Patients*, American Society of Nephrology (Poster No. TH-PO149) (Nov. 2023), (https://www.asn-online.org/education/kidneyweek/2023/program-abstract.aspx?controlId=3931328).

[41] *See* Cara Therapeutics, Inc., Q. Rep. (Form 10-Q) 33 (Mar. 31, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/1346830/000155837024007964/cara-20240331x10q.htm.

[42] *See id.*

different therapeutic indication with greater "commercial potential."[43]

CMS's placement of oral-only drugs into the bundle will therefore reduce patient access to oral-only drugs in the short term, and discourage manufacturers from developing innovative drugs going forward.  Williams Decl. ¶¶ 69-81; Clynes Decl. ¶¶ 22-34; Puckrein Decl. ¶¶ 21-35.  Because access to such drugs is critical for ESRD patients, CMS's plan to add oral only drugs, including XPHOZAH, into the bundle will seriously and irreparably harm ESRD patients.  Williams Decl. ¶ 21, 40, 77 (explaining that failure to manage hyperphosphatemia can prevent patients from obtaining a place on the kidney transplant list); *Wilson v. Grp. Hospitalization & Med. Servs., Inc*., 791 F. Supp. 309, 314 (D.D.C. 1992) (finding irreparable harm when "plaintiff's health and future remain[ed] in serious doubt" because an insurance company refused to pay for treatments); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 243 (D.D.C. 2014) (measuring irreparable harm for a non-profit children's hospital in terms of the reduced services to children); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 489, 500 (D. Md. 2020) (noting irreparable harm likely to harm befall patients where rule would create "great risks for patients who rely on drugs covered under Medicare").  That harm will disproportionately fall on patients from minority, rural, and low-income backgrounds, who represent an outsized share of patients suffering from ESRD and hyperphosphatemia.  Puckrein  Decl. ¶¶ 7-13, 33; Williams Decl. ¶ 52; *supra* at 6-7.[44]  Indeed,

---

[43] Press Release, Cara Therapeutics, Cara Therapeutics Prioritizes Late-Stage Notalgia Paresthetica Program and Extends Cash Runway into 2026 (Jan. 22, 2024), https://ir.caratherapeutics.com/news-releases/news-release-details/cara-therapeutics-prioritizes-late-stage-notalgia-paresthetica.

[44] *See also* Orlando M. Gutierrez et al., *Low Socioeconomic Status Associates With Higher Serum Phosphate Irrespective of Race*, 21 J. Am. Soc'y of Nephrology 1953 (Nov. 21, 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3014009 ("Large cohort studies have shown that hyperphosphatemia is more common and more severe in blacks than in whites, both among patients with CKD and among individuals with normal kidney function.").

there is widespread opposition across a broad range of kidney-care stakeholders to the placement of oral-only drugs into the ESRD PPS Bundle.  Clynes Decl. ¶ 35; Puckrein Decl. ¶¶ 36, 38.[45]

Ardelyx will also be irreparably harmed absent an injunction.  If CMS ceases payment for XPHOZAH under Medicare Part D, and only provides reimbursement via the ESRD PPS Bundle, dialysis facilities will be financially incentivized to facilitate or promote the uptake of less expensive alternatives to XPHOZAH.  Williams Decl. ¶ 77.  As a result, despite the immense unmet need for XPHOZAH among the large numbers of ESRD patients whose hyperphosphatemia is not controlled by phosphate binders, beginning January 1, 2025, patient access to XPHOZAH will be severely restricted.  *Id.*  That loss of market share, and related unrecoverable economic harm, constitutes irreparable harm to Ardelyx.  *See, e.g.*, *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021); *Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013); *Feinerman v. Berardi*, 558 F. Supp. 2d 36, 50-51 (D.D.C. 2008).

Congress's original intent in providing Medicare coverage to *all* ESRD patients was to ensure access to needed, life-saving treatment.[46]  Yet by sweeping into the ESRD PPS bundled payment drugs that Congress *declined* to include in the bundle, CMS will diminish access and discourage innovation.  Williams Decl. ¶¶ 69-81; Clynes Decl. ¶¶ 22-34; Puckrein Decl. ¶¶ 21-35.  For all these reasons, injunctive relief prior to January 1, 2025 is necessary to preserve the status quo and prevent irreparable harm to Plaintiffs and the patients they serve.

