IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ARDELYX, INC.,**<br>400 Fifth Avenue, Suite 210<br>Waltham, MA 02451<br><br>**AMERICAN ASSOCIATION OF KIDNEY PATIENTS,**<br>14440 Bruce B. Downs Blvd.<br>Tampa, FL 33613<br><br>**NATIONAL MINORITY QUALITY FORUM,**<br>1201 15th Street NW # 340<br>Washington, DC 20005<br><br>           **Plaintiffs,**<br>   v.<br><br>**XAVIER BECERRA,**<br>*Secretary of Health and Human Services*<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,**<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>**CHIQUITA BROOKS-LASURE, AND**<br>*Administrator of Centers for Medicare and Medicaid Services*<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>**CENTERS FOR MEDICARE AND MEDICAID SERVICES,**<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>           **Defendants.** | Case No. 1:24-cv-02095 |

<u>**DECLARATION OF DIANA CLYNES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT**</u>

I, Diana Clynes, do hereby declare under penalty of perjury that:

1. I have personal knowledge of the facts I state below and would testify truthfully to them if called upon to do so.

2. I am currently the Executive Director at the American Association of Kidney Patients ("AAKP"). I hold a Bachelor of Arts degree in Mass Communication with an emphasis in Public Relations and a Minor in Business from the University of South Florida in Tampa, FL. Prior to my tenure at AAKP, I worked in both the government and non-profit sectors. I joined AAKP in 2005. During my tenure, I was part of, and director of, Programs and Developments for 12 years where I was responsible for launching cutting-edge development and patient programs. I was appointed Interim Executive Director in 2017, the youngest Executive Director in the history of the organization, and I transitioned into the Executive Director position in 2019. As Executive Director, I am responsible for implementing and executing the mission and national strategy for the Association. I initiate and manage the organization's funding contracts and maintain and develop existing and new relationships with industry, government, and organizational partners. I represent AAKP on a variety of state and national renal-related committees, coalitions, and workgroups. I work directly with the organization's National Board of Directors and Executive Leadership Committee to manage the organization's policy portfolio and create program metrics and analyses to ensure mission, goals, and objectives of the Association are being met. In my position, it is important that I understand and keep up to date with legal changes that could impact kidney patients, and to understand those effects.

3. AAKP is the oldest and largest fully independent kidney-patient organization in the United States. The AAKP represents the largest base of both patient and care partner consumers in the kidney space. Since its founding in 1996, AAKP has been a leading independent and patient-

led voice for greater investments and innovations in kidney disease research, detection, and treatment. AAKP is nationally known for its aggressive advocacy on behalf of kidney patient consumers and their right to care choice in consultation with the doctors who they choose to care for them. AAKP defines high-quality kidney care as timely patient access, without interference, to prevention and treatment innovations that empower patients to remain healthy, independent, and able to pursue their aspirations.

4. AAKP is dedicated to improving the lives and long-term outcomes of kidney patients through education, advocacy, patient engagement, and the fostering of patient communities. AAKP fights for early disease detection and the appropriate diagnosis of rare/genetic conditions; increased kidney transplantation and pre-emptive transplantation; full patient choice of either in-center or home dialysis; protection of the patient/physician relationship; promotion of research and innovation including artificial implantable and wearable kidneys and xenotransplantation (using non-human cells or tissues to treat medical conditions in humans); and the elimination of barriers for patient access to available treatment options.

5. As part of my role as Executive Director at AAKP, I routinely listen to and respond to members' concerns. Consistent with those concerns, I have led AAKP to aggressively challenge the obstacles to dialysis and transplantation in order to both expand patient care choice and access to all treatment options. As a result of my efforts with AAKP, I am familiar with the history of Medicare coverage for individuals suffering from end-stage renal disease ("ESRD"), including CMS's efforts to place oral-only drugs into the ESRD Prospective Payment System bundle ("ESRD PPS bundle"). Similarly, in order to effectively carry out my responsibilities, I am familiar with the ESRD patient experience, the funding challenges faced by dialysis providers, and the likely effects of moving oral-only drugs into the bundle. Based on an independent flash survey

conducted by AAKP's Center for Patient Research and Education, 57% of kidney patient respondents who currently take status quo phosphate binders confirm that they suffer from 'pill burden,' taking 6-10 phosphate binders daily to help manage their phosphorus level. Furthermore, 88% of kidney-patient respondents agree that physicians and patients should have access to new, innovative phosphorus lowering therapies if the drugs are proven to improve patient health and decrease burdens associated with older types of treatments.

6. In response to growing numbers of dialysis patients and treatment centers, as well as the high costs of life-saving dialysis treatment, Congress first extended Medicare coverage to individuals suffering from ESRD in 1972. The catalyst for the extension of this coverage was supported by an act of a former AAKP Board Member, Shep Glazer, who dialyzed in front of the House Ways and Means Committee to demonstrate the lifesaving effect of dialysis treatment.

7. In 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"), which, among other things, created a new bundled payment system for "renal dialysis services" under which a single prospective payment through Medicare Part B is made to dialysis facilities for certain categories of ESRD drugs and services.

