IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARDELYX, INC.,<br>400 Fifth Avenue, Suite 210<br>Waltham, MA 02451<br><br>AMERICAN ASSOCIATION OF KIDNEY PATIENTS,<br>14440 Bruce B. Downs Blvd.<br>Tampa, FL 33613<br><br>NATIONAL MINORITY QUALITY FORUM,<br>1201 15th Street NW # 340<br>Washington, DC 20005<br><br>        Plaintiffs,<br>v.<br><br>XAVIER BECERRA,<br>*Secretary of Health and Human Services*<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>CHIQUITA BROOKS-LASURE, AND<br>*Administrator of Centers for Medicare and Medicaid Services*<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>CENTERS FOR MEDICARE AND MEDICAID SERVICES,<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>        Defendants. | Case No. 1:24-cv-02095 |

**DECLARATION OF DR. GARY PUCKREIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT**

I, Dr. Gary Puckrein, do hereby declare under penalty of perjury that:

1. I have personal knowledge of the facts I state below and would testify truthfully to them if called upon to do so.

2. I am the founding President and Chief Executive Officer of the National Minority Quality Forum ("NMQF"), a not-for-profit healthcare research, education, and advocacy organization headquartered in Washington, DC. The mission of NMQF is to reduce patient risk by assuring optimal care for all. NMQF's vision is an American health services research, delivery, and financing system whose operating principle is to reduce patient risk for amenable morbidity and mortality while improving quality of life. NMQF conducts evidence-based, data-driven initiatives to inform the systems and structures that enable a science-driven American health services enterprise. I received my doctorate from Brown University.

3. NMQF is the largest health equity research, education, and advocacy organization whose mission is to reduce patient risk and advance health equity by assuring optimal care for all.

4. NMQF works to reduce negative health outcomes and promote high-quality, long lives, particularly for the most vulnerable, by using data and research to support and mobilize healthcare organizations, leaders, policymakers, and patients in advocating for optimal care for every individual.

5. As part of my role at NMQF, I support our mission of researching and advocating for health equity, especially for the most vulnerable. In order to effectively carry out my responsibilities, I am familiar with the health inequities regarding end-stage renal disease ("ESRD"), the financial realities for dialysis centers, and the experience of ESRD patients. Patient centered care requires healthcare policy and financing that enable the best possible

outcomes for patients.

6. The consequence of not designing treatment and financing practices through the lenses of science and clinical evidence has been structural and systemic inequities that are measurable in preventable morbidity and mortality.

1. ESRD offers one of the starkest examples of racial, ethnic, and socioeconomic disparities in American healthcare.

2. A disproportionate share of patients suffering from ESRD are racial and ethnic minorities, with African Americans in the United States impacted more than any other racial group.

3. In total, African Americans are almost 4 times more likely, and Hispanics or Latinos are 1.3 times more likely, to have ESRD than white Americans.

4. While African Americans make up 13.5% of the population, they represent more than 35% of dialysis patients.

5. In addition to accounting for a disproportionate share of ESRD patients, African Americans are more prone to death due to ESRD than white Americans.

6. ESRD is often caused by other underlying, uncontrolled health conditions, like high blood pressure and diabetes. As a result, disparities in healthcare provision and treatment outcomes for minorities and other underserved populations result in avoidable diagnoses of ESRD. Lower income and lack of health insurance are additional risk factors associated with a 50 percent or greater increase in the risk of developing ESRD. A higher proportion of African Americans and Hispanics share those risk factors compared to white Americans.

7. Health inequities are also manifest with respect to comorbidities of ESRD. For example, many ESRD patients suffer from hyperphosphatemia, a condition in which there is too

much phosphate in the body. Hyperphosphatemia is a common comorbidity in ESRD patients, and is more common and more severe in African American ESRD patients.

8. As of January 1, 2025, CMS is removing oral-only drugs from Medicare Part D and into the ESRD Prospective Payment System bundle ("ESRD PPS Bundle").

9. CMS has recently claimed that "the incorporation of oral-only drugs in the ESRD PPS will increase access to these drugs for beneficiaries" and create "significant positive health equity impacts." 89 Fed. Reg. 55,760, 55,797 (2024).

10. These assertions are flatly wrong. CMS's decision to move oral-only drugs into the ESRD PPS bundle will exacerbate health inequities and impose particular harm on minority populations and other underserved groups by reducing access to these critical drugs among the most vulnerable populations.

11. The ESRD PPS bundle is already significantly stretched and inadequately funded, such that many dialysis providers struggle to break even on their Medicare patients. Some dialysis providers already lose money providing services to Medicare patients.

7. Over time, CMS has come to set the bundled payment at an amount that barely covers the cost of providing renal dialysis services and related drugs, and at times and for certain providers fails entirely to cover the costs of service delivery.

12. In recent years, CMS has admittedly failed to adjust the ESRD bundled payment amount to account for the actual growth in the cost of providing dialysis services, which has increased financial strain on dialysis providers.

