IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARDELYX, INC.,<br>400 Fifth Avenue, Suite 210<br>Waltham, MA 02451<br><br>AMERICAN ASSOCIATION OF KIDNEY PATIENTS,<br>14440 Bruce B. Downs Blvd.<br>Tampa, FL 33613<br><br>NATIONAL MINORITY QUALITY FORUM,<br>1201 15th Street NW # 340<br>Washington, DC 20005<br><br>      Plaintiffs,<br>  v.<br><br>XAVIER BECERRA,<br>*Secretary of Health and Human Services*<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>CHIQUITA BROOKS-LASURE, AND<br>*Administrator of Centers for Medicare and Medicaid Services*<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>CENTERS FOR MEDICARE AND MEDICAID SERVICES,<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>      Defendants. | Case No. 1:24-cv-02095 |

## DECLARATION OF LAURA WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT

I, Laura Williams, do hereby declare under penalty of perjury that:

1. I have personal knowledge of the facts I state below and would testify truthfully to them if called upon to do so.

2. Headquartered in Waltham, Massachusetts, Ardelyx is a biopharmaceutical company founded in 2007 with a mission to discover, develop, and commercialize innovative first-in-class medicines that meet significant unmet medical needs. As detailed below, Ardelyx is advancing XPHOZAH (tenapanor), a new, innovative therapy for hyperphosphatemia.

3. I am an experienced physician scientist committed to discovering, developing and commercializing innovative therapies to positively impact the lives of patients. I have over 25 years of experience in the pharmaceutical industry, across all clinical development phases and multiple therapeutic areas. I am a strong patient advocate and healthcare policy advisor. I earned my Bachelor of Science degree from Mississippi State University, a Doctor of Medicine degree from University of Iowa, and a Master of Public Health degree in epidemiology from University of Washington, where I completed a fellowship in infectious diseases. I completed my Internal Medicine residency at University of Michigan, where I also had the honor to serve as Chief Medical Resident and Junior Faculty. As Chief Medical Officer of Ardelyx, I am responsible for providing clinical collaborative leadership across all key clinical development functions; evaluating therapeutic areas of unmet need and assisting with analyses and insights that guide prioritization of opportunities to address unmet medical needs; overseeing Ardelyx's medical affairs and broader medical teams, with the goal of maintaining effective medical and scientific communications and ensuring timely response to medical information inquiries; providing support for corporate and commercial activities that are highly dependent on the accurate communication of clinical or scientific data; leading activities to assure the safety of patients both during

investigational and post-marketing evaluations of development-stage portfolio assets and marketed products, respectively; maintaining a high level of communication with Ardelyx sales, marketing, market access and commercial operations teams to ensure that Ardelyx's activities are appropriately aligned with Ardelyx's mission and patient centric values. In all my efforts, the goal of ensuring the inclusion of patient advocacy and engagement throughout all of Ardelyx's activities is paramount. As part of my role, I am familiar with Ardelyx's market strategy, pricing, revenues, margins, and market shares associated with XPHOZAH. So as far as possible, I am familiar with government laws and policies affecting revenues as related to XPHOZAH. I am also familiar with XPHOZAH itself, including its function as an innovative therapy for hyperphosphatemia.

## END STAGE RENAL DISEASE

4.  Approximately 550,000 people in the United States suffer from end stage renal disease (ESRD), also known as kidney failure, a life-threatening condition in which the kidneys can no longer function on their own.

5.  ESRD is the final, permanent stage of chronic kidney disease (CKD), a condition in which the kidneys become progressively damaged over time and eventually lose the ability to function.

6.  Because of the essential role the kidneys play in filtering waste products and toxins from the body, ESRD will result in certain death if left untreated.

7.  Unless a patient suffering from ESRD is able to obtain a kidney transplant, he or she must undergo routine maintenance dialysis treatment in order to survive. These treatment modalities are often called renal replacement therapy (RRT), with approximately two-thirds of patients with ESRD receiving maintenance dialysis as their primary treatment, and the remaining

one-third being kidney transplant recipients.

8. Patients with ESRD who receive in-center maintenance dialysis—in which a machine manually filters waste in place of the kidneys—are typically scheduled 3 dialysis sessions a week for 3 to 5 hours per session. An in-center dialysis facility is a kidney dialysis center that is staffed by a specialized dialysis care team.

9. Even with dialysis, patients with ESRD experience frighteningly high mortality rates—20 to 50% of ESRD patients on dialysis die within 24 months of diagnosis, and a recent study of patients with kidney failure showed a five-year survival rate of 31% when adjusted for age, gender, race and year, and 36% when also adjusted for co-morbidities (other medical conditions patients with ESRD may also have).

### COMORBIDITIES OF END STAGE RENAL DISEASE

10. There are other medical conditions that are associated with ESRD, but that are not ESRD themselves.

11. Such a disease or medical condition that is simultaneously present with another in a patient can also be referred to as a "comorbidity."

12. For example, diabetes (DM) is a common comorbidity seen in patients with ESRD. In fact, DM is the leading cause of ESRD, accounting for approximately 50% of cases in developed countries worldwide.

13. Hypertension is another common comorbidity in patients with ESRD—found in 84% of ESRD patients. It also represents the second leading cause of ESRD.

14. Other major comorbidities seen in patients with ESRD include bone disease, secondary hyperparathyroidism (the excessive secretion of parathyroid hormone that results in elevated serum calcium levels), anemia, stroke, hepatitis, and cardiovascular disease (CVD). CVD

4

is the leading cause of death in patients on maintenance dialysis, accounting for a 10-30 times higher risk of death in these patients compared to the general population.

15. Treatments for most comorbidities associated with ESRD are usually provided in an oral form (typically a tablet, capsule or liquid), as most of these medical conditions require chronic therapy.

16. Importantly, medications used to treat some of the more common comorbidities in patients with ESRD, like diabetes, hypertension and CVD, independent of route of administration (oral or infusion/injectable), are covered under Medicare Part D.

### HYPERPHOSPHATEMIA

17. Phosphate is an important mineral (nutrient) that plays a vital role in the body (bone, teeth, cellular energy, etc.).

18. In addition to the aforementioned conditions, many ESRD patients suffer from hyperphosphatemia, or elevated levels of phosphate in the blood. Hyperphosphatemia is common among patients whose kidneys have failed. Hyperphosphatemia occurs in approximately 80% of patients with ESRD on maintenance dialysis.

19. Hyperphosphatemia is associated with a higher risk of morbidity and mortality (all-cause and cardiovascular mortality) in patients with ESRD on maintenance dialysis. It can also lead to the progression of bone disorders, which can cause bone pain and fractures.

20. As a result of the increased morbidity and mortality associated with hyperphosphatemia, international guidelines establish that the treatment goal is to lower serum phosphate levels toward the normal reference range in an effort to decrease the associated risk.

21. Effective management of phosphorous is also important to facilitate successful kidney transplants. A failure to manage hyperphosphatemia can prevent patients from obtaining

a place on the kidney transplant list based on data that suggest poorer transplant graft success rates in patients with significantly higher abnormal phosphorus levels prior to transplant.

22. Nephrologists often manage ESRD patients' phosphorous levels by prescribing phosphate lowering therapies (PLTs). Until recently, PLTs consisted of only one class of pharmaceutical therapy, phosphate-binders (drugs that lower phosphate levels in the body by binding excess phosphate molecules in the gastrointestinal tract and preventing them from reaching the bloodstream).

23. Phosphate binders must be taken daily by mouth with each meal due to their mechanism of action (binding to phosphate in the gut), and thus cannot be delivered via infusion or injection.

24. Many patients who receive phosphate binders do not have an adequate treatment response, such that their blood phosphate levels remain elevated.

25. Approximately 70% percent of patients with ESRD on maintenance dialysis who have hyperphosphatemia are unable to maintain target phosphate levels over a 6-month period despite treatment with phosphate binders.

## XPHOZAH

26. Ardelyx is a biopharmaceutical company founded with a mission to discover, develop and commercialize innovative, first-in-class medicines that meet significant unmet medical needs.

27. Ardelyx is the manufacturer of XPHOZAH (tenapanor), a new, innovative therapy for hyperphosphatemia.

28. XPHOZAH first became available to patients in October 2023 following approval by the Food and Drug Administration ("FDA").

29. XPHOZAH is a phosphate absorption inhibitor approved as an add-on-therapy for patients with ESRD on maintenance dialysis with hyperphosphatemia who have an inadequate response to or are intolerant to phosphate binder therapy. Meaning, XPHOZAH provides an additional novel treatment option for the many patients who have not had a good response to phosphate binders or who simply cannot tolerate them.

30. While phosphate binders function by binding to phosphate in the gut after a meal, XPHOZAH works differently—a different mechanism of action— blocking phosphate absorption at the primary para-cellular pathway. XPHOZAH therefore provides the first new mechanism of action in over five decades to reduce phosphate in patients with hyperphosphatemia.

31. XPHOZAH's label states that XPHOZAH is "indicated to reduce serum phosphorus in adults with chronic kidney disease (CKD) on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy." Ex. 1. XPHOZAH's mode of action is to "manage serum phosphorus levels" by blocking phosphate absorption at the primary pathway. *Id*. A true and correct copy of the XPHOZAH Label, "Prescribing Information," as revised by the FDA in October 2023, is attached as Exhibit 1.

32. Therefore, XPHOZAH is not even indicated for use in many patients with ESRD. Rather, as its label explains, XPHOZAH is indicated only as an add-on therapy for the majority of CKD patients on dialysis who (1) have hyperphosphatemia; and (2) have an inadequate response to or are intolerant of phosphate binders.

33. Although it is not a phosphate binder, like all other PLTs, XPHOZAH must also be administered orally because its mechanism of action works in the gastrointestinal tract to block absorption of dietary phosphorus into the bloodstream. The XPHOZAH mechanism of action

requires transit through the gastrointestinal tract to work.

34. As such, XPHOZAH, like other phosphate-lowering therapies, does not and cannot have injectable or non-oral equivalents. XPHOZAH is available only in an oral form.

35. XPHOZAH is offered as a tablet taken orally two times a day.

36. XPHOZAH's dosing regimen does not follow the regimen of dialysis administration sessions, which typically occur for at least three hours per day, for three days per week. XPHOZAH is not administered during a renal dialysis session.

37. XPHOZAH must be taken just prior to a meal, making it impossible to be taken at the same time as dialysis sessions, as meals and snacks are generally not allowed during dialysis. XPHOZAH's label instructs patients not to take XPHOZAH right before a dialysis session, and instead to take it right before the next meal following dialysis. *See* Ex. 1 (XPHOZAH Label stating: "Recommended dosage: 30 mg orally twice daily before the morning and evening meals" and "Instruct patients not to take right before a hemodialysis session, and instead take right before the next meal following dialysis").

38. XPHOZAH is not distributed or administered by dialysis facilities, is not taken during dialysis, and is not indicated to be taken as part of dialysis. XPHOZAH has never been administered or distributed by dialysis facilities and is not part of a renal dialysis session.

39. Instead, like other oral PLTs, namely, phosphate binders, XPHOZAH is prescribed by nephrologists for patients with ESRD and distributed through a pharmacy.

40. As of September 6, 2024, Ardelyx estimates that roughly 7.1% of patients with ESRD on maintenance dialysis with hyperphosphatemia are currently prescribed XPHOZAH, a number which has continued to grow since XPHOZAH's late 2023 launch. Based on anecdotal reports from patients and health care providers, XPHOZAH is having a significant, positive effect

on patients, including by facilitating reductions in serum phosphorus sufficient to allow patients to become viable candidates for transplant, who may have been considered ineligible for transplant based on data that suggest poorer transplant graft success rates in patients with significantly higher abnormal phosphorus levels prior to transplant.

### CMS'S HISTORICAL TREATMENT OF ORAL-ONLY DRUGS

41. In response to growing numbers of dialysis patients and dialysis centers, and the high costs of life-saving dialysis treatment, Congress first extended Medicare coverage to individuals suffering from ESRD in 1972.

42. Beginning in the 1980s, Medicare began paying for dialysis services using the "composite rate" system, a blended prospective payment and fee-for-service system. Under the composite rate system, dialysis facilities received a single, prospectively determined payment amount per treatment to cover a defined set of regularly provided tests and supplies, while injectable ESRD drugs were separately reimbursed under Medicare Part B. In addition, oral-only ESRD drugs have been covered separately under Medicare Part D since Medicare Part D's inception in 2006.

43. In 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"), which, among other things, created a new bundled payment system for "renal dialysis services" under which a single prospective payment through Medicare Part B is made to dialysis facilities.

44. The new bundled payment system, the ESRD Prospective Payment System bundle ("ESRD PPS bundle"), was designed to limit over utilization of some drugs and incentivize efficiency for dialysis providers, as providers would retain any difference between Medicare's payment and the costs they incurred to provide renal dialysis services.

9

45. At the time Congress enacted MIPPA in 2008, drugs and biologics administered to patients by dialysis facilities for the treatment of ESRD were administered intravenously or by injection during dialysis. Oral-only drugs were neither provided by dialysis facilities, nor during dialysis, nor were the equivalent of injectable drugs that were.

46. In 2009, CMS issued a proposed rule to implement the bundled payment system created by MIPPA starting in 2011. In its final rule issued in 2010, CMS decided to include oral-only drugs in the ESRD PPS bundle starting in 2014. 75 Fed. Reg. 49,030 (2010).

47. Congress has repeatedly intervened to delay CMS's plan to place oral-only drugs into the bundle. In 2012, Congress prevented CMS from including oral-only drugs in the ESRD bundle until 2016. American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 632(b), 126 Stat. 2313 (2012). Then, in 2014, Congress twice delayed the implementation of the oral-only-drug inclusion: first until 2024, and then until 2025. *See* Pub. L. No. 113-93 § 217(a)(1), 129 Stat. 1040 (2014); Achieving a Better Life Experience Act of 2014, Pub. L. No. 113-295, § 204, 128 Stat. 1040 (2014).

48. As a result, despite CMS's over decade-old rulemaking, pharmaceutical companies have not had to contend with the effects of CMS's oral-only-drug rule until very recently, as the 2025 deadline approached and CMS began to take action to implement its decision to eliminate Part D coverage for oral-only drugs, and pay for them via Part B by placing them into the bundled payment system.

49. Currently, oral-only drugs are covered by Medicare Part D (the Medicare drug insurance provisions). Under Medicare Part D, the government provides reimbursement for oral prescription drugs on an as needed basis when physicians, in partnership with their patients, determine that those drugs are the best fit for a patient's individual health needs.

50. Medicare Part D plans have historically provided sufficient compensation to pharmacies responsible for dispensing Part D drugs to facilitate patient access to innovative, effective treatments.

51. The placement of drugs and services into Medicare Part B, by contrast, creates added challenges for patients with ESRD. Under Medicare Part B, patients typically must pay 20% coinsurance for expenses. ESRD patients incur substantial medical costs for ESRD and other medical conditions. At the same time, many ESRD patients cannot work regular hours given the demands of dialysis. Although insurers in some states are required to offer Medigap coverage to all Medicare recipients, which can at least reduce that burden, there are many states in which insurers are not required to offer Medigap coverage to patients under 65. As a result, the placement of oral-only therapies into Medicare Part B can increase expenses on ESRD patients who can ill afford to bear them, and further diminish access to needed therapies.

52. These burdens fall disproportionately on minority, low-income, and rural Americans, who are disproportionately affected by ESRD.

### CMS'S DECISION TO INCLUDE XPHOZAH IN THE ESRD PPS BUNDLE

53. Ardelyx believes that XPHOZAH should not be placed into the ESRD PPS bundle for numerous reasons. On July 17, 2024, Ardelyx filed a complaint setting forth various justifications why XPHOZAH should not be placed into the ESRD PPS Bundle. For one, Congress defined "renal dialysis services" to include only "drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease" and "any oral equivalent form of such drug or biological." 42 U.S.C. § 1395rr(b)(14)(B). Because XPHOZAH is an oral-only drug, it is not the oral equivalent form of an injectable drug or biologic and does not qualify. Further, the statute provides that, for inclusion in the bundle, a drug must be (among other requirements) a drug

11

"for the treatment of end stage renal disease." 42 U.S.C. § 1395rr(b)(14)(B). As described above, XPHOZAH is not such a drug. Moreover, under CMS's regulation, 42 C.F.R. § 413.171(5), "[r]enal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis." Again, as explained, XPHOZAH is not essential to maintenance dialysis, as it is administered twice daily just before a meal, and is in no way a prerequisite or requisite to maintenance dialysis. Finally, CMS has issued guidance that the ESRD PPS bundle applies to drugs "expected to be utilized for ESRD-related conditions in a dialysis unit (and therefore would be a renal dialysis service)." 75 Fed. Reg. at 49047. Once again, XPHOZAH simply is not used that way; XPHOZAH is not administered in a dialysis unit, as it must be given just prior to a meal and meals are typically not allowed during a dialysis session.

54. Given CMS's articulated intent to sweep oral-only drugs into the ESRD PPS bundle, and given the numerous features of XPHOZAH that exclude it from the scope of the ESRD PPS bundle, Ardelyx has made numerous submissions to CMS urging it to maintain coverage for XPHOZAH under Medicare Part D, consistent with governing law. As detailed below, CMS finally decided this issue against Ardelyx, issuing a decision that XPHOZAH shall be included in the ESRD PPS bundle beginning in January 2025.

55. For example, on June 22, 2023, Ardelyx presented to CMS a presentation titled "Management of Hyperphosphatemia and Implications of ESRD PPS" where Ardelyx requested that CMS continue to exclude phosphate-lowering therapies, including XPHOZAH, from the ESRD PPS bundle, and describing potential harms to patients of a contrary determination. A true and correct copy of this presentation, in the form presented to CMS, is attached as Ex. 2.

56. Then, on August 21, 2023, Ardelyx sent CMS a letter entitled "Medicare Program; End-Stage Renal Disease Prospective Payment System and Related Provisions Proposed Rule for

Calendar Year 2024 [CMS-1782-P]," where Ardelyx detailed patient harms and operational challenges related to unlawfully including oral-only phosphate-lowering therapies, including XPHOZAH, in the bundle, and urging CMS not to do so. Ex. 3. A true and correct copy of this letter, in the form sent to CMS, is attached as Ex. 3.

57. Similarly, on September 5, 2023, Ardelyx sent CMS another letter, titled "Follow-up on June 22 Meeting on Oral-only Phosphate-Lowering Therapies" where Ardelyx argued that MIPPA, nor its implementing regulations, do not require CMS to include oral-only phosphate-lowering therapies in the definition of "renal dialysis services." Ex. 4. A true and correct copy of this letter, in the form sent to CMS, is attached as Ex. 4.

58. On March 11, 2024, Ardelyx presented to CMS a presentation titled "Exclusion of Oral-Only Phosphate-Lowering Therapies From the ESRD PPS" in which Ardelyx requested that "CMS continue to exclude oral-only phosphate-lowering therapies from the End Stage Renal Disease (ESRD) Prospective Payment System (PPS or 'bundle') beyond January 1, 2025, until an IV formulation is available." Ex. 5 at 4, 6, 10. Ardelyx identified that "[i]nclusion in the ESRD PPS will significantly impede physician decision-making on treatment options for managing serum phosphorus," and that "[p]atients are likely to face significant challenges in receiving therapies prescribed based on their individual serum phosphorus management needs and clinical judgment of their nephrologists." Ex. 5 at 4, 6. A true and correct copy of this presentation, in the form presented to CMS, is attached as Ex. 5.

59. A few days later, on March 13, 2024, Ardelyx sent another letter to CMS regarding the presentation, titled "Oral-Only Phosphate Lowering Therapies: Request to Maintain Coverage Under Medicare Part D for CY 2025 ESRD PPS Rulemaking" further expanding on the harms that would result from adding oral-only phosphate-lowering therapies in the bundle. Ex. 6. A true and

correct copy of this letter, in the form sent to CMS, is attached as Ex. 6.

60. On April 29, 2024, CMS issued guidance entitled "Including Oral-Only Drugs in the ESRD PPS Bundled Payment," with an effective date and implementation date of January 1, 2025. Ex. 7. CMS explained that "[u]nder 42 C.F.R. § 413.174(f)(6), effective January 1, 2025, payment to an ESRD facility for renal dialysis service drugs and biologicals with only an oral form furnished to ESRD patients is incorporated within the prospective payment system rates established by CMS in § 413.230 and separate payment will no longer be provided." *Id.* at 1. A true and correct copy of this guidance, in the form obtained by Ardelyx, is attached as Ex. 7.

61. On May 13, 2024, CMS sent a letter-decision addressed to Laura Williams, M.D., Chief Medical Officer of Ardelyx that set forth that "CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171, because it is furnished to individuals to treat a condition associated with ESRD and is essential to the delivery of maintenance dialysis." Ex. 8 at 1. CMS stated that "beginning January 1, 2025, all renal dialysis services, including oral-only drugs, will be incorporated into the ESRD PPS, and no separate payment under Medicare Part D will be made for any oral-only renal dialysis drugs. This will include XPHOZAH." *Id.* A true and correct copy of this letter, in the form sent to me, is attached as Ex. 8.

### HARMS OF INCLUDING XPHOZAH IN THE ESRD PPS BUNDLE

62. As discussed, Medicare Part D plans have historically provided sufficient compensation to pharmacies responsible for dispensing Part D drugs to facilitate patient access to innovative, effective treatments, including XPHOZAH.

63. That has been demonstrated by XPHOZAH's rapid uptake by patients. Thousands of patients are benefiting today from this new and innovative treatment option.

64. By contrast, today, the ESRD PPS bundle is already significantly overburdened and

inadequately funded to cover services and drugs already properly included within the bundle.

65. Congress's intent in creating the bundle was to incentivize efficiency in dialysis service delivery by allowing dialysis providers to retain any cost difference between the bundled payment made by Medicare to dialysis providers, and costs incurred for dialysis service delivery. *See* 75 Fed. Reg. at 49,034 (ESRD bundle was intended to "reduc[e] incentives to overuse profitable separately billable drugs" and to "promot[e] operational efficiency").

66. However, over time CMS has come to set the bundled payment to an amount that barely covers the cost of providing renal dialysis services and related drugs, and thus, often fails to cover the costs of service delivery for certain providers.

67. In recent years, CMS has under-forecasted actual increases in costs of dialysis services, which has led to a lower bundled payment and increased financial strain on dialysis providers. Currently, many dialysis providers struggle to break even financially on providing dialysis services and related drugs to Medicare patients, with some dialysis providers even having negative profit margins (that is, they lose money).

68. Adding to these problems, CMS also fails to sufficiently reimburse dialysis providers for new, innovative products when they are added to the ESRD PPS bundle.

69. As the ESRD PPS bundle balloons in the scope of services and drugs covered each year, but government payments toward the bundle stagnate, it causes dialysis facilities to hesitate to adopt new products and diminishes patients' long-term access to needed medical care. Instead, dialysis providers are incentivized to underutilize novel therapies for which they would not be fully reimbursed through the ESRD PPS bundle.

70. And although CMS makes (temporarily) available certain additional funds to cover new drugs upon their entry to the bundle through the Transitional Drug Add-On Payment

(TDAPA) for a short period of time, such additional payments—even when made available—do not cover the full cost to the dialysis facility of providing such prescription drugs, and typically expire after two years.

71. During the temporary TDAPA period, Medicare reimbursement for new drugs added to the ESRD PPS bundle is generally set at the drug's average sales price (ASP). ASP is a market-based price that reflects the weighted average of all manufacturer sales prices, including all rebates and discounts that are privately negotiated between manufacturers and purchasers (with the exception of Medicaid and certain federal discounts and rebates).

72. By reimbursing providers at ASP-based rates, Medicare insufficiently reimburses any dialysis facility that is unable to purchase the drug at or near the "average" price, taking account of all discounts. This disproportionately challenges small, independent dialysis providers, who do not generate sufficient volume to negotiate the discounts on drugs offered to large dialysis providers.

73. TDAPA support for new drugs in the bundle also generally expires after two years.

74. The limited long-term reimbursement provided by CMS for novel drugs, paired with CMS's failure to adequately fund the ESRD PPS bundled system, significantly discourages dialysis providers from adopting or facilitating the uptake of novel treatments.

75. Experience with drugs like Parsabiv (etelcalcitide) has shown that when TDAPA support expires and novel treatments are added to the bundle, access to these treatments plummets to the detriment of patients. When Parsabiv, an important and innovative therapeutic intravenous calcimimetic (a drug that addresses hyperparathyroidism) was first introduced and covered under TDAPA in 2018, approximately 10 percent of dialysis patients utilized the drug. Immediately after the TDAPA period ended and Parasbiv was moved into the ESRD PPS bundle, patient

utilization dropped to 3 percent in 2021, even though, by then, almost one in three ESRD patients were treated with a calcimimetic. By 2023, less than one percent of ESRD patients were prescribed Parasbiv. As Parsabiv utilization dropped, the prevalence of ESRD patients with increased levels of parathyroid hormone above recommended guidelines increased. The movement of Parsabiv into the bundle, thus reduced patient access to an innovative treatment, resulting in negative health consequences for patients with ESRD.

76. If oral-only drugs are no longer eligible for Medicare Part D reimbursement and are instead moved into the ESRD PPS bundle, dialysis facilities will have to cover the cost of purchasing the drugs from their single, inadequate bundled payment. All of that will depress patient utilization of needed oral-only drugs, despite physicians' belief that such drugs would be beneficial for their patients.

77. Placement of XPHOZAH in the bundle would significantly interfere with access to XPHOZAH for patients who are in need, namely those who have not had an adequate response to phosphate binders or who simply cannot tolerate them. At a minimum it is likely to discourage uptake of XPHOZAH in favor of older, less effective therapies.

78. CMS's decision to include XPHOZAH and other oral only drugs in the bundle will also impede innovation in medical treatment for patients. By artificially suppressing reimbursement for these drugs, CMS's decisions will deprive manufacturers of the economic incentive and ability to bring and maintain innovative treatments to market.

79. Placing oral-only drugs, like XPHOZAH, in the bundle will significantly discourage innovation that could benefit chronic kidney disease patients. This risk is far from hypothetical, as it has already occurred.

80. For example, Cara Therapeutics terminated its Phase 3 clinical program for an oral

form of Korsuva, which treats pruritis (severe itchiness of the skin) in patients with ESRD after the injectable form of the same drug was moved into the ESRD PPS bundle. Pruritis, when left untreated in patients with ESRD, can have a significant negative impact on quality of life, eventually leading to psychiatric disorders and suicide attempts. Cara Therapeutics explained in an SEC filing that "[t]he unfavorable CMS reimbursement codified in the final CY 2024 rule [by including the drug in the bundle] has resulted in a lack of sequential revenues growth for KORSUVA injection since its launch . . . . [w]e expect no meaningful revenue contribution from KORSUVA injection following the TDAPA period expiration." The same year, Cara Therapeutics decided to focus its oral Korsuva trials on a different therapeutic indication with greater "commercial potential."

81.     If CMS is permitted to place all oral-only drugs into the ESRD PPS bundle, it will therefore deter innovation that is essential to confront the serious health needs faced by ESRD patients, either in relation to ESRD, or its comorbidities and complications.

I declare under penalty of perjury under the laws of the United States of America that the foregoing declaration is true and correct.

Executed on September 17, 2024

Waltham, Massachusetts

Laura Williams

17 SEP 2024