UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARDELYX, INC., et al.,

            Plaintiffs,

      v.

XAVIER BECERRA,
Secretary of Health and Human Services, et al.,

           Defendant.

Civil Action No. 24-2095 (BAH)

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION..........................................................................................................- 1 -

BACKGROUND...........................................................................................................- 1 -

    I.    The Medicare Program and Coverage for End-Stage Renal Disease........................................- 1 -

    II.   Implementation of the Medicare Improvement Act...................................................- 4 -

    III.   Transitional Drug Add-On Payment Adjustments...............................................- 8 -

    IV.   Factual Background. ....................................................................................- 9 -

    V.   This Lawsuit and Plaintiffs' Motion for Preliminary Injunctive Relief. ...................- 10 -

LEGAL STANDARD .................................................................................................- 11 -

ARGUMENT .............................................................................................................- 13 -

    I.    This Court Should Grant Defendants' Motion to Dismiss, Which Would Render Plaintiffs'

    Preliminary Injunction Motion Moot...............................................................- 14 -

    II.   Plaintiffs Preliminary Injunction Motion Should Be Denied Because They Do Not Allege

    Imminent, Irreparable Harm..........................................................................- 15 -

    III.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims .......................- 26 -

    IV.   Neither the Balance of the Equities Nor the Public Interest Favors Plaintiffs.....................- 39 -

    V.   This Court Should Not Grant Expedited Summary Judgment ...................................- 41 -

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Abdullah v. Obama*,
    753 F.3d 193 (D.C. Cir. 2014) ......................................................... -15 -
*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
    840 F. Supp. 2d 327 (D.D.C. 2012) ..........................................- 16 -, - 17 -
*Alcresta Therapeutics, Inc. v. Azar*,
    318 F. Supp. 3d 321 (D.D.C. 2018) ...............................- 17 -, - 19 -, - 26 -
*Am. Ass'n for Homecare v. Leavitt*, Civ. A.,
    No. 08-0992, 2008 WL 2580217 (D.D.C. June 30, 2008) ..................- 17 -, - 20 -
*Am. Ass'n of Pol. Consultants v. Small Bus. Admin.*,
    613 F. Supp. 3d 360 (D.D.C. 2020) ...................................... - 18 -
*Asante v. Azar*, Civ. A.,
    No. 20-0601 (TSC), 2020 WL 1930263 (D.D.C. Apr. 21, 2020) .................. - 17 -
*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
    509 F. Supp. 3d 482 (D. Md. 2020) ..................................... - 23 -
*Bartko v. Dep't of Just.*,
    Civ. A. No. 13-1135 (JEB), 2015 WL 13673371 (D.D.C. Mar. 12, 2015) ............ - 12 -
*Bayer HealthCare, LLC v. FDA*,
    942 F. Supp. 2d 17 (D.D.C. 2013) .................................... - 19 -
*Becerra v. Empire Health Found.*,
    597 U.S. 424 (2022) ............................................. - 2 -
*Cardinal Health, Inc. v. Holder*,
    846 F. Supp. 2d 203 (D.D.C. 2012) ................................... - 16 -
*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ...................................... - 12 -
*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...............................- 12 -, - 13 -, - 15 -
*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ...................................... - 13 -
*Collagenex Pharmaceuticals, Inc. v. Thompson*,
    Civ. A. No. 03-1405, 2003 WL 21697344 (D.D.C. July 22, 2003) ..........- 40 -, - 41 -
*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) .................................... - 18 -
*Damus v. Nielsen*, Civ. A.,
    No. 18-0578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) ...................... - 12 -
*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) .................................... - 12 -
*Dep't of Homeland Sec.*,
    105 F. Supp. 3d 108 (D.D.C. 2015) ................................... - 17 -
*E.B. v. Dep't of State*,
    422 F. Supp. 3d 81 (D.D.C. 2019) ................................... - 15 -
*Farm Econ. v. Dep't of Agric.*,

876 F.2d 994 (D.C. Cir. 1989) ...................................................................... - 28 -
*Feinerman v. Bernardi,*
  558 F. Supp. 2d 36 (D.D.C. 2008) ............................................- 19 -, - 20 -
*Girouard v. United States,*
  328 U.S. 61 (1946) ...................................................................... - 29 -
*Henke v. Dep't of Interior,*
  842 F. Supp. 2d 54 (D.D.C. 2012) ............................................ - 13 -
*Hospitality Staffing Sols., LLC v. Reyes,*
  736 F. Supp. 2d 192 (D.D.C. 2010).......................................... - 12 -
*Lee v. Christian Coal. of Am., Inc.,*
  160 F. Supp. 2d 14 (D.D.C. 2001) ............................................ - 20 -
*Luokung Technology Corp. v. Department of Defense,*
  538 F. Supp. 3d 174 (D.D.C. 2021)........................................... - 18 -
*Mott Thoroughbred Stables, Inc. v. Rodriguez,*
  87 F. Supp. 3d 237 (D.D.C. 2015) ............................................ - 41 -
*Nken v. Holder,*
  556 U.S. 418 (2009) ...................................................................... - 12 -
*Power Mobility Coal. v. Leavitt,*
  404 F. Supp. 2d 190 (D.D.C. 2005)..........................................- 15 -, - 22 -
*Pursuing Am's Greatness v. Fed. Election Comm'n,*
  831 F.3d 500 (D.C. Cir. 2016) ...................................................... - 39 -
*Rozenkrantz v. Inter-Am. Dev. Bank, Civ. A.,*
  No. 20-3670 (BAH), 2021 WL 1254367 (D.D.C. Apr. 5, 2021) ...................... - 14 -
*Safari Club Int'l v. Salazar,*
  852 F. Supp. 2d 102 (D.D.C. 2012)..............................- 20 -, - 22 -, - 31 -
*Shelley v. Am. Postal Workers Union,*
  775 F. Supp. 2d 197 (D.D.C. 2011)............................................. - 14 -
*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) .....................................................- 12 -, - 39 -
*Texas Children's Hospital v. Burwell,*
  76 F. Supp. 3d 224 (D.D.C. 2014) ............................................- 23 -, - 24 -
*United States v. Philip Morris USA Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009)...................................................- 30 -, - 32 -
*Uranga v. Citizenship & Immigr. Servs.,*
  Civ. A. No. 20-0521 (ABJ), 2020 WL 7230675 (D.D.C. Dec. 8, 2020)............ - 15 -
*Wilson v. Grp. Hosp. & Med. Servs., Inc.,*
  791 F. Supp. 309 (D.D.C. 1992).................................................- 22 -, - 23 -
*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .........................................................................- 11 -, - 12 -
*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) .....................................- 15 -, - 16 -, - 17 -, - 23 -

## Statutes

42 U.S.C. § 426-1 .......................................................................... - 2 -
42 U.S.C. § 1395 ............................................................................. - 1 -
42 U.S.C. § 1395rr(b)(7) .................................................................. - 2 -

42 U.S.C. § 1395rr(b)(12) ............................................................................................ - 3 -
42 U.S.C. § 1395rr(b)(14) ....................................................................................... - 3 -, - 4 -
42 U.S.C. §§ 1395d(a) ................................................................................................ - 1 -
Pub. L. 108-173 ......................................................................................................... - 3 -
Pub. L. 110-275 ......................................................................................................... - 3 -
Pub. L. 112-240 .................................................................................................. - 7 -, - 27 -
Pub. L. 113-93 .................................................................................................... - 7 -, - 29 -
Pub. L. 113-295 .................................................................................................. - 7 -, - 29 -
Pub L. 97-35 § 2145(a)(7) .......................................................................................... - 2 -

## Regulations

42 C.F.R. § 413.171 ....................................................................... - 9 -, - 10 -, - 11 -
42 C.F.R. § 413.171(3) ............................................................................................... - 6 -
42 C.F.R. § 413.171(5) ........................................................................................ - 37 -, - 38 -
42 C.F.R. § 413.174(f)(6) ........................................................................................... - 6 -
42 C.F.R. § 413.232 ................................................................................................... - 8 -
42 C.F.R. § 413.234 ............................................................................................ - 5 -, - 8 -
42 C.F.R. § 413.234(a) ...................................................................... - 8 -, - 9 -, - 21 -
42 C.F.R. § 413.234(b)(1) ........................................................................................ - 5 -
42 C.F.R. § 413.234(c) ....................................................................................... - 9 -, - 21 -
42 C.F.R. § 413.237 ................................................................................................... - 8 -
42 C.F.R. § 494.90(a)(3) ........................................................................................... - 24 -
42 C.F.R. §§ 413.234(c)(3) ....................................................................................... - 22 -
74 Fed. Reg. ............................................................................................................... - 35 -
75 Fed. Reg. 49030 .......................................................................................... - 27 -, - 28 -
C.F.R. § 413.174(f)(6) (2010) ................................................................................... - 6 -

-

## INTRODUCTION

Plaintiffs seek to enjoin the Secretary from including the drug XPHOZAH in the End-Stage Renal Disease Prospective Payment System bundle, under which Medicare pays for "renal dialysis services" via a single payment to End-Stage Renal Disease facilities.  Because the Medicare statute expressly precludes "administrative or judicial review" of "the identification of renal dialysis services included in the bundled payment," 42 U.S.C. § 1395rr(b)(14)(G), this Court should not address Plaintiffs' preliminary injunction motion ("PI Mot.," ECF No. 14) at all, as explained in Defendants' pending Motion to Dismiss (ECF No. 11).  If the Court does rule on Plaintiffs' motion, it should deny preliminary injunctive relief for any of several independent reasons: Plaintiffs have shown no likelihood of imminent harm, much less irreparable harm; Plaintiffs' decision not to apply for the Transitional Drug Add-on Payment Adjustment for XPHOZAH renders even their speculative economic harm self-inflicted; Plaintiffs are unlikely to succeed on the merits because Congress has acknowledged and approved the regulations they purport to challenge and the relevant regulations are consistent with the statute; and the balance of the equities and the public interest favor the government.

## BACKGROUND

I.    <u>The Medicare Program and Coverage for End-Stage Renal Disease.</u>

Medicare is a federal health insurance program for the elderly and disabled, *see* 42 U.S.C. § 1395, *et seq.*, and the Secretary administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS").  The Medicare program generally provides benefits via four parts: Part A, hospital insurance; Part B, medical insurance covering physician and other outpatient health care services, including renal dialysis; Part C, privately administered Medicare managed care plans; and Part D, which provides subsidized outpatient prescription drug coverage for enrollees.  *See* 42 U.S.C. §§ 1395d(a); 1395o; 1395w-21; 1395w-101.  Since 1973, Medicare

has provided health insurance coverage for people suffering from End-Stage Renal Disease who need either dialysis or kidney transplantation to maintain life.  Pub. L. 92-603, § 299I, 86 Stat. 1463-64; *see also* 42 U.S.C. § 426-1; *see generally* Medicare.gov, End-Stage Renal Disease, available at https://www.medicare.gov/basics/end-stage-renal-disease.   Under the original law, Medicare paid for dialysis services on a cost basis with an upper limit per treatment, meaning that Medicare paid the reasonable costs incurred by a provider up to a statutory limit.

During the 1980s, in part to control costs, Congress began moving away from reasonable cost reimbursement towards prospective payment systems for many aspects of the Medicare program.  Under a prospective payment system, payment is determined in advance based on a formula that can include a patient's diagnosis, geographic wage factors, and other considerations. For example, under the inpatient prospective payment system, a hospital is paid "a fixed rate for treating each Medicare patient, based on the patient's diagnosis and regardless of the hospital's actual costs." *Becerra v. Empire Health Found.*, 597 U.S. 424, 429 (2022) (citing 42 U.S.C. § 1395ww(d)(1)-(4)).  Prospective payment is designed to reflect what efficiently run providers or suppliers would expend to treat a patient with a certain diagnosis; it provides an incentive to provide efficient medical service.   Most prospective payment systems include adjustments incorporating various factors that might make a patient's treatment more expensive than the formula predicts.

As part of the Omnibus Budget Reconciliation Act of 1981, Congress instructed the Secretary to "provide by regulation for a method (or methods) for determining prospectively the amounts of payments to be made for dialysis services furnished by providers of services and renal dialysis facilities to individuals in a facility and to such individuals at home."  Pub L. 97-35 § 2145(a)(7), 95 Stat. 800; *see* 42 U.S.C. § 1395rr(b)(7).   This system, despite determining

payment amounts for certain dialysis-related items and services prospectively, did not establish a single bundled rate for renal dialysis services, meaning providers and End-Stage Renal Disease facilities were not paid a fixed rate per patient.  In the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, however, Congress mandated a bundled rate for certain renal dialysis services: "[B]eginning with services furnished on January 1, 2005, the Secretary shall establish a . . . prospective payment system for dialysis services furnished by providers of services and renal dialysis facilities[.]"  Pub. L. 108-173, 117 Stat. 2313; *see* 42 U.S.C. § 1395rr(b)(12). The bundled payment established in 2003 did not include, among other things, certain drugs commonly used to treat anemia and vitamin D deficiency, which Medicare paid for separately on a fee-for-service or reasonable cost basis.  *See* 75 Fed. Reg. 49,030, 49,032 (Aug. 12, 2010).

Congress later expanded the items and services included in the End-Stage Renal Disease bundle in the Medicare Improvements for Patients and Providers Act of 2008 ("Medicare Improvement Act"), including specifically instructing the agency to include erythropoiesis stimulating agents (a common treatment for anemia caused by severe kidney disease) and drugs and biological products that treat End-Stage Renal Disease: "[F]or services furnished on or after January 1, 2011, the Secretary shall implement a payment system under which a single payment is made under this title to a provider of services or a renal dialysis facility for renal dialysis services."  Pub. L. 110-275, 122 Stat. 2553; *see* 42 U.S.C. § 1395rr(b)(14).  Congress defined the term "renal dialysis services" to include:

     (i)      items and services included in the composite rate for renal dialysis services as of December 31, 2010;

     (ii)     erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;

     (iii)    other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the

application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and

(iv)     diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease.

42 U.S.C. § 1395rr(b)(14)(B).  Congress specifically stated that the term "renal dialysis services . . . does not include vaccines."  *Id.*  It also expressly excluded certain actions by the agency from "administrative or judicial review," including, as relevant here, "the identification of renal dialysis services included in the bundled payment."  42 U.S.C. § 1395rr(b)(14)(G).

## II.     <u>Implementation of the Medicare Improvement Act.</u>

CMS promulgated via notice-and-comment several final rules implementing Congress's directive to establish a bundled payment system for renal dialysis services.  In its first final rule implementing the Medicare Improvement Act, CMS observed that Congress's definition of renal dialysis services "viewed as a whole . . . suggests a comprehensive definition that wraps in all items and services related to outpatient renal dialysis that are furnished to individuals for the treatment of" End-Stage Renal Disease.  75 Fed. Reg. 49,030, 49,040 (Aug. 12, 2010).  As part of its development of the final rule, the agency "performed an extensive analysis of Medicare payments for Part B drugs and biologicals billed on [End-Stage Renal Disease] claims in 2007, 2008, and 2009 to identify drugs or biologicals that are [End-Stage Renal Disease]-related and therefore met the definition of renal dialysis services" under section 1395rr(b)(14)(B).  75 Fed. Reg. at 49,047.  CMS categorized drugs and biological products "on the basis of drug action . . . to determine which categories (and therefore, drugs and biologicals within the categories) would be" End-Stage Renal Disease-related.  *Id.*  Based on its analysis, CMS determined that certain "functional categories" were not End-Stage Renal Disease-related (even if they were frequently

administered to beneficiaries suffering from chronic kidney disease) and therefore excluded them from the bundled base rate.  *Id* at 49,048-49.

The agency also determined that several drug categories should be classified as renal dialysis services, including the "[b]one and mineral metabolism" category, which CMS described as "[d]rugs used to prevent/treat bone disease secondary to dialysis."  *Id.* at 49,050. "Recogniz[ing] that drugs and biologicals used for [End-Stage Renal Disease]-related conditions may change over time based on many factors including new developments," CMS stated that its categorization "based on mechanism of action" would allow it to "account for other drugs and biologicals that may be used for those actions in the future under the" End-Stage Renal Disease Prospective Payment System.  The agency listed specific drugs in an appendix to the final rule and clarified that "any drug or biological furnished for the purpose . . . of bone and mineral metabolism will be considered renal dialysis services under the" End-Stage Renal Disease Prospective Payment System.  *Id.*

The agency later codified in regulation the drug designation process as applied to new injectable and intravenous products.  *See* 42 C.F.R. § 413.234; 80 Fed. Reg. 68,968, 69,013-24 (Nov. 6, 2015).  CMS subsequently modified the regulation to reflect that the drug designation process applies to all new renal dialysis drugs and biological products.  *See* 83 Fed. Reg. 56,922, 56,927-32 (Nov. 14, 2018).  For new products, "[i]f the new renal dialysis drug or biological process is used to treat or manage a condition for which there is an [End-Stage Renal Disease Prospective Payment System] functional category, the new renal dialysis drug is considered included" in the bundled payment.  42 C.F.R. § 413.234(b)(1).  Under this policy, End-Stage Renal Disease facilities would not receive a separate payment for administering an injectable drug that is related to the treatment of End-Stage Renal Disease; instead, payment for the drug would be

covered as part of the single bundled payment for performing dialysis.  Similarly, under the End-Stage Renal Disease Prospective Payment System as designed, for End-Stage Renal Disease-related "oral-only" drugs—that is, drugs without an injectable equivalent—payment would be unavailable under Medicare Part D, and the End-Stage Renal Disease bundled payment to the End-Stage Renal Disease facility would therefore cover dispensing of the drug through either an in-house or contracted pharmacy.

CMS decided to delay inclusion of oral drugs with no injectable equivalent in the End-Stage Renal Disease bundle until January 1, 2014, three years after the effective date of the rest of the payment bundle.  75 Fed. Reg. at 49,044; *see* 42 C.F.R. § 413.171(3) (renal dialysis services includes "drugs and biologicals with only an oral form") & 42 C.F.R. § 413.174(f)(6) (2010) ("Effective January 1, 2014, payment to an [End-Stage Renal Disease] facility for renal dialysis service drugs and biologicals with only an oral form furnished to [End-Stage Renal Disease] patients is incorporated within the prospective payment system rates established by CMS in § 413.230 and separate payment will no longer be provided").[1]  This delay was meant to allow End-Stage Renal Disease facilities to prepare for dispensing non-injectable drugs that would be included in their bundled payments.  The agency explained that the delay "would provide sufficient time for [End-Stage Renal Disease] facilities to establish a pharmacy in accordance with state licensure requirements, or establish arrangements with pharmacies to provide oral-only drugs to their patients," *id.* at 49,043, and "provide additional time to evaluate the need for additional clinical indicators applicable to the monitoring of certain patient conditions associated with oral-only drugs," *id.* at 49,044.

---

[1]    After Congress further delayed implementation of the oral-only drugs policy, CMS modified its regulations to reflect the later effective dates.  The provision currently begins "[e]ffective January 1, 2025."  42 C.F.R. § 413.174(f)(6).

Since the agency promulgated its final rule in 2010, Congress has further legislated on the issue of the End-Stage Renal Disease Prospective Payment System bundle and the timing of its implementation.  The American Taxpayer Relief Act of 2012 instructed the Secretary to reduce the End-Stage Renal Disease prospective payment amount "to reflect the Secretary's estimate of the change in the utilization of drugs and biologicals described in clauses (ii), (iii), and (iv) of [42 U.S.C. § 1395rr(b)(14)(B)] (other than oral-only End-Stage Renal Disease-related drugs, as such term is used in the final rule promulgated by the Secretary in the Federal Register on August 12, 2010 (75 Fed. Reg. 49,030)."  Pub. L. 112-240, 126 Stat. 2354.  An adjacent provision delayed the inclusion of "oral-only [End-Stage Renal Disease]-related drugs in the [End-Stage Renal Disease] prospective payment system" until January 1, 2016.

The 2014 Protecting Access to Medicare Act further delayed inclusion of oral-only End-Stage Renal Disease-related drugs in the bundle until January 1, 2024.  Pub. L. 113-93, § 217, 128 Stat. 1061.  Later that same year, Congress added another year to the delay.  Pub. L. 113-295, § 204, 128 Stat. 4065.  Oral-only drugs will therefore become part of the End-Stage Renal Disease bundled payment effective January 1, 2025.  Separate Medicare payment under the Part D program for outpatient drugs will then no longer be available for End-Stage Renal Disease-related drugs that are part of the End-Stage Renal Disease payment bundle.  In a recent proposed rule, CMS explained that "incorporating Medicare Part D drugs into the [End-Stage Renal Disease Prospective Payment System] has had a significant positive effect of expanding access to such drugs for beneficiaries who do not have Medicare Part D coverage, with significant positive health equity impacts."  89 Fed. Reg. 55,760, 55,797 (July 5, 2024).  "We anticipate that the incorporation of oral-only drugs into the [End-Stage Renal Disease Prospective Payment System] will increase access to those drugs for beneficiaries."  *Id.*

III.     **Transitional Drug Add-On Payment Adjustments.**

The End-Stage Renal Disease Prospective Payment System statute, 42 U.S.C. § 1395rr(b)(14)(D), and regulations include several provisions providing for adjustments to the base rate (i.e., the prospectively determined rate for furnishing renal dialysis services) to End-Stage Renal Disease facilities in designated circumstances.  For example, the "outliers" provisions at 42 C.F.R. § 413.237 are designed to "protect an [End-Stage Renal Disease] facility from significant financial losses due to unusually high costs."  CMS.gov, End-Stage Renal Disease PPS Outlier Services, available at https://www.cms.gov/medicare/payment/prospective-payment-systems/end-stage-renal-disease-esrd/esrd-pps-outlier-services.  Adjustments to the base rate are also available for other circumstances, including for low-volume facilities, 42 C.F.R. § 413.232, rural facilities, *id.* § 413.233, and for treating patients with "characteristics that result in higher costs for" End-Stage Renal Disease facilities.  *Id.* § 413.235.

Recognizing the value of supporting "high-value innovation" and giving practitioners "the ability to evaluate the appropriate use of a new product and its effect on patient outcomes," 84 Fed. Reg. 60,648, 60,654 (Nov. 8, 2019), CMS has also established an End-Stage Renal Disease Prospective Payment System add-on payment adjustment for certain transitional drugs, meaning that a facility administering a drug covered by the policy can receive extra Medicare funds for using that drug in its treatment of a dialysis patient.  *See* 42 C.F.R. § 413.234.  The payment adjustment is available for certain commercially available drugs "used to treat or manage a condition(s) associated with" End-Stage Renal Disease that were approved by the FDA after January 1, 2020.  *See* 42 C.F.R. § 413.234(a).  As applied to drugs within an existing functional category, this add-on is meant "to help [End-Stage Renal Disease] facilities to incorporate new drug and biological products and make appropriate changes in their businesses to adopt such products; provide additional payment for such associated costs, [and] promote competition among

drugs and biological products within the [ End-Stage Renal Disease Prospective Payment System] functional categories."  84 Fed. Reg. at 60,654.

Under this policy, an End-Stage Renal Disease facility treating a patient with a new renal dialysis drug or biological product as defined at § 413.234(a) and not excluded by § 413.234(e) that fits within one of the functional categories that CMS established in implementing the End-Stage Renal Disease Prospective Payment System, such as the "bone and mineral metabolism" category, can receive a Transitional Drug Add-on Payment Adjustment for two years.  *Id.* § 413.234(c)(1).  Thereafter, a further post-transitional drug add-on payment adjustment is made for an additional three years.  *Id.* § 413.234(c)(3).  Because the add-on payment adjustments are based on a drug's average sales price, *id.* § 413.234(c), the agency issued guidance directing manufacturers how and when to provide the required data, and payment of both add-on payment adjustments is conditional on the agency receiving such data.  *See* Pls. Ex. 2; 42 C.F.R. § 413.234(c), (c)(3).

## IV.   **Factual Background.**

Plaintiff Ardelyx, Inc. developed the drug XPHOZAH (tenapanor), which according to its FDA label "is indicated to reduce serum phosphorus in adults with chronic kidney disease on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  Ex. A to Def's Mot. to Dismiss (XPHOZAH FDA Label).  The FDA approved XPHOZAH in October 2023.  Compl. ¶ 74. Following FDA approval and in response to a request from Ardelyx to exclude its drug from the End-Stage Renal Disease bundled payment, CMS determined that XPHOZAH, which the FDA approved to treat patients "with chronic kidney disease on dialysis," is a "renal dialysis service" under 42 U.S.C. § 1395rr(b)(14)(B) and 42 C.F.R. § 413.171.

As the agency explained in its letter to the Chief Medical Officer of Ardelyx, XPHOZAH "is used as an add-on therapy in patients with chronic kidney disease who are on dialysis who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  Pls. Ex. 1.  CMS further explained that XPHOZAH meets the "regulatory definition of an oral-only drug at [42 C.F.R.] section 413.234(a)," meaning that it would be included in the End-Stage Renal Disease Prospective Payment System bundled payment effective January 1, 2025.  *Id*.  In the same letter, CMS described to Ardelyx the process to apply to include XPHOZAH in the Transitional Drug Add-on Payment Adjustment and directed the company to agency guidance on the issue.

The agency reiterated its determination that XPHOZAH is a renal dialysis service in the Calendar Year 2025 End-Stage Renal Disease Prospective Payment System proposed rule, stating that "CMS has identified XPHOZAH to be a renal dialysis service because it is used to treat or manage a condition associated with" End-Stage Renal Disease and that it "meets the current regulatory definition of an oral-only drug as defined at § 413.234(a)."  89 Fed. Reg. at 55,796.  "Specifically, it is used as an add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  *Id.*  When it first established the functional categories, CMS noted that phosphate binders were among the drugs in the "bone and mineral metabolism" functional category.  74 Fed. Reg. at 49,929.

On July 2, 2024, Ardelyx announced that it had decided against submitting an application for XPHOZAH to receive the Transitional Drug Add-on Payment Adjustment.  Ex. B to Def's Mot. to Dismiss (Ardelyx Form 8-K dated July 2, 2024).

## V.   <u>This Lawsuit and Plaintiffs' Motion for Preliminary Injunctive Relief.</u>

Plaintiffs filed their Complaint on July 17, 2024.  Compl. (ECF No. 1).  Plaintiffs challenge "CMS's recent determination that XPHOZAH is a renal dialysis service, to be included in the

[End-Stage Renal Disease] bundled payment as of January 1, 2025." *Id.* ¶ 33.  The complaint identifies as the "final agency action" at issue CMS's determination "in a letter decision issued on May 13, 2024 that 'CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171' and will be included in the [End-Stage Renal Disease Prospective Payment System] bundled payment system effective January 1, 2025." *Id.* ¶ 54 (quoting Pls. Ex. 1).  Their three claims for relief allege that the "May 13, 2024 determination that XPHOZAH is a 'renal dialysis service' that shall be added to the bundled payment system as of January 1, 2025" violates the Administrative Procedure Act and the Medicare statute, *id.* ¶¶ 202, 211, and challenge "Defendants' determination that any new oral-only drug is a 'renal dialysis service' . . . that shall be added to the bundled payment system as of January 1, 2025," *id.* ¶ 215.  They seek declaratory and injunctive relief stating that XPHOZAH is not a renal dialysis service and is not subject to inclusion in the End-Stage Renal Disease Prospective Payment System bundle, vacating Defendants' determinations to the contrary, and enjoining Defendants from treating XPHOZAH as a renal dialysis service or placing it into the bundled payment system.  They also seek an order vacating Defendants' determinations that oral-only drugs can be "renal dialysis service[s]" subject to inclusion in the bundle and enjoining Defendants from so treating oral-only drugs or placing them into the bundled payment system.

On September 17, Defendants filed a Motion to Dismiss Plaintiff's Complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(1).  Mot. Dismiss (ECF No. 11).  Two days later, Plaintiffs filed a Motion for a Preliminary Injunction or, in the Alternative, for Expedited Summary Judgment.  PI Mot. (ECF No. 14).

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy never awarded as of right."  *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (quoting *Winter*, 555 U.S. at 20).  The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Hospitality Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  The third and fourth factors, balance of equities and the public interest, "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another.  *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009)).  The D.C. Circuit has suggested, without deciding, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm" standard—"should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Bartko v. Dep't of Just.*, Civ. A. No. 13-1135 (JEB), 2015 WL 13673371, at *1 (D.D.C. Mar. 12, 2015) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011), and *Davis*, 571 F.3d at 1292); *see also Changji Esquel*, 40 F.4th at 726.

Even before *Winter*, courts in this Circuit consistently stressed that "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue."  *Chaplaincy of Full*

*Gospel Churches*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).  Thus, "if a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors."  *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (quoting *CityFed Fin.*, 58 F.3d at 747); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

## ARGUMENT

This Court should not reach Plaintiffs' motion for preliminary injunctive relief because the Court lacks jurisdiction over this suit.  If the Court does consider Plaintiffs' motion, it should deny it on the grounds that Plaintiffs have not demonstrated that they are likely to suffer irreparable harm in the absence of preliminary relief.  The alleged harm to Ardelyx is purely economic, and there are no claims that the asserted harm threatens the existence of the company's business, meaning that it therefore is not irreparable.  Such harm is also self-inflicted; the company chose not to apply for the Transitional Drug Add-on Payment Adjustment for XPHOZAH.  Plaintiffs offer a laundry list of other alleged harms, including harms to the health of patients represented by Plaintiff American Association of Kidney Patients, and financial harms to dialysis facilities.  None of these alleged harms meets the exacting standard for imminent irreparable harm necessary to support preliminary injunctive relief.  The alleged harms to patient health are speculative and either arise because of hypothetical acts by third parties or are the direct result of Ardelyx's own decision not to participate in the Transitional Drug Add-on Payment Adjustment.

This Court should also deny the preliminary injunction motion because Plaintiffs are unlikely to succeed on the merits.  Their recitation of the statutory and regulatory history of the

relevant provisions omits critical information, including a congressional approval of one of the regulations they seek to challenge. CMS's decade-old regulations do not, in any event, conflict with the governing statute. Finally, neither the balance of equities nor the public interest favors Plaintiffs.

## I.  This Court Should Grant Defendants' Motion to Dismiss, Which Would Render Plaintiffs' Preliminary Injunction Motion Moot.

Defendants responded to Plaintiffs' complaint by filing a motion to dismiss for lack of subject matter jurisdiction. "At the outset, in evaluating plaintiffs' likelihood of success on the merits, the Court must first determine that it may properly exercise jurisdiction over the action." *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 203 (D.D.C. 2011); *see also Rozenkrantz v. Inter-Am. Dev. Bank*, Civ. A. No. 20-3670 (BAH), 2021 WL 1254367, at *7 (D.D.C. Apr. 5, 2021) (Defendant's "Motion to Dismiss under Rule 12(b)(1) therefore must be decided before plaintiffs' Motion for Preliminary Injunction may be considered"). As explained in Defendants' Motion to Dismiss, which is incorporated herein by reference, Congress specifically precluded "administrative and judicial review" of the agency action Plaintiffs seek to challenge: the identification of XPHOZAH as a renal dialysis service included in the End-Stage Renal Disease Prospective Payment System bundled payment. *See generally* Mot. Dismiss (ECF No. 11). This Court thus should grant Defendants' Motion to Dismiss and then deny as moot Plaintiffs' Motion for Preliminary Injunction.[2]

---

[2]    Defendants anticipate filing a reply in support of their Motion to Dismiss after Plaintiffs file their forthcoming opposition, in which Defendants will respond to Plaintiffs' specific arguments. At bottom, as Plaintiffs acknowledge repeatedly in their Complaint, this case amounts to a challenge to CMS's identification of XPHOZAH as a renal dialysis service included in the payment bundle—a challenge that is squarely foreclosed by the jurisdictional preclusion provision. Plaintiffs' belated effort to refashion their case as a challenge to a regulation does not resolve this fundamental defect in their pleading.

## II.     Plaintiffs Preliminary Injunction Motion Should Be Denied Because They Do Not Allege Imminent, Irreparable Harm.

A preliminary injunction movant must demonstrate that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014). "[F]ailure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *see E.B. v. Dep't of State*, 422 F. Supp. 3d 81, 88 (D.D.C. 2019) ("Failing to show a likelihood of irreparable harm is fatal to a request for a preliminary injunction[.]"); *Uranga v. Citizenship & Immigr. Servs.*, Civ. A. No. 20-0521 (ABJ), 2020 WL 7230675, at *5 (D.D.C. Dec. 8, 2020) (regardless whether the sliding scale framework applies, "it remains the law in this Circuit that a movant must demonstrate irreparable harm").

Showing irreparable injury is a "considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674) (D.C. Cir. 1985)) (internal quotation marks omitted). Additionally, "the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Plaintiffs put forth (PI Mot. (ECF No. 14) at 37-43) various harms—to Ardelyx itself, to other drug manufacturers who might be deterred from developing innovative drugs, and to patients—that allegedly satisfy their "considerable burden" to demonstrate irreparable injury. None does. The alleged harm to Ardelyx itself is purely economic and thus not irreparable for purposes of obtaining a preliminary injunction, and Ardelyx's decision not to apply to include XPHOZAH in the Transitional Drug Add-on Payment Adjustment is a significant contributor to any economic harm it may experience. The abstract and hypothetical harms to other

manufacturers are similarly insufficient for a preliminary injunction, even if any Plaintiff had standing to raise them—and they do not.  And the threatened hams to patients are rooted in an unstated assumption that End-Stage Renal Disease facilities will refuse to provide drugs included in a patient's plan of care, in violation of CMS regulations.  In addition, Ardelyx's decision not to seek XPHOZAH's inclusion in the Transitional Drug Add-on Payment Adjustment has deprived the End-Stage Renal Disease facilities treating the very patients whose interests Plaintiffs seek to represent of two years of enhanced payments for the drug (and a further three-year post-transitional adjustment).  According to Plaintiffs' own briefing, the price adjustment would increase the drug's availability and thus mitigate or eliminate harm to patients from lack of access.  Because Plaintiffs cannot show imminent irreparable harm, preliminary injunctive relief is inappropriate.

### A.    Any Harm to Ardelyx Is Purely Economic and, Thus, Not Irreparable, and Ardelyx Has Not Quantified the Alleged Harm.

Ardelyx claims that the inclusion of XPHOZAH in the End-Stage Renal Disease Prospective Payment System bundle will cause a "loss of market share, and related unrecoverable economic harm, [which] constitutes irreparable harm to Ardelyx."  PI Mot. (ECF No. 14) at 43. Even assuming that placing XPHOZAH in the bundle would cause a loss of market share and economic harm to Ardelyx, "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms."  *Air Transp. Ass'n of Am., Inc. v. Exp.- Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).  And it is "well settled" that economic harm "does not, in and of itself, constitute irreparable harm."  *Wis. Gas*, 758 F.2d at 674; *see also Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 212 (D.D.C. 2012) (plaintiff's claims of "lost customers, reduced sales" to other distributors were not irreparable harms).

Courts hold that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wis. Gas*, 758 F.2d at 674. Plaintiffs have not shown or even alleged that Ardelyx would suffer such a loss. And to the extent (*see* PI Mot. (ECF No. 14) at 43) that Ardelyx argues that the economic losses would be "unrecoverable" because it may not recoup economic losses from the Government, courts in this District hold that the "economic harm [must] be significant, even where it is irretrievable[.]" *Air Transp. Ass'n*, 840 F. Supp. 2d at 336; *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326-27 (D.D.C. 2018) (noting "the vast majority of district court opinions in this Circuit have rejected the rule that unrecoverable monetary losses constitute per se irreparable harm"). The movant must still make "a strong showing that the economic loss would significantly damage its business, . . . would cause extreme hardship to the business, or even threaten destruction of the business." *Air Transp. Ass'n*, 840 F. Supp. 2d at 336 (citations omitted). Ardelyx has not done this.

Further, Plaintiffs have provided no information that would allow the Court to quantify the harm to Ardelyx's overall businesses or operations in any sense. This is fatal to Plaintiffs' attempt to meet their burden. *See, e.g., Asante v. Azar*, Civ. A. No. 20-0601 (TSC), 2020 WL 1930263, at 4 (D.D.C. Apr. 21, 2020) (ruling no irreparable harm where hospitals "provide[d] no specific facts . . . about the effects" of not receiving $15 million in government funds); *Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 115 (D.D.C. 2015) (finding no irreparable injury where plaintiff "made no effort to quantify" the extent of its damages from rule change, leaving the court "to speculate as to the magnitude of the injury"); *Air Transp. Ass'n*, 840 F. Supp. 2d at 336 (ruling plaintiff "must 'adequately describe and quantify the level of harm it[] . . . face[s]'"); *Am. Ass'n for Homecare v. Leavitt*, Civ. A. No. 08-0992, 2008 WL 2580217, at *5

(D.D.C. June 30, 2008) (claimed future losses were insufficient because plaintiffs "submitted no evidence as to the magnitude or likelihood of those speculative losses"); *Am. Ass'n of Pol. Consultants v. Small Bus. Admin.*, 613 F. Supp. 3d 360, 370 (D.D.C. 2020) ("The Court has no way of measuring whether these hardships are imminent and irreparable without access to more detailed financial documentation."); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014) ("A claim of substantial financial losses must be evaluated from the perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief.").

The three cases cited by Plaintiffs (PI Mot. (ECF No. 14) at 43) illustrate the inadequacy of Plaintiffs' showing here.  In *Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174, 193-94 (D.D.C. 2021), the company seeking a preliminary injunction faced "irreparable reputational harm" as well as "deprivation of access to U.S. capital markets," "the complete loss of *any* public market for its securities," and "loss of talent and the inability to recruit and retain employees to build—or even maintain—a plaintiff's business."  *Id.* (internal quotation marks omitted).  Plaintiffs here do not suggest any analogous harms will befall Ardelyx as a result of the addition of XPHOZAH to the End-Stage Renal Disease Prospective Payment System bundle.  The movant in *Luokong* described losses that had already occurred and quantified the lost revenue arising therefrom as "more than $10 million."  *Id.* at 192.  As described above, Ardelyx has made no effort to quantify its future losses.  Plaintiffs would have this Court hold that the only factor in common between Luokong and Ardelyx—an alleged likely loss of market share—is sufficient to support preliminary injunctive relief.  *See* PI Mot. (ECF No. 14) at 43.  But *Luokong* is a categorically different case, featuring numerous factors absent here.

- 18 -

*Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17 (D.D.C. 2013), is similarly unhelpful to Plaintiffs.  In that case, the movant included a declaration "explain[ing] specifically how Bayer will experience a decline in market share, price erosion, loss of customer good will, and loss of research and development funding as a result of" the action it sought to enjoin.  *Id.* at 26.  As explained above, Ardelyx has offered nothing analogous.  The sole citation in support of Ardelyx's claim for irreparable injury is a single paragraph of the Declaration of Laura Williams, which reads in full: "Placement of XPHOZAH in the bundle would significantly interfere with access to XPHOZAH for patients who are in need, namely those who have not had an adequate response to phosphate binders or who simply cannot tolerate them.  At a minimum it is likely to discourage uptake of XPHOZAH in favor of older, less effective therapies."  Williams Decl. (ECF No. 14-3) ¶ 77; *see* PI Mot. (ECF No. 14) at 43.  This is not remotely similar to what the *Bayer* court found sufficient to support a finding of irreparable harm.

Finally, in *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50-51 (D.D.C. 2008), the Court applied an approach to the four-factor test for preliminary relief that has fallen out of favor in the D.C. Circuit.  The Court held that while the movant's statements "hardly present an overwhelming case for a finding of irreparable injury, they do suggest that he is likely to suffer at least some degree of irreparable injury absent preliminary injunctive relief, which may be sufficient to warrant injunctive relief depending on the degree to which the other factors considered in assessing a plaintiff's motion for a preliminary injunction favor the plaintiff."  *Id.* at 51.  The *Feinerman* Court also relied on the conclusion that "any loss of income suffered by a plaintiff is irreparable *per se*" where sovereign immunity bars recovery of damages from the government.  *Id.*  But "the vast majority of district court opinions in this Circuit have rejected the rule that unrecoverable monetary losses constitute per se irreparable harm."  *Alcresta*

- 19 -

*Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326-27 (D.D.C. 2018).  And even if this Court were to apply the outdated *Feinerman* framework, the movant in that case submitted a declaration stating that forty percent of his business would be threatened absent an injunction.  *Id.* at 50. Plaintiffs here have made no similar effort to quantify their allegedly irreparable economic losses, a shortcoming that is fatal to their request for preliminary injunctive relief. *See Am. Ass'n for Homecare v. Leavitt*, Civ. A. No. 08-0992, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008).

### B.   Ardelyx Cannot Obtain an Injunction Against Harms That It Has Inflicted on Itself by Refusing to Apply for Inclusion in the Transitional Drug Add-On Payment Adjustment

Separate from their failure to demonstrate an irreparable economic injury, Plaintiffs' motion for preliminary injunctive relief should be denied because the alleged imminent economic harm they ask this Court to redress is, in substantial part, self-inflicted.  Ardelyx could have, but did not, seek to have the Medicare program make an add-on payment adjustment to End-Stage Renal Disease facilities when they use XPHOZAH to treat patients. "Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." Wright & Miller, Fed. Practice & Proc., § 2948.1. "It is 'well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.'" *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quoting *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001).  "Plaintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the relief." *Id.*  The relief afforded by the declined regulatory scheme does not necessarily have to be complete or permanent to undermine a plaintiff's claim for preliminary injunctive relief.  *See id.* at 124 ("This kind of market harm . . . is just not sufficient to warrant preliminary injunctive relief, especially where . . . ranchers had the opportunity to seek

permits to alleviate at least temporarily some of the forces of the market that were outside of their control.").

The Transitional Drug Add-on Payment Adjustment is a regulatory scheme that provides an increased payment to End-Stage Renal Disease facilities using a "new renal drug or biological product . . . based on 100 percent of average sales price."  42 C.F.R. § 413.234(c). Notably, the only thing preventing End-Stage Renal Disease facilities from receiving an add-on payment when they use XPHOZAH to treat dialysis patients is Ardelyx's affirmative refusal to apply to include XPHOZAH in the payment adjustment.  Drugs are included in the Transitional Drug Add-on Payment based on a series of objective criteria: the date of FDA approval, the drug being commercially available, the date of submission for a Health Care Procedure Code, and the new drug application category determined prior to FDA approval.  *See* 42 C.F.R. §§ 413.234(a) & (e). The payment adjustment is available for two years, after which a further three years of post-transitional drug add-on payment adjustments are available.  *Id.* at §§ 413.234(c)(1)-(3) & (g). The payment adjustment is meant to mitigate challenges to End-Stage Renal Disease facilities caused by the possibility that new drugs can be "unpredictable with regard to their uptake and pricing" and to allow "practitioners . . . to evaluate the appropriate use of a new product and its effect on patient outcomes."  84 Fed. Reg. at 60,654.

Plaintiffs themselves acknowledge that the Transitional Drug Add-on Payment Adjustment improves the uptake of new drugs.  *See* PI Mot. (ECF No. 14) at 40 (discussing Parsabiv utilization during Transitional Drug Add-on Payment Adjustment period).  They complain that after the payment adjustment ends, utilization may decrease.  *See id.*  But an economic harm that may arise in twenty-seven months is hardly imminent.  Further, Plaintiffs do not address at all the additional three-year period that would be available for XPHOZAH under

42 C.F.R. §§ 413.234(c)(3), (g).  Despite the opportunity to participate in a regulatory scheme that would "alleviate at least temporarily some of the forces of the market," *Safari Club*, 852 F. Supp. 2d at 124, Ardelyx has announced that it will not submit data for XPHOZAH's inclusion in the Transitional Drug Add-on Payment Adjustment.  *See* Ardelyx Form 8-K Dated July 2, 2024.  Ardelyx is declining to participate in a program explicitly designed to encourage End-Stage Renal Disease facilities to buy its product and deliver it to patients.  Although the company has stated publicly that it has decided "not to file for TDAPA," *see* Ardelyx July 2, 2024 Press Release, available at https://ir.ardelyx.com/news-releases/news-release-details/preserve-patient-access-xphozahr-ardelyx-chooses-not-file-tdapa, Ardelyx does not acknowledge its non-participation in its Complaint or in its Motion for a Preliminary Injunction.  At a bare minimum, Ardelyx has caused any alleged economic harms to happen sooner than they would have otherwise.  Preliminary injunctive relief based on alleged harm to Ardelyx is thus inappropriate.

### C.   The Risk of Patient Harm Described by Plaintiffs Is Unsupported and Attributable Not to XPHOZAH's Inclusion in the End-Stage Renal Disease Prospective Payment System Bundle.

Plaintiffs predict that XPHOZAH's inclusion in the End-Stage Renal Disease Prospective Payment System bundle "will diminish [End-Stage Renal Disease] patients' access to essential therapies and precipitate worse health outcomes."  PI Mot. (ECF No. 14) at 37.  Harm to a person's health can constitute irreparable injury for the purposes of obtaining preliminary injunctive relief.  *See Wilson v. Grp. Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 313-14 (D.D.C. 1992).  But Plaintiffs must prove "that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (cleaned up; quoting

*Wis. Gas Co. v. FERC*, 758 F.2d 669, 674) (D.C. Cir. 1985)).  Plaintiffs[3] have not satisfied their considerable burden.

Here, the alleged patient injuries are highly speculative.  For example, Plaintiffs say that "dialysis providers are penalized financially for treating patients using novel drugs for which they are not fully reimbursed."  PI Mot. (ECF No. 14) at 38.  In support, they cite a paragraph from the declaration of Ardelyx's Chief Medical Officer that reads, in full, "[t]he limited long-term reimbursement provided by CMS for novel drugs, paired with CMS's failure to adequately fund the End-Stage Renal Disease Prospective Payment System bundled system, significantly discourages dialysis providers from adopting or facilitating the uptake of novel treatments." Williams Decl. (ECF No. 14-3) ¶ 74.  Conspicuously absent here is any statement from an End-Stage Renal Disease facility even implying it might be deterred from providing XPHOZAH to a patient to whom it has been prescribed, or a statement from a patient who has been informed that his or her End-Stage Renal Disease facility plans to refuse to honor his or her XPHOZAH prescription beginning January 1, 2025.  Plaintiffs' speculative pleading falls well short of the detailed allegations found in the cases they cite where preliminary relief was granted.  *See, e.g.*, *Wilson*, 791 F. Supp. at 313-14 (plaintiff hospitalized with cancer that her insurer was refusing to pay to treat); *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 502 (D. Md. 2020) (detailed affidavits describing patient harms, including potential loss of treatment altogether). The third that Plaintiffs cite, *Texas Children's Hospital v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014), is inapposite.  In describing "certain" and "imminent" harms to the plaintiff hospitals, the court noted

---

[3]        Only Plaintiff the American Association of Kidney Patients purports to represent patients. The American Association of Kidney Patients describes itself as "the oldest and largest fully independent kidney patient organization in the United States."  Compl. (ECF No. 1)¶ 47.  The declaration of its Executive Director states that it "represents the largest base of both patient and care partner consumers in the kidney space."  Clynes Decl. (ECF No. 14-1) ¶ 3.

that "Plaintiffs, moreover, are not for-profit entities facing the loss of profit; rather, they are non-profits for whom lost funds would mean reducing hospital services to children, many of whom are Medicaid-eligible." *Id*. at 243.  Apart from the above-described failure by Ardelyx to describe any certain or imminent harm, none of the Plaintiffs here claims to be a non-profit whose ability to provide services to patients will be affected by the inclusion of XPHOZAH in the bundle.

Plaintiffs acknowledge that the addition of XPHOZAH into the bundle is not the proximate cause of the harm they fear.  They rely on what they speculate End-Stage Renal Disease facilities will do.  "Absent court action before January 1, 2025, CMS's plan to cease payment under Medicare Part D for oral-only drugs, and instead incorporate reimbursement for oral-only drugs into its bundled payment, will result in the development of protocols by the dialysis organizations severely restricting access to oral-only drugs—particularly novel ones—to the immediate detriment of patients."  PI Mot. (ECF No. 14) at 39.  As an initial matter, Plaintiffs offer no evidence that such protocols exist or that they are under development.  And even if an End-Stage Renal Disease facility were to impose such protocols, notwithstanding its obligation under the End-Stage Renal Disease Conditions for Coverage to "[p]rovide the necessary care to manage mineral metabolism and prevent or treat renal bone disease," 42 C.F.R. § 494.90(a)(3), including adjustment of "the patient's plan of care to achieve the specified goals," *id.* § 494.90(b)(3), an injury to a patient denied access to XPHOZAH pursuant to those hypothetical protocols would be caused not by CMS but by the End-Stage Renal Disease facility.

Finally, and as discussed *supra*, 20-22, Ardelyx's decision to forgo participation in the Transitional Drug Add-on Payment Adjustment available for XPHOZAH will—according to Plaintiffs' own brief—contribute to reduced utilization of XPHOZAH in the short term (i.e., the period relevant to any imminent irreparable harm analysis).  Plaintiffs readily acknowledge higher

uptake of the intravenous calcimimetic Parsabiv during the period when it was eligible for add-on payment adjustments.  PI Mot. (ECF No. 14) at 40.  And they offer no evidence that XPHOZAH would be any different; indeed, unlike Parsabiv, XPHOZAH would be eligible for the post-transitional payment adjustment for an additional three years.  The status quo that Ardelyx asks the Court to preserve by injunction has resulted in part from choices made by Ardelyx itself.  Had Ardelyx applied to include XPHOZAH in the payment adjustment, End-Stage Renal Disease facilities would receive additional payment for using XPHOZAH in their treatment of patients.

Therefore, this Court should conclude that Plaintiffs have failed to carry their burden of establishing irreparable harm to patients sufficient to support preliminary injunctive relief.  Ardelyx cannot show that its economic harms are sufficiently imminent to justify relief, and its failure to quantify the expected harm is fatal to its claims.  The alleged harms to patients are similarly speculative, rely on Plaintiffs' conjecture about the actions of third parties not before this Court, and are in significant part the result of Ardelyx's own decision not to participate in the Transitional Drug Add-on Payment Adjustment.

### D.    To The Extent That Plaintiffs Rely on Alleged Harms to Other Manufacturers or End-Stage Renal Disease Facilities or On Diminished Incentives For Innovation Generally, Those Alleged Harms Are Not Cognizable.

Plaintiffs catalogue several other ills allegedly arising from CMS's regulation including oral-only drugs in the End-Stage Renal Disease bundle.  For example, they cite increased financial burdens on End-Stage Renal Disease facilities with low margins, PI Mot. (ECF No. 14) at 38, and disincentives for manufacturers generally to develop innovative therapies, PI Mot. (ECF No. 14) at 41.  They point in particular to another manufacturer that terminated a clinical program for a different drug.  None of these alleged harms are cognizable.  No Plaintiff purports to be or to represent an End-Stage Renal Disease facility, and a plaintiff cannot assert harms on

behalf of third parties to obtain a preliminary injunction.  "[I]njuries to third parties are not a basis to find irreparable harm." *Alcresta Therapeutics*, 318 F. Supp. 3d at 326.  For similar reasons, Plaintiffs' arguments regarding disincentives for research do not support a finding of irreparable harm.  No plaintiff alleges that it has abandoned development of any new drug as a result of CMS's inclusion of XPHOZAH in the End-Stage Renal Disease bundle.  Even if Plaintiffs had pled such a claim, they have offered nothing other than conjecture, rendering any alleged harm vague and hypothetical.  Plaintiffs' inchoate allegations about alleged disincentives for innovation and harms to other actors with an interest in Medicare coverage of renal dialysis services are no basis for a finding of imminent irreparable harm.  And because Plaintiffs' other allegations—with respect to economic harm to Ardelyx and harm to patients generally—fall well short of the required threshold, this Court should deny preliminary injunctive relief on that basis alone.

## III.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

Even if this Court finds that it has jurisdiction and that Plaintiffs have met their "considerable burden" to show irreparable harm, it should deny preliminary injunctive relief because Plaintiffs are unlikely to succeed on the merits.  The statute at issue, 42 U.S.C. § 1395rr(b)(14)(B), defines "renal dialysis services" to include four categories of items and services and to exclude vaccines.  In a final rule that appeared in the Federal Register in 2010, the agency concluded that the term "renal dialysis services" could include oral-only drugs, but it delayed implementation of that policy until January 1, 2014.  Congress then passed three separate statutes acknowledging the agency's oral-only drug policy and delaying its implementation until January 1, 2025.

Plaintiffs ignore Congress's acknowledgement and approval of the agency's regulation defining "renal dialysis services" to include oral-only drugs.  This alone is reason enough for

this Court to conclude that Plaintiffs are unlikely to succeed on the merits.  On top of that, Plaintiffs are wrong to interpret the statute as excluding oral-only drugs from the End-Stage Renal Disease bundle, both because the statute contains a specific exclusion (for vaccines) and because the broad language of the statute does not bar oral-only drugs from the bundle.  Finally, CMS has not violated its own regulations in including XPHOZAH in the bundle.

### A.    Congress Acknowledged and Approved the Regulation That Plaintiffs Challenge.

Plaintiffs say (PI Mot. (ECF No. 14) at 20-30) that Congress excluded oral-only drugs from the End-Stage Renal Disease bundle.  But their description of congressional action is incomplete and ignores congressional text acknowledging and approving the CMS regulation including oral-only drugs.  CMS's first final rule implementing the Medicare Improvement Act was published on August 12, 2010, and became effective January 1, 2011, although the agency delayed the effective date of its oral-only drug policy until January 1, 2014.  *See* 75 Fed. Reg. at 49,030 (January 1, 2011, effective date), 49,044, 49,049, 49,198–99 (delay in effective date of oral-only drug policy).  On January 2, 2013, the President signed the American Taxpayer Relief Act, which includes a section called "Revisions to the Medicare [End-Stage Renal Disease] Bundled Payment System to Reflect Findings in the GAO Report."  Pub. L. 112-240, § 632, 126 Stat. 2354.  That provision repeatedly references the Secretary's final rule.  First, it instructs the Secretary to "make reductions" to the bundled payment "to reflect the Secretary's estimate of the change in utilization of drugs and biologicals described in clauses (ii), (iii), and (iv) of subparagraph (B) (other than oral-only ESRD-related drugs, as such term is used in the final rule promulgated by the Secretary in the Federal Register on August 12, 2010 (75 Fed. Reg. 49030))."  *Id.*  Second, it delays until 2016 implementation of the "policy under section 413.174(f)(6) . . . relating to oral-only [End-Stage Renal Disease]-related drugs in the [End-Stage

Renal Disease] prospective payment system." *Id.*  Third, it instructs the Secretary "to monitor the bone and mineral metabolism of individuals with end stage renal disease" as part of the "implementation of oral-only [End-Stage Renal Disease]-related drugs in the [End-Stage Renal Disease] prospective payment system." *Id.*

Fewer than three years after the agency published its oral-only drugs regulation in the Federal Register, Congress recognized that inclusion and passed a new statute contemplating that the policy would be implemented in the future.  "Congress' explicit recognition of the Secretary's regulations is entitled to some weight in determining whether that regulation is at least a reasonable interpretation of the statute." *Women Involved in Farm Econ. v. Dep't of Agric.*, 876 F.2d 994, 1003 (D.C. Cir. 1989).  The text of the American Taxpayer Relief Act evinces congressional approval of the agency's policy "relating to oral-only [End-Stage Renal Disease]-related drugs."  126 Stat. 2354.  It would be incoherent for Congress to instruct the Secretary to monitor individuals' bone and mineral metabolism as part of the implementation of a policy relating to oral-only drugs if Congress believed that the "implementation of oral-only [End-Stage Renal Disease] related drugs" in that category in the bundle were an unlawful expansion of the authority it delegated to the agency.

Plaintiffs argue (PI Mot. (ECF No. 14) at 32), that CMS's use of the term "End-Stage Renal Disease-related" in its Federal Register notice exceeds its statutory authority.  But Congress itself repeatedly used that term with approval two years later, referring—with a Federal Register citation—to the very rule that Plaintiffs oppose.  Had Congress disagreed with the agency's use of the phrase "End-Stage Renal Disease-related" or with its policy decision to include oral-only drugs in the bundle, it would not have enacted section 632 of the American Taxpayer Relief Act in the form that it did.  Congress delayed implementation of the oral-only

- 28 -

drug policy but contemplated it would be implemented in the future.  A congressionally imposed delay is not a disapproval, and the fact that Congress acknowledged precisely the policy at issue and instructed the agency to delay its implementation of that policy while monitoring an aspect of that policy's implementation is evidence that Congress approved the agency's interpretation of the statute.

A later Congress twice enacted further delays to what it called in the statute the "oral-only policy."  Protecting Access to Medicare Act, Pub. L. 113-93, § 217, 128 Stat. 1061; Tax Increase Prevention Amendments, Pub. L. 113-295, § 204, 128 Stat. 4065.  These enactments show that Congress remained aware of CMS's oral-only drug policy and instructed the Secretary to delay its implementation to January 1, 2025.  Had Congress disapproved of the policy, it presumably would have instead instructed the Secretary not to implement it at all.

Plaintiffs direct this court to proposed legislation that was never enacted that, they argue, "underscores that CMS's contrary construction is inconsistent with" the statutory language.  PI Mot. (ECF No. 14) at 25-26 (citing H.R. 3200, 111th Cong., § 1232 (2009)).  "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Girouard v. United States*, 328 U.S. 61, 69 (1946); *accord. AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987).  The treacherousness is magnified here, when the unenacted legislative language Plaintiffs cite is found in a bill as sweeping in scope and as lengthy as H.R. 3200, which is captioned "A bill to provide affordable, quality health care for all Americans and reduce the growth in health care spending, and for other purposes."  H.R. 3200, 111th Cong (2009).  Plaintiffs offer no evidence that Congress failed to enact that bill over concerns about its modification of the scope of items and services included in the End-Stage Renal Disease Prospective Payment System Bundle, and such an inference is unwarranted.  Indeed, there is

evidence of congressional intent to include oral-only drugs in the bundle via the Medicare Improvement Act itself.  *See* 154 Cong. Rec. H5908 (daily ed. June 24, 2008) (speech of Rep. Pallone) ("My understanding of the [Medicare Improvement Act] language is that it provides for inclusion of all oral dialysis-related drugs in the bundle, including calcimimetics and phosphate binders."). The fact that Congress specifically identified the Secretary's regulation, including its inclusion of oral-only drugs in the bundle, and passed a law that would be incoherent if it meant for oral-only drugs to be excluded from the bundle, strongly favors that Congress approved the Secretary's regulation.

###### B.     Plaintiffs' Argument That the Relevant Statutory Language Includes Only What Is Expressly Listed and Excludes Oral-Only Drugs Ignores the Statute.

Plaintiffs would have this Court apply a crabbed reading of the statute defining "renal dialysis services."   Because the statute does not specifically include "oral-only drugs," and because it mentions "any oral equivalent form of such drug or biological," Plaintiffs conclude that Congress excluded oral-only drugs.  PI Mot. (ECF No. 14) at 21-25.  Plaintiffs are wrong, both because they ignore key statutory text ("the term renal dialysis services includes" and "such term does not include," 42 U.S.C. § 1395rr(b)(14)(B)), and because the key sections themselves do not prohibit the agency's inclusion of oral-only drugs in the bundle.

The statute describing the scope of renal dialysis services states that the term "includes" four categories.  42 U.S.C. § 1395rr(b)(14)(B); *see United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1114-15 (D.C. Cir. 2009) (distinguishing between "includes" and "means" to introduce statutory definitions, and noting that the "non-exhaustive nature of 'includes'" is "clear"); *see also* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts, at 132 (2012) ("The verb *to include* introduces examples, not an exhaustive list.").  The statute further contains an explicit exclusion: the term "renal dialysis services . . . does not include vaccines."

42 U.S.C. § 1395rr(b)(14)(B); *cf.* PI Mot. (ECF No. 14) at 27 (quoting Scalia & Garner, *supra*, at 107) ("The expression of one thing implies the exclusion of others.").  Congress's definition of renal dialysis services begins with a word meaning that the listing that follows is "non-exhaustive," and it ends with a single explicit exclusion for "vaccines"—implying that there are not other exclusions of items and services otherwise falling in the statute's scope.  Plaintiffs overlook this statutory context, which is critical to understanding the meaning of Congress's specific enumeration of what the term renal dialysis services "includes."  Plaintiffs read the statute as describing the precise scope of the bundle.  But that is not how Congress wrote the law; it said the bundle "includes" four categories of items and services and excludes a fifth category.  Had Congress wanted to limit the scope of the bundle, it might have said "renal dialysis services" *consist of* the following things.  And had it wanted to exclude oral-only drugs from the bundle, it might have said "such term does not include vaccines and oral-only drugs."  It did neither.

It is with this context in mind that the Court should analyze the relevant subclauses of Section 1395(b)(14)(B): (iii) and (iv).  Subclause (iii) says that included as renal dialysis services are "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological."  Plaintiffs make two key errors in reading subclause (iii).  First, they say that it supports their position (PI Mot. (ECF No. 14) at 30-33) that a "renal dialysis service" must treat End-Stage Renal Disease directly.  Second, they say that the text of subclause (iii) excludes oral-only drugs.  PI Mot. (ECF No. 14) at 22-26.

First, Plaintiffs are wrong to assert that a drug that does not treat End-Stage Renal Disease directly cannot be a renal dialysis service under the statute.  The first part of subclause (iii) says included in "renal dialysis services" are "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease . . ."  42 U.S.C. § 1395rr(b)(14)(B)(iii).  The word "other" in (b)(14)(B)(iii) refers to the drugs described in the immediately preceding (b)(14)(b)(ii) and therefore means drugs "other than erythropoiesis stimulating agents."  *See id.* § 1395rr(b)(14)(B)(ii).  This, in turn, makes clear that erythropoiesis stimulating agents are an example of "drugs . . . that are furnished to individuals for the treatment of end stage renal disease."  But erythropoiesis stimulating agents are drugs approved for the treatment of anemia, not to directly treat end-stage renal disease.  *See* FDA, Information on Erythropoiesis-Stimulating Agents (ESA) Epoetin alfa (marketed as Procrit, Epogen), Darbepoetin alfa (marketed as Aranesp), available at https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-erythropoiesis-stimulating-agents-esa-epoetin-alfa-marketed-procrit-epogen-darbepoetin; *see also, e.g.*, Aranesp FDA Label, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/103951orig1s5173_103951orig1s5258lbl.pdf (Aranesp indicated, among other things, for the treatment of anemia due to chronic kidney disease).  In other words, the "treatment of end stage renal disease," as Congress uses that phrase, must include treatment of at least some conditions associated with End-Stage Renal Disease because the End-Stage Renal Disease bundle must include erythropoiesis-stimulating agents, which treat anemia but do not treat End-Stage Renal Disease directly.  *Cf.* PI Mot. (ECF No. 14) at 30-34.  Further, Plaintiffs are wrong to say that "other" refers to both subclauses (i) and (ii).  *See* PI Mot. (ECF No. 14) at 23.  Subclause (i) refers to "items and services," of which drugs and biologicals are a subset.  Erythropoiesis stimulating agents are drugs.

As the agency acknowledged, not all drugs treating a comorbidity of End-Stage Renal Disease are "renal dialysis services."  CMS conducted an extensive analysis of data as part of its 2010 rulemaking to determine which drug functional categories met the statutory definition of renal dialysis services.  *See* 75 Fed. Reg. at 49,047-50.  It determined, consistent with the statute, that "anemia management" was one example of such a functional category.  And CMS determined that there were other functional categories that should be part of the bundle, including (as relevant here) bone and mineral metabolism.  Inclusion of this category of drugs is not contrary to statute, as Plaintiffs claim.  Just as erythropoiesis-stimulating agents must be included among renal dialysis services, other drugs and biological products treating End-Stage Renal Disease comorbidities can also be included.  Similarly, the statutory exclusion for vaccines shows that Congress intended that the End-Stage Renal Disease Prospective Payment System bundle include items and services that do not treat End-Stage Renal Disease directly.  There is no vaccine against End-Stage Renal Disease; that Congress nevertheless specifically excluded vaccines shows that the bundle includes items and services that do not directly address End-Stage Renal Disease.

Plaintiffs also wrongly use subclause (iii) to argue that oral-only drugs cannot be included in the bundle because, they suggest, it reaches only those oral drugs with a non-oral equivalent. PI Mot. (ECF No. 14) at 23.  The next few words in subclause (iii)—"and for which payment was (before the application of this paragraph) made separately under this subchapter"— undermine that argument.  As discussed extensively already, Congress has delayed implementation of the Secretary's oral-only drugs policy until January 1, 2025.  So "this paragraph" has not yet been applied to oral-only drugs, and payment for such drugs is—as all parties agree—"made separately" under Medicare Part D, which is a part of "this subchapter,"

i.e., Title XVIII of the Social Security Act, more commonly known as the Medicare statute. Oral-only drugs for the treatment of End-Stage Renal Disease (including at least some conditions associated with End-Stage Renal Disease) in other words, squarely satisfy the statutory definition.

Plaintiffs accuse defendants of rewriting the statute to add the phrase "including drugs and biologicals with only an oral form."  PI Mot. (ECF No. 14) at 24.  But subsection (iii) does not have any text limiting its applicability to injectable or intravenous drugs.  It is Plaintiffs who are reading the rest of the subclause to exclude drugs and biologicals with only an oral form, despite the absence of any text justifying such an exclusion.  If Congress meant subclause (iii) to apply only to injectable or intravenous drugs and biologicals and oral drugs with injectable or intravenous equivalents, it could have said so.  Or it could have said, for example, "for which payment was . . . made separately under Part B of this subchapter," thereby excluding from the bundle those drugs eligible for payment under Part D (unless they are the "oral equivalent form" of a Part B drug).

Plaintiffs might respond that the final words of subclause (iii), "and any oral equivalent form of such drug or biological," should be read to imply that "other drugs and biologicals" must not be oral-only.  *See* PI Mot. (ECF No. 14) at 23.  As discussed above, this argument might have more force if the list of "renal dialysis services" were not introduced with the non-exhaustive "includes," and if there were not an explicit exclusion later in the statute.  Even in isolation, the phrase is properly interpreted to include oral-only drugs.  Without it, an oral version of a drug paid by Medicare in its injectable or intravenous version might arguably be excluded from the bundle, if the oral version becomes available after "the application of this paragraph."  And, of course, the statutory phrase is "any oral equivalent form."  That oral-only drugs do not

themselves have an oral equivalent form does not mean they are excluded from subsection (iii) entirely, provided (*see supra*) they otherwise qualify as drugs for the treatment of End-Stage Renal Disease that were separately paid under Medicare prior to the application of the paragraph bringing them into the bundle.

Plaintiffs' arguments to the contrary miss the mark.  For example, they accuse CMS of disagreeing with Congress as a matter of policy.  *See* PI Mot. (ECF No. 14) at 24.  In support, they cite the preamble to the 2009 proposed rule.  *See* 74 Fed. Reg. 49,922 (Sep. 29, 2009) (proposed rule).  But the final rule is clear that CMS was not motivated by a disagreement with Congress's wording of the statute; the agency explained why its rule was consistent with the statute.  *See, e.g.*, 75 Fed. Reg. at 49,038-39 (Congress did not intend "to limit the renal dialysis services included in the [End-Stage Renal Disease Prospective Payment System] bundle to services for which only [End-Stage Renal Disease] facilities are currently paid").

Plaintiffs also misread subclause (iv).  *See* PI Mot. (ECF No. 14) at 26-30.  As Plaintiffs acknowledge, *see* PI Mot. (ECF No. 14) at 26, CMS in its rulemaking relied on subclause (iv) in the alternative for its inclusion of oral-only drugs in the End-Stage Renal Disease payment bundle.  Subclause (iv) pulls into the bundle "diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iv).  Clause (i), in turn, says that the bundle includes items and services in the composite rate as of the day before the effective date of the End-Stage Renal Disease Prospective Payment System.  *Id.* § 1395rr(b)(14)(B)(I).  Some diagnostic laboratory services were separately billed before that effective date, so it is unsurprising that Congress would identify them specifically as included in the bundle.  *See* Medicare Benefit Policy Manual, Ch. 11, § 20.2, available at https://www.cms.gov/regulations-

and-guidance/guidance/manuals/downloads/bp102c11.pdf.   But it is also unsurprising that Congress might have wanted to ensure "items and services" that did not exist on December 31, 2010—for example, drugs and biologicals developed after that date—were included in the bundle once they became available, as long as they are "furnished to individuals for the treatment of end stage renal disease."  Clause (iv) is thus best understood as ensuring that CMS may include newly developed items and services in the End-Stage Renal Disease bundle.

### C.    CMS Did Not Violate Its Own Regulations in Identifying XPHOZAH as a Renal Dialysis Service Included in the Bundle.

Plaintiffs' remaining challenges concern the identification of XPHOZAH specifically as a renal dialysis service, which they argue is contrary to CMS's own regulations and violative of the APA.  *See* PI Mot. (ECF No. 14) at 30 ("XPHOZAH also falls outside the ERD PPS bundle for two additional reasons").  Plaintiffs are unlikely to succeed on the merits of such claims primarily because the Court lacks jurisdiction to consider them.   *See* 42 U.S.C. § 1395rr(b)(14)(G); *see generally* Mot. Dismiss (ECF No. 11).  But Plaintiffs' arguments in their motion for preliminary injunction are also meritless.

Plaintiffs claim that XPHOZAH is not a "renal dialysis service" because it is not used in a dialysis unit.  PI Mot. (ECF No. 14) at 33.  But nothing in CMS's regulations limits "renal dialysis services" to items or services used in a dialysis unit; indeed, diagnostic laboratory tests (which are statutorily included in the bundle) can be performed in a lab, not in a dialysis unit. Plaintiffs cite a portion of a Federal Register notice in which CMS explained how it developed the original functional categories by analyzing historical claims data from a period when Medicare paid for End-Stage Renal Disease under the composite rate system and such services were performed in a dialysis unit.  *See* PI Mot. (ECF No. 14) at 33 (quoting 75 Fed. Reg. at 49,047).  But this preamble describes what CMS did as part of its data analysis; the text does

not establish a binding rule for the future.  Nothing in that Federal Register preamble—and certainly nothing in the regulation text—implies that, going forward, an item or service must be furnished or performed in a dialysis unit to qualify as a renal dialysis service.

Contrary to Plaintiffs' arguments, CMS is not changing its position (in violation of the APA) without acknowledging a past position because the alleged prior position is an invention of Plaintiffs.  *Cf.* PI Mot. (ECF No. 14) at 34.  For example, CMS has paid for the oral calcimimetic Sensipar (cinacalcet) under the End-Stage Renal Disease Prospective Payment System since January 1, 2018.  *See* CMS Manual System, Transmittal 1999 (January 10, 2018), available at   https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/2018 Downloads/R1999OTN.pdf.   Much like XPHOZAH, Sensipar is taken with meals.  Sensipar FDA Label, available at   https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/ 021688s017lbl.pdf.  Plaintiffs cannot demonstrate that CMS has ever required that an item be used in a dialysis unit to qualify as a renal dialysis service; indeed, there is ample evidence to the contrary.

Similarly, CMS has not failed to treat like cases alike, contrary to Plaintiffs' arguments. *See* PI Mot. (ECF No. 14) at 34-35.  CMS explained in its 2010 rulemaking how it developed the End-Stage Renal Disease functional categories, and why drugs in the "bone and mineral metabolism" functional category are renal dialysis services, while drugs that treat "diabetes, cardiac conditions, and hypertension," PI Mot. (ECF No. 14) at 34-35, are not.  That Plaintiffs have declined to engage with CMS's explanation does not mean that the agency has failed to provide it.

Plaintiffs argue that XPHOZAH cannot be a "renal dialysis service" because it is not "essential for the delivery of maintenance dialysis" as required by 42 C.F.R. § 413.171(5)

("Renal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis.").  Plaintiffs point out that XPHOZAH is not taken contemporaneously with dialysis, and they note that XPHOZAH is a second-line treatment for patients who do not respond to or cannot take phosphate binders.  PI Mot. (ECF No. 14) at 36.  However, CMS has explained, even before XPHOZAH was approved, that "essential to the delivery of maintenance dialysis" means "necessary to treat or manage conditions associated with the beneficiary's [End-Stage Renal Disease], and thus, help the beneficiary to remain sufficiently healthy to continue receiving maintenance dialysis."  83 Fed. Reg. at 56,931.  XPHOZAH is prescribed to those on dialysis to reduce serum phosphorus.  Elevated serum phosphorus is a condition that threatens a person's health to the extent that they may be unable to continue receiving maintenance dialysis; indeed, Plaintiffs describe XPHOZAH as a "critically important tool for nephrologists."  PI Mot. (ECF No. 14) at 36.  Hyperphosphatemia can damage bones and increase the risk of heart attack, stroke, and death.  Hyperphosphatemia, Cleveland Clinic, available at https://my.clevelandclinic. org/health/diseases/24293-hyperphosphatemia.  It is wholly consistent with CMS's prior interpretation of its own regulation to deem XPHOZAH "essential for the delivery of maintenance dialysis."

Plaintiffs' interpretation of the regulation, on the other hand, would exclude items and services clearly within the ambit of the statute.  Much like hyperphosphatemia, anemia is a common co-morbidity of End-Stage Renal Disease that harms patients' general health and can affect a person's ability to continue receiving maintenance dialysis.  Erythropoiesis stimulating agents, as discussed above, are among the items and service statutorily included in the bundle, and they can be used to treat anemia secondary to End-Stage Renal Disease.  Plaintiffs' preferred interpretation of 42 C.F.R. § 413.171(5) would exclude these statutorily included items from the

bundle.  CMS's interpretation would not because erythropoiesis stimulating agents, much like XPHOZAH and other phosphate-lowering drugs, can help a patient remain healthy enough to continue receiving maintenance dialysis.

Plaintiffs invite this Court to decide whether oral-only drugs generally or XPHOZAH specifically are renal dialysis services, in direct contravention of Congress's instruction that there be no administrative or judicial review of CMS's identification of renal dialysis services.  *See* 42 U.S.C. § 1395rr(b)(14)(G).  This Court does not need to—and should not—address Plaintiffs' arguments on the merits because, as discussed above and in Defendants' Motion to Dismiss, the Court lacks jurisdiction.  Even if it concludes otherwise, it should deny preliminary injunctive relief on the basis that Plaintiffs have not shown the requisite irreparable harm.  But if this Court does reach the statutory issues, it should conclude that Congress has approved the regulations that Plaintiffs seek to challenge and that the statute, read in its full context, does not exclude oral-only drugs from the End-Stage Renal Disease Prospective Payment System bundle.  In short, Plaintiffs have not shown a likelihood of success on the merits.

## IV.     Neither the Balance of the Equities Nor the Public Interest Favors Plaintiffs

Plaintiffs have not demonstrated that "the balance of equities tips in their favor," and that "an injunction is in the public interest."  *Sherley*, 644 F.3d at 392.  When the government is a party to the litigation, these two factors merge and "are one and the same, because the government's interest is the public interest."  *Pursuing Am's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Here, the equities and public interest would not be served by enjoining the inclusion of oral-only drugs, including XPHOZAH, in the End-Stage Renal Disease bundle.  This is particularly true in light of the speculative nature of Plaintiffs' arguments—they do not know how End-Stage Renal Disease facilities will respond to the inclusion of oral-only drugs in the

bundle, and they can only speculate that the facilities will steer patients to less expensive products (and that less costly products are necessarily less effective).

Plaintiffs ignore the harms that would be caused by a decision enjoining the oral-only drug policy.  CMS has stated that it "anticipate[s] that the incorporation of oral-only drugs into the [End-Stage Renal Disease Prospective Payment System] will increase access to these drugs for beneficiaries," 89 Fed. Reg. at 55,797, because some beneficiaries who do not have access to oral-only drugs will gain access once such drugs are included in the End-Stage Renal Disease payment bundle.  Plaintiffs focus on the impact they speculate the inclusion of its product in the bundle will have on Medicare beneficiaries with End-Stage Renal Disease who are enrolled in Medicare Part D, but not all Medicare beneficiaries have Part D coverage.  There is no dispute that Medicare beneficiaries without Part D coverage currently have significant difficulty accessing XPHOZAH.  CMS estimates that twenty-one percent of End-Stage Renal Disease beneficiaries covered under fee for service Medicare lack coverage under Medicare Part D.  *Id.* at 55,671.  For these beneficiaries, XPHOZAH's incorporation into the bundle will provide them access to a drug that was, in many cases, previously unobtainable.  There is no doubt that increased access to beneficial drugs is in the public interest.

Plaintiffs' remaining arguments that an injunction is in the public interest largely bootstrap on their claims about the merits.  There is no doubt a public interest in having agencies that follow the law, PI Mot. (ECF No. 14) at 44, but if—as Defendants have shown—Plaintiffs have failed to demonstrate a likelihood of success on the merits, they have similarly failed to demonstrate that CMS's inclusion of XPOAZAH is contrary to law.  Plaintiffs' reliance on *Collagenex Pharmaceuticals, Inc. v. Thompson*, Civ. A. No. 03-1405, 2003 WL 21697344, at *11 (D.D.C. July 22, 2003), *see* PI Mot. (ECF No. 14) at 44, is misplaced.  They rely on that case to assert a

public interest in "encouraging the development of innovative drugs," omitting that the opinion goes on to say "by ensuring a period of market exclusivity." *Id.* Market exclusivity is not at issue here.

Even if Plaintiffs had demonstrated the equities favor them, this factor cannot make up for Plaintiffs' failure to demonstrate likelihood of success on the merits or irreparable harm. *See Mott Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 248 (D.D.C. 2015) (concluding that balance of equities analysis cannot justify preliminary injunction where plaintiff did not demonstrate a likelihood of success on the merits). Plaintiffs' requested injunction would disrupt a policy that participants in delivering treatment for End-Stage Renal Disease—including End-Stage Renal Disease facilities and other drug manufacturers—have been preparing to implement for a long time.

## V.    This Court Should Not Grant Expedited Summary Judgment

Even if this Court denies Defendants' Motion to Dismiss, its decision on that motion will likely affect the scope of issues to be determined on summary judgment. For that reason, Defendants urge this Court, if it denies the Motion to Dismiss but determines that Plaintiffs have not satisfied the factors necessary for entry of a preliminary injunction, to set a new briefing schedule for summary judgment.

\*    \*    \*

**CONCLUSION**

For the above reasons, this Court should deny Plaintiffs' motion for a preliminary injunction or, in the alternative, for expedited summary judgment.

Dated: October 4, 2024
      Washington, DC

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____/s/ *John J. Bardo*_____
    JOHN J. BARDO, D.C. Bar #1655534
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 870-6770

*Attorneys for the United States of America*

OF COUNSEL:

ALEXANDER R. WHITE
Attorney
Department of Health & Human Services
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 619-0182
alexander.white@hhs.gov

SAMUEL R. BAGENSTOS
General Counsel

JANICE L. HOFFMAN
Associate General Counsel

DAVID L. HOSKINS
Acting Deputy Associate General Counsel
for Litigation

*Attorneys for the United States of America*