## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ARDELYX, INC.,**
400 Fifth Avenue, Suite 210
Waltham, MA 02451

**AMERICAN ASSOCIATION OF KIDNEY PATIENTS,**
14440 Bruce B. Downs Blvd.
Tampa, FL 33613

**NATIONAL MINORITY QUALITY FORUM**,
1201 15th Street NW #340
Washington, DC 20005

    **Plaintiffs,**

  **v.**

**XAVIER BECERRA,**
*Secretary of Health and Human Services*
200 Independence Avenue, SW
Washington, DC 20201

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,**
200 Independence Avenue, SW
Washington, DC 20201

**CHIQUITA BROOKS-LASURE, AND**
*Administrator of Centers for Medicare and Medicaid Services*
7500 Security Boulevard
Baltimore, MD 21244

**CENTERS FOR MEDICARE AND MEDICAID SERVICES,**
7500 Security Boulevard
Baltimore, MD 21244,

    **Defendants.**

Case No. 1:24-cv-02095-BAH

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................5

    A.    End Stage Renal Disease ...........................................................................5

    B.    Medicare Coverage For End Stage Renal Disease .....................................5

    C.    The Creation Of The Modern ESRD "Bundle" ..........................................6

    D.    CMS Acts To Add Oral-Only Drugs Into The ESRD PPS Bundle ............8

    E.    Congress Repeatedly Prevents CMS From Implementing The
Inclusion Of Oral-Only Drugs Into The ESRD PPS Bundle ...................10

    F.    Ardelyx's XPHOZAH ...............................................................................11

    G.    CMS Adds Oral-Only Drugs To The ESRD PPS Bundle, Including
XPHOZAH ...............................................................................................13

    H.    This Litigation ..........................................................................................13

ARGUMENT .....................................................................................................................14

I.     THIS COURT CAN REVIEW PLAINTIFFS' CHALLENGE TO A CMS
REGULATION PURPORTING TO REDEFINE "RENAL DIALYSIS
SERVICES" ............................................................................................................15

    A.    Section 1395rr(b)(14)(G) Does Not Limit Judicial Review Of CMS
Regulations Redefining The Scope Of "Renal Dialysis Services" ...........16

    B.    Provisions Like Section 1395rr(b)(14)(G) Are Properly Construed Not To
Bar Judicial Review Of Actions Beyond The Agency's Statutory
Authority ..................................................................................................20

        1.    Under D.C. Circuit Precedent, § 1395rr(b)(14)(G) Is Properly
Construed To Limit Review Only Of Determinations That
Defendants Are Statutorily Authorized To Make ..........................20

        2.    CMS Has Not Acted Within the Bounds Of Its Statutorily
Delegated Authority .......................................................................24

II.    SECTION 1395rr(B)(14)(G) DOES NOT BAR JUDICIAL REVIEW OF
PLAINTIFFS' PARTICULAR CHALLENGES TO THE
XPHOZAH DECISION ..........................................................................................37

CONCLUSION ..................................................................................................................42

# **TABLE OF AUTHORITIES**

**Page(s)**

### **CASES**

*Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*,
  37 F.4th 667 (D.C. Cir. 2022) ................................................................................34

*Am. Hosp. Ass'n v. Azar*,
  967 F.3d 818 (D.C. Cir. 2020) ....................................................................3, 14, 40

*Am. Hosp. Ass'n v. Becerra*,
  596 U.S. 724 (2022) ..............................................................................................18

*Am. Petroleum Inst. v. E.P.A.*,
  52 F.3d 1113 (D.C. Cir. 1995) ..............................................................................25

*American Hospital Association v. Azar*,
  964 F.3d 1230 (D.C. Cir. 2020) ................................................................21, 22, 24

*Amgen Inc. v. Smith*,
  357 F.3d 103 (D.C. Cir. 2004) ........................................................................ *passim*

*Apple Inc. v. Omni MedSci, Inc.*,
  No. 2023-1034, 2024 WL 3084509 (Fed. Cir. June 21, 2024) ..............................17

*Ascension Borgess Hosp. v. Becerra*,
  557 F. Supp. 3d 122 (D.D.C. 2021) ..........................................................23, 24, 27

*Bissonnette v. LePage Bakeries Park St., LLC*,
  601 U.S. 246 (2024) ..............................................................................................35

*Bowen v. Michigan Academy of Family Physicians*,
  476 U.S. 667 (1986) ..............................................................................................18

*Cir. City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001) ..............................................................................................36

*COMSAT Corp. v. FCC*,
  114 F.3d 223 (D.C. Cir. 1997) ....................................................................16, 21, 22

*Council for Urological Interests v. Burwell*,
  790 F.3d 212 (D.C. Cir. 2015) ..............................................................................30

*Eagle Pharms., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ..............................................................................25

*EchoStar Satellite L.L.C. v. FCC,*
    704 F.3d 992 (D.C. Cir. 2013) ........................................................................26

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) .......................................................................................27

*Fischer v. United States,*
    144 S. Ct. 2176 (2024) ........................................................................34, 35, 36

*Fresno Cmty. Hosp. & Med. Ctr. v. Azar,*
    370 F. Supp. 3d 139 (D.D.C. 2019) ...........................................................18, 21

*Gen. Motors Corp. v. Ruckelshaus,*
    742 F.2d 1561 (D.C. Cir. 1984) .....................................................................32

*Grange Mut. Cas. Co. v. Woodward,*
    861 F.3d 1224 (11th Cir. 2017) .....................................................................41

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) .......................................................................................33

*Koi Nation of N. Cal. v. U.S. Dep't of Interior,*
    361 F. Supp. 3d 14 (D.D.C. 2019) .................................................................25

*Koretoff v. Vilsack,*
    707 F.3d 394 (D.C. Cir. 2013) ..................................................................16, 19

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ........................................................................24, 25, 31

*Merck & Co. v. HHS,*
    385 F. Supp. 3d 81 (D.D.C. 2019) .................................................................25

*Michigan v. E.P.A.,*
    576 U.S. 743 (2015) .......................................................................................27

*Nat'l Mining Ass'n v. U.S. Dep't of Interior,*
    105 F.3d 691 (D.C. Cir. 1997) .......................................................................27

*Obduskey v. McCarthy & Holthus LLP,*
    586 U.S. 466 (2019) .......................................................................................34

*Panhandle E. Pipe Line Co. v. FERC,*
    613 F.2d 1120 (D.C. Cir. 1979) .....................................................................40

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) .........................................................................................40

*Santa Barbara Cnty. Air Pollution Control Dist. v. EPA*,
  31 F.3d 1179 (D.C. Cir. 1994) ...................................................................19

*Utility Air Regul. Grp. v. E.P.A.*,
  573 U.S. 302 (2014) ..................................................................................30

*Wint v. Yeutter*,
  902 F.2d 76 (D.C. Cir. 1990) ....................................................................31

**STATUTES**

5 U.S.C.
  § 701 *et seq.* .............................................................................................14
  § 706 ..........................................................................................................27

18 U.S.C. § 1512 ................................................................................................34

28 U.S.C. § 1331 ................................................................................................14

42 U.S.C.
  § 426-1 .........................................................................................................6
  § 1302 .........................................................................................................25
  § 1395 .........................................................................................................21
  § 1395rr ................................................................................................*passim*

Pub. L. No. 92-603, 86 Stat. 1329 (1972) ...........................................................6

Pub. L. No. 97-35, § 2145, 95 Stat. 357 (1981) ..................................................6

Pub. L. No. 112-240, § 632(b), 126 Stat. 2313 (2012) ......................................10

Pub. L. No. 113-93, § 217(a)(1), 128 Stat. 1040 (2014)....................................10

Pub. L. No. 113-295, § 401, 128 Stat. 4010 (2014)...........................................11

**REGULATIONS**

42 C.F.R. § 413.171 ..................................................................................*passim*

**FEDERAL REGISTER NOTICES**

74 Fed. Reg. 49,922 (Sept. 29, 2009) ..................................................................9

75 Fed. Reg. 49,040 (Aug. 12, 2010)...........................................................*passim*

80 Fed. Reg. 69,027 (Nov. 6, 2015).....................................................................11

89 Fed. Reg. 55,796-97 (July 5, 2024) ...........................................................13, 19

**INTRODUCTION**

Plaintiffs Ardelyx, Inc., American Association of Kidney Patients, and National Minority Quality Forum (collectively, "Plaintiffs") respectfully oppose Defendants' Motion to Dismiss. Contrary to Defendants' contentions, this Court has jurisdiction to review Plaintiffs' claims.

Because of the demonstrable patient need for life-saving treatment and high cost of treatment, Congress over 50 years ago extended Medicare coverage to patients with End Stage Renal Disease ("ESRD"), regardless of their age.  In 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"), which created a bundled payment system for "renal dialysis services" under which a single payment under Medicare Part B is made to dialysis facilities for certain items, drugs, and tests in lieu of any other separate payment.  *See* 42 U.S.C. § 1395rr(b)(14)(A)-(B).

The ESRD Prospective Payment System ("PPS") bundle was intended to incentivize dialysis facilities to more efficiently deliver maintenance dialysis.  Consistent with that goal, Congress defined "renal dialysis services" to reach four enumerated categories of services administered by dialysis facilities in the course of providing dialysis to ESRD patients.  42 U.S.C. § 1395rr(b)(14)(B).  Rather than implement that statutory directive, however, the Center for Medicare Services ("CMS") is seeking to expand the definition of "renal dialysis services" to encompass categories of drugs that are not administered during dialysis, let alone by dialysis providers, and which fall outside the definition of "renal dialysis services" enacted by Congress. As a wide cross-section of the kidney-care community, including physicians, nurses, patients, dialysis providers, and drug manufacturers have repeatedly warned, CMS's plan to add such drugs to a bundled payment system that already fails to adequately reimburse dialysis providers will

reduce access to life-saving drugs, harm patients, and stifle innovation—all while imposing added costs on patients who can ill afford to bear it.

This action challenges CMS's promulgation of a regulation that expanded the definition of "renal dialysis services" to encompass oral-only drugs, as well as CMS's recent determination that Ardelyx's novel oral-only phosphate-lowering therapy ("PLT"), XPHOZAH, is a "renal dialysis service." *See* Dkt. 1 ¶¶ 195-215 and Prayer for Relief. As Plaintiffs explained in their Complaint and motion for a preliminary injunction or expedited summary judgment, CMS's actions are incompatible with Congress's statute and CMS's own regulations. And Plaintiffs and ESRD patients will be meaningfully harmed in the short and long term absent action from this Court.

In moving to dismiss Plaintiffs' complaint, Defendants notably do not dispute Plaintiffs' claims on the merits. Instead, Defendants move to dismiss the complaint solely on the basis of 42 U.S.C. § 1395rr(b)(14)(G), which provides that "[t]here shall be no administrative or judicial review . . . of . . . the identification of renal dialysis services included in the bundled payment." *Id.* § 1395rr(b)(14)(G). Asserting that "CMS recently identified the drug XPHOZAH as a 'renal dialysis service' that would be 'included in the ESRD [Prospective Payment System] bundled payment' effective January 1, 2025," Mot. 2, Defendants argue that § 1395rr(b)(14)(G) strips this Court of jurisdiction to consider Plaintiffs' complaint.

Defendants are wrong. To begin with, § 1395rr(b)(14)(G) is only relevant to CMS's identification of a particular drug or other service as a "renal dialysis service"—it does not speak to or preclude review of Plaintiffs' challenge to CMS's promulgation of a regulation that expanded the definition of "renal dialysis services" to include categories of drugs that Congress elected to exclude. Thus, § 1395rr(b)(14)(G) does not preclude judicial review of Plaintiffs' challenge to

CMS's adoption of a regulation redefining "renal dialysis services" to include oral-only drugs. *See* Dkt. 1 ¶¶ 212-15 (setting forth challenge to 42 C.F.R. § 413.171).

Defendants do not seriously attempt to show that § 1395rr(b)(14)(G) reaches that sort of challenge. For good reason. Because there is a "strong presumption that Congress intends judicial review of administrative action," the Government bears the burden of proving by "clear and convincing evidence that Congress intended to preclude the suit." *Amgen Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004) (citation and internal quotation marks omitted); *see Am. Hosp. Ass'n v. Azar*, 967 F.3d 818, 825 (D.C. Cir. 2020) (same). "The presumption is particularly strong that Congress intends judicial review of agency action taken in excess of delegated authority." *Amgen*, 357 F.3d at 111. Courts generally therefore will permit review unless the wording of a preclusion clause is "'absolute'" with respect to the claim at issue. *Id.* (citation omitted).

Defendants cannot satisfy that heavy burden. Section 1395rr(b)(14)(G) speaks to the identification of particular drugs or services as "renal dialysis services." Even Defendants claim that the agency's recent "'identification' of XPHOZAH as a 'renal dialysis service included in the bundled payment'" is "exactly the type of action . . . that Congress precluded from judicial review." Mot. 12. Plaintiffs' challenge to that decision, however, is distinct from Plaintiffs' challenge to CMS's prior enactment of a regulation purporting to define "renal dialysis services" to encompass oral-only drugs. Section 1395rr(b)(14)(G) does not preclude such a challenge.

In any event, the D.C. Circuit has made clear that preclusion provisions like § 1395rr(b)(14)(G) will "prevent review only of those [determinations] that the Medicare Act authorizes the Secretary to make; in other words, the preclusion on review of [determinations] extends no further than the Secretary's statutory authority to make them." *Amgen*, 357 F.3d at 112. Where, as here, "the determination of whether the court has jurisdiction is intertwined with

the question of whether the agency has authority for the challenged action," the challenged agency action is not the sort "shielded from review." *Id.*  For that reason too, this Court can readily review Plaintiffs' claim that Defendants lack statutory authority to extend the definition of "renal dialysis services" to include oral-only drugs, including XPHOZAH.

For related reasons, Section 1395rr(b)(14)(G) also does not preclude review of Plaintiffs' remaining challenges.  First, Congress expressly limited the definition of "renal dialysis services" to drugs "that are furnished to individuals *for the treatment of end stage renal disease*."  42 U.S.C. § 1395rr(b)(14)(B)(iii)-(iv) (emphasis added).  As Defendants admit, however, XPHOZAH "treats hyperphosphatemia."  Opp. 2 (emphasis added).    In designating XPHOZAH as a renal dialysis service anyways, Defendants found not that XPHOZAH treats ESRD, but rather "is furnished to individuals to treat a condition *associated with* ESRD."  Dkt. 1-1 (emphasis added).  Plaintiffs argue that the agency lacked statutory authority to expand the definition of "renal dialysis services" in that manner.  Dkt. 1 ¶¶ 199-200.  As a result, § 1395rr(b)(14)(G)'s prohibition on review is again inapplicable.  *See Amgen*, 357 F.3d at 112 ("[T]he preclusion on review of [determinations] extends no further than the Secretary's statutory authority to make them.").

Finally, Plaintiffs challenge Defendants' determination that XPHOZAH is "a renal dialysis service under 42 C.F.R. § 413.171, because it is . . . essential to the delivery of maintenance dialysis."  Section 1395rr(b)(14)(G) only limits review of agency determinations that particular renal dialysis services meet Congress's *statutory* definition of a "renal dialysis service."  That is not implicated by Plaintiffs' challenge to CMS's failure to properly apply 42 C.F.R. § 413.171(5), a regulatory innovation that post-dates the statute, and which exempts services from the bundled payment system when they are not "essential to the delivery of maintenance dialysis."

Because Defendants do not meet their burden to show this Court lacks jurisdiction to review Plaintiffs' particular challenges, Defendants' Motion to Dismiss should be denied.

## BACKGROUND

### A.     End Stage Renal Disease

Approximately 550,000 people in the United States suffer from ESRD, a life-threatening condition in which the kidneys can no longer function on their own.  Complaint ¶ 55, Dkt. 1. ESRD is the final, permanent stage of chronic kidney disease, a condition in which the kidneys become progressively damaged over time and eventually lose the ability to function.  *Id.*

Unless a patient suffering from ESRD is able to obtain a kidney transplant, he or she must undergo routine dialysis treatment in order to survive.  Dkt. 1 ¶ 57.  ESRD patients therefore typically undergo dialysis—in which a machine manually filters waste and excess fluid in place of the kidneys—3 times a week for 3 to 5 hours each session, at a dialysis center which specializes in this treatment.  *Id.* ¶ 58.  Even with dialysis, ESRD patients experience frighteningly high mortality rates, with 20-50% of ESRD patients on dialysis dying within 24 months of diagnosis, while the five-year survival rate for dialysis patients is under 50%.  *Id.* ¶ 59.

ESRD offers a stark example of the racial, ethnic, and socioeconomic disparities in American healthcare.  *Id.* ¶ 56.  African Americans are almost 4 times more likely, and Hispanics or Latinos 1.3 times more likely, to have ESRD than white Americans.  *Id.*  While African Americans make up 13.5% of the population, they represent more than 35% of dialysis patients, and are more likely to die from ESRD than white patients.  *Id.*  Low income and lack of health insurance are also risk factors for developing ESRD because ESRD is often caused by other underlying health conditions, like high blood pressure and diabetes, that go un- or under-treated.

### B.     Medicare Coverage For End Stage Renal Disease

The Social Security Amendments of 1972 first extended Medicare coverage to individuals

suffering from kidney disease who required dialysis or a kidney transplant, without regard to their age or disability status.  *See* An Act to Amend the Social Security Act, and for Other Purposes, Pub. L. No. 92-603, 86 Stat. 1329 (1972); 42 U.S.C. § 426-1(a).

Beginning in the 1980s, Medicare began paying for dialysis services using the "composite rate" system, a blended prospective payment and fee-for-service system.  Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2145, 95 Stat. 357, 799-800 (1981).  Under the composite rate system, dialysis facilities received a single, prospectively determined payment amount per treatment to cover costs for a defined set of regularly provided tests and supplies, as well as a narrow set of injectable drugs associated with dialysis services.  *See id.*

In addition to the composite rate, dialysis facilities were separately reimbursed for each use of injectable ESRD drugs with payments under Medicare Part B, which generally covers drugs that patients would not administer themselves.[1]  Orally administered drugs, by contrast, are covered separately under Medicare Part D, which offers prescription drug coverage for self-administered drugs.  75 Fed. Reg. 49,030, 49,040 (Aug. 12, 2010).

C.     **The Creation Of The Modern ESRD "Bundle"**

In 2008, Congress enacted MIPPA, codified today at 42 U.S.C. § 1395rr.  MIPPA directs CMS to implement a bundled payment system for "renal dialysis services" under which a single payment is made to dialysis facilities for certain items, drugs, and tests, in lieu of any other separate payment for these materials.  42 U.S.C. § 1395rr(b)(14)(A)-(B).  Under the ESRD PPS, dialysis facilities receive—in general—the same amount per dialysis treatment per patient, regardless of the specific individual costs incurred to treat that patient.  *See id.*

---

[1] *See* U.S. Gov't Accountability Off., (GAO-11-36), *End-Stage Renal Disease: CMS Should Assess Adequacy of Payment When Certain Oral Drugs are Included and Ensure Availability of Quality Monitoring Data* 2 n.6 (2011), https://www.gao.gov/assets/gao-11-365.pdf.

Congress expected that the bundled payment system would incentivize dialysis facilities to operate more efficiently because the facilities would "retain the difference if Medicare's payment exceed[ed] the costs they incur[red] to provide the services."[2]   In practice, however, CMS has come to set the bundled payment rate at an amount that barely covers a dialysis facility's cost of care.  Dkt. 1 ¶ 9.  In 2023, the Medicare Payment Advisory Commission, a nonpartisan legislative-branch agency, calculated that dialysis facilities were experiencing *negative margins* when treating Medicare patients due to the bundled payment system and rising costs.  *Id.* ¶ 172.[3]

Members of Congress have also criticized CMS for failing to "sufficiently reimburse for new, innovative products."  *Id.* ¶ 10.[4]  Following a short period in which CMS may temporarily provide additional reimbursement to dialysis facilities in relation to their use of new drugs, CMS withdraws that reimbursement in favor of small adjustments to the bundled rate.  *Id.* ¶¶ 9-10.  As a consequence, dialysis facilities are disincentivized from adopting treatment approaches—and novel drugs in particular—that would increase their cost of treatment beyond the bundled payment amount.   As Congressional leaders have recognized, this financial challenge causes dialysis facilities to "hesitate to adopt new products" and novel drugs, diminishing patients' access to needed medical care.  *Id.*

---

[2] *See* U.S. Gov't Accountability Off., (GAO-07-77), *End-Stage Renal Disease: Bundling Medicare's Payment for Drugs with Payment for all ESRD Services Would Promote Efficiency and Clinical Flexibility* 22 (2006), https://www.gao.gov/assets/gao-07-77.pdf [hereinafter "GAO 2006 Report"].

[3] *See also* Medicare Payment Advisory Comm'n, 2023 Report to the Congress – Medicare Payment Policy, at 194 (Mar. 2023), https://www.medpac.gov/wp-content/uploads/2023/03/Mar23_MedPAC_Report_To_Congress_v2_SEC.pdf.

[4] *See also* Congressional Kidney and Health Care Innovation Caucuses, Letter to Chiquita Brooks-LaSure (Oct. 2, 2023), https://kidneycarepartners.org/wp-content/uploads/2023/10/CY24-ESRD-Innovation-Letter-Final.pdf.

### D.     CMS Acts To Add Oral-Only Drugs Into The ESRD PPS Bundle

The ESRD PPS bundled "single payment is made . . . for renal dialysis services (as defined in subparagraph (B))."  42 U.S.C. § 1395rr(b)(14)(A).

Congress defined the four categories of "renal dialysis services" for which dialysis providers receive a bundled payment as follows:

> (B) For purposes of this paragraph, the term "renal dialysis services" includes—
>
> (i)     items and services included in the composite rate for renal dialysis services as of December 31, 2010;
>
> (ii)    erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;
>
> (iii)   other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and
>
> (iv)    diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease.

42 U.S.C. § 1395rr(b)(14)(B).

Under the statute's express terms, orally administered drugs qualify as "renal dialysis services" only when they are (1) oral forms of erythropoiesis stimulating agents ("ESAs," which stimulate production of red blood cells) under clause (ii); or (2) "oral equivalent forms" of "other drugs and biologicals that are furnished to individuals for the treatment of [ESRD]" under clause (iii).  That accords with the fact that dialysis facilities have historically administered certain drugs through injections (or oral equivalents of injectable drugs), but have not historically administered "oral-only" drugs to ESRD patients, let alone as part of dialysis.  Dkt. 1 ¶¶ 13-14, 129.  As a result, there would have been little need to account for the cost of such drugs in the single bundled

payment made *to dialysis facilities* for each *dialysis treatment*.   *See id.* ¶ 129.  And unless such oral-only drugs were equivalent to injectable drugs that would otherwise be administered by dialysis facilities, inclusion of such drugs within the bundled payment would not promote the efficient use of resources by dialysis facilities when providing renal dialysis services.  *See id.*

In 2009, CMS issued a proposed rule to implement the bundled payment system created by MIPPA beginning in 2011.  74 Fed. Reg. 49,922, 49,922 (Sept. 29, 2009).  Despite the fact that Congress only directed that a subset of orally administered drugs be included within the bundle, CMS proposed to interpret 42 U.S.C. § 1395rr(b)(14)(B) so as not to limit the oral drugs qualifying as "renal dialysis services" to the "oral form" of ESAs or the "oral equivalent form" of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease." 74 Fed. Reg. at 49,928.  Instead, CMS proposed to include in the bundle *all* drugs and biologicals furnished to individuals for ESRD treatment, including those with only an oral form.  *Id.*

That is exactly what CMS did.  42 U.S.C. § 1395rr(b)(14)(B)(iii) defines "renal dialysis services" to include "other drugs and biologicals . . .  for the treatment of end stage renal disease . . . and any oral equivalent form of such drug or biological."  But CMS altered the statute's text in 42 C.F.R. § 413.171, effectively removing the struck through language below from the statute and replacing it with the bolded regulatory text.

> (3) Other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was (prior to January 1, 2011) made separately under Title XVIII of the Act (~~and any oral equivalent form of such drug or biological~~ **including drugs and biologicals with only an oral form**) . . .

*Compare* 42 U.S.C. § 1395rr(b)(14)(B)(iii) *with* 42 C.F.R. § 413.171(3).  Whereas the statute broadly excludes oral-only drugs from the bundle, the regulation modifies the text to include them. *Id.*

Most comments on the proposed regulation opposed the inclusion of oral-only drugs in the bundle, and "many" focused on CMS's improper expansion of the statutory definition to include these oral-only drugs. *See* 75 Fed. Reg. at 49,038 (criticizing CMS reading as "a misreading of statutory intent and violat[ing] principles of statutory construction"). In questioning CMS's proposal, various commentors also noted that the statute "focuses on payments to ESRD facilities," and argued "that the four categories of renal dialysis services specified in [§ 1395rr(b)(14)(B)] only pertain to services furnished for which payment is made to ESRD facilities." *Id.*

Many commenters expressed concern that CMS's proposed regulation would undermine the statute's purpose and harm patients, explaining that because dialysis providers "would be liable for the difference if costs exceeded Medicare payments," adding oral-only drugs into the bundle would result in "unintended clinical consequences for patients as ESRD facilities seek to maximize profits by resorting to cheaper but less effective alternatives" to oral-only drugs. *Id.* at 49,032, 49,040. CMS admitted that including oral-only drugs in the bundle could result in "underutilization" of needed drugs. *Id.* at 49,041. CMS nonetheless implemented the ESRD PPS in the 2011 ESRD PPS final rule (75 Fed. Reg. 49,030) and adopted its own regulatory definition of "renal dialysis services" to broadly encompass oral-only drugs at 42 C.F.R. § 413.171.

**E.    Congress Repeatedly Prevents CMS From Implementing The Inclusion Of Oral-Only Drugs Into The ESRD PPS Bundle**

Congress has repeatedly delayed CMS's plan to place oral-only drugs into the bundled payment system. In 2012, Congress prevented CMS from including oral-only drugs in the ESRD PPS bundle until January 1, 2016. *See* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 632(b), 126 Stat. 2313 (2012). In 2014, Congress again delayed the implementation of the oral-only drug inclusion in the Protecting Access to Medicare Act of 2014 (PAMA), preventing CMS from including oral-only drugs until 2024. Pub. L. No. 113-93, § 217(a)(1), 128 Stat. 1040,

1061 (2014).  Later that same year, Congress delayed the implementation until 2025.  Achieving

a Better Life Experience Act of 2014, Pub. L. No. 113-295, § 401, 128 Stat. 4010, 4056 (2014).

In response to this legislation, CMS updated its regulations to state that "[e]ffective January

1, 2025, payment to an ESRD facility for renal dialysis service drugs and biologicals with only an

oral form furnished to ESRD patients is incorporated within the prospective payment system rates

established by CMS . . . and separate payment will no longer be provided."  42 C.F.R.

§ 413.174(f)(6); *see also* 80 Fed. Reg. 68,968, 69,027-28 (Nov. 6, 2015) (finalizing this language).

Therefore, despite CMS's initial 2011 rulemaking and promulgation of 42 C.F.R.

§ 413.171, stakeholders have not had to contend with the potential impact of CMS's regulation

until very recently, as the 2025 deadline approached and CMS began to take action to apply its

regulations and place oral-only drugs into the bundled payment system, as detailed below.

### F.   Ardelyx's XPHOZAH

Many ESRD patients suffer from a variety of comorbidities, including hypertension,

diabetes, cardiovascular disease ("CVD"), and hyperphosphatemia—the condition of having too

much phosphate in the body.  *See* Dkt. 1 ¶¶ 75, 150.   Hyperphosphatemia is associated with a

higher risk of cardiovascular mortality, and it can also lead to the progression of bone disorders.

*Id.* ¶ 75.  Managing phosphate levels is therefore important for patients with hyperphosphatemia.

Approximately 80 percent of ESRD patients on dialysis have hyperphosphatemia.  *See id.*

¶ 150; Williams Decl. ¶ 18, Dkt. 14-3.   A substantial number of ESRD patients do not have

hyperphosphatemia, however.  *Id*.  And some patients have hyperphosphatemia, but not ESRD.

*See* Dkt. 1 ¶ 75.

XPHOZAH is a novel, oral-only drug developed by Ardelyx to treat hyperphosphatemia

through a new mechanism of action in the body.  Dkt. 1 ¶¶ 78-80.  Nephrologists (kidney doctors)

generally manage hyperphosphatemia by prescribing a range of phosphate lowering therapies.  As

first-line therapies, many patients are prescribed phosphate binders, which lower phosphate levels in the body by binding to excess phosphate molecules in the gastrointestinal tract and preventing them from reaching the bloodstream.  *Id.* ¶ 22. But not all patients have an adequate response to phosphate binders alone, meaning their blood phosphate levels are still too high even with treatment. *Id.* ¶ 24. Indeed, approximately 70% of ESRD patients are unable to maintain target phosphate levels despite treatment with phosphate binders.[5]

In 2023, FDA approved XPHOZAH.  *Id*. ¶ 27.  XPHOZAH is "indicated to reduce serum phosphorus in adults with chronic kidney disease (CKD) on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  *Id.* ¶ 27.[6]  Unlike phosphate binders, which bind to phosphate, XPHOZAH blocks phosphate absorption at the primary cellular pathway.  By providing the first new mechanism of action to reduce phosphate in decades, XPHOZAH can help patients who are inadequately managed by phosphate binders.

XPHOZAH is not distributed or administered by dialysis facilities, nor is it taken during dialysis*. Id*. ¶ 29.  While dialysis is typically performed three times a week, XPHOZAH is taken twice daily, just prior to the first and last meals of the day.  *Id.* ¶¶ 28, 30-31.  XPHOZAH is not administered as part of the delivery of maintenance dialysis.  *Id*.  ¶¶ 29-31.  In fact, XPHOZAH's label makes clear patients should not take XPHOZAH right before or during dialysis.  *See id.* ¶ 31. (Indeed, taking XPHOZAH right before or during dialysis can risk the patient's health.)  *See id.*

---

[5] *Id.* ¶ 25; Pablo E. Pergola, Phosphate Frustration: Treatment Options to Complement Current Therapies, Int'l J. Nephrology (Aug. 22, 2022), www.ncbi.nlm.nih.gov/pmc/articles/PMC9424003/.

[6] *See also* U.S. Food & Drug Admin., XPHOZAH Label 2 (Oct. 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/213931s000lbl.pdf; Ardelyx, XPHOZAH, http://xphozah-hcp.com/.

¶¶ 31, 164; Dkt. 14-4 at 2 (side effects include dehydration, which is dangerous during dialysis). XPHOZAH is covered under Medicare Part D, like other self-administered oral drugs.  Dkt. 1 ¶ 86.

### G.    CMS Adds Oral-Only Drugs To The ESRD PPS Bundle, Including XPHOZAH

On April 29, 2024, CMS issued guidance stating that "effective January 1, 2025, payment to an ESRD facility for renal dialysis service drugs and biologicals with only an oral form furnished to ESRD patients is incorporated within the prospective payment system rates established by CMS in § 413.230 and separate payment will no longer be provided."  Dkt. 14-10 at 1.

Additionally, on May 13, 2024, CMS sent a letter to Ardelyx stating that "CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171, because it is furnished to individuals to treat a condition associated with ESRD and is essential to the delivery of maintenance dialysis."  Dkt. 1-1 at 1 (XPHOZAH Decision).

In a Notice issued July 5, 2024, CMS reiterated that it would begin to apply its regulations to oral-only drugs effective January 1, 2025.  89 Fed. Reg. 55,760, 55,796-97 (July 5, 2024).

### H.    This Litigation

On July 17, 2024, Plaintiffs filed their Complaint, asserting that CMS's regulation, which purports to dictate that oral-only drugs are to be included in the ESRD PPS bundle, as well as CMS's XPHOZAH Decision itself, violate the statute and are unlawful.  *See generally* Dkt. 1.

Starting in July, Plaintiffs reached out to the government via email in an attempt to negotiate an organized schedule for expedited summary judgment that would dispense with the need for preliminary injunction proceedings.  Instead, on September 17, 2024, Defendants unexpectedly filed their Motion To Dismiss, alleging that this Court lacks jurisdiction under 42 U.S.C. § 1395rr(b)(14)(G).  Dkt. 11.  Two days later, on September 19, Plaintiffs filed their anticipated motion for a preliminary injunction or expedited summary judgment.  Dkt. 14.

**ARGUMENT**

Absent an applicable preclusion provision, the Court possesses subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, which provides jurisdiction over federal questions arising under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.  While Defendants may seek to rebut the existence of jurisdiction by identifying a statutory provision precluding judicial review, there is a "strong presumption that Congress intends judicial review of administrative action."  *Amgen*, 357 F.3d at 111.  And that presumption is "particularly strong" here, as "Congress rarely intends to foreclose review of action exceeding agency authority."  *Id.* at 111-12.  The burden therefore falls to the government to overcome that presumption of reviewability by advancing "clear and convincing evidence that Congress intended to preclude the suit."  *Amgen*, 357 F.3d at 111; *see also Am. Hosp. Ass'n*, 967 F.3d at 825 ("[I]t is the government's burden" to show jurisdiction has been stripped by "clear and convincing evidence.").  The balance weighs in favor of judicial review where "the wording of a preclusion clause is less than absolute" in clearly barring jurisdiction over a particular claim.  *Amgen*, 357 F.3d at 112.

Defendants cannot meet their heavy burden to show that this Court lacks jurisdiction here. 42 U.S.C. § 1395rr(b)(14)(G) limits judicial review of the agency's identification of a *particular* renal dialysis service—*e.g.*, a specific item, service, or drug—that falls within the statutory definition of "renal dialysis services."  It does not preclude a challenge—as Plaintiffs make here— to CMS's adoption of a regulation that expands the definition of "renal dialysis services" beyond that which Congress authorized.  Defendants do not seriously argue otherwise.

As the D.C. Circuit has made clear, moreover, provisions like § 1395rr(b)(14)(G) will "prevent review only of those [determinations] that the Medicare Act authorizes the Secretary to make; in other words, the preclusion on review of [determinations] extends no further than the

14

Secretary's statutory authority to make them." *Amgen*, 357 F.3d at 112.  Because Defendants lack statutory authority to re-write the statutory definition of "renal dialysis services" to create a regulatory definition broader than the one Congress enacted, and then to apply it to regulated parties, § 1395rr(b)(14)(G) does not prevent review of Plaintiffs' challenge to Defendants' unlawful regulation or Defendants' proposed application thereof.

Finally, Plaintiffs' XPHOZAH-specific arguments are likewise not precluded.  Plaintiffs' challenge does not involve a challenge to the agency's identification of a "renal dialysis service" within the terms of the statutory definition set forth by Congress.  As a result, Plaintiffs' challenges are not the sort that § 1395rr(b)(14)(G) is designed to shield from review.

For all of these reasons, § 1395rr(b)(14)(G) does not preclude judicial review here.

## I.   THIS COURT CAN REVIEW PLAINTIFFS' CHALLENGE TO A CMS REGULATION PURPORTING TO REDEFINE "RENAL DIALYSIS SERVICES"

Relying on 42 U.S.C. § 1395rr(b)(14)(G), which precludes judicial review of "the identification of renal dialysis services included in the bundled payment," Defendants principally argue that this Court lacks jurisdiction to consider "CMS['s] recent[] identifi[cation of] the drug XPHOZAH as a 'renal dialysis service.'" Mot. to Dismiss at 2, Dkt. 11-1; *see also* 10, 12, 14.  But Plaintiffs also challenge Defendants' promulgation of a regulation expanding the definition of "renal dialysis services" beyond that which Congress authorized.

Defendants do not seriously argue that § 1395rr(b)(14)(G) precludes a challenge to such a regulation.  Nor could they.  Section 1395rr(b)(14)(G) speaks to the agency's identification of a particular item or drug as a "renal dialysis service" within the definition set forth by 42 U.S.C. § 1395rr(b)(14)(B).  It does not preclude challenges to regulations preceding that step.  Under D.C. Circuit precedent, moreover, § 1395rr(b)(14)(G)'s "preclusion on review of [determinations] extends no further than the Secretary's statutory authority to make them."  *Amgen*, 357 F.3d at

112.   Because Plaintiffs allege that Defendants lacked such statutory authority here, the jurisdictional and merits questions effectively merge.  For both reasons, Defendants fail to meet their heavy burden to show that this Court lacks jurisdiction to review Plaintiffs' challenge to CMS's attempt to redefine "renal dialysis services" to include oral-only drugs.

## A.   Section 1395rr(b)(14)(G) Does Not Limit Judicial Review Of CMS Regulations Redefining The Scope Of "Renal Dialysis Services"

Defendants' cited jurisdiction-stripping provision addresses only the "identification of renal dialysis services," *i.e.*, the agency's identification of a specific drug or treatment as falling within the statutory definition of "renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(G).  It does not preclude Plaintiffs' challenge to CMS's promulgation of a regulation expanding the *definition* of "renal dialysis services" beyond the four defined categories that Congress enacted.  *See id.*

To determine whether judicial review is precluded, the Court must first decide whether, under its plain text, "the provision of the statute that limits judicial review is . . . applicable." *COMSAT Corp. v. FCC*, 114 F.3d 223, 226 (D.C. Cir. 1997).  With respect to Plaintiffs' challenge to 42 C.F.R. § 413.171(3), it is not.  Defendants strive to cast Plaintiffs' claims as limited to challenging "CMS's recent determination that XPHOZAH is a renal dialysis service."  Dkt. 11-1 at 11-15.  But Plaintiffs' claims sweep more broadly—also challenging the regulation that expanded the definition of "renal dialysis services" to include oral-only drugs, notwithstanding Congress's exclusion of that category.  *See* Dkt. 1 ¶ 215 (challenging CMS's "definition of 'Renal dialysis services' at 42 CFR 413.171(3)" as in "excess of statutory jurisdiction and authority"); *id.* at 50 (seeking an order "vacating and setting aside" 42 C.F.R. § 413.171 and "enjoining" its application to oral-only drugs).  Plaintiffs argue that the regulation is both (i) facially invalid, and (ii) cannot be lawfully applied to regulated parties.  *Id.*;  *Koretoff v. Vilsack*, 707 F.3d 394, 399

(D.C. Cir. 2013) (distinguishing facial and as-applied challenges to regulations, both of which are at issue here).

CMS's issuance of a regulation redlining Congress's four, prescribed categories of "renal dialysis services" might amount to the "interpretation" or "construction" of that phrase, but it does not amount to the "identification" of renal dialysis services.  42 U.S.C. § 1395rr(b)(14)(G).  The term "identification" instead connotes the classification of a specific object.  *See Identify*, Merriam-Webster Dictionary (2024) (to "state the *identity* of . . . *something*").  To "'identify an object' . . . means 'to recognize or establish an object as being a particular thing.'"  *Apple Inc. v. Omni MedSci, Inc.*, No. 2023-1034, 2024 WL 3084509, at *5 (Fed. Cir. June 21, 2024).  "Identification of renal dialysis services" thus means identifying a particular drug or treatment as a "renal dialysis service."  *See* 42 U.S.C. § 1395rr(b)(14)(G).  Defendants themselves assert that the agency's recent "'identification' of XPHOZAH as a 'renal dialysis service' included in the bundled payment'" is "exactly the type of action . . . that Congress precluded from judicial review."  Dkt. 11-1 at 12.  As that underscores, Congress limited judicial review of agency decisions identifying particular services as "renal dialysis services"—not regulations that would expand the definition of "renal dialysis services" to encompass categories of treatments that Congress excluded.  *See* 42 C.F.R. § 413.171.

It is one thing to suggest that Congress intended to limit judicial review of challenges to an agency decision that a particular service falls within one of the enumerated categories of "renal dialysis services" that Congress itself identified.  It is quite another to suggest that Congress intended to prevent judicial review of an agency's attempt to substitute its own judgment for Congress's with respect to the definition of those categories.  Defendants point to nothing in the language or legislative history of § 1395rr(b)(14)(G) that clearly evinces such an unlikely

intention—under which courts would be powerless to prevent CMS from rewriting Congress's definition of "renal dialysis services" to include "*any* drug provided to individuals on dialysis," whether or not for the treatment of end stage renal disease; or even services entirely unrelated to renal dialysis like primary care, diabetes management, cardiac checkups, and so on.

There is no reason to read § 1395rr(b)(14)(G) to countenance such absurd results.  Rather, as this Court has explained, "[p]reclusion statutes should be read narrowly in light of the strong presumption that 'Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Fresno Cmty. Hosp. & Med. Ctr. v. Azar*, 370 F. Supp. 3d 139, 148 (D.D.C. 2019) (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681 (1986)).  Indeed, any "ambiguity" in a preclusion provision's scope is interpreted in favor of review.  *Amgen*, 357 F.3d at 111.  As such, there is no reason to understand § 1395rr(b)(14)(G) to prevent review of Defendants' promulgation of regulations that exceed their statutory authority.   To the contrary, § 1395rr(b)(14)(G) is more naturally read only to limit review of Defendants' "identification" of particular drugs or treatments as falling within Congress's definition of "renal dialysis services"— a reading that better accords with the "traditional presumption in favor of judicial review of administrative action."  *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 734 (2022).

Notably, Defendants do not seriously contend that a challenge to a regulation rewriting the definition of "renal dialysis services" would fall within the scope of § 1395rr(b)(14)(G).  Instead, Defendants appear to will that part of Plaintiffs' case away—repeatedly endeavoring to recast Plaintiffs' suit as limited to challenging the identification of a specific drug, XPHOZAH, as a renal dialysis service.  Mot. at 11-15.  But as Defendants ultimately recognize, Plaintiffs' claims also challenge CMS's definition of "renal dialysis services" to include oral-only drugs.  *See* Opp. at 13

(acknowledging Plaintiffs' challenge to the definition of renal dialysis services at 42 C.F.R. § 413.171); *see also id.* at 15 (recognizing Plaintiffs seek to set aside Defendants' determinations that oral-only drugs are "renal dialysis services").

Perhaps in an attempt to overcome that problem, Defendants complain that "Plaintiffs identify no 'oral-only drug' other than XPHOZAH that might be included in the bundle, now or in the future." Mot. at 15. But that is factually wrong and legally irrelevant. As a factual matter, Defendants have made clear that other oral-only drugs will be included in the bundle starting January 1, 2025. *See* Dkt. 1 ¶¶ 169-194 (discussing CMS's plan to place all phosphate lowering therapies, including phosphate binders, into the bundle); *see also* 89 Fed. Reg. at 55,796-97 (similar). And as a legal matter, Plaintiffs have no obligation to identify other affected drugs in order to challenge to the validity of an agency regulation that exceeds the agency's statutory authority. *See, e.g.*, *Santa Barbara Cnty. Air Pollution Control Dist. v. EPA*, 31 F.3d 1179, 1180 (D.C. Cir. 1994) (partially vacating air-pollution rule challenged by a single county); *Koretoff*, 707 F.3d at 399 (explaining individual companies could reassert challenge to rule "if and when the Secretary applies the rule" to them).

Courts presume that Congress intended judicial review of agency action in contravention of statutory authority. Although Congress limited judicial review of Defendants' "identification" of "renal dialysis services," § 1395rr(b)(14)(G), Defendants do not point to "clear and convincing evidence" that Congress intended to preclude review of agency regulations rewriting Congress's definition of "renal dialysis services" to add categories of services that Congress excluded. Accordingly, Defendants fail to show that this Court lacks jurisdiction to consider Plaintiffs' challenge to 42 C.F.R. § 413.171.

**B.**     **Provisions Like Section 1395rr(b)(14)(G) Are Properly Construed Not To Bar Judicial Review Of Actions Beyond The Agency's Statutory Authority**

1.     *Under D.C. Circuit Precedent, § 1395rr(b)(14)(G) Is Properly Construed To Limit Review Only Of Determinations That Defendants Are Statutorily Authorized To Make*

Defendants cannot meet their burden to show this Court lacks jurisdiction over Plaintiffs' challenge to 42 C.F.R. § 413.171 for an additional reason.  "In light of the presumption that Congress rarely intends to foreclose review of action exceeding agency authority," the D.C. Circuit has construed provisions similar to § 1395rr(b)(14)(G) to "prevent review only of those [determinations] that the Medicare Act authorizes the Secretary to make."  *Amgen*, 357 F.3d 112. That accords with the inference that Congress intends a provision limiting judicial review of enumerated agency actions not to reach determinations that Congress set outside the agency's authority in the first place.  That line of authority also reinforces that this Court has jurisdiction to consider Plaintiffs' challenge to 42 C.F.R. § 413.171 here.

Plaintiffs argue that CMS exceeded its statutory authority when it redefined "renal dialysis services" in 42 C.F.R. § 413.171 to broadly include oral-only drugs like XPHOZAH that Congress excluded.  Dkt. 1 ¶¶ 87-145, 195-215.  Section 1395rr(b)(14)(G) is properly construed, as in *Amgen*, to limit review only when the agency exercises its authority to identify "renal dialysis services" *within* the statutory bounds set by Congress.  By contrast, the provision would not apply to the extent that CMS exceeds its authority and thus is not genuinely engaged in the identification of "renal dialysis services" as defined by Congress, but a different exercise entirely.

An extreme example helps illustrate the point.  Suppose that CMS decided to redefine "renal dialysis services" to mean *all* drugs provided to ESRD patients, including drugs that are not furnished to individuals for the treatment of end stage renal disease, but instead furnished to treat conditions like asthma, HIV, or arthritis.  Such a regulatory definition of "renal dialysis services"

indisputably would violate 42 U.S.C. § 1395rr(b)(14)(B)(ii-iv), which limit "renal dialysis services" only to services that are "furnished to individuals for the treatment of end stage renal disease."  In limiting judicial review of agency action to "the identification of renal dialysis services included in the bundled payment," 42 U.S.C. § 1395(b)(14)(G), Congress could not have contemplated that the power to "identif[y] renal dialysis services included in the bundled payment" encompassed the authority to redefine "renal dialysis services" and then identify drugs for the treatment of asthma, HIV, or arthritis as renal dialysis services.  Accordingly, Congress could not have intended to limit judicial review of such determinations either.  *See Fresno Cmty. Hosp.*, 370 F. Supp. 3d at 149 (citing *Amgen* for the proposition that "courts typically construe preclusion statutes to extend 'no further than the Secretary's statutory authority'").

Where, as here, "the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action," the D.C. Circuit has instructed that "the court must address the merits to the extent necessary to determine whether the challenged agency action falls within the scope of the preclusion on judicial review." *Amgen*, 357 F.3d at 113.  Because the Complaint alleges that CMS "has acted outside the scope of its statutory mandate" in redefining the statutory phrase "renal dialysis services" in its regulation, the Court has "jurisdiction to review the [agency's] action." *COMSAT*, 114 F.3d at 227.

*American Hospital Association v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020), is instructive.  There, the plaintiffs argued that the Department of Health & Human Services ("HHS") had acted in excess of its statutory authority when it reduced certain reimbursement rates for outpatient services.  The Government responded that the Court lacked jurisdiction because the Medicare statute precluded review of agency decisions related to reimbursement for outpatient services, including "the establishment of . . . methods described in paragraph 2(F)." *Id.* at 1237-

38.  But the plaintiffs' core claim was that the challenged rate reduction was "*not* a 'method[]

described in paragraph 2(F).'"  *Id.* at 1238.  Thus, "to determine whether the judicial-review bar

applie[d]," the Court had to answer the merits question presented by the plaintiffs' suit.  *Id.*  As

the Court explained, if the plaintiffs were right that the agency "ha[d] acted outside the scope of

its statutory mandate," then the Court would "have jurisdiction."  *Id.* (citation omitted).  "Put

differently, 'the jurisdiction-stripping provision does not apply' if the agency's action fails to

qualify as the kind of action for which review is barred."  *Id.*  Thus, if the court "find[s] that [the

agency] has acted outside the scope of its statutory mandate, we also find that we have

jurisdiction," and "the court can simply skip to the merits question in its analysis."  *Id.*[7]

        The D.C. Circuit has also explained *why* the Court must reach the merits of whether the

agency has exceeded its delegated authority:  Were the law otherwise, "agencies could characterize

reviewable or unauthorized action as falling within the scope of no-review provisions whose

application to such action Congress did not intend."  *Amgen*, 357 F.3d at 113.  But the D.C. Circuit

has "categorically reject[ed]" the assumption that an agency "possesses plenary authority to act

within a given area simply because Congress has endowed it with some authority to act in that

area."  *COMSAT*, 114 F.3d at 227.  Ensuring the agency has acted within its statutory authority is

especially important with high-stakes preclusion provisions like this one:  Since the preclusion

provision here applies to both "*administrative* [and] judicial review" of agency action, 42 U.S.C.

---

[7] The D.C. Circuit distinguished this analysis from the more-demanding standard of "*ultra vires*"
review, which requires a showing that the agency "plainly acted in excess of its delegated powers
and contrary to a specific, clear, and mandatory prohibition."  *Id.*  That framework did not apply
in *American Hospital Association*, because there, as here, the challenger argued that the "same
agency error . . . simultaneously ma[kes] the jurisdictional bar inapplicable and compel[s] setting
aside the challenged agency action," not that the Court should assert jurisdiction *notwithstanding*
the clear application of the jurisdictional bar to remedy a "statutory violation[] even when a statute
precludes review."  *Id.* at 1238-39.

§ 1395rr(b)(14)(G), CMS apparently views the provision as preventing even *internal appeals* to higher authority within CMS.  *See* Dkt. 1-1 (offering no right of appeal); *Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 127 (D.D.C. 2021) (noting that CMS had denied internal appeal due to similar preclusion provision).

That the Court needs to ensure CMS is acting within its statutory authority to answer the jurisdictional question is not to say that the preclusion provision has no teeth:  "If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective, but it *must* determine whether the challenged agency action is of the sort shielded from review."  *Amgen*, 357 F.3d at 113 (emphasis added); *see also Ascension*, 557 F. Supp. 3d at 129 (similar).  So too here.

Defendants' lead case in support of dismissal, *Ascension*, illustrates this distinction and shows why Plaintiffs' challenge to Defendants' redlining of the definition of "renal dialysis services" is reviewable.  In *Ascension*, this Court confronted a challenge to HHS's "use of an undisclosed audit protocol to estimate" certain factors required for reimbursement, which HHS had allegedly "failed to properly promulgate through *notice-and-comment rulemaking*."  557 F. Supp. 3d at 124 (emphasis added).  This Court held that this classic procedural challenge was barred from judicial review by a provision precluding "review . . . [of] [a]ny estimate of the Secretary for purposes of determining the [relevant] factors."  *Id.* at 125 (quoting 42 U.S.C. § 1395ww(r)(3)).  As this Court explained, the plaintiffs could not get around that statutory bar by claiming that "procedural challenges" to the agency's methodology fell outside the scope of the preclusion provision.  *Id.* at 129-31.  And because the challenger had *not* argued that CMS acted beyond its statutory authority in promulgating the ultimate estimate in that case, jurisdiction and the merits did not merge.  *See id.*

*Ascension* is therefore readily distinguishable from the scenario envisioned by *Amgen* and *American Hospital Association*, in which the core challenge is whether the agency acted beyond and in conflict with its statutory authority.  In that situation, a provision limiting judicial review is naturally read so as not "to foreclose review of action exceeding agency authority." *Amgen*, 357 F.3d at 112.  Rather, "the preclusion on review" is read to "extend[] no further than the Secretary's statutory authority to make the[] [challenged decision]." *Amgen*, 357 F.3d at 112.  Because this case is in the vein of *Amgen* and *American Hospital Association*, as opposed to the procedural challenge in *Ascension*, Defendants' jurisdictional challenge requires this Court to consider whether CMS acted beyond its statutory authority.[8]  As detailed below, the record answers that question in the affirmative.  Accordingly, § 1395rr(b)(14)(G) does not apply.

2.     *CMS Has Not Acted Within the Bounds Of Its Statutorily Delegated Authority*

In determining whether CMS "has acted outside the scope of its statutory mandate" such that the Court would also have jurisdiction, *Am. Hosp. Ass'n*, 964 F.3d at 1238, the Court must evaluate in its "independent judgment" whether "the best reading of a statute is that it delegates discretionary authority to an agency" to promulgate regulations implementing the relevant statutory provision. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).  If Congress provides such a delegation, the Court then "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority," by independently "fix[ing] the boundaries of [the] delegated authority" and "ensuring that the agency acts within" them— specifically, by ensuring the agency has applied the "best reading" of the statutory text, and not

---

[8] To the extent Defendants argue that the regulation is "inextricably intertwined with" subsequently identifying XPHOZAH as a "renal dialysis service," 557 F. Supp. 3d at 130, that is not correct. The regulation is a separate agency action with broad application that exceeds Defendants' statutory authority.

any other reading.  *Id.* at 2263, 2273.  As detailed below, CMS has not acted within the bounds of its statutorily delegated authority.

Here, CMS has never identified any source of authority to expand the definition of "renal dialysis services" to include additional categories beyond the four categories that Congress delimited in the statute.  There is none.  To the extent CMS has generalized rulemaking authority under the Act, it is limited to promulgating "regulations, *not inconsistent with this Act*, as may be necessary to the efficient administration of the functions with which [the agency] *is charged under this Act*," 42 U.S.C. § 1302(a) (emphasis added), and to "prescribe such regulations as may be necessary to *carry out the administration* of the insurance programs under this subchapter," *id*. § 1395hh(a)(1) (emphasis added).  Those generalized rulemaking provisions permit CMS to carry out the statutory functions charged by Congress in the Act, not to expand upon those functions. *See Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019) (collecting cases for the view that HHS's "general rulemaking authority" does not "equal congressional authorization" to modify statute); *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 331 (D.C. Cir. 2020) (rulemaking authority does not permit agency to add requirements beyond those Congress enumerated); *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) (agency cannot add "new factors to a list of statutorily specified ones"); *see also Koi Nation of N. Cal. v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 42 (D.D.C. 2019) (Howell, J.) (finding "administrative definition" invalid because it varied "plain language of the statute").

Nor did Congress more specifically delegate to CMS the authority to expand the statutory definition of "renal dialysis services."  *See generally* 42 U.S.C. § 1395rr (provisions governing the End Stage Renal Disease Program).  While the statute provides CMS with a host of authorities to

25

define specific, enumerated statutory terms governing the End Stage Renal Disease Program,[9] and to promulgate specific regulations implementing that Program,[10] conspicuously lacking from the statute is any delegated authority to expand upon the definition of "renal dialysis services" that Congress itself enacted.  That makes sense:  Given the critical impacts on patients, providers, and manufacturers of sweeping drugs into the ESRD PPS bundle, Congress reserved to itself the authority to make those important decisions.  *See* 42 U.S.C. § 1395rr(b)(14)(B).  Given Congress's intentional choice to convey a broader "textual delegation of authority" over *specific* aspects of the End Stage Renal Disease Program, but *not* to delegate responsibility for drafting or revising the definition of "renal dialysis services," CMS cannot "override Congress's clearly expressed will" by taking upon itself delegated authority that Congress conspicuously decided to withhold.  *See, e.g., EchoStar Satellite L.L.C. v. FCC*, 704 F.3d 992, 999-1000 (D.C. Cir. 2013) (noting similar absence of specific, delegated authority).

Far from conveying authority to expand upon Congress's definition of "renal dialysis services," the statute twice expressly instructs CMS to adhere to Congress's chosen definition of "renal dialysis services . . . as defined in subparagraph (B)" of the statute.  *See, e.g.*, 42 U.S.C. § 1395rr(b)(14)(A)(i) (authorizing bundled payment "to a provider of services or a renal dialysis facility for renal dialysis services (*as defined in subparagraph (B)*) (emphasis added)); 42 U.S.C.

---

[9] A "period of time" is to be "defined in regulations," 42 U.S.C. § 1395rr(b)(3)(A)(ii); "medically necessary supplies and equipment" is to be "defined in regulations," *id.* § 1395rr(b)(8); "qualified provider or facility personnel" are to be "defined in regulations," *id.* § 1395rr(b)(9)(A); "self-dialysis services" is also to be "defined by the Secretary in regulations," *id.* § 1395rr(b)(10); and "low-volume facilities" are to be "defined by the Secretary" too," *id.* § 1395rr(b)(14)(D)(iii).

[10] *See, e.g.*, 42 U.S.C. § 1395rr(b)(1) (payments to renal dialysis facilities must "meet such requirements as the Secretary shall by regulation prescribe …"); *id.* § 1395rr(b)(2)(B) ("The Secretary shall prescribe in regulations any methods and procedures …"); *id.* § 1395rr(b)(5) ("in accordance with regulations prescribed by the Secretary"); *id.* § 1395rr(b)(7) ("Secretary shall provide by regulation for a method …); *id.* § 1395rr(b)(10) ("meet such other requirements as the Secretary may prescribe …").

§ 1395rr(h)(1)(A) (authorizing quality incentives "[w]ith respect to renal dialysis services (*as defined in subsection (b)(14)(B)*)" (emphasis added)).  This case is thus far afield from a case where Congress has expressly delegated an agency "broad discretion" to select an "appropriate" regulatory approach to fill Congress's silence.  *Ascension*, 557 F. Supp. 3d at 132.  Congress did nothing like that.

CMS cannot "exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (citation and internal quotation marks omitted); *Michigan v. EPA*, 576 U.S. 743, 751 (2015) (agency must "operate within the bounds" of Congress's text); *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 105 F.3d 691, 694 (D.C. Cir. 1997) (an agency cannot "trump Congress's specific statutory directive").  Yet Defendants exceeded the bounds set by Congress in their regulation at 42 C.F.R. § 413.171, bringing oral-only drugs within the scope of the regulatory definition of "renal dialysis services."  Pursuant to MIPPA, Congress defined "renal dialysis services" to include four categories of services provided by dialysis facilities in the course of providing dialysis.  42 U.S.C. § 1395rr(b)(14)(B).  In so doing, Congress provided that only two categories of oral drugs be included within the bundled payment: the "oral form" of an erythropoiesis stimulating agent, and the "oral equivalent form" of a "drug[] or biological[] . . . furnished to individuals for the treatment of end stage renal disease."  *Id.* at 1395rr(b)(14)(B)(ii)-(iii).  Because an oral-only drug falls within neither category, CMS's inclusion of such drugs within the bundle pursuant to its regulation in 42 C.F.R. § 413.171 is in excess of statutory authority.  5 U.S.C. § 706.  That regulation should be vacated and set aside.

Here, the statutory provision establishing the ESRD PPS bundle generally provides that the bundled payment is made "to a provider of services or a renal dialysis facility *for renal dialysis*

27

*services* (*as defined in subparagraph (B)*)."  42 U.S.C. § 1395rr(b)(14)(A) (emphasis added).

Congress's definition of "renal dialysis services" consists of four subparts:

> (i)   items and services included in the composite rate for renal dialysis services as of December 31, 2010;
>
> (ii)  erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;
>
> (iii) other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and
>
> (iv)  diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease.

42 U.S.C. § 1395rr(b)(14)(B).  Oral-only drugs come within none of these subparts.

**Clauses (i) and (ii).**  It is undisputed that neither oral-only drugs in general, nor XPHOZAH in particular, fall within the scope of clause (i) or (ii):  CMS has never argued otherwise. *See* 74 Fed. Reg. at 49,922; 75 Fed. Reg. at 49,030.  Clause (i) is limited to "items and services" already included in the "composite rate for renal dialysis services," as of December 31, 2010.  75 Fed. Reg. at 49,036.   As of December 31, 2010, there were no-oral-only drugs included in the composite rate for renal dialysis services, nor did dialysis facilities administer such drugs. *Supra* at 6-10; *see* Dkt. 1 ¶¶ 65-67.  XPHOZAH, for example, was not approved by the FDA until over a decade later, in 2023.  Dkt. 1 ¶ 27.[11]  Likewise, clause (ii) is limited to "erythropoiesis stimulating

---

[11] *See also* Ex. 3 to Williams Decl., Dkt. 14-6 (Ardelyx Comment to CY 2024 ESRD PPS Proposed Rule (Aug. 21, 2023)); *see also* Ardelyx Press Release, FDA Approves XPHOZAH® (tenapanor), a First-in-Class Phosphate Absorption Inhibitor (Oct. 17, 2023), https://ir.ardelyx.com/news-releases/news-release-details/fda-approves-xphozahr-tenapanor-first-class-phosphate-absorption (stating FDA approved XPHOZAH in October 2023).

agents" (drugs that stimulate the production of red-blood cells) and "any oral form of such agents," thereby excluding XPHOZAH and other oral-only drugs that are not ESAs.  *See* 75 Fed. Reg. at 49,036.

*Clause (iii).*  In proposing to incorporate oral-only drugs into the ESRD bundle under 42 C.F.R. § 413.171, CMS principally relied on clause (iii), which encompasses "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this [paragraph]) made separately under this title"— *i.e.,* outside the composite rate system—"and any oral equivalent form of such drug or biological." Despite that nuanced definition, CMS interpreted this provision "to include *all* drugs and biologicals formerly payable under either Medicare Part B or Part D used to treat ESRD, *regardless of the route of administration*." 74 Fed. Reg. at 49,927-28 (emphasis added); 75 Fed. Reg. at 49,038 (same).  CMS thus redefined "renal dialysis services" in its regulation to include "drugs . . . with only an oral form."  42 C.F.R. § 413.171(3).

That is untenable.  By its express terms, clause (iii) does not define "renal dialysis services" to include *all* drugs.  Rather, it includes only a particular subset of drugs: "other drugs" furnished "for the treatment of end stage renal disease"—*i.e.*, "other" drugs not included in clauses (i) or (ii)—for which payment was made separately under this title, as well as "any oral *equivalent* form *of such drug or biological*."  42 U.S.C. § 1395rr(b)(14)(B)(iii) (emphasis added).  Clause (iii) thus reaches only "oral" drugs that are the "*equivalent*" of "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease" and for which payment had been made by Medicare under a separate Medicare provision (like Medicare Part B).  *Id.*

That text accords with MIPPA's purpose.  MIPPA was designed to promote cost-effective provision of renal dialysis services.  When MIPPA was enacted, however, drugs and biologics

furnished to patients by dialysis facilities for the treatment of ESRD were generally administered intravenously or by injection during dialysis, not orally.  *Supra* at 6-10.  The inclusion of oral-only drugs would have done little, therefore, to advance Congress's goals of deterring *dialysis facilities* from overusing then-profitable, separately billable drugs or promoting operational efficiency at such facilities.  *See* 75 Fed. Reg. at 49,032 (ESRD bundle was intended to "reduc[e] incentives to overuse profitable separately billable drugs" and promote "operational efficiency").  So it would have made little sense to define "renal dialysis services" to encompass oral-only drugs neither provided by dialysis facilities, nor administered as part of renal dialysis services.[12]

CMS itself recognized that "an alternative reading of the last part of clause (iii) with respect to the phrase 'and any oral equivalent form of such drug or biological' could be interpreted to limit the scope of the drugs and biologicals included in the bundle to only oral versions of injectables." 74 Fed. Reg. at 49,928 (emphasis added).  CMS disagreed with that outcome as a matter of *policy*.[13] *Id.*  It therefore dismissed that construction as "unduly constrained."  *Id.*  But in implementing the statute, CMS was not free to "rewrite clear statutory terms to suit its own sense of how the statute should operate."  *Utility Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014); *see also Council for*

---

[12] By contrast, extending the bundled payment to encompass the "oral equivalent form" of an injectable drug or biological administered by a dialysis facility during renal dialysis serves MIPPA's purpose by facilitating the use of generally less expensive oral equivalents to drugs that a dialysis facility would otherwise administer during dialysis.

[13] Ironically, CMS's policy concerns were backwards.  Numerous stakeholders, from patient groups to physicians to drug manufacturers to dialysis providers, have repeatedly warned CMS that the inclusion of oral-only drugs into the bundle is bad policy that will undermine health outcomes and harm patients.  Dkt. 1 ¶ 19; Clynes Decl. ¶ 35, Dkt. 14-1; Puckrein Decl. ¶ 38, Dkt. 14-2; Dkt. 14-3 ¶¶ 77-78.  Not only that, placing oral-only drugs into the bundle will increase the cost to patients who are ill-suited to pay it; indeed, CMS itself admits that placing oral phosphate binders into the bundle alone will impose $130 *million* in additional costs on ESRD patients who are disproportionately low income and unemployed.  *See* 89 Fed. Reg. at 55,760.

*Urological Interests v. Burwell*, 790 F.3d 212, 228 (D.C. Cir. 2015) ("An agency crosses an impermissible line when it moves from interpreting a statute to *rewriting* it.").

That is exactly what CMS did.  42 U.S.C. § 1395rr(b)(14)(B)(iii) defines "renal dialysis services" to include "other drugs and biologicals . . .  for the treatment of end stage renal disease . . . and any oral equivalent form of such drug or biological."  But CMS altered that language when interpreting that provision in 42 C.F.R. § 413.171, effectively removing the struck through language below from the statute and replacing it with the bolded regulatory text.

> (3) Other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was (prior to January 1, 2011) made separately under Title XVIII of the Act (~~and any oral equivalent form of such drug or biological~~ **including drugs and biologicals with only an oral form**) . . .

*See* 42 C.F.R. § 413.171.  In effect, CMS rewrote clause (iii) of the statute to cover "*all* other drugs and biologicals" that treat ESRD and would otherwise have been paid for outside the composite rate system.  Had Congress intended clause (iii) to cover "all drugs and biologicals that treat ESRD," it could easily have said so, using far fewer and simpler words.  *See Wint v. Yeutter*, 902 F.2d 76, 82 (D.C. Cir. 1990) (agency properly eschewed "all-inclusive definition" because "Congress could have said simply 'all plants' if Congress had indeed meant just that").  It did not. It should be unsurprising, therefore, that "many comment[er]s" criticized CMS's interpretation of clause (iii) as "a misreading of statutory intent" that "violates principles of statutory construction." 75 Fed. Reg. at 49,038.  Fundamentally, the "best reading" of clause (iii) excludes oral-only drugs, *Loper Bright*, 144 S. Ct. at 2266.[14]  CMS's contrary regulatory construction should be rejected.

---

[14] CMS's regulatory interpretation would negate Congress's decision to carefully prescribe the types of drugs that fall within its definition of "renal dialysis services."  Interpreting (iii) to exclude oral-only drugs accords with Congress's choice in clause (ii) to specifically instruct that ESAs, and any oral form of such agents, are encompassed within the definition of renal dialysis

Notably, Congress expressly considered and *rejected* legislation that would have amended clause (iii) to expand the definition of "renal dialysis services" to include oral-only drugs. One year after the enactment of MIPPA, the House of Representatives introduced a bill that would have amended clause (iii) to read as follows (*italicized text* would have been added):

> (iii)    Other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this title, and any oral equivalent form of such drug or biological *including oral drugs that are not the oral equivalent of an intravenous drug (such as oral phosphate binders and calcimimetics)*.

H.R. 3200, 11th Cong. § 1232 (2009), America's Affordable Health Choices Act of 2009 (emphasis added). But Congress chose not to adopt this statutory language, which would have adopted CMS's preferred construction of clause (iii) and extended that definition to "oral drugs that are not the oral equivalent of an intravenous drug." The fact that Congress considered but did not adopt a proposal to specifically include oral-only drugs in the ESRD PPS further underscores that CMS's contrary construction is inconsistent with MIPPA's language. *See, e.g.*, *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1578 (D.C. Cir. 1984) ("Where Congress has so explicitly and deliberately considered, and then rejected, a more expansive requirement than that ultimately enacted, it is not for the agency to exceed the statutory limits under the guise of 'interpretation.'").

**Clause (iv).** Perhaps recognizing the tenuous nature of its interpretation of clause (iii), CMS also suggested that "if oral-only drugs are not considered to fall within clause (iii) of the

---

services. Had Congress intended for *all* injectable and oral treatments provided to ESRD patients to fall within the scope of "renal dialysis services," there would have been no need to specify that renal dialysis services extend to "erythropoiesis stimulating agents and any oral form of *such agents*." 42 U.S.C. § 1395rr(b)(14)(B)(iii). To give effect to Congress's decision to separately identify ESAs and other drugs and biologicals, and then to specifically include only oral *equivalent* forms of *such* agents, drugs, or biologicals, the statute is best read to exclude oral-only drugs for which there is no equivalent, non-oral agent, drug, or biological.

statutory definition . . . [it] believe[d] that such drugs would appropriately fall under clause (iv)." 75 Fed. Reg. at 49,040; *see also* 74 Fed. Reg. at 49,928 (asserting the inclusion of oral-only drugs is "supportable under clause (iv)").  Clause (iv) directs CMS to include in the bundle "diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iv).  In its 2011 rulemaking, CMS suggested clause (iv) "can be interpreted as a residual or catch all category for drugs which do not fall under the scope of those renal dialysis services identified in clauses (ii) and (iii)," including oral-only drugs that "do not fall under the scope of those specified renal dialysis services identified in clauses (ii) and (iii)."  75 Fed. Reg. at 49,039.

CMS's "catch-all" reading of clause (iv) is impermissible because it negates Congress's choice to enumerate specific categories of drugs as falling within the definition of "renal dialysis services."  Congress chose to reference particular "oral" or "oral equivalent" forms of "*such*" drugs or agents—which means that these are the *only* oral drugs covered.  *See, e.g.*, A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*  107 (2012) ("Negative-Implication Canon[:] The expression of one thing implies the exclusion of others."); *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) (same).  If Congress intended *all* drugs (or even all *oral* drugs) furnished to individuals for the treatment of ESRD to qualify as "renal dialysis services," there would have been no need to more narrowly define other drugs, biologicals, and oral equivalent forms of such drugs and biologicals in clauses (ii) and (iii).

Put another way, if clause (iv) was interpreted, as CMS has suggested, to encompass *all* drugs for the treatment of ESRD not incorporated by clause (i), it would render clauses (ii) and (iii) superfluous:  Any drug, biological, or oral equivalent form that falls within clauses (ii) and (iii) necessarily would qualify as "items and services not described in clause (i) that are furnished

to individuals for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iv); *see also Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022) ("It is a familiar canon of statutory construction that, if possible, we are to construe a statute so as to give effect to every clause and word.") (citations omitted); *Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019) (courts "presum[e]" that laws do not contain "surplusage").

CMS appeared to recognize, in response to comments, that it would "violate[] a principle of statutory construction [to] mak[e] clauses (ii) and (iii) otherwise redundant."  75 Fed. Reg. at 49,039.  To that end, it conceded that clause (iv) "does not mean all drugs currently available to Medicare beneficiaries for the treatment of ESRD."  *Id.*  But it believed that clause (iv) "can be interpreted as a residual or catch all category for drugs which do not fall under the scope of those specified renal dialysis services identified in clauses (ii) and (iii)."  *Id.*  That ignores clause (iv)'s actual language, which speaks to "laboratory tests and other items and services not described in *clause (i)*," not to drugs which are not described in *clause* (*ii*) and *clause* (*iii*).  *Id.* at 49,040 (emphasis added).  Clause (iv) therefore cannot be interpreted to encompass all drugs not encompassed in clause (i) (including oral-only drugs) without rendering clause (ii) and (iii) utterly redundant and superfluous.

In *Fischer v. United States*, the Supreme Court recently confronted a similar "surplusage problem."  144 S. Ct. 2176, 2188 (2024).  At issue were two subsections—one that described "particular types" of conduct in "specific terms," with another "broader" provision going beyond the first.  *Id.* at 2183; *see* 18 U.S.C. § 1512(c)(1)-(2).  The question was whether the second subsection was best read as linked with (and limited by) the first subsection.  *See Fischer,* 144 S. Ct. at 2183.  The Court's answer was "yes."  It found that though the latter, "all-encompassing interpretation *may be literally permissible*, it defie[d] the most plausible understanding of why [the

relevant subsections] are conjoined, and it render[ed] an unnerving amount of statutory text mere surplusage." *Id.* at 2190 (emphasis added).  After all, because "Congress would not go to the trouble of spelling out the list in (c)(1) if a neighboring term swallowed it up, the most sensible inference is that the scope of (c)(2) is defined by reference to (c)(1)." *Id.* at 2185.

The question, therefore, is not whether clause (iv)'s  reference to "other items and services" could literally be read to encompass drugs, a construction that would override the more focused, limited categories of drugs that Congress saw fit to include in clauses (ii) and (iii).  42 U.S.C. § 1395rr(b)(14)(B)(iv).  Instead, such a "general phrase can be given a more focused meaning by the terms linked to it.  That principle ensures—regardless of how complicated a sentence might appear—that none of its specific parts are made redundant by a clause literally broad enough to include them." *Fischer*, 144 S. Ct. at 2184.

So too here.  If CMS's reading is right, "there would have been scant reason for Congress to provide any specific examples at all" in clauses (ii) and (iii).  *Id.* at 2185.  The "sweep" of clause (iv) "would consume" clauses (ii) and (iii), "leaving th[ose] narrower provision[s] with no work to do." *Id.*  Instead, clauses (ii) and (iii) would be an "elaborate pumpfake," *id.*—two clauses specifically referencing oral forms of particular drugs would be immediately superseded in the very next clause (in the very same sentence) by a category that covers all drugs, including all oral-only ones.  But construing clause (iv) that way gets standard statutory analysis "'exactly backwards,' eliminating specific terms because of broad language that follows them, rather than limiting the broad language in light of narrower terms that precede it." *Id.* (quoting *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252, 255 (2024)).

CMS's expansive alternative reading of clause (iv) also contradicts the canon of *ejusdem generis*, the principle that "a 'general or collective term' at the end of a list of specific items' is

typically 'controlled and defined by reference to' the specific classes . . . that precede it." *Fischer*, 144 S. Ct. at 2184.  Here, Congress signaled the narrower scope of clause (iv) by addressing it to cover "*diagnostic laboratory tests* and other items and services not [covered by] clause (i)."  42 U.S.C. § 1395rr(b)(14)(B) (emphasis added).  Particularly in light of a statutory scheme in which clause (ii) and (iii) carefully specify only certain categories of drugs, clause (iv) is best read to encompass "objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)); *see also* 75 Fed. Reg. at 49,064 (indicating that "other items and services" could be read more narrowly to mean "[o]ther items and services separately billed by ESRD facilities that are used *in conjunction* with injectable medications or laboratory tests, such as blood products, syringes, and other dialysis supplies that are billed on Medicare outpatient institutional claims") (emphasis added).  Instead embracing a broad reading of clause (iv) in the event that its principal construction of clause (iii) was found lacking, CMS ignored the "common sense intuition that Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer*, 144 S. Ct. at 2184.  This Court should not endorse that reading, which *CMS itself* recognized would render its statutory definition "overlapping or redundant."  75 Fed. Reg. at 49,040.

For all of these reasons, CMS's attempt to redefine "renal dialysis services" to include oral-only drugs is contrary to law and in excess of statutory authority.  Because there is no dispute phosphate-lowering therapies, including XPHOZAH, are oral-only drugs, Dkt. 14-3 ¶¶ 33-35; Ex. 8 to Williams Decl. at 1, Dkt. 14-11, CMS's decision to cease payment for them under Medicare Part D and treat those drugs as part of the ESRD PPS bundle starting on January 1, 2025, pursuant to CMS's regulations is likewise contrary to law and in excess of statutory authority.  Accordingly,

under *Amgen* and *American Hospital Association*, and for the reasons explained *supra* at 14-36, § 1395rr(b)(14)(G)'s limitation on the judicial review of Defendants' "identification" of renal dialysis services does not bar Plaintiffs' challenge.

## II. SECTION 1395rr(B)(14)(G) DOES NOT BAR JUDICIAL REVIEW OF PLAINTIFFS' PARTICULAR CHALLENGES TO THE XPHOZAH DECISION

In their Complaint, Plaintiffs also challenge Defendants' specific decision to designate XPHOZAH as a renal dialysis service within the meaning of 42 C.F.R. § 413.171. *See, e.g.*, Dkt. 1 ¶¶ 146-168, 199, 206; *see also* Dkt. 14 at 30-37 (briefing these XPHOZAH-specific arguments). Those particular challenges also fall outside Section 1395rr(b)(14)(G)'s reach.

***XPHOZAH Is An Oral-Only Drug:*** To begin with, Plaintiffs argue that (i) Defendants acted outside their statutory authority by enlarging the definition of "renal dialysis services" to include oral-only drugs, *supra* at 27-36, and then (ii) unlawfully applied that unauthorized definition when designating XPHOZAH a "renal dialysis service."  As explained above, § 1395rr(b)(14)(G) does not preclude judicial review of such challenges.  As *Amgen* explained, a jurisdiction-stripping provision like § 1395rr(b)(14)(G) "prevent[s] review only of those [determinations] that the Medicare Act authorizes the Secretary to make." *Amgen*, 357 F.3d 112. To the extent that this Court agrees that Defendants exceeded their statutory authority when redefining "renal dialysis services" to include oral-only drugs, the agency similarly exceeded its statutory authority when designating XPHOZAH to be a renal dialysis service on that basis.  As explained *supra* at 14-36, Section 1395rr(b)(14)(G)'s limitation on judicial review would not bar a challenge to the agency's decision in that scenario.

***XPHOZAH Is Not Furnished For The Treatment Of End-Stage Renal Disease:*** Plaintiffs also argue that Defendants exceeded their statutory authority by designating XPHOZAH a renal dialysis service even though Defendants did *not* find that XPHOZAH was "furnished to

individuals for the treatment of end stage renal disease," as required by Congress's definition of renal dialysis services at § 1395rr(b)(14)(B)(ii-iv).  Because Defendants' characterization of XPHOZAH as a "renal dialysis service" fell outside the agency's statutory authority, § 1395(b)(14)(G)'s limitation on judicial review is again inapplicable.

Congress specified that services would qualify as a "renal dialysis service" under § 1395rr(b)(14)(B)(ii-iv) only to the extent that the service is "furnished to individuals *for the treatment of end stage renal disease*."  (emphasis added).  The XPHOZAH Decision, however, purported to sweep XPHOZAH within the scope of renal dialysis services "because it is furnished to individuals to treat a condition *associated with* ESRD." Dkt. 1-1 at 1 (emphasis added).  But Congress imposed a narrower and more demanding requirement: drugs cannot qualify as "renal dialysis services" merely because they treat a condition "associated with ESRD," like hypertension or diabetes.  Instead, the drug must be "for the treatment of end stage renal disease." 42 U.S.C. § 1395rr(b)(14)(B)(iii)-(iv).  Defendants did not make that required finding.

It is hardly surprising that Defendants did not make a finding that XPHOZAH is for the treatment of end stage renal disease.  As they concede in this Court, XPHOZAH "treats *hyperphosphatemia*, a common comorbidity of chronic kidney disease that can cause, among other things, loss of bone density." Dkt. 11-1 at 2 (emphasis added).  A comorbidity is "[t]he condition of having two or more diseases at the same time."[15]  *See also* Oxford English Dictionary (2020) (defining  comorbidity as "[t]he coexistence of two or more diseases, disorders, or pathological processes in one individual").  Accordingly, Defendants do not seriously contest that XPHOZAH treats a separate disease, hyperphosphatemia, not ESRD.

---

[15] National Institute of Health, National Cancer Institute, NCI Dictionary, *available at* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/comorbidity.

Although Defendants emphasize that the drug has been initially approved for treating "adults with chronic kidney disease on dialysis," Dkt. 11-1 at 2, Congress's definition of "renal dialysis services" requires more—that the service is "furnished for the treatment of end stage renal disease." 42 U.S.C. § 1395rr(b)(14)(B)(ii-iv). Because adults with chronic kidney disease on dialysis often experience any number of comorbidities, it is not uncommon for such individuals to be prescribed a variety of drugs to treat other conditions, like hyperphosphatemia. *See* Dkt. 1 ¶ 150 (prevalence of hypertension in ESRD patients is about 84% percent); *id.* ¶ 14 (noting ESRD patients are commonly furnished drugs for the treatment of other conditions); *see also* Dkt. 11-1 (acknowledging certain drugs frequently administered to ESRD patients should be excluded from the bundled rate).

In designating XPHOZAH as a "renal disease service" because it treats a condition "associated with ESRD," Defendants took a shortcut that Congress's statutory definition did not permit. Dkt. 1 ¶¶ 14-15, 146-147, 153, 199-200 (alleging that because XPHOZAH is not furnished "for the treatment of end state renal disease" "Defendants lack any statutory authority to . . . sweep XPHOZAH into the bundle"); Dkt. 14 at 32 (arguing that CMS's evaluation of whether XPHOZAH treats a "condition associated with ESRD" exceeds the "definition of 'renal dialysis services'" and thus is "in excess of statutory authority"). Because the preclusion provision does not "shield the Secretary's unauthorized action" from review, the Court has jurisdiction. *Amgen*, 357 F.3d at 114.

***Essential For The Delivery Of Maintenance Dialysis***: Finally, Plaintiffs challenge Defendants' determination that XPHOZAH is "essential for the delivery of maintenance dialysis" such as is necessary under CMS's own regulations to qualify for the bundled payment system. *See* Dkt. 1-1 ("CMS has identified XPHOZAH to be a renal dialysis service under 42 CFR 413.171,

*because* it . . . is essential to the delivery of maintenance dialysis.") (emphasis added); *see also* 42

C.F.R. § 413.171(5) ("Renal dialysis services do not include those services that are not essential

for the delivery of maintenance dialysis."). As Plaintiffs have explained, however, XPHOZAH is

not administered by dialysis facilities, let alone taken during or essential to the delivery of

maintenance dialysis. Dkt. 1 ¶ 43. As a result, it should not qualify as a renal dialysis service

under CMS's own regulations.

Although this claim is differently situated than Plaintiffs' other challenges, it too falls

outside the scope of § 1395rr(b)(14)(G)'s limitations on judicial review. The APA provides for

review of an agency's failure to comply with its own regulations, because an agency is "bound by

its own regulations." *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979).

After all, regulations validly promulgated by "notice-and-comment" bind with the "force and

effect of law." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Absent clear and

convincing evidence that Congress intended to preclude judicial review of agency determinations

of whether a service is "not essential for the delivery of maintenance dialysis" under 42 C.F.R.

§ 413.171(5), therefore, such determinations are outside the scope of § 1395rr(b)(14)(G). *See*

*Amgen Inc.*, 357 F.3d at 111; *see AHA*, 967 F.3d at 825.

Defendants have not and cannot point to any such clear and convincing evidence. 42

C.F.R. § 413.171(5) is a regulatory tool whereby CMS identifies services that might *otherwise*

qualify as renal dialysis services, and removes them from the scope of the ESRD prospective

payment system because they are "not essential for the delivery of maintenance dialysis." 42

C.F.R. § 413.171(5). There is no indication that Congress intended to preclude review of that

regulatory inquiry of CMS's own creation, which CMS developed well after Congress enacted

§ 1395rr(b)(14)(G). While Congress limited judicial review of the agency's identification of

services as qualifying within one of the categories of "renal dialysis services" set forth in 1395rr(b)(14)(B), the inquiry envisioned by 42 C.F.R. 413.171(5) is distinct—a process by which services that might otherwise meet Congress's definition are nonetheless excluded from the definition of "renal dialysis services" by CMS.

Here, the statute does not evidence Congress's intent to preclude the Court's jurisdiction over a challenge that CMS has failed to comply with its own regulations, much less the needed "clear and convincing" evidence the statute's intent is "absolute." *Amgen*, 357 F.3d at 111. Nor would such evidence be likely given that MIPPA predated CMS's enactment of the regulatory inquiry set forth in 42 C.F.R. § 413.171(5).

This case also underscores the need for review of such determinations. CMS's regulation is clear: Drugs that are not "essential for the delivery of maintenance dialysis" are excluded from the regulatory definition of renal dialysis services. 42 C.F.R. § 413.171(5). "'Essential' means '[a]bsolutely necessary' or 'indispensably requisite.'" *Grange Mut. Cas. Co. v. Woodward*, 861 F.3d 1224, 1232 (11th Cir. 2017) (citing Essential, Oxford English Dictionary). But XPHOZAH is not even *indicated* for use during the delivery of maintenance dialysis. *See* Dkt. 14-1, XPHOZAH Label. Rather, patients are directed *not* to take XPHOZAH prior to the delivery of maintenance dialysis. *Id.*; Dkt. 1 ¶¶ 41-43, 158-68; Dkt. 14 at 35-36; Dkt. 14-3 ¶¶ 37-38. Nor is XPHOZAH even administered in a dialysis unit. *But see* 75 Fed. Reg at 49,047 (categorizing drugs "utilized . . . in a dialysis unit (and *therefore* would be a renal dialysis service)") (emphasis added). And even among the subset of dialysis patients who have hyperphosphatemia, XPHOZAH is only approved as a second-line treatment for reduction of serum phosphorus in those whose condition is not sufficiently managed by, or who are intolerant of, phosphate binders. Dkt. 14-1,

XPHOZAH Label at 1.  To say that XPHOZAH is "essential for the delivery of maintenance dialysis" would deprive those words of any meaning.

In challenging CMS's compliance with its own regulatory tool for removing services from the scope of "renal dialysis services," Plaintiffs challenge a procedure that was neither envisioned by nor precluded by MIPPA.  This Court thus also retains jurisdiction to review Defendants' determination that XPHOZAH is not a renal dialysis service.

## CONCLUSION

For these reasons, Defendants' Motion to Dismiss should be denied.

Dated:  October 4, 2024

Respectfully submitted,

/s/ Michael E. Bern
Michael E. Bern  (DC Bar No. 994791)
Christine C. Smith (DC Bar No. 1658087)
Delia Tasky (DC Bar No. DC Bar No. 1724285)
Alexander G. Siemers (DC Bar No. 900067465)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   michael.bern@lw.com
         christine.smith@lw.com
         alex.siemers@lw.com
         delia.tasky@lw.com

Nicholas L. Schlossman
(DC Bar No. 1029362)
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email:   nicholas.schlossman@lw.com

*Attorneys for Plaintiffs Ardelyx, Inc.,*
*American Association of Kidney Patients*

James E. McCollum, Jr. (DC Bar. No. 398117)
Amit K. Sharma (D.C. Bar No. 503604)
The McCollum Firm, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
Tel: (301) 537-0661
Fax: (301) 864-4351
Email:    jmccollum@jmlaw.net
              asharma@jmlaw.net

*Attorneys for Plaintiff National Minority Quality Forum*