**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ARDELYX, INC.,**
400 Fifth Avenue, Suite 210
Waltham, MA 02451

**AMERICAN ASSOCIATION OF KIDNEY
PATIENTS,**
14440 Bruce B. Downs Boulevard
Tampa, FL 33613

**NATIONAL MINORITY QUALITY FORUM**,
1201 15th Street NW #340
Washington, DC 20005

                    **Plaintiffs,**

     **v.**

**XAVIER BECERRA,**
*Secretary of Health and Human Services*
200 Independence Avenue, SW
Washington, DC 20201

**U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,**
200 Independence Avenue, SW
Washington, DC 20201

**CHIQUITA BROOKS-LASURE, AND**
*Administrator of Centers for Medicare and
Medicaid Services*
7500 Security Boulevard
Baltimore, MD 21244

**CENTERS FOR MEDICARE AND
MEDICAID SERVICES,**
7500 Security Boulevard
Baltimore, MD 21244,

                    **Defendants.**

Case No. 1:24-cv-02095-BAH

**Oral Argument Requested**

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
OR, IN THE ALTERNATIVE, FOR EXPEDITED SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...........................................................................................................1

ARGUMENT ................................................................................................................5

I.  DEFENDANTS' PLACEMENT OF ORAL-ONLY DRUGS INTO THE ESRD
    PPS BUNDLE IS UNLAWFUL...........................................................................5

    A.  The Placement Of Oral-Only Drugs Into The ESRD PPS Bundle Conflicts
        With The Statutory Definition Of "Renal Dialysis Services" ....................5
        1.  Defendants Cannot Add Oral-Only Drugs To The Categories
            Enumerated By Congress.................................................................6
        2.  Oral-Only Drugs Do Not Fall Within Congress's Enumerated
            Categories ......................................................................................8
        3.  Defendants' Ratification Theory Is Meritless...............................11
    B.  At Minimum, XPHOZAH Does Not Qualify As A Renal Dialysis Service14
        1.  XPHOZAH Is Not A Drug Furnished For The Treatment Of End
            Stage Renal Disease ....................................................................14
        2.  XPHOZAH Is Not Essential For The Delivery Of Maintenance
            Dialysis .......................................................................................18

II.  THE EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF
     INJUNCTIVE RELIEF.......................................................................................20

    A.  Plaintiffs Have Demonstrated That They Are Likely To Suffer Irreparable
        Harm In The Absence Of Preliminary Relief ...........................................20
    B.  The Balance Of The Equities And The Public Interest Favor Plaintiffs....24

CONCLUSION..............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*,
   37 F.4th 667 (D.C. Cir. 2022) ............................................................................11

*Ashton v. Pierce*,
   716 F.2d 56 (D.C. Cir. 1983) ..............................................................................12

*AT&T Corp. v. FCC*,
   970 F.3d 344 (D.C. Cir. 2020) .........................................................................3, 19

*Atlantic City Elec. Co. v. FERC*,
   295 F.3d 1 (D.C. Cir. 2002) ..................................................................................8

*Carcieri v. Salazar*,
   555 U.S. 379 (2009) ..........................................................................................2, 7

*Carter v. Urb. Serv. Sys. Corp.*,
   324 F. Supp. 3d 19 (D.D.C. 2018) ..................................................................20, 21

*Comm'r of Internal Revenue v. Acker*,
   361 U.S. 87 (1959) ..............................................................................................12

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ..............................................................................................1, 20

*Dong v. Smithsonian Inst.*,
   125 F.3d 877 (D.C. Cir. 1997) ...........................................................................2, 7

*Elec. Priv. Info Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   266 F. Supp. 3d 297 (D.D.C. 2017) ......................................................................8

*Everglades Harvesting & Hauling v. Scalia*,
   427 F. Supp. 3d 101 (D.D.C. 2019) .....................................................................24

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ..............................................................................................7

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
   314 U.S. 95 (1941) ................................................................................................7

*Gen. Motors Corp. v. Ruckelshaus*,
   742 F.2d 1561 (D.C. Cir. 1984) ..........................................................................14

*Grange Mut. Cas. Co. v. Woodward*,
    861 F.3d 1224 (11th Cir. 2017) ...............................................................................19

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ..................................................................................3, 19, 20

*Leary v. United States*,
    395 U.S. 6, 24 (1969)), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v.*
    *Zinke*, 852 F.3d 1131 (D.C. Cir. 2017) ...............................................................2, 12

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)...........................................................................................11

*Luokung Tech. Corp. v. DOD*,
    538 F. Supp. 3d 174 (D.D.C. 2021) ..................................................................22, 24

*Merck & Co. v. HHS*,
    385 F. Supp. 3d 81 (D.D.C. 2019) .......................................................................6, 8

*Michigan v. EPA*,
    576 U.S. 743 (2015).................................................................................................8

*Motion Picture Ass'n of Am. v. FCC*,
    309 F.3d 796 (D.C. Cir. 2003) ................................................................................8

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ..............................................................................20

*Nat'l Mining Ass'n v. U.S. Dep't of Interior*,
    105 F.3d 691 (D.C. Cir. 1997) ................................................................................2

*Obduskey v. McCarthy & Holthus LLP*,
    586 U.S. 466 (2019).................................................................................................9

*Power Mobility Coal. v. Leavitt*,
    404 F. Supp. 2d 190 (D.D.C. 2005) ......................................................................21

*Smoking Everywhere, Inc. v. FDA*,
    680 F. Supp. 2d 62 (D.D.C. 2010) ........................................................................24

*Tex. Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ........................................................................22

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
    103 F. Supp. 3d 133 (D.D.C. 2015) ..........................................................2, 12, 13

*United States v. Brock*,
    94 F.4th 39 (D.C. Cir. 2024)...............................................................................2, 7

*Women Involved in Farm Economics v. U.S. Dep't of Agric.*,
  876 F.2d 994 (D.C. Cir. 1989) ..................................................................13

## STATUTES

18 U.S.C. § 42(a)(1) ................................................................................13

42 U.S.C.
  § 1302(a) .........................................................................................6
  § 1395hh(a)(1) ..................................................................................6
  § 1395rr(b)(14)(A) ..............................................................................7
  § 1395rr(b)(14)(B) ........................................................................ *passim*
  § 1395rr(h)(1)(A) ................................................................................7

American Taxpayer Relief Act, Pub. L. No. 112-240, § 632, 126 Stat. 2354
  (2012) ...........................................................................................12

H.R. 3200, 11th Cong. § 1232 (2009) ...............................................................14

Omnibus Budget Reconciliation Act, Pub. L. No. 101-508, § 4201(c) 104 Stat.
  1388 (1990) ......................................................................................17

Protecting Access to Medicare Act, Pub. L. No. 113-93, § 217, 128 Stat. 1061
  (2014) ...........................................................................................12

Tax Increase Prevention Amendments, Pub. L. No. 113-295, § 204, 128 Stat.
  4065 (2014) ......................................................................................12

## RULES

Fed. R. Civ. P. 65 .....................................................................................4

## REGULATIONS

42 C.F.R. § 413.171 ...................................................................3, 5, 6, 9, 14, 18

## FEDERAL REGISTER NOTICES

74 Fed. Reg. 49,922 ..................................................................................1, 10

75 Fed. Reg. 49,030 ...............................................................10, 11, 17, 18, 19, 21

83 Fed. Reg. 56,922 ...................................................................................18

# INTRODUCTION

Defendants' Opposition fails to rebut Plaintiffs' showing that Plaintiffs are entitled to a preliminary injunction, or in the alternative, expedited summary judgment in their favor.

Defendants attempt to bury the merits more than 25 pages into their Opposition, which is understandable, given that Defendants concede the central thrust of Plaintiffs' arguments: That the governing statute "does not specifically include 'oral-only drugs'" in the ESRD PPS Bundle. Dkt 16 at 30 ("Opp."). Defendants instead argue that the statute does not "*prohibit* the agency's inclusion of oral-only drugs in the bundle," claiming that Congress's definition of "renal dialysis services" merely sets forth a "non-exhaustive" list that empowers Defendants to expand Congress's definition of "renal dialysis services" to include categories that Congress did not.

This argument is nothing like the justification Defendants originally provided for their oral-only drug rule, which acknowledged that "Section 1881(b)(14)(B) of the Act . . . identifies the renal dialysis services that are to be included in the ESRD PPS payment bundle" and sought to justify the inclusion of "oral-only" drugs solely on the theory it comported with clause (iii) or (iv) of that statutory definition. 74 Fed. Reg. 49,922, 49,927 (Sept. 29, 2009). At the time, Defendants even conceded that the statute "could be interpreted to limit the scope of the drugs . . . included in the bundle to only oral versions of injectables," but rejected that reading on "policy" grounds. *Id.* at 49,928. Defendants' post-hoc, made-for-litigation justification is not only unpersuasive but also improper. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (explaining that "judicial review of agency action is limited to the grounds that the agency invoked when it took the action.").

In any event, Defendants' newfound justification ignores the statutory text and structure: Congress expressly defined "renal dialysis services" to include four categories, and provided for the inclusion of orally administered drugs *only* when they were the "oral *equivalent* form" of non-orally administered drugs furnished to individuals for the treatment of end stage renal disease. 42

1

U.S.C. § 1395rr(b)(14)(B)(iii) (emphasis added).  Defendants suggest that Congress empowered CMS to *expand* that definition of "renal dialysis services" by using the word "includes" to describe the four categories of services that qualify.  Not so.  Congress's use of "include" does not leave a gap for the agency to fill when, as here, Congress "explicitly and comprehensively defined the term by including only three"—or here four—"discrete definitions."  *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009); *see also Dong v. Smithsonian Inst.*, 125 F.3d 877, 880 (D.C. Cir. 1997) (finding Congress's use of "includes" did *not* amount to an open-ended "invitation to extend [the statutory definition] to [objects] that do not belong among the types enumerated").  Even in cases where "includes" is used to set forth examples, unenumerated items "must fit th[e] same mold" as statute's enumerated categories, and cannot "break[] that mold."  *United States v. Brock*, 94 F.4th 39, 57 (D.C. Cir. 2024).  Here, Congress spoke specifically to what oral drugs are renal dialysis services, expressly limiting such drugs through the phrase "oral equivalent form."  CMS cannot "trump Congress's specific statutory directive."  *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 105 F.3d 691, 694 (D.C. Cir. 1997).

Defendants also attempt to bypass the statutory text by arguing that Congress ratified their approach through scattered statutory enactments delaying CMS from implementing its oral-only drug "policy" for a decade or more.  But none of those enactments endorsed CMS's policy, let alone purported to amend MIPPA to enable it.  Such provisions "cannot save a regulation which contradicts the requirements of the statute itself."  *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 154–55 (D.D.C. 2015) (quoting *Leary v. United States*, 395 U.S. 6, 24 (1969)), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017).  Because the best reading of the statutory text excludes oral-only drugs and Congress has not amended that text, Defendants' ratification arguments are unavailing.

Even if Defendants' treatment of oral-only drugs generally did not violate the statute (it does), Defendants cannot defend their designation of XPHOZAH as a "renal dialysis service." First, XPHOZAH is not a drug furnished "for the treatment of end stage renal disease." 42 U.S.C. § 1395rr(b)(14)(B).    Rather, as Defendants admit, XPHOZAH is a treatment for hyperphosphatemia, not for ESRD.    Defendants are thus forced to argue that the statute leaves CMS room to designate as "renal dialysis services" drugs like XPHOZAH that treat "conditions *associated with* End-Stage Renal Disease" or a "*comorbidity* of End-Stage Renal Disease." Opp. 32-33.    But that is not what the statute says.    Only drugs "for the treatment of end stage renal disease" qualify.    And "the treatment of end stage renal disease" does not mean "the treatment of [**<u>a condition associated with</u>**] end stage renal disease," new language that Defendants attempt to graft onto the statute.    At minimum, Defendants' failure to specifically find that XPHOZAH is "for the treatment of end stage renal disease," as the statute requires, is enough to warrant vacatur.

Second, "[r]enal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis."    42 C.F.R. § 413.171(5).    Defendants do not dispute that XPHOZAH *cannot* be used during dialysis, nor do they argue that XPHOZAH is "essential for the delivery of maintenance dialysis" in the sense of actually being required for the delivery of dialysis. Instead, Defendants argue "essential for the *delivery* of maintenance dialysis" should be viewed per agency guidance to mean "necessary to *treat or manage conditions associated with* the beneficiary's [ESRD], and thus, help the beneficiary to remain sufficiently *healthy to continue receiving maintenance dialysis*." Opp. at 38 (emphasis added).

CMS's spin is irreconcilable with the clear and unambiguous language of CMS's own regulation.    That language controls.    *See Kisor v. Wilkie*, 588 U.S. 558, 589–90 (2019) (unambiguous meaning of regulation controls); *AT&T Corp. v. FCC*, 970 F.3d 344, 350 (D.C. Cir.

2020) (in case of "discrepancy" between guidance documents and the Code of Federal Regulations, "it is the codified provisions that control"). Defendants' expansive and atextual reading would treat drugs for hypertension, diabetes, hepatitis, and more as "essential for the delivery of maintenance dialysis"—despite Defendants' real-world practice to exclude such drugs from the Bundle. Defendants' attempted about-face here should be rejected.

Unable to defend their actions on the merits, Defendants insist that Plaintiffs cannot point to irreparable harm. In light of Defendants' admissions, this question is largely academic: Plaintiffs moved in the alternative for expedited summary judgment, and Defendants now concede that they "have not currently identified additional materials, not already docketed with the Court or contained in the Federal Register, *necessary to the resolution of the pending Motions or that would form part of the administrative record*." Dkt. 15 at 2 (emphasis added). The Parties stipulated to an agreed "schedule that would allow for the Court to decide the pending Motions, and provide a *final judgment* in this matter by January 1, 2025, pursuant to Plaintiffs' pending request for preliminary injunction in consolidation with the merits under Fed. R. Civ. P. 65, *or in the alternative for expedited summary judgment*." *Id.* (emphases added). Since nothing more is needed to resolve the pending motions, this Court can proceed to summary judgment.

In any event, Plaintiffs have shown that CMS's decision will impose irreparable harm on the patients whom Plaintiffs American Association of Kidney Patients ("AAKP") and National Minority Quality Forum ("NMQF") represent, as well as Ardelyx itself, by reducing patient access to essential oral-only drugs. Defendants' primary response is that Ardelyx could have limited the harm by applying for the Transitional Drug Add-on Payment Adjustment ("TDAPA"), a two-year program that temporarily increases reimbursement for drugs transitioning into the Bundle. That response is wrong for many reasons. Most importantly, applying for the TDAPA is no panacea,

and would not have promoted access to or utilization of XPHOZAH, particularly in light of recent developments that have highlighted TDAPA's limited reimbursement, reach, and utility.  Because patients would lose access to XPHOZAH and other oral-only drugs if forced into the Bundle, TDAPA or no, Plaintiffs have readily established irreparable harm from Defendants' decisions.

Defendants' arguments to the contrary only show how out of touch they are to the reality of ESRD patient care.  There is a reason why patient groups, along with other stakeholders across the kidney-care community, have consistently opposed the inclusion of oral-only drugs in the ESRD PPS Bundle:  because it will diminish patient access to needed therapies, as it has done with other drugs in the past.  CMS argues, in effect, that every one of these patient groups (and their allies) have the facts backwards.  Defendants' blinkered view is naïve, both to how the ESRD drug market functions, and to the imminent harms that CMS's unlawful decisions will impose on Plaintiffs and those they serve absent relief from this Court.

The Court should therefore grant Plaintiffs' requested preliminary relief, or, in the alternative, enter expedited summary judgment in Plaintiffs' favor.

## ARGUMENT

## I.    DEFENDANTS' PLACEMENT OF ORAL-ONLY DRUGS INTO THE ESRD PPS BUNDLE IS UNLAWFUL

### A.    The Placement Of Oral-Only Drugs Into The ESRD PPS Bundle Conflicts With The Statutory Definition Of "Renal Dialysis Services"

Because oral-only drugs fall within none of the four statutory categories of "renal dialysis services" in 42 U.S.C. § 1395rr(b)(14)(B), CMS's inclusion of such drugs within the ESRD PPS bundle pursuant to 42 C.F.R. § 413.171 is contrary to law and in excess of statutory authority.

Importantly, Defendants concede Plaintiffs' central contention:  That the statutory definition of renal dialysis services "does not specifically include 'oral-only drugs.'"  Opp. at 30. Defendants instead primarily argue that the statute does not "*prohibit* the agency's inclusion of

oral-only drugs in the bundle," claiming that Congress's list is non-exhaustive because it is introduced by the word "includes" and contains a specific exclusion for vaccines. *Id.* That analysis, which conflicts with Defendants' actual justification for adding oral-only drugs to the definition of "renal dialysis services," *see* 42 C.F.R. § 413.171(3),[1] is erroneous multiple times over. And Defendants' alternative attempts to justify their regulation likewise fail.

### 1. Defendants Cannot Add Oral-Only Drugs To The Categories Enumerated By Congress

Initially, Defendants are wrong to suggest that the statute empowers them to *expand* upon Congress's chosen definition of "renal dialysis services" by regulation. It does not. To the extent CMS has generalized rulemaking authority under the Medicare Act,[2] that authority permits CMS to carry out the statutory functions charged by Congress in the Act, not to expand upon those functions. *See Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019) (collecting cases for the view that HHS's "general rulemaking authority" does not "equal congressional authorization" to modify statute). And while the statute provides CMS with a host of authorities to define specific, enumerated terms governing the End Stage Renal Disease Program, and to promulgate regulations implementing specified aspects of that Program, conspicuously lacking is any similar delegated authority to expand upon the definition of "renal dialysis services" that Congress itself enacted. *See* Dkt. 17 at nn.9-10 (discussing these different, specific authorities). On the contrary, the statute

---

[1]    In adopting § 413.171(3), CMS did not rely on a free-wheeling authority to expand Congress's definition of renal dialysis services, but rather claimed that oral-only drugs could fit within clause (iii) or (iv) of that definition. Defendants' effective suggestion that CMS was free to create clause (v), (vi), and (vii) ignores that CMS did not even attempt to justify its regulation on that ground. That is reason alone to reject their post-hoc attempt to defend CMS's regulation on that basis.

[2]    CMS's generalized rulemaking authority is limited to promulgating "regulations, *not inconsistent with this Act*, as may be necessary to the efficient administration of the functions with which [the agency] *is charged under this Act*," 42 U.S.C. § 1302(a) (emphases added), and to "prescribe such regulations as may be necessary to *carry out the administration* of the insurance programs under this subchapter," *id.* § 1395hh(a)(1) (emphasis added).

twice expressly instructs CMS to adhere to Congress's chosen definition of "renal dialysis services . . . as defined in subparagraph (B)" of the statute, not as determined by regulation. *See* 42 U.S.C. § 1395rr(b)(14)(A)(i); *id.* § 1395rr(h)(1)(A). Congress meant its definition to control.

Defendants argue that Congress indicated otherwise by providing that "the term 'renal dialysis services' *includes*—" and then providing four discrete categories. But Congress's use of "include" does not leave a gap for CMS to fill when Congress "explicitly and comprehensively defined the term by including only three"—or here four—"discrete definitions." *Carcieri*, 555 U.S. at 391. That conclusion is reinforced by the fact that Congress provided that CMS shall make a single bundled payment "for renal dialysis services (*as defined in subparagraph B*)"—not as further defined by agency regulation. 42 U.S.C. § 1395rr(b)(14)(A)(i).

This is not a case, therefore, where Congress sets forth a general principle and then uses "includes" merely to "set out examples." *Compare Dong*, 125 F.3d at 880 (rejecting invitation to "extend [the statutory definition] to [objects] that do not belong among the types enumerated" where statute set forth defined list rather than examples following a "general principle") *with Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) (finding "includes" to introduce examples in statute providing that "every Federal land bank … shall be exempt from Federal, State, municipal, and local taxation including the capital and reserve or surplus therein and the income derived therefrom"). But even in cases dealing with the latter kind of statutes, an agency lacks power to "exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000); *see also Brock*, 94 F.4th at 57 (finding that "includes" provides that items "must fit that same mold" as statute's enumerated categories, and cannot "break[] that mold"). Here, as Plaintiffs have explained, the inclusion of oral-only drugs is incompatible with Congress's

7

explicit choice to limit "renal dialysis services" to "other drugs and biologicals … and *any oral equivalent form* of such drug or biological." 42 U.S.C. § 1395rr(b)(14)(B)(iii). CMS must "operate within the bounds" of the statute. *Michigan v. EPA*, 576 U.S. 743, 751 (2015).

Nor is a different result warranted because the statute expressly excludes vaccines from the definition of "renal dialysis services." Defendants suggest that Congress's singular exclusion of vaccines from the definition of renal dialysis services "impl[ies] that there are not other exclusions of items and services *otherwise falling in the statute's scope.*" Opp. 31 (emphasis added). But Plaintiffs argue that oral-only drugs do *not* fall within the statute's four categories of renal dialysis services. So Defendants' observation, even if correct, provides them no help. Regardless, Congress's exclusion of one type of service (vaccines) does not indicate that every *other* item or service besides vaccines can be included in the bundle. *See, e.g.*, *Elec. Priv. Info Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 315 (D.D.C. 2017) (that the APA expressly "exclude[s] certain components of the federal government" does not mean other components are not also "excluded from APA review").

Defendants finally insist that they are free to add oral-only drugs to the list of renal dialysis services that Congress created because Congress did not *expressly exclude* them. Opp. 31. That is wrong. The "absence of an express limitation of authority" does not establish Defendants' "capacity to act." *Merck*, 385 F. Supp. 3d at 93. That is because "agencies would enjoy virtually limitless hegemony" if courts were "to presume a delegation of power absent an express withholding of such power." *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002); *see also, e.g.*, *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 805-06 (D.C. Cir. 2003).

### 2. Oral-Only Drugs Do Not Fall Within Congress's Enumerated Categories

That Defendants devote such energy to insisting that the statute does not "describ[e] the

precise scope of the bundle," Opp. 31, speaks volumes about Defendants' inability to match their inclusion of oral-only drugs, *see* 42 C.F.R. § 413.171(3), to any of Congress's enumerated categories of "renal dialysis services." For good reason. The statute's text, structure, and purpose make clear that oral-only drugs are not "renal dialysis services."

Defendants focus their arguments on clause (iii), which encompasses "other drugs . . . that are furnished to individuals for the treatment of [ESRD] and for which payment was (before the application of this paragraph) made separately under this subchapter *and any oral equivalent form of such drug or biological*." *Id.* § 1395rr(b)(14)(B)(iii) (emphasis added). As Plaintiffs have explained, Dkt. 14 at 24, CMS's regulation strikes out the underlined language, replacing it with "including drugs and biologicals with only an oral form." 42 C.F.R. § 413.171(3).

Defendants' attempts to justify that redlining are unpersuasive. Defendants first argue that (1) "renal dialysis services" includes "other drugs . . . for which payment was (before the application of this paragraph) made separately under this subchapter," (2) Congress has delayed implementation of CMS's oral-only drugs policy until January 1, 2025, and so (3) "this paragraph" has not yet been applied to oral-only drugs, and payment for such drugs is "made separately" under Medicare Part D, which is a part of "this subchapter." Opp. 30-35. But prior to MIPPA's enactment, payment for *all* oral drugs was made separately. *See* Dkt. 14 at 7-8, 11. And reading the first half of clause (iii) to encompass *all* oral drugs would impermissibly render the second half of § 1395rr(b)(14)(B)(iii) both nonsensical and surplusage, leaving no work for the clause "and any oral equivalent form of such drug or biological" to do. *But see Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019) (courts "presum[e]" that laws do not contain "surplusage").

There is a far better reading of Congress's text: At the time MIPPA was enacted in 2008, dialysis facilities did not administer "oral-only" drugs to ESRD patients; rather the only drugs or

biologicals that they "furnished to individuals for the treatment of end stage renal disease" were injectable or intravenously delivered drugs and biologicals, and *their* oral equivalents.  Dkt. 14-3 ¶¶ 42, 45.  Reading clause (iii) to include those categories of drugs and biologicals furnished by dialysis facilities not only makes better textual sense but also better accords with MIPPA's purpose to promote "operational efficiency" at *dialysis facilities* and deter such facilities from "overus[ing]" then-profitable, separately billable drugs.  *See* 75 Fed. Reg. at 49,032.  Accordingly, the first half of clause (iii) is best read to refer to *non*-oral (*e.g.*, injectable) drugs, and its second half to refer to "any oral equivalent form of such drug."   42 U.S.C. § 1395rr(b)(14)(B)(iii).

CMS contemporaneously acknowledged that clause (iii) "could be interpreted to limit the scope of the drugs and biologicals included in the bundle to only oral versions of injectables," just as Plaintiffs argue today.  74 Fed. Reg. at 49,928.  At the time, CMS disagreed with that outcome as a matter of "policy."  *Id.*[3]  Tellingly, Defendants do not renew that policy-based defense before this Court.  And they go so far as to admit that Plaintiffs' textual reading of clause (iii) might have "force"—at least if not for the statute's use of "includes" or its exclusion of vaccines.  Opp. 34. But as explained above, neither the statute's use of "includes" nor its exclusion of vaccines provides any support for Defendants' extension of "renal dialysis services" to encompass oral-only drugs.  Ultimately, Defendants cannot escape the fact that, by expressly defining renal dialysis services only to include the "*oral equivalent form*" of drugs and biologicals furnished to

---

[3] Defendants are wrong (at 34) that Plaintiffs' position would risk that "an oral version of a drug paid by Medicare in its injectable or intravenous version might arguably be excluded from the bundle, if the oral version becomes available after 'the application of this paragraph.'"  By defining renal dialysis to include "*drugs . . . for which payment was (before the application of this paragraph) made separately under this subchapter* and any oral equivalent form of such drug or biological," Congress added drugs that would have been separately covered under Medicare Part B or D.  The reference to "any oral equivalent form of such drug or biological" plainly encompasses *subsequently developed* oral-equivalent versions of such non-oral drugs.

individuals by dialysis facilities for the treatment of ESRD, Congress necessarily excluded oral-only drugs.  Clause (iii) cannot, therefore, justify Defendants' regulation.

Defendants barely even try to defend the proposition that oral-only drugs fall within clause (iv) of the statute.  CMS previously suggested clause (iv) "can be interpreted as a residual or catch all category for drugs which do not fall under the scope of those specified renal dialysis services identified in clauses (ii) and (iii)," including oral-only drugs.  75 Fed. Reg. at 49,039.  Plaintiffs explained that reading of clause (iv) is impermissible because it would negate Congress's choice to enumerate only certain categories of drugs as "renal dialysis services," and because reading clause (iv) to include all drugs not incorporated by clause (i) would render clauses (ii) and (iii) superfluous.  *See, e.g.*, *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022) (explaining that surplusage is generally impermissible).  Defendants do not dispute that their interpretation of clause (iv) renders clauses (ii) and (iii) surplusage, nor offer any explanation of how that result could be the best reading of the statute.   It is not.

This Court is obligated to assess whether the agency has "acted within its statutory authority" by applying the "best reading" of the statutory text.  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).  The best reading of MIPPA excludes oral-only drugs.

### 3.    Defendants' Ratification Theory Is Meritless

Finding no shelter for their regulatory interpretation in MIPPA's plain text, Defendants pivot to a final tack, suggesting that Congress ratified CMS's regulatory interpretation of "renal dialysis services" through a few scattered references to it in later statutes delaying implementation of Defendants' oral-only drugs policy.  *See* Opp. 27-29.  That argument fails.  None of the later legislative actions on which Defendants rely purport to amend Congress' definition of renal dialysis services.  And delaying the effective date of CMS's policy, or monitoring its risks, is

hardly an endorsement of CMS's statutory interpretation, let alone a poison pill changing MIPPA's definition of "renal dialysis services."  Because Defendants' oral-only drug policy contradicts the statute's plain text, congressional awareness of CMS's policy does not save it.  Opp. at 28.

Defendants argue that Congress ratified the oral-only drug policy by thrice instructing the Secretary to delay its implementation, and by further instructing the Secretary to "monitor the bone and mineral metabolism of individuals with [ESRD]" "[w]ith respect to [its] implementation." American Taxpayer Relief Act, Pub. L. No. 112-240, § 632, 126 Stat. 2354 (2012); *see also* Protecting Access to Medicare Act, Pub. L. No. 113-93, § 217, 128 Stat. 1061 (2014) (delaying implementation); Tax Increase Prevention Amendments, Pub. L. No. 113-295, § 204, 128 Stat. 4065 (2014) (same).  Defendants contend (at 28-29) that if Congress had disapproved of the policy, it would have directed CMS not to implement it at all.  In doing otherwise, Defendants argue, Congress implicitly deemed the policy consistent with the statute, *i.e.*, ratified it after the fact.

That is incorrect.  To begin with, arguments about congressional ratification "cannot save a regulation which contradicts the requirements of the statute itself."  *Reptile Keepers*, 103 F. Supp. 3d at 154–55 (quoting *Leary v. United States*, 395 U.S. 6, 24 (1969)).  "Applying the ratification doctrine to change the plain meaning of a statute crosses the line from embracing a legitimate interpretation of the law to changing its meaning."  *Id.* at 155; *see also Ashton v. Pierce*, 716 F.2d 56, 63 (D.C. Cir. 1983) (Congress cannot indirectly "ratify an administrative interpretation that is contrary to the plain meaning of the Act."); *Comm'r of Internal Revenue v. Acker*, 361 U.S. 87, 93 (1959) ("Congress could not add to or expand this statute by impliedly approving the regulation.").

This Court's decision in *Reptile Keepers* is instructive.  There, the Court interpreted the Lacey Act's prohibition on "any shipment" of certain enumerated species "between the continental United States, the District of Columbia, Hawaii, the Commonwealth of Puerto Rico, or any

possession of the United States." *Reptile Keepers*, 103 F. Supp. 3d at 143 (quoting 18 U.S.C. § 42(a)(1)). The Court held that prohibition did not bar transportation between two states *within* the continental United States. *Id.* at 145-49. The Government argued otherwise, relying on post-enactment legislation whereby Congress had added certain invasive species to the enumerated list out of concern that they would spread from one area within the continental United States to another. *Id.* at 149-52. Although Congress had apparently understood that the Act would apply to interstate transportation, this Court held that later congressional view could not overcome the original statute's plain meaning, which was "clear at the time of its enactment." *Id.* at 155. "[P]articularly where [Congress] did not amend—or even discuss—the relevant language," the Court concluded that Congress did not amend the dispositive statutory language. *Id.* at 154-55. The same is true here. That later Congresses repeatedly agreed not to let CMS's policy take effect, or required monitoring of any negative effects, does not have the effect of amending MIPPA's statutory definition of renal dialysis services, which does not include oral-only drugs.

Defendants rely on *Women Involved in Farm Economics v. U.S. Dep't of Agric.*, 876 F.2d 994, 1003 (D.C. Cir. 1989), for the contrary position. But that case is far afield. There, the statute directed the Secretary of Agriculture to "issue regulations defining the term 'person.'" *Id.* at 995. The D.C. Circuit concluded that the Secretary had acted within his statutory authority in defining a husband and wife as "one person." That Congress had left that rule in place for over a decade was simply icing on the cake in support of an interpretation the court stated it would have upheld regardless. *Id.* at 1003. *Women Involved* does not stand for the proposition that post-enactment history can change the plain meaning of the statute—Defendants have identified no such case.

Finally, the fact that Congress considered and *rejected* a bill shortly after MIPPA was enacted that would have amended the statute to expressly include oral-only drugs is further

evidence that Congress did not approve the inclusion of oral-only drugs in the ESRD Bundle.  H.R. 3200, 11th Cong. § 1232 (2009).  Defendants posit (at 29) that Congress might have declined to pass the bill for reasons unrelated to the ESRD statute, but so too might Congress have passed the language on which Defendants rely without agreeing with CMS's policy.[4]  At minimum, this history indicates that Congress was aware of language that would have provided for exactly the policy result Defendants seek, and declined to use it.  CMS cannot subvert that choice through regulation.  *Cf. Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1578 (D.C. Cir. 1984) ("Where Congress has . . . considered, and then rejected, a more expansive requirement than that ultimately enacted, it is not for the agency to exceed the statutory limits under the guise of 'interpretation.'").

## B.    At Minimum, XPHOZAH Does Not Qualify As A Renal Dialysis Service

Regardless of whether oral-only drugs might potentially qualify as "renal dialysis services," XPHOZAH does not for two independent reasons.  First, XPHOZAH is not furnished "for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B).  And second, XPHOZAH is not "essential for the delivery of maintenance dialysis."  42 C.F.R. § 413.171(5).

### 1.    XPHOZAH Is Not A Drug Furnished For The Treatment Of End Stage Renal Disease

To qualify under the statute as a "renal dialysis service," a drug must be furnished "for the treatment of end stage renal disease."  42 U.S.C. § 1395rr(b)(14)(B)(iii).  As Defendants have conceded, however, XPHOZAH "treats hyperphosphatemia, a common *comorbidity*[5] of chronic kidney disease."  Dkt. 11-1 at 2 (emphasis added); *see also* Opp. at 9, 38.  Hyperphosphatemia is

---

[4] To state one obvious possibility, the fact that post-MIPPA Congresses declined to amend the definition of "renal dialysis services" to add oral-only drugs, and instead repeatedly pushed back the effective date of CMS's policy, suggests that, at minimum, there was no Congressional consensus to approve of CMS's construction of MIPPA.

[5] As Plaintiffs have explained elsewhere, a comorbidity is a second disease that impacts the individual with the primary condition.  *See* Dkt. 17 at 38.

not ESRD, nor does it necessarily accompany ESRD.  Perhaps for that reason, CMS did not find that XPHOZAH is "for the treatment of end stage renal disease," despite the statutory requirement to do so.  Instead, all CMS determined was that XPHOZAH "is furnished to individuals to *treat a condition associated with* ESRD."  Dkt. 14-11 at 1 (emphasis added).  Because CMS did not even purport to make the statutorily required finding, that should be the end of the matter.

Defendants nonetheless claim that the statute allows CMS to add to the Bundle drugs that treat "some conditions *associated with* [ESRD]" or that treat some "[ESRD] *comorbidities.*"  Opp. at 32-33; *see also id.* at 32 ("Plaintiffs are wrong to assert that a drug that does not treat End-Stage Renal Disease directly cannot be a renal dialysis service under the statute.").  But that is not what the statute says.  Rather, it expressly limits the definition of "renal dialysis services" to drugs "furnished to individuals for the treatment of end stage renal disease," § 1395rr(b)(14)(B)(iii)—not conditions *associated* with end stage renal disease or its comorbidities.

To try to overcome this problem, Defendants note (at 32-33) that Congress included in the Bundle a different category of drugs, "erythropoiesis stimulating agents" ("ESAs"), which stimulate the production of red blood cells to combat anemia.  According to Defendants, the fact that Congress included as "renal dialysis services" both "erythropoiesis stimulating agents" and "*other* drugs . . . that are furnished to individuals for the treatment of end stage renal disease" signals that Congress thought that treating "at least some conditions associated with End-Stage Renal Disease" amounts to the "treatment of end stage renal disease" itself.  *Id.*  But Defendants draw the wrong lesson from the statutory text, which indicates only that Congress understood ESAs to be furnished to individuals for the treatment of ESRD—a conclusion that accords with the unique relationship between ESRD, ESRD treatment, and the need for ESAs.

Congress was well within its rights to make that judgment:  ESAs are labeled and indicated

for "the treatment of anemia *due to* chronic kidney disease."[6]   Indeed, such anemia is often commonly understood as "anemia *of* chronic kidney disease,"[7] or as a "side effect of kidney disease."[8]   ESRD causes anemia because the kidneys can no longer generate erythropoietin (EPO), a hormone that is required to stimulate new red-blood cells, so red-blood-cell counts drop and anemia develops.[9]   In addition, dialysis itself causes blood loss that may necessitate treatment with ESAs.[10]   ESAs thus bear a unique relationship to ESRD and ESRD treatment that other drugs (such as phosphate-lowering therapies) do not.   Congress's choice to consider ESAs as drugs for the treatment of end stage renal disease also makes sense within the context of Congress's definition of "*renal dialysis* services."   Patients on ESAs are injected those drugs "at nearly every *dialysis treatment*."[11]   By contrast, phosphate-lowering therapies like XPHOZAH *cannot* be used just prior to or during dialysis, and are not administered by dialysis facilities.   Dkt. 14 at 16-17.

Congress's choice to expressly include "erythropoiesis stimulating agents" within the definition of "renal dialysis services" only highlights its decision to *exclude* other drugs from the

---

[6]   Epogen FDA Label, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/103234s5378lbl.pdf; Aranesp FDA Label, available at www.accessdata.fda.gov/drugsatfda_docs/label/2011/ 103951orig1s5173_103951orig1s5258lbl.pdf (emphasis added).

[7]   Tarek Souaid, et al., *Anemia Of Chronic Kidney Disease: Will New Agents Deliver On Their Promise*, Cleveland Clinic Journal of Medicine April 2022, 89 (4) 212-222, https://www.ccjm.org/content/89/4/212.

[8]   American Kidney Fund, *Anemia Symptoms, Causes And Treatments*, https://www.kidneyfund.org/living-kidney-disease/health-problems-caused-kidney-disease/anemia-symptoms-causes-and-treatments.

[9]   *See, e.g.*, Nat'l Kidney Foundation, *Anemia and Chronic Kidney Disease*, https://www.kidney.org/kidney-topics/anemia-and-chronic-kidney-disease.

[10] *See, e.g.*, *id.*; *see also* NIH, National Institute of Diabetes and Digestive and Kidney Diseases, *Anemia in Chronic Disease*, www.niddk.nih.gov/health-information/kidney-disease/anemia.

[11] U.S. Gov't Accountability Off., (GAO-07-77), *End-Stage Renal Disease: Bundling Medicare's Payment for Drugs with Payment for all ESRD Services Would Promote Efficiency and Clinical Flexibility* 3, 10 (2006), https://www.gao.gov/assets/gao-07-77.pdf [hereinafter "GAO 2006 Report"] (emphasis added).

definition of 42 U.S.C. § 1395rr(b)(14)(B) that were then available—such as oral-only drugs, including phosphate-lowering therapies.  In any event, nothing about Congress's conclusion that ESAs are furnished for the treatment of end stage renal disease relieves Defendants of the obligation to make that determination before finding XPHOZAH to be a "renal dialysis service" within the meaning of the statute, which they did not do.

Defendants are also wrong to suggest that Congress included "erythropoiesis stimulating agents" in the definition of "renal dialysis services" so as to signal its intent—notwithstanding the actual statutory language—to include *other* drugs that are not for the treatment of end stage renal disease.  Rather, there is a far simpler explanation (and one consistent with the text).  In 1990, Congress provided that ESAs to promote "erythropoietin . . . shall *not* be included as a dialysis service" under the then-existing payment system.  Omnibus Budget Reconciliation Act, Pub. L. No. 101-508, § 4201(c), 104 Stat. 1388 (1990).  This exclusion resulted in significant annual costs of "$2 billion, accounting for more than two-thirds of Medicare payments for all separately billable ESRD drugs."[12]  As a result, erythropoiesis stimulating agents were "a focus of Medicare ESRD cost containment efforts" leading to MIPPA.  GAO 2006 Report at 17.  Given that history and policy objective, Congress had particular need to specifically identify ESAs as "renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(B)(ii).[13]  By contrast, oral-only drugs were not administered by dialysis facilities; their inclusion in the Bundle therefore would *not* have served Congress's

---

[12] GAO 2006 Report at 2; *see also id.* at 10 (noting that ESAs consisted of 73.7% of Medicare expenditures for separately billable injectable drugs used by dialysis facilities in 2005); 75 Fed. Reg. 49,030 49,160 (Aug. 12, 2010) (noting that EPO "is currently a separately billable drug and accounts for the majority of ESRD facility drug expenses").

[13]  Given the possibility for reasonable disagreement over whether ESAs are furnished for the treatment of end-stage renal disease, it is also conceivable that Congress recognized a particular value in specifically identifying ESAs as renal dialysis services.  Notably, however, it chose not to do so with other drugs that treat conditions associated with ESRD.

goal to promote the efficient use of resources by dialysis facilities.

Defendants' actions outside this case further bely their present argument that Congress intended that drugs that treat conditions "associated with [ESRD]" or its "comorbidities" would qualify as "for the treatment of end stage renal disease." Although ESRD causes complications ranging from hypertension and diabetes to stroke, hepatitis, and cardiovascular disease, many of which are plainly "associated with" ESRD or ESRD-related "comorbidities," *see* Dkt. 14-3 ¶¶ 12-16, CMS does not consider drugs that treat these conditions to be drugs "for the treatment of end stage renal disease." *See* 75 Fed. Reg. at 49,047. To explain away this discrepancy, Defendants say that "for the treatment of end stage renal disease" should be read to mean only *selected*, undefined conditions "associated with [ESRD]" or *selected* ESRD "comorbidities." Opp. 33 ("not all drugs treating a comorbidity" qualify). But that reading has no nexus to the actual statutory language. Congress did not delegate authority to CMS to include in the Bundle "ESRD-related" drugs or drugs for "comorbidities," much less to pick and choose selectively among them.

### 2.    XPHOZAH Is Not Essential For The Delivery Of Maintenance Dialysis

XPHOZAH also is not "essential for the delivery of maintenance dialysis" within the meaning of 42 C.F.R. § 413.171(5).

Notably, Defendants do not argue that XPHOZAH is "essential for the delivery of maintenance dialysis" in the plain sense of the phrase—namely, that it is indispensable or necessary to deliver maintenance dialysis. Instead, Defendants contend that CMS can, through non-binding guidance in the Federal Register, rewrite "essential for the delivery of maintenance dialysis" to mean "necessary to *treat or manage conditions associated with* the beneficiary's ESRD and thus, help the beneficiary to remain sufficiently *healthy to continue receiving maintenance dialysis*." Opp. 38 (quoting 83 Fed. Reg. 56,922, 56,931 (Nov. 14, 2018)). But that

wholesale transformation of the regulatory text is impermissible, because the regulation is clear and unambiguous: "'Essential' means '[a]bsolutely necessary' or 'indispensably requisite'" to maintenance dialysis, *see Grange Mut. Cas. Co. v. Woodward*, 861 F.3d 1224, 1232 (11th Cir. 2017), which XPHOZAH undisputedly is not. *See also Kisor*, 588 U.S. at 589–90 (unambiguous meaning of regulation controls over guidance).

CMS cannot simply issue guidance in the Federal Register that redlines CMS's binding regulation:  Where there is a "discrepancy" between guidance and the codified regulation, "it is the codified provisions" that control.  *AT&T*, 970 F.3d at 350.  In any event, CMS long ago recognized—in accord with the actual text of its regulation—that "essential for the delivery of maintenance dialysis" requires, at a minimum, a drug to be administered "in a dialysis unit (and therefore would be a renal dialysis service)."  75 Fed. Reg. at 49,047; *id.* at 49,048 (finding that drugs "unlikely to be . . . provided in an ESRD facility" are not renal dialysis services).  Defendants cannot now ignore that history, or the actual regulatory language on which it is founded.

Defendants' reinterpretation of "essential for the delivery of maintenance dialysis" to mean anything that helps an ESRD patient "remain healthy" is practically boundless, capturing any drug that benefits patients' "general health" so as to "continue receiving maintenance dialysis."  Opp. 38.  That includes drugs to treat diabetes, hypertension, and hepatitis, even though CMS has long excluded such drugs from the Bundle.  *Supra* at 18.  So even Defendants do not apply their regulation in the expansive manner they now urge upon the Court here.

Finally, to attempt to avoid the plain meaning of "essential for the delivery of maintenance dialysis," Defendants once again fall back to ESAs, arguing that such drugs are not essential for the delivery of maintenance dialysis.  But that ignores that ESAs are often administered during dialysis to supplement the production of red blood cells in dialyzed blood and counterbalance the

19

loss of blood that occurs during dialysis. *Supra* at 15-16. Regardless, Defendants cannot avoid the plain meaning of their regulations by claiming they are in tension with other portions of the statute: Because "an agency is bound by its own regulations." *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014), an agency cannot disregard a regulation by claiming it to be in tension with a statute, absent rescinding the regulation. *Cf. Regents*, 591 U.S. at 24 (agency cannot "cut[] corners" by skipping necessary process to rescind policy as contrary to law). Until then, the unambiguous text of the regulation remains binding. *Kisor*, 588 U.S. at 589–90.

## II. THE EQUITABLE FACTORS WEIGH STRONGLY IN FAVOR OF INJUNCTIVE RELIEF

As noted, the equitable factors are now largely academic in light of Defendants' acknowledgement that the administrative record upon which the agency relied is already before the Court. Dkt. 15 at 2. This Court therefore can simply grant expedited summary judgment in lieu of issuing a preliminary injunction. *See Carter v. Urb. Serv. Sys. Corp.*, 324 F. Supp. 3d 19, 38 (D.D.C. 2018) (granting motion for expedited summary judgment in lieu of motion for preliminary injunction). In any event, the equitable factors strongly favor preliminary relief.

### A. Plaintiffs Have Demonstrated That They Are Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief

Absent preliminary or at least expedited relief, Plaintiffs will suffer irreparable harm.

Defendants spend most of their Opposition arguing that Plaintiff *Ardelyx* will not suffer cognizable harm, or that *Ardelyx* has inflicted harm on itself. In so doing, they largely elide the harm to AAKP and NMQF and the patients they represent. As detailed below, Defendants' arguments regarding Ardelyx are misdirected, but we start with the broader harms to patients.

Defendants concede (at 22) that "harm to a person's health can constitute irreparable harm." And they do not dispute that, if patients will be denied access to drugs that would benefit their health due to an unlawful agency decision, that injury is sufficiently "certain, great and actual" to support preliminary relief. *Id.* (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)). Defendants simply claim harm to patients is "speculative." It is not.

The unlawful placement of oral-only drugs into the ESRD PPS Bundle will materially diminish ESRD patients' access to essential therapies and precipitate worse health outcomes. Because Medicare Part D plans currently compensate pharmacies for oral-only drugs, including XPHOZAH, based on the particular kind and amount of drugs they dispense, they are not a barrier to facilitating patient access to innovative, effective treatments. *See* Dkt. 14-1 ¶¶ 22, 34; Dkt. 14-3 ¶ 79. By contrast, placing oral-only drugs into the Bundle and curtailing their reimbursement will diminish access to critical oral-only treatments, degrade health outcomes, and alter the critical decision-making relationship between patients and their physicians—all of which will significantly harm patient health. *See* Dkt. 14-1 ¶¶ 21-25, 29, 34-35; Dkt. 14-3 ¶¶ 69, 74, 76-79, 81; Dkt. 14-2 ¶¶ 16, 30-35. CMS has admittedly failed to increase the amount of its bundled payment in keeping with actual increases in the cost of providing dialysis. *See* Dkt. 14-3 ¶¶ 66-67; Dkt. 14-1 ¶¶ 18-20. Defendants do not appear to dispute that. Indeed, CMS has expressly acknowledged the risk of "underutilization" of novel and necessary therapies. 75 Fed. Reg. at 49,041. That is exactly what will occur here.

Defendants label these concerns speculative because they claim Plaintiffs should have *also* provided a "statement from an [ESRD] facility [stating] it might be deterred from providing XPHOZAH to a patient to whom it has been prescribed," or a "statement from a patient who has been informed that his or her End-Stage Renal Disease facility plans to refuse to honor his or her

XPHOZAH prescription."  Opp. at 23.  That is nonsense:  There is no requirement that Plaintiffs *also* elicit additional declarations from various non-parties.  Instead, Plaintiffs have provided three "detailed affidavits describing patient harms" which include the harm of "potential loss of treatment altogether," which is exactly what Defendants claim Plaintiffs needed to do.  *See id.*; Dkt. 14-1 ¶¶ 21-25, 29, 34-35; Dkt 14-3 ¶¶ 69, 74, 76-79, 81.

Defendants also seek to inject an additional requirement, that the challenged agency action must be the "proximate cause" of the irreparable harm.  Defendants contend that any denial of access to needed medications would be caused by the "End-Stage Renal Disease facilities," not by CMS.  But the fact that CMS's inclusion of XPHOZAH and other oral-only drugs does not *directly forbid* access to those drugs, but instead makes it economically non-viable for providers and facilities to maintain patient access to the drugs, makes no difference:  Absent CMS's inclusion of these drugs in the Bundle, patients would still have access to the drugs; the fact that third parties are also involved in the causal chain is irrelevant.  *See, e.g.*, *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 229,  (D.D.C. 2014) (finding irreparable harm met when a federal government policy caused third parties—two states—to recoup costs from plaintiffs, and thus indirectly harmed the plaintiffs); *Luokung Tech. Corp. v. DOD*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (finding irreparable harm from company's designation as a Communist Chinese military company, given indirect third-party harms to employee recruitment, customer retention, and business reputation).

Defendants also argue that these harms are "self-inflicted" by virtue of Ardelyx's decision not to apply to TDAPA, a two-year transitional program for drugs entering the Bundle.  But Ardelyx's decision not to apply to TDAPA reflected its view that access to TDAPA would not have ameliorated the harm imposed on patients and Ardelyx if XPHOZAH was placed into the ESRD PPS Bundle.  Suppl. Williams Decl. ¶¶ 19, 25.  When Ardelyx evaluated applying to

TDAPA in mid-2024, it closely studied the experience of Korsuva, the most recent drug to apply for and complete a TDAPA two-year benefit. *Id.* ¶ 11. Korsuva had negligible adoption during TDAPA despite substantial patent need; after its TDAPA period ended in March 2024, moreover, Korsuva's market share declined essentially to zero. *Id.* ¶¶ 12, 17.[14] In the course of analyzing Korsuva's recent experience in the lead up to its June 2024 decision not to apply for TDAPA, Ardelyx learned that dialysis facilities increasingly considered TDAPA payments inadequate, both because CMS limits the reimbursement it provides under TDAPA, and because over 40 percent of Medicare ESRD patients had transitioned to Medicare Advantage plans by mid-2024—plans in relation to which dialysis facilities do not receive TDAPA payments. *Id.* ¶ 13.

As a result of its evaluation of TDAPA in the lead up to its June 2024 decision, Ardelyx concluded that the lower level of reimbursement available to dialysis facilities even under TDAPA would not cover the cost to many of those facilities of prescribing XPHOZAH. *Id.* ¶ 10. In addition, Ardelyx learned that, as with Korsuva, providers would have been heavily disincentivized to prescribe XPHOZAH during the TDAPA period in order to avoid having to cease prescribing XPHOZAH at the end of that short period. *Id.* ¶¶ 15-16. In light of these and other recent developments, Ardelyx recognized in mid-2024 that applying to TDAPA would not have preserved access to XPHOZAH even for existing patients. *Id.* ¶ 10. Ardelyx publicly explained this when it announced its decision to not apply for TDAPA, as "even during the TDAPA period, the restrictions placed on XPHOZAH would be such that patient access to this novel therapy would be *effectively eliminated for all patients*."[15] As a result, patient access will

---

[14] Defendants argue that Parsabiv fared better under TDAPA. But Parsabiv was reimbursed at a higher level than proposed for XPHOZAH. Even then, patient access declined. Dkt 14-3 ¶ 75.

[15] Ardelyx, *To Preserve Patient Access to XPHOZAH, Ardelyx Chooses Not to File for TDAPA* (July 2, 2024), https://ir.ardelyx.com/news-releases/news-release-details/preserve-patient-access-xphozahr-ardelyx-chooses-not-file-tdapa (emphasis added).

decline if XPHOZAH is added to the Bundle—a reality that TDAPA would not change.

Defendants are also wrong in suggesting that Ardelyx cannot show irreparable harm unless Defendants' actions will cause it to go entirely out of business:  The government's sovereign immunity makes the harms arising from the XPHOZAH Decision irreparable.  *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (stating "even if the claimed economic injury did not threaten plaintiffs' viability, it is still irreparable because plaintiffs cannot recover money damages against FDA"); *Everglades Harvesting & Hauling v. Scalia*, 427 F. Supp. 3d 101, 115 (D.D.C. 2019) (same); *see also Luokung*, 538 F. Supp. 3d at 192 (finding loss of market share irreparable).  Effectively eliminating access to a critical drug is irreparable harm.

### B.    The Balance Of The Equities And The Public Interest Favor Plaintiffs

For the balance of the equities, Defendants mostly rehash their arguments that inclusion of oral-only drugs in the Bundle will not diminish patient access, which is wrong for the reasons discussed above.  Defendants also speculate (at 40) that XPHOZAH's movement into the Bundle will actually *expand* patient access, on the theory that certain ESRD patients covered by fee-for-service Medicare lack prescription drug coverage under Medicare Part D, and would purportedly gain access if XPHOZAH is placed into the Bundle, which is covered by Medicare Part B.

That argument is wrong for several reasons.  To begin with, Defendants substantially overestimate the number of patients that purportedly lack access to XPHOZAH today.  As detailed in the supplemental declaration of Dr. Williams, Medicare Part D enrollment continues to increase year-over-year, reducing the number of patients without access to an outpatient prescription benefit plan that covers XPHOZAH and other oral-only drugs.  Suppl. Williams Decl. ¶ 21.  Nearly 80% of Medicare Part B ESRD beneficiaries are also enrolled in Part D, and currently can obtain access to XPHOZAH through their Part D coverage.  *Id.* ¶ 22.  Even for the minority (roughly 20%) of

Medicare Part B patients who currently lack a Medicare Part D plan, there exist meaningful options to obtain access to XPHOZAH already, including patient assistance and financial hardship programs.  *Id.* ¶ 23.

In any event, the additional access about which Defendants speculate is theoretical rather than real.  *See id.* ¶ 24.  Owing to the financial limitations of the ESRD PPS Bundle and TDAPA, XPHOZAH's addition to the Bundle would not facilitate meaningful access for the small minority of Medicare Part B ESRD patients who lack Medicare Part D coverage.  *Id.* ¶ 25.  By contrast, the addition of XPHOZAH to the ESRD PPS Bundle *would* materially reduce access for the far greater proportion (80%) of Part B ESRD patients who *do* currently have Medicare Part D coverage.  *Id.* The balance of equities thus weighs strongly in Plaintiffs' favor.

At base, Defendants' arguments simply ignore the reality of the marketplace:  Patient groups, including Plaintiffs NMQF and AAKP, universally oppose the inclusion of oral-only drugs in the Bundle because it will diminish patient access to needed therapies, as has occurred with other drugs in the past.  CMS argues, in effect, that every one of these patient groups has the facts backwards.  Defendants' view blinkers the market reality, and is simply incorrect.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant preliminary relief or expedited summary judgment in their favor.

Dated:  October 16, 2024

Respectfully submitted,

*/s/ Michael E. Bern*

Michael E. Bern  (DC Bar No. 994791)
Christine C. Smith (DC Bar No. 1658087)
Delia Tasky (DC Bar No. 1724285)
Alexander G. Siemers (DC Bar No. 90006765)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   michael.bern@lw.com
            christine.smith@lw.com
            delia.tasky@lw.com
            alex.siemers@lw.com

Nicholas L. Schlossman
(DC Bar No. 1029362)
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email:   nicholas.schlossman@lw.com

*Attorneys for Plaintiffs Ardelyx, Inc. and American Association of Kidney Patients*

James E. McCollum, Jr. (DC Bar. No. 398117)
Amit K. Sharma (D.C. Bar No. 503604)
The McCollum Firm, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
Tel: (301) 537-0661
Fax: (301) 864-4351
Email:   jmccollum@jmlaw.net
            asharma@jmlaw.net

*Attorneys for Plaintiff National Minority Quality Forum*