---

[45] Among those organizations to have opposed the placement of oral-only drugs into the ESRD PPS bundle include the American Health Care Association, the American Kidney Fund, the American Society for Nephrology, Kidney Care Partners, the National Kidney Foundation, the Renal Healthcare Association, and the Renal Physicians Association.

[46] *See* 42 U.S.C. § 1395 *et seq.* (providing coverage for those over the age of 65, for those with disabilities, and those with end stage renal disease).

**B.  The Balance Of The Equities And The Public Interest Also Favor Injunctive Relief**

The remaining two equitable factors—the balance of the equities and the public interest—also weigh heavily in favor of granting preliminary injunctive relief.  When, as here, a claimant challenges unlawful agency action, these factors merge into a single inquiry. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In particular, "[a] party's likelihood of success on the merits 'is a strong indicator that a preliminary injunction would serve the public interest' because '[t]here is generally no public interest in the perpetuation of unlawful agency action.'"  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  In fact, there is a public interest "'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Newby*, 838 F.3d at 12 (citation omitted).  Moreover, there is an important public interest in "encourag[ing] the development of innovative drugs," *Collagenex Pharms. v. Thompson*, No. 03-cv-1405, 2003 WL 21697344, at *11 (D.D.C. July 22, 2003), that is undercut by CMS's inclusion of oral-only drugs in the bundle.  *Supra* at 38-42.

As shown above, CMS's proposed inclusion of oral-only drugs generally, including XPHOZAH, in the ESRD PPS bundle is contrary to law, and is therefore impermissible.  *Supra* at 18-37.  Sweeping such drugs into the bundle will impose added financial pressure on dialysis facilities that will have the effect of limiting access to oral-only drugs, diminishing health outcomes, and reducing innovation.  *Supra* at 38-44.  And those harms will be particularly visited on minority, low-income, and rural populations who are disproportionately affected by ESRD. *Supra* at 43.  The public interest and equities weigh heavily against those results.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court preliminarily enjoin Defendants from enforcing their regulation in 42 C.F.R. §§ 413.171, 413.174(f)(6) unlawfully including oral-only drugs within the regulatory definition of "renal dialysis services"; from classifying XPHOZAH as a "renal dialysis service" pursuant to § 413.171; from placing oral-only drugs, including XPHOZAH, into the ESRD PPS bundled payment system pursuant to §§ 413.171, 413.174(f)(6) effective January 1, 2025; and from ceasing reimbursement for any oral-only drug under Medicare Part D as of that date.  Alternatively, Plaintiffs respectfully request expedited summary judgment in their favor, granting the same injunctive relief on a permanent basis. Plaintiffs further request that the Court vacate and set aside Defendants' regulations in 42 C.F.R. §§ 413.171, 413.174(f)(6), to the extent they provide that oral-only drugs are "renal dialysis services" subject to inclusion in the ESRD PPS bundle.  And Plaintiffs further request that the Court vacate and set aside Defendants' XPHOZAH Decision.

Dated:  September 19, 2024

Respectfully submitted,

*/s/ Michael E. Bern*
Michael E. Bern  (DC Bar No. 994791)
Delia Tasky (DC Bar No. 1724285)
Alexander G. Siemers (DC Bar No. 90006765)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   michael.bern@lw.com
              delia.tasky@lw.com
              alex.siemers@lw.com

Nicholas L. Schlossman
(DC Bar No. 1029362)
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email:   nicholas.schlossman@lw.com

*Attorneys for Plaintiffs Ardelyx, Inc. and American Association of Kidney Patients*

James E. McCollum, Jr. (DC Bar. No. 398117)
Amit K. Sharma (D.C. Bar No. 503604)
The McCollum Firm, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
Tel: (301) 537-0661
Fax: (301) 864-4351
Email:   jmccollum@jmlaw.net
              asharma@jmlaw.net

*Attorneys for Plaintiff National Minority Quality Forum*