8. At the time MIPPA was enacted in 2008, drugs and biologics administered to patients by dialysis facilities for the treatment of ESRD were administered intravenously or by injection during dialysis. Oral-only drugs were neither provided during dialysis, nor were the equivalent of injectable drugs that were.

9. In 2009, CMS issued a proposed rule to implement the bundled payment system created by MIPPA starting in 2011. In its final rule issued in 2010, CMS decided to include oral-only drugs in the ESRD PPS bundle starting in 2014. 75 Fed. Reg. 49,030 (2010).

10. Congress has repeatedly intervened to delay CMS's plan to place oral-only drugs

into the bundle. In 2012, Congress prevented CMS from including oral-only drugs in the ESRD bundle until 2016. Then, in 2014, Congress twice delayed CMS from implementing its proposal to include oral-only-drugs in the ESRD bundle: first until 2024, and then until 2025.

11. As a result, despite CMS's rulemaking over a decade ago, patients and other stakeholders in the kidney-care community have not had to contend with the potential impact of CMS's oral-only-drug rule until very recently, as the 2025 deadline approached and CMS began to take action to implement its policy decision from over a decade ago to place oral-only drugs into the bundled payment system. The "bundled payment system" was created by CMS to limit kidney-care costs approximately 15 years ago. It is a complex system of protocols overseen by non-kidney administrators with little sensitivity to patients' lived experience and patient-reported outcomes. The bundled payment system has simply failed to keep pace with patient-centered medicine and the new care innovations that patients, care partners, healthcare professionals, and other advocates in the kidney space have fought hard to advance through the FDA regulatory process.

12. Historically, oral-only drugs have never been included within the ESRD PPS bundle. Instead, oral-only drugs are currently covered by Medicare Part D (the Medicare drug insurance provisions), which ensures that ESRD patients have access to the oral-only drugs that their providers prescribe with limited costs to patients.

13. Oral drugs are critical to treatment of a wide variety of comorbidities that are common in ESRD patients, such as hypertension, diabetes, hepatitis, and hyperphosphatemia.

14. Most ESRD patients suffer from at least one, if not multiple, of these comorbidities. For each of these common comorbidities, oral drugs play an important part in treatment. For some comorbidities, like hyperphosphatemia, the only available treatment options are oral-only drugs

5

with no injectable equivalent. Furthermore, oral-only phosphate-lowering drugs, like other oral drugs treating the comorbidities of diabetes and hypertension, are not administered during dialysis treatments, meaning the patient must take their oral-only drugs outside of the facility, such as at home.

15. Phosphorus management is a critical issue for many kidney patients on dialysis. Until recently, phosphate binders were the only therapeutic treatment for hyperphosphatemia. Phosphate binders are highly burdensome to patients with reported side effects such as pill burden, gastrointestinal issues, and fatigue occurring in 60% of kidney patients. These status quo therapies have also been reported to be limited in their effectiveness across the kidney population. More effective phosphorus management therapies have long been considered an unmet need by both patients and medical professionals—and are now available.

16. The addition of oral-only drugs to the ESRD PPS bundle is likely to interfere with shared patient-physician decision-making and reduce access to novel therapies for ESRD patients.

17. Congress's initial intention in creating the bundle was to promote efficiency in dialysis service delivery by reducing incentivizes to overuse certain drugs then administered by dialysis providers during dialysis. To that end, Congress provided that dialysis providers could retain any difference between Medicare payments to dialysis providers and costs incurred for dialysis service delivery.

18. Over time, however, CMS has come to set the bundled payment at an amount that barely covers the cost of providing renal dialysis services and related drugs, and at times and for certain providers fails entirely to cover the costs of service delivery. The kidney community has also seen CMS include new oral-only therapies into the bundle, such as Korsuva, when it is a treatment that is in no way associated with dialysis treatment itself. This has had tremendously

negative effects on kidney patients.

19. Congress directed CMS to "annually increase payment amounts" by an amount "that reflects changes over time in the prices of an appropriate mix of goods and services included in renal dialysis services." 42 U.S.C. § 1395rr(b)(14)(F)(i)(I). In recent years, however, CMS has under-forecasted actual increases in costs of dialysis services, which has led to a lower bundled payment and increased financial strain on dialysis providers which in turn presents a barrier for a physician to prescribe appropriate treatment to their patient, and thus, not allowing the patient to have choice and access to new therapeutics. Thus, in 2023, the Medicare Payment Advisory Commission estimated that the bundled payment was set so low that dialysis facilities experienced *negative* margins on Medicare patients. Those who lose in this scenario are ESRD patients who depend on these treatments to manage their health and related conditions.

20. As a result, many dialysis providers struggle to break even financially on providing dialysis services and related drugs to Medicare patients; other dialysis providers have negative profit margins (that is, they lose money) on their Medicare patients, and ESRD patients' health suffers.

21. Compounding these problems, CMS also fails to sufficiently reimburse dialysis providers for new, innovative products when they are added to the ESRD PPS bundle. Although CMS makes temporarily available certain additional funds to cover new drugs upon their entry to the bundle through the Transitional Drug Add-On Payment (TDAPA), such additional payments—even when made available—do not cover the full cost to the dialysis facility of providing such prescription drugs, and in many cases expire after two years. For instance, following the end of TDAPA payments for Korsuva, the first and only FDA-approved treatment specifically designed to treat moderate-to-severe itching—known as Chronic Kidney Disease Associated Pruritus

(CKD-aP)—in adults on hemodialysis, CMS increased the ESRD PPS base rate by *nine cents*, a tiny fraction of the over $100 it costs a dialysis facility to administer the drug. This resulted in a barrier for ESRD patients to access this treatment, even though CKD-aP is estimated to affect 65% of hemodialysis patients.

22. This state of affairs does not support patient access to new drugs and diminishes patients' long-term access to needed medical care. As the scope of drugs covered by the ESRD PPS bundle balloons, but government payments toward the bundle stagnate, dialysis facilities understandably hesitate to facilitate the uptake of novel treatments in order to maintain existing standards of care. This challenge, in turn, discourages manufacturers from developing innovative therapies for ESRD patients in the first place, despite the tremendous medical need experienced by ESRD patients, and negatively impacts the quality of life and health outcomes of America's ESRD population.

23. The addition of oral-only drugs to the ESRD PPS bundle will sharply exacerbate these problems.

24. Making dialysis facilities, rather than Medicare Part D plans, financially responsible for oral-only drugs that were previously outside the bundled payment system will increase financial pressure on dialysis facilities—forcing them to bear financial responsibility for purchasing and dispensing new drugs despite the inadequacy of the existing bundled payment for the existing bundle of drugs. Doing so will depress patient care choice, access, and utilization of needed oral-only drugs relative to what would be the case under Medicare Part D.

25. Because of the way drug prescribing works in the United States, CMS's plan to add oral-only drugs to the ESRD PPS bundle will also shift decision-making on oral-only drugs— particularly novel oral-only drugs—from nephrologists and patients to dialysis centers that are

8

already under immense financial pressure.

26. Traditionally, for oral-only drugs subject to Medicare Part D reimbursement, the patient and his or her nephrologist (kidney doctor) have a shared decision-making role in which the nephrologist first individually evaluates the patient's condition and recommends oral-only drugs when they become medically indicated as the patient's condition evolves. The patient is then able to decide whether to accept that recommendation and obtain his or her needed drugs from a pharmacy pursuant to Medicare Part D reimbursement.

27. By contrast, moving oral-only drugs into the bundled services provided by dialysis centers removes the decision-making from the nephrologist, who is not financially interested in whether to issue a prescription covered by Medicare Part D, and reassigns that decision-making to the dialysis center. Dialysis centers are financially impacted when they decide whether to furnish an oral-only drug to a patient, since doing so imposes costs on the dialysis center that cut into the dialysis center's bottom line.

28. As described above, dialysis centers are under immense financial pressure due to CMS's failure to adequately fund the bundle. If dialysis centers can barely cover, or cannot cover, the costs of treating Medicare patients using the existing bundled payment (and many cannot), they will have limited ability to absorb the additional costs of furnishing new drugs to patients and provide antiquated, status quo care to their ESRD patients—much to the detriment of these individuals' health and well-being.

29. The result is that, once oral-only drugs are included in the bundle, utilization of these critical and potentially life-saving drugs will decline significantly, not due to any change in the medical necessity of those treatments for patients, but because CMS is seeking to force oral-only drugs that are typically taken apart from dialysis care into a bundled payment that was

designed for treatment during dialysis only by dialysis facilities.

30. That decision is particularly hard to understand because CMS estimates that shifting oral-only drugs from Medicare Part D to the ESRD PPS bundle will dramatically *increase* costs to taxpayers, by resulting in an additional $180 million in CMS expenditures annually for dialysis care.

31. The decision will also increase the costs for many (if not most) dialysis patients, who pay a 20% co-pay for bundled services.

32. Following the inclusion of oral-only drugs in the ESRD PPS bundle, patients will suffer. Adding oral-only drugs into the bundle will seriously (and, in some cases, irreparably) jeopardize the health of ESRD patients on dialysis.

33. By moving oral-only drugs into the bundle, CMS has failed to protect the best interests of the highly diverse kidney-patient population, the medical professionals charged with their care, and American taxpayers.

34. CMS's action will reduce patient choice and timely access to important medications for dialysis patients, stymie desperately needed innovation, and exacerbate the very inequities in kidney-patient care that CMS publicly claims to be an agency priority.

35. For all these reasons, there is widespread consensus across all major stakeholders in the kidney-care community that movement of oral-only drugs into the ESRD PPS bundle is a mistake that risks substantially harming patients.

I declare under penalty of perjury under the laws of the United States of America that the foregoing declaration is true and correct.

Executed on September 13, 2024

*Diana Clynes*

Diana Clynes

**AMERICAN ASSOCIATION OF KIDNEY PATIENTS,**
14440 Bruce B. Downs Blvd.
Tampa, FL 33613

11