13. CMS also fails to sufficiently reimburse dialysis providers to furnish new, innovative treatments, including drugs.

14. Making dialysis providers financially responsible for oral-only drugs that were

previously outside of the ESRD PPS bundle and covered by Medicare Part D (the Medicare prescription drug benefit) will increase the financial strain on dialysis providers. As a consequence, patients will enjoy reduced access to oral-only therapies, even in situations where their care providers determine the therapies are the best option for their health.

15. CMS appears to believe that incorporating oral-only drugs into the ESRD PPS bundle will increase access to these drugs and ameliorate health inequities. Real-world experience highlights those hopes are misguided.

16. The example of Parsabiv, an intravenous calcimimetic (which is a drug that increases the sensitivity of the body to calcium), demonstrates the dangers to minority and disadvantaged patients of adding oral-only drugs into the ESRD PPS bundle.

17. Before Parsabiv, calcimimetics were oral-only drugs excluded from the ESRD PPS bundle under Congressional action that prevented CMS from implementing its policy decision to place oral-only drugs into the bundle until January 1, 2025.

18. Following the introduction of Parsabiv, CMS moved calcimimetics to the bundle because they no longer were oral-only drugs.

19. When Parsabiv was first introduced and covered under the Transitional Drug Add-On Payment ("TDAPA"), approximately 10 percent of dialysis patients utilized the drug. Immediately after the TDAPA period ended and Parasbiv was moved into the ESRD PPS bundle, patient utilization dropped to 3 percent in 2021, even though almost one in three ESRD patients used a calcimimetic. In 2023, that utilization number dropped below 1 percent.

20. The drop in Parsabiv usage is particularly noteworthy, and worrisome, for the African American population. In 2020, Parsabiv was utilized by 14.3 percent of African Americans treated with calcimimetics. In 2021, this number decreased to a mere 4.5 percent.

5

Considering the greater severity of ESRD in this patient population, the significant reduction in African Americans' access to a more potent, effective therapy is deeply concerning.

21. Indeed, from July 2020 to July 2021, after Parsabiv entered the ESRD PPS bundle, the prevalence of parathyroid levels above the threshold for hyperparathyroidism among ESRD patients who discontinued Parsabiv increased from 28% to 43% overall, and from 32% to 50% among African American patients. See Angelo Karaboyas et al., *Calcimimetic Reimbursement Changes in 2021: Impact of Etelcalcetide Discontinuation on Parathyroid Hormone (PTH) Levelsin US Hemodialysis Patients*, American Society of Nephrology (Poster No. TH-PO149) (Nov. 2023), (https://www.asn-online.org/education/kidneyweek/2023/programabstract.aspx?controlId=3931328).

22. The movement of Parsabiv into the bundle thus reduced patient access to an innovative treatment for patients across the board—and especially for African Americans—with a resulting increase in a comorbidity for ESRD patients. If CMS is allowed to move oral-only drugs like XPHOZAH into the bundle, there is no reason to expect a different result.

23. Thus, the inclusion of oral only drugs in the ESRD PPS bundle will curtail patient access to new treatments and incentivize a resource-minimizing approach to treatment that does not account for the diverse needs of individual patients.

24. In sum, if oral-only drugs are placed into the ESRD PPS bundle, patients will not have as much access to these drugs. This will deprive patients of critical—and in some cases, life-saving—treatments.

25. CMS's decision to add oral-only drugs to the ESRD PPS bundle will seriously, and in some cases irreparably, jeopardize the health of ESRD patients, particularly the most vulnerable.

26. The burden of CMS's inclusion of oral-only drugs in the bundle will fall most heavily on patients from minority, rural, and low-income backgrounds, who represent a disproportionate share of patients suffering from ESRD and hyperphosphatemia.

27. Minority patients lacking private health insurance will particularly struggle to obtain access to the latest oral-only drugs once they are moved into the ESRD PPS bundle—and, for that matter, to older conventional treatments—due to CMS's failure to adequately fund the bundled payment.

28. In short, by sweeping oral-only drugs into the ESRD PPS bundle, CMS perversely ensures that the neediest patients are deprived of key treatments.

29. Such pronouncements, which ignore the consistent and contrary experience of stakeholders from the entire spectrum of the kidney-care community, ignore the real-world problems with CMS's plan to enlarge the ESRD PPS bundle.

30. CMS's claim that addition of oral-only drugs to the ESRD PPS bundle will improve positive health equity impacts is simply wrong. Doing so will only strengthen and reinforce the systemic healthcare inequities that impact this country's most vulnerable patients.

31. For these reasons, among others, there is widespread consensus across all major stakeholders in the kidney-care community that movement of oral-only drugs into the bundle is a mistake that risks substantially harming patients.

I declare under penalty of perjury under the laws of the United States of America that the foregoing declaration is true and correct.

Executed on September 19, 2024

_____

_____
Dr. Gary Puckrein