## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ARDELYX, INC., *et al.*,

               Plaintiffs,

       v.

BECERRA, *et al.*,

               Defendants.

Civil Action No. 24-cv-02095 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiffs—a biopharmaceutical company, Ardelyx, Inc.; a nonprofit organization that represents kidney patients, the American Association of Kidney Patients; and a nonprofit healthcare research group, the National Minority Quality Forum (collectively "plaintiffs"), Compl. ¶¶ 19, 21, 45-47, ECF No. 1—brought this lawsuit, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to challenge the classification by defendants Department of Health and Human Services ("HHS") and its component Centers for Medicare and Medicaid Services ("CMS") (collectively, "defendants") of oral-only drugs, including the drug XPHOZAH, which is manufactured by Ardelyx, as "renal dialysis services" subject to a bundled reimbursement payment under Medicare Part B.  XPHOZAH treats hyperphosphatemia, a condition characterized by too much phosphate in the blood, occurring in patients with chronic kidney disease on dialysis.  The two regulatory actions by defendants at issue in this lawsuit—the regulation classifying some oral-only drugs as falling within the definition of "renal dialysis services" and the decision to identify XPHOZAH as such a drug—are effective as of January 1, 2025.

Now pending before the Court are defendants' motion, under Federal Rule of Civil Procedure 12(b)(1), to dismiss this case for lack of jurisdiction, due to the operation of 42 U.S.C.

§ 1395rr(b)(14)(G), *see* Defs.' Mot. Dismiss ("Defs.' MTD"), ECF No. 11, and plaintiffs'

motion for a preliminary injunction or, in the alternative, for expedited summary judgment to

prevent the challenged classifications from going into effect, *see* Pls.' Mot for Prelim. Inj. or

Expedited Summ. J. ("Pls.' Mot. PI"), ECF No. 14.

      For the reasons explained below, subparagraph (G) of 42 U.S.C. § 1395rr(b)(14)

precludes the exercise of jurisdiction to review the agency's classification of certain oral-only

drugs as "renal dialysis services" and its decision to identify XPHOZAH as qualifying for such

classification.  Accordingly, defendants' motion is granted, requiring dismissal of this case.

## I.    BACKGROUND

      This Court once again returns to the "labyrinthine world" of Medicare reimbursements,

*Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 124 (D.D.C. 2021) (quoting

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 694 (D.C. Cir. 2014)), this time as applied to

oral-only drugs for patients who suffer from severe kidney disease and require dialysis to filter

out the toxins in their bloodstream.

### A.    Pertinent Facts

      About 550,000 people in the United States suffer from end-stage renal disease ("ESRD"),

the most severe, fatal form of chronic kidney disease where the kidneys no longer function.

Compl. ¶ 4.  Many ESRD patients require dialysis treatments multiple times a week to filter the

waste and toxins out of their bloodstream.  *Id.* ¶ 5.  ESRD patients often also suffer from

associated conditions, including hyperphosphatemia, the condition of having too much phosphate

in the blood.  *Id.* ¶ 24.  About 70 or 80% of patients with ESRD on dialysis suffer from

hyperphosphatemia, although hyperphosphatemia may occur without ESRD.  Pls.' Mot. PI, Ex.

3, Declaration of Laura Williams, Chief Medical Officer of Ardelyx ("Williams Decl.") ¶ 18,

ECF No. 14-3; Compl. ¶ 150; Pls.' Mem. Supp. for PI or Expedited Summ. J. ("Pls.' Mem. PI")

at 15 & n.17, ECF No. 14.  Untreated, hyperphosphatemia can lead to bone disorders.  Compl. ¶ 75.

Traditional hyperphosphatemia drugs bind to phosphate molecules in the gastrointestinal tract.  *Id*. ¶ 25.  Ardelyx manufactures a drug, tenapanor, branded as XPHOZAH, that treats hyperphosphatemia by a different mechanism of reducing the absorption of phosphate through the paracellular pathway.  *Id.* ¶ 26.  The FDA approved XPHOZAH in 2023 to "reduce serum phosphorous in adults with chronic kidney disease (CKD) on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  *Id.* ¶ 27; Williams Decl., Ex. 1, XPHOZAH Prescribing Information ("XPHOZAH Prescr. Info.") at 1, ECF No. 14-4.  This drug is administered in the form of a pill that is taken orally twice a day near meals, not in conjunction with dialysis.  *Id.* ¶¶ 28, 30, 31, 163.

### B.    Statutory Framework

Individuals suffering from ESRD requiring dialysis treatment are eligible for Medicare, *see* 42 U.S.C. § 426-1(a), which is a federal health insurance program administered by HHS and CMS, *see id*. §§ 1395 *et seq.*; *id.* § 1395kk.  Medicare consists of four parts, two of which are relevant here: Part B provides insurance for outpatient health services, *id.* § 1395*o*, and Part D provides prescription drug coverage for enrollees as a "fee-for-service" plan, *id.* § 1395w-101.  All ESRD patients are eligible for coverage under Part B; most (around 80%) have additional coverage under Part D.  Notice of Proposed Rule related to Medicare Program; End-Stage Renal Disease Prospective Payment System ("2024 NPR ESRD PPS"), 89 Fed. Reg. 55,760, 55,761 (proposed July 5, 2024) (to be codified at 42 C.F.R. §§ 410, 413, 494, and 512).

In the 1980s, Congress established a "composite rate system" to reimburse dialysis services.  Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, ch.3, sec. 2145(a)(7),

§ 1881(b), 95 Stat. 357 (codified as amended at 42 U.S.C. § 1395rr).  Dialysis facilities received a set rate of reimbursement under Part B that was prospectively determined based on the number of dialysis treatments they administer, referred to as a "prospective payment."  *Id.*; Compl. ¶ 64. That rate covered dialysis and associated supplies and services.  U.S. Gov't Accountability Off., (GAO-07-77), END-STAGE RENAL DISEASE 1 (2006), gao.gov/assets/gao-07-77.pdf ("GAO 2006 Rep.");  Compl. ¶ 64.  The goal of the prospective payment was to "encourage the more efficient delivery of dialysis services," 42 U.S.C. § 1395rr(b)(7), because facilities could retain any amount of the payment that exceeded their costs, GAO 2006 Rep. 22; Notice of Proposed Rule regarding Medicare Programs; End-Stage Renal Disease Prospective Payment System ("2009 NPR ESRD PPS"), 74 Fed. Reg. 49,922, 49,924 (proposed Sep. 29, 2009) (to be codified at 42 C.F.R. § 413).  Other items, making up about 40% of total spending for outpatient dialysis, were reimbursed separately on a fee-for-service basis either under Part B (e.g., for injectable ESRD drugs and certain laboratory tests) or under Part D (e.g., for oral ESRD drugs).  U.S. Gov't Accountability Off., (GAO-11-36), END-STAGE RENAL DISEASE 8 (2011), gao.gov/assets/gao-11-365.pdf; Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System ("2010 Final Rule ESRD PPS"), 75 Fed. Reg. 49,030, 49,032 (Aug. 12, 2010) (codified at 42 C.F.R. § 413.171); Compl. ¶ 64.

Congress became concerned about potential overreliance on services reimbursed via fee-for-service outside of the prospective payment.  GAO 2006 Rep. at 2-3.  One example that garnered attention was Epogen, an erythropoiesis stimulating agent ("ESA") that treats anemia caused by ESRD.  *Id.*  Dialysis facilities had an incentive to rely heavily on such drugs because they were separately reimbursable and thus did not come out of the lump sum payment that they could otherwise retain.  *See id.*  In response, Congress moved toward a single, bundled rate for

all ESRD services, asking CMS to report on the design of such a system in 2003.  GAO 2006 Rep. at 3; *see* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, sec. 623, 117 Stat. 2066, 2313, 2315-17.  The new regime, still applicable today, went into effect in 2008.  Medicare Improvements for Patients and Providers Act of 2008 ("MIPPA"), Pub. L. 110-275, sec. 153, § 1881(b)(12)(G), 122 Stat. 2553 (codified as amended at 42 U.S.C. § 1395rr(b)(14)).  MIPPA instructs the Secretary of HHS to "implement a payment system under which a single payment is made under this subchapter to a provider of services or a renal dialysis facility for renal dialysis services (as defined in subparagraph (B)) in lieu of any other payment."  42 U.S.C. § 1395rr(14)(A)(i).  The referenced "subparagraph (B)," in turn, states:

> For purposes of this paragraph, the term "renal dialysis services" includes—
>
> (i) items and services included in the composite rate for renal dialysis services as of December 31, 2010;
> (ii) erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;
> (iii) other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and
> (iv) diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease.
>
> Such term does not include vaccines.

42 U.S.C. § 1395rr(b)(14)(B) ("definitional subparagraph (B)").

ESRD drugs that were previously reimbursed separately as fee-for-service became reimbursable under MIPPA's expanded Part B bundle.  The goal was to remove the incentive for dialysis facilities to rely more heavily on drugs reimbursed on a fee-for-service basis, as opposed to ones included in the bundle, and to motivate these facilities to use whatever combination of treatments would be most effective and economical.

5

MIPPA also limited judicial review of the bundled system by expressly stating, in subparagraph (G), in pertinent part, that:

> There shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise of the determination of payment amounts under subparagraph (A), the establishment of an appropriate unit of payment under subparagraph (C), [or] the identification of renal dialysis services included in the bundled payment . . . .

*Id.* § 1395rr(b)(14)(G) ("preclusion subparagraph (G)").

Plaintiffs allege that CMS's actions were not consistent with the definition of "renal dialysis services" in subparagraph (B) with respect to drugs available only in an oral form. Defendants respond that review of that question is precluded by subparagraph (G).

### C.    Relevant Regulations

To implement MIPPA's bundled payment system, CMS elaborated on the statutory definition of "renal dialysis services" by regulation, providing, in pertinent part:

> Renal dialysis services. Effective January 1, 2011, the following items and services are considered "renal dialysis services," and paid under the ESRD prospective payment system under section 1881(b)(14) of the Act:
>
> (1) Items and services included in the composite rate for renal dialysis services as of December 31, 2010;
> (2) Erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of ESRD;
> (3) Other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was (prior to January 1, 2011) made separately under Title XVIII of the Act (including drugs and biologicals with only an oral form),
> (4) Diagnostic laboratory tests and other items and services not described in paragraph (1) of this definition that are furnished to individuals for the treatment of ESRD.
> (5) Renal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis.

42 C.F.R. § 413.171.

CMS explained that the bundle is interpreted to include, under subpart (iii) of definitional subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B)(iii), "all drugs and biologicals that were

separately billable prior to the implementation of MIPPA" whether under Part B or Part D.  2009 NPR ESRD PPS, 74 Fed. Reg. at 49,928.  While recognizing that "the last part of clause (iii) with respect to the phrase 'and any oral equivalent form of such drug or biological' could be interpreted to limit the scope of the drugs and biologicals included in the bundle to only oral versions of injectables (or other non-oral routes of administration)," CMS rejected that reading as "unduly constrained" and inconsistent with "one of the very purposes of the new system—the inclusion of all renal dialysis services furnished to ESRD patients in a comprehensive payment bundle." *Id.*  CMS further noted that "the inclusion of [oral-only] drugs and biologicals is supportable under [subparagraph B's] clause (iv)," which was comprehensive enough to include all drugs in the payment bundle.  *Id.*

CMS additionally analyzed which of the separately billable drugs were sufficiently related to ESRD to qualify for the bundle.  *See* 2010 Final Rule ESRD PPS*, 75 Fed. Reg. at 49,047.  This analysis categorized "drugs and biologicals on the basis of drug action" and then assessed whether they would be expected to be used for "ESRD-related conditions in a dialysis unit."  *Id.*  Based on this analysis, CMS determined that drugs in the "bone and mineral metabolism" category—defined as "drugs used to prevent/treat bone disease secondary to dialysis"—are part of the ESRD bundle.  *Id.* at 49,050.  The functional category designation process is reflected in the regulation 42 C.F.R. § 413.234(b)(1).

To ease the transition of drugs into the bundled payment, CMS made certain new additions eligible for a "transitional drug add-on payment adjustment" ("TDAPA").  *Id.* § 413.234(c).  TDAPA was adopted pursuant to Congress's authorization for adjustments to the bundle payment under certain circumstances.  *See* 42 U.S.C. § 1395rr(b)(14)(D).  Under TDAPA, a facility could receive an add-on to its base rate for new drugs for an initial two years

(and then up to three more).  42 C.F.R. §§ 413.234(c)(1), (3).  TDAPA intended to "help ESRD facilities to incorporate new drug and biological products," "make appropriate changes in their businesses to adopt such products," and "promote competition among drugs and biological products."  Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System, 84 Fed. Reg. 60,648, 60,654 (Nov. 8, 2019) (codified at 42 C.F.R. § 413.234(c)).

Despite the adoption of CMS's regulation under 42 C.F.R. § 413.171 in 2010, its definition of "renal dialysis services" as incorporating oral-only drugs has not yet gone into effect.  CMS first delayed the adoption of this definition until 2014 in order to "provide sufficient time for ESRD facilities to establish a pharmacy" or "establish arrangements with pharmacies to provide oral-only drugs to their patients" under Part B.  2010 Final Rule ESRD PPS, 75 Fed. Reg. at 49,043.  Congress then thrice delayed implementation of the oral-only drug provision: first until 2016, American Taxpayer Relief Act of 2012, Pub. L. 112-240, sec. 632(b),§ 1881(b), 126 Stat. 2313, 2354 (2013); then until 2024, Protecting Access to Medicare Act of 2014, Pub. L. 113-93, sec. 217(a), 128 Stat. 1040, 1061; and finally, until 2025, Tax Increase Prevention Act of 2014, Pub. L. 113-295, sec. 204, 128 Stat. 4010, 4065.

In doing so, Congress explicitly acknowledged the inclusion of "oral-only ESRD-related drugs in the bundle," Pub L. 112-240, sec. 632(b), 126 Stat. at 2354, and, in fact, ordered HHS to "monitor the bone and mineral metabolism of individuals with end stage renal disease" "with respect to the implementation of oral-only ESRD-related drugs . . . under subsection (b)(14)," *id.* At the same time, Congress did not amend MIPPA to codify CMS's inclusion of oral-only drugs in the bundled prospective payment system, though one bill proposing to do so was introduced. *See* H.R. 3200, 11th Cong. § 1232 (2009).

### D.    Procedural History

Plaintiff Ardelyx's drug, XPHOZAH, like other oral-only drugs, is currently reimbursed through Medicare Part D.  Compl. ¶ 170.  In July 2024, however, CMS issued a letter-decision determining that XPHOZAH is a renal-dialysis service that will be included in the bundled Part B payment as of January 1, 2025, pursuant to 42 C.F.R. § 413.171.  Compl., Ex. 1, XPHOZAH Letter-Decision at 1, ECF No. 1-1.  The letter states, in pertinent part:

> CMS has identified XPHOZAH™ to be a renal dialysis service under 42 CFR 413.171, because it is furnished to individuals to treat a condition associated with ESRD and is essential to the delivery of maintenance dialysis. . . . CMS has also determined that XPHOZAH meets the current regulatory definition of an oral-only drug at section 413.234(a), with no injectable equivalent or non-oral form of administration, and thus is not included in the ESRD PPS bundled payment until January 1, 2025.

*Id.*

Plaintiffs believe inclusion of oral-only drugs in the bundle will discourage the use of innovative and effective, yet expensive, treatments like XPHOZAH, thereby worsening patient outcomes.  Compl. ¶¶ 18, 174, 183.  The bundle, they contend, is severely underfunded, with many facilities experiencing 0% or negative margins for Medicare patients, which leaves them unable fully to meet patient needs.  *Id.* ¶¶ 9, 18, 172-75.  Plaintiffs point to the example of the drug Parsabiv, which treats hyperparathyroidism in ERSD patients and was added to the bundle in 2017.  *Id.* ¶¶ 176-77.  After the temporary TDAPA period ended in 2020, the use of Parsabiv dropped from around 10% of dialysis patients to 1% in three years as patients were switched to an older, less effective drug.  *Id.*  Among the patients who stopped taking Parsabiv, hyperparathyroidism rates increased from 28 to 43%.  *Id.* ¶ 180.  In the same way, plaintiffs predict that once XPHOZAH is part of the bundle, the drug will not be as readily prescribed to hyperphosphatemia patients and their health will deteriorate.  Racial minorities and low-income

people in rural areas will be most affected, as they disproportionately suffer from ESRD and are often being treated at more resource-constrained facilities.  *Id*. ¶¶ 56, 184-89.[1]

Additionally, plaintiffs allege that pharmaceutical companies are harmed by incorporation of drugs into the bundle because they cannot expect to reap sufficient profits after the initial TDAPA period, resulting in a reduced incentive to innovate.  *Id.* ¶ 181 (providing the example of a company halting clinical trials for an oral drug treating pruritis, itchiness of the skin, in ESRD patients after the injectable form was moved into the bundle).[2]

Plaintiffs now challenge defendants' July 2024 letter-decision classifying XPHOZAH as a renal dialysis service and the regulation, 42 C.F.R. § 413.171, which includes oral-only drugs in the bundled payment system.  *Id.* ¶¶ 199, 208, 215.  Plaintiffs argue (1) that oral-only drugs, including XPHOZAH, are not "renal dialysis services" under the statutory definition codified at 42 U.S.C. § 1395rr(b)(14)(B), *id.* ¶¶ 198, 214-15; (2) that XPHOZAH is not a "renal dialysis service" because this drug is not "furnished for the treatment of ESRD," as required by 42 U.S.C. § 1395rr(b)(14)(B), *id.* ¶¶ 198-99; and (3) that XPHOZAH is not a "renal dialysis service" under CMS's own regulatory definition, codified at 42 C.F.R. § 413.171(5), *id.* ¶¶ 205-08.  According to plaintiffs, CMS's actions lack statutory authority and are arbitrary and capricious and an abuse of discretion, in violation of the APA.  *See id.* at 46-48.  As relief, plaintiffs seek an order

---

[1]    Incorporating XPHOZAH into the bundle would, on the other hand, expand access to those who do not have Medicare Part D and thus may currently struggle to get XPHOZAH reimbursed as a fee-for-service.  2024 NPR ESRD PPS, 89 Fed. Reg. at 55,797 ("We anticipate that incorporation of oral-only drugs into the [bundle] will increase access to those drugs for beneficiaries."); *id.* at 55,761; Defs.' Opp'n Mot. Prelim. Inj. or Expedited Summ. J. ("Defs.' Opp'n PI") at 40, ECF No. 16.

[2]    Ardelyx did not apply for TDAPA funding, despite CMS's invitation for the company to do so. XPHOZAH Letter-Decision at 2.  Plaintiffs express the position that such funding would not have mitigated the harm to Ardelyx and patients.  Pls.' Reply Supp. Mot. PI or Expedited Summ. J. ("Pls.' Reply PI") at 22-23, ECF No. 20.

declaring the regulation and XPHOZAH Letter-Decision unlawful, vacating the regulation and Letter-Decision, and enjoining their applications. *Id.* at 49-50.

Defendants move to dismiss, under Federal Rule of Civil Procedure 12(b)(1), on the ground that subject matter jurisdiction over this case is lacking, pursuant to 42 U.S.C. § 1395rr(b)(14)(G). Defs.' Mem. Supp. Mot. Dismiss ("Defs'. Mem. MTD"), ECF No. 11-1. Plaintiffs oppose dismissal, contending that preclusion subparagraph (G) does not apply here, Pls.' Opp'n Mot. Dismiss ("Pls.' Opp'n MTD"), ECF No. 17, and separately seek a preliminary injunction, or in the alternative, expedited summary judgment, Pls.' Mem. PI, ECF No. 14. Both motions are now ripe for resolution.

## II.   LEGAL STANDARD

A federal district court has an "obligation" to avoid "exceed[ing] the scope of [its] jurisdiction." *Broner ex rel. Am. Studies Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)). A court of "limited subject-matter jurisdiction" has "the power to decide only those cases over which Congress grants jurisdiction," *id.* (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)), and therefore "must consider the barriers to federal adjudication the Congress has erected," *id*. A court lacking subject matter jurisdiction must dismiss the case. *See Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1131-32 (D.C. Cir. 2017).

In determining whether to grant a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a district court "may consider materials outside the pleadings" but "must still 'accept all of the factual allegations in [the] complaint as true,'" *Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (alterations in original) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)), and must construe the complaint

liberally, *Zukerman v. USPS*, 961 F.3d 431, 441 (D.C. Cir. 2020). Plaintiffs bear the burden of establishing jurisdiction. *Knapp Med. Ctr.*, 875 F.3d at 1128.

## III.    DISCUSSION

The threshold question to resolve is posed in defendants' motion to dismiss, namely whether preclusion subparagraph (G), 42 U.S.C. § 1395rr(b)(14)(G), deprives this Court of authority to exercise jurisdiction over plaintiffs' claims. As explained in more detail below, despite the presumption of judicial review of agency action, subparagraph (G) precludes judicial review of both the regulatory determination, 42 C.F.R. § 413.171(3), that oral-only renal dialysis drugs for which payment was made separately prior to January 2011 are included in the bundle, and the decision to include XPHOZAH in the bundle, per the XPHOZAH Letter-Decision, because these decisions are "identification[s] of renal dialysis services," 42 U.S.C. § 1395rr(b)(14)(G), that fall within the statutory definitions provided in definitional subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B). Resultantly, defendants' motion is granted, the case is dismissed, and plaintiffs' motion for preliminary injunctive relief or expedited summary judgment is denied as moot.

### A.    Statutory Preclusion

"There is a 'strong presumption that Congress intends judicial review of administrative action,'" *Amgen, Inc. v. Smith*, 357 F.3d 103, 111-12 (D.C. Cir. 2004) (quoting *Bowen v. Mich. Aca. of Fam. Physicians*, 476 U.S. 667, 670 (1986)), especially "of agency action taken in excess of delegated authority," *id.* That presumption can "be overcome by a 'clear and convincing evidence' that Congress intended to preclude the suit." *Id.* at 111 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967)).

1.    *Preclusion Subparagraph (G)*

Here, Congress explicitly directed, in subparagraph (G), "no judicial review of . . . the identification of renal dialysis services." 42 U.S.C. § 1395rr(b)(14)(G). This stripping of judicial review jurisdiction could not be clearer. *See Amgen*, 357 F.3d at 111. Plaintiffs dispute, however, whether subparagraph (G) applies to the challenged agency actions.

To start, plaintiffs assert that subparagraph (G) precludes judicial review of only CMS's identification "of a particular drug or other service" and does not reach more general regulations, which are "interpretations" or "constructions" rather than specific "identification[s]." Pls.' Opp'n MTD at 2, 17. In their view, the challenge to 42 C.F.R. § 413.171 is not precluded as a matter of the plain language of the statute. Defendants counter that "identification" can refer to denotation of categories and to particular items in categories, § 413.171(3), such that including oral-only drugs in renal dialysis services qualifies as an "identification of renal dialysis services" under preclusion subparagraph (G). Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply MTD") at 11, ECF No. 19. In their view, both the challenges to the XPHOZAH Letter-Decision and the regulation, 42 C.F.R. § 413.171(3), fall within this scope.

As an initial matter, the word "identification" does not have the narrow meaning plaintiffs propose. *See, e.g.*, *Identify*, CAMBRIDGE ENGLISH DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/identify ("to recognize . . . something and say or prove . . . what that . . . thing is") (last visited Nov. 6, 2024). Thus, the use of this word in, and the plain text of, subparagraph (G) is sufficiently broad to reach both categorical determinations made via regulation and specific determinations of individual items. Put another way, the preclusion subparagraph (G) does not specify that only identification of "particular" or "specific" drugs is precluded from judicial review. That does not, however, end the inquiry.

### 2.    *Application of Preclusion Subparagraph (G) Is Limited to Authorized Agency Actions*

Preclusion of review of any type of agency action "extends no further than the Secretary's statutory authority to" take the action. *Amgen*, 357 F.3d at 112.  To "determine whether [a] judicial-review bar applies in [any] case," the court "must decide whether the challenged agency action counts as" the specific action for which the bar precludes review.  *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020).  "Otherwise, agencies could characterize reviewable or unauthorized action as falling within the scope of no-review provisions whose application to such action Congress did not intend."  *Amgen*, 357 F.3d at 113. That inquiry may merge with the merits in cases where "the challenge to the [agency's] action raises the question of the [agency's statutory] authority."  *Id.* at 113-14 (quoting *COMSAT Corp. v. FCC*, 114 F.3d 223, 226-27 (D.C. Cir.1997)).  In such cases, the court may "skip to the merits question" of compliance with the statute, *American Hospital Association*, 964 F.3d at 1238-39, while stopping short of "inquir[ing] whether a challenged agency decision is arbitrary, capricious, or procedurally defective" unless sure of its subject matter jurisdiction, *Knapp Med. Ctr.*, 875 F.3d at 1128 (quoting *Amgen*, 357 F.3d at 113).

Judicial review here therefore rests on the answer to the question whether the challenged regulation, 42 C.F.R. § 413.171(3), and the challenged XPHOZAH Letter-Decision, by including certain oral-only drugs and XPHOZAH in the bundle, constitute "identification[s] of renal dialysis services included in the bundled payment," under preclusion subparagraph (G).  *See Am. Hosp. Ass'n*, 964 F.3d at 1238.  That answer turns on whether certain oral-only drugs—namely those "for which payment was (prior to January 1, 2011) made separately," 42 C.F.R. § 413.171(3)—and XPHOZAH qualify as "renal dialysis services," as defined by the statutory definitional subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B).  If the certain oral-only drugs as

14

defined in the challenged regulation and XPHOZAH do so qualify, then CMS was acting within its statutory authority in classifying them as such.  The jurisdictional question here thus merges with one of the questions on the merits.  *See id.*; *Amgen*, 357 F.3d at 113-14; *see also COMSAT*, 114 F.3d at 226-27 (determining whether jurisdiction could be exercised by analyzing whether the challenged fee change was properly imposed pursuant to the paragraph for which such fee changes were precluded from review); *cf. E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 124-25 (1977) (determining whether jurisdiction exists by analyzing whether the challenged rule was properly promulgated pursuant to the part of the statute that authorized judicial review).

Defendants dispute any need to consult definitional subparagraph (B), instead reasoning by common sense that the letter determining XPHOZAH is included in the bundle is surely an "identification of a renal dialyses service[] included in the bundle[]."  Defs.' Mem. MTD at 14-15.  Whether such an identification is properly one of a "renal dialysis service," however, cannot turn solely on CMS's say-so.  As plaintiffs correctly complain, under defendants' reading, any determination *purporting* to be an identification of a renal dialysis service would be precluded from review.  Pls.' Opp'n MTD at 20-22.  The D.C. Circuit in *COMSAT* described as "preposterous" such a position—that "the no-review provision . . . could be read to shield from review any [agency] action purportedly taken pursuant to" that provision."  114 F.3d at 227.  CMS could then identify anything, even "all drugs," as renal dialysis services without judicial interference.  Pls.' Opp'n MTD at 20-21.[3]  Congress's definition of "renal dialysis services" in subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B), would do no work in constraining the agency.

---

[3]    Defendants respond to plaintiffs' "extreme example" by arguing that CMS would not adopt such a rule because the agency takes a "data-driven" approach to designate "functional categor[ies]" for ESRD drugs and noting that Congress has acknowledged after the fact CMS's inclusion of oral-only drugs.  Defs.' Reply MTD at 16-17. Neither one of these observations, however, mean that when drafting the statute *ex ante* Congress would have wanted to give the agency free rein to label any drug a "renal dialysis service."

The statutory scheme does not countenance such a vast conferral of unreviewable discretion.  Congress expressly limited the agency's authority to "implement a payment system under which a single payment is made under this chapter to a provider of services or a renal dialysis facility for *renal dialysis services (as defined in subparagraph (B))*."  42 U.S.C. § 1395rr(b)(14)(A)(i) (emphasis added).  As a result, CMS can designate for a bundled payment only items that fall within Congress's definition of "renal dialysis services" in subparagraph (B). Whether the challenged regulation and Letter-Decision here are "identification[s] of renal-dialysis services" in the preclusion subparagraph (G) thus turns on how *Congress*, not the *agency*, defines "renal dialysis services" in definitional subparagraph (B).

The D.C. Circuit's opinions in *Amgen* and *American Hospital Association* similarly require that the preclusion provision be tethered to the part of the statute defining the scope of agency authority.  "In light of the presumption that Congress rarely intends to foreclose review of action exceeding agency authority," the D.C. Circuit in *Amgen* construed a different section of the Medicare Act, 42 U.S.C. § 1395*l*(t)(12)(A)—which precluded review of "other adjustments"—to "prevent review only of the 'other adjustments' that the Medicare Act authorize[d] the Secretary to make" in neighboring § 1395*l*(t)(2)(E).  *Amgen*, 357 F.3d at 112-13. Likewise, in *American Hospital Association*, the D.C. Circuit again examined the same preclusion provision at issue in *Amgen* and determined whether the part of this provision precluding review of "establishment of methods described in paragraph 2(F)," applied based on whether the challenged action complied with paragraph 2(F).  *See* 964 F.3d at 1238.  In both cases, HHS's claim that the challenged actions were, practically speaking, "other adjustments" or the "establishment of methods," within the meaning of the preclusion provision, was insufficient

for that provision to apply without also showing that the actions fell within the applicable definitional section of the statute.

In an effort to distinguish *Amgen* and *American Hospital Association*, defendants point out that the preclusion provision at issue in both those cases explicitly referenced the definitional clause constraining the scope of agency authority, Defs.' Reply MTD at 9-10, as follows:

> There shall be no administrative or judicial review . . . of—
> (A)  the development of the [prospective payment] classification system *under paragraph (2)*, including the establishment of groups and relative payment weights for covered OPD services, of wage adjustment factors, other adjustments, and methods described *in paragraph (2)(F)*.

42 U.S.C. § 1395*l*(t)(12) (emphasis added).  *Amgen* involved "other adjustments," 357 F.3d at 111-12, and *American Hospital Association* involved "methods described in paragraph (2)(F)," 964 F.3d at 1237-38.  The preclusion subparagraph (A) explicitly references paragraph 2, which contained the definitional clauses referenced in *Amgen* (i.e., 42 U.S.C. § 1395*l*(t)(2)(E)) and in *American Hospital Association* (i.e., 42 U.S.C. § 1395*l*(t)(2)(F)).  Defendants contrast that with preclusion subparagraph (G) here, which does not explicitly reference definitional subparagraph (B) when referring to "identification of renal dialysis services," despite explicitly referencing other subparagraphs for the other issues precluded for review.  *See, e.g.*, *id.* § 1395rr(b)(14)(G) ("the establishment of an appropriate unit of payment under subparagraph (C)").

Although true that the preclusion provision in *American Hospital* and *Amgen*, § 1395*l*(t)(12)(A), explicitly references the definitional subparagraph, § 1395*l*(t)(2)(F), at issue in *American Hospital*, *Amgen* is more similar to this case than defendants admit.  The definitional subparagraph at issue in *Amgen*, § 1395*l*(t)(2)(E), defining "other adjustments" is absent from the preclusion subparagraph, § 1395*l*(t)(12)(A).  That preclusion subparagraph does reference paragraph (2), but does so only generally at the start of the list, preceding the "including" phrase that incorporates "other adjustments."  *Id.* § 1395*l*(t)(12)(A).  The preclusion subparagraph lacks

any explicit link between "other adjustments" and the specific subsection of paragraph (2) defining it, despite that more precise link existing between § 1395*l*(t)(2)(F) and "methods." *Id.* The Court in *Amgen* nonetheless held that the subsection of the definitional subparagraph, § 1395*l*(t)(2)(E), was implicitly linked to the relevant provision of the preclusion subparagraph and analyzed whether HHS's action was an "other adjustment" under § 1395*l*(t)(2)(E) to determine if review was precluded. *See* 357 F.3d at 112-13. The same conclusion is appropriate here.

Just as in *Amgen*, the definitional subparagraph (B) is absent from the preclusion subparagraph (G), but the link is sufficiently implied. Subparagraph (B) makes clear that the definition of "renal dialysis services" applies to all uses in paragraph (14) of § 1395rr(b), *see id.* § 1395rr(b)(14)(B) ("For purposes of this paragraph, the term 'renal dialysis services' includes— . . . "), obviating a need for an additional express link in preclusion subparagraph (G) in the same paragraph (14). In any case, it would be reductive to conclude from subparagraph (G)'s absence of three words, "under subparagraph (B)," that Congress intended for its definition of "renal dialysis services" to be unenforceable, especially in light of the presumption of judicial review.[4]

Defendants further argue that evaluation of definitional subparagraph (B) nullifies the preclusion provision by requiring resolution of the merits question of the agency's compliance with the statutory definition even if the ultimate conclusion is that judicial review is precluded.

---

[4]    Plaintiffs nowhere request *ultra vires* review—the "Hail Mary pass" that "permits, in certain limited circumstances, judicial review of agency action for alleged statutory violations even when a statute precludes review." *Am. Hosp. Ass'n*, 964 F.3d at 1238 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d at 445, 449 (D.C. Cir. 2009). Rather, they insist preclusion subparagraph (G) does not preclude review. Pls.' Opp'n MTD at 22 n.7. Regardless, *ultra vires* review is not available where the source for statutory preclusion is express, as it is here. *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (describing the narrow circumstances allowing ultra vires review, which has three prerequisites, including that "the statutory preclusion of review is implied rather than express" (quoting *Nyunt*, 589 F.3d at 449)). Consequently, *ultra vires* review would not be available as a backstop in case CMS enacted a regulation that clearly flouted Congress's definition of "renal dialysis services" in subparagraph (B) and is yet another reason to reject defendants' request to interpret preclusion subparagraph (G) without any reference to definitional subparagraph (B).

Defs.' Reply MTD at 5.  The short-cut urged by defendants, however, amounts simply to accepting the agency's say-so as to the scope of preclusion and, for this reason, the D.C. Circuit has endorsed the alternative approach set out in *American Hospital* and *Amgen*, to confirm that the agency's action is statutorily authorized.  Contrary to defendants' argument, doing so does not deprive the preclusion provision of all force.  The preclusion provision still precludes all forms of judicial review except that of the agency's statutory authority.  *See Amgen*, 357 F.3d at 113-14 (noting that the "inquir[y] whether a challenged agency decision is arbitrary, capricious, or procedurally defective" is barred by a no-review provision).  If the court finds that the agency complied with the statute, the preclusion provision applies to bar the exercise of jurisdiction, and the case must be dismissed without further judicial review of the claims asserted.  *See id.*  Conversely, if "the court 'find[s] that [the agency] has acted outside the scope of its statutory mandate,'" jurisdiction may be exercised to hold unlawful and set aside the challenged actions on that ground alone.  *Am. Hosp. Ass'n*, 964 F.3d at 1238 (alterations in original) (quoting *COMSAT*, 114 F.3d at 227); *Amgen*, 357 F.3d at 114.

### 3.    *Scope of Plaintiffs' Challenge*

Finally, defendants argue that plaintiffs' complaint does not actually challenge the regulation, 42 C.F.R. § 413.171(3), and contend that plaintiffs' challenge to CMS's identification and classification of XPHOZAH—which they view as clearly barred by preclusion subparagraph (G)—cannot be refashioned into a challenge to a regulation to "evade a jurisdictional bar." Defs.' Reply MTD at 12-13 (citing cases including *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 508 (D.C. Cir. 2019) and *Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*, 830 F.3d 515, 519 (D.C. Cir. 2016)).  This argument also fails.

Plaintiffs' complaint sufficiently alleges a challenge to the regulation itself, apart from the XPHOZAH Letter-Decision.  In reviewing a motion to dismiss for lack of jurisdiction under

Rule 12(b)(1), the Court must "construe [the complaint] liberally, granting [plaintiff] 'the benefit of all inferences that can be derived from the facts alleged." *Zukerman*, 961 F.3d at 441 (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).  Although Ardelyx's participation in this lawsuit may largely be motivated by the July 2024 XPHOZAH Letter-Decision, the complaint contains ample allegations as to why the challenged regulation, 42 C.F.R. § 413.171(3), is inconsistent with the statute, *see, e.g.,* Compl. ¶¶ 87-108.  The Third Claim for Relief makes this challenge directly, *id*. ¶¶ 212-15, and the Prayer for Relief requests an order "vacating and setting aside Defendants' determinations, *see* 42 C.F.R. § 413.171(3), that oral-only drugs are a 'renal dialysis service' subject to inclusion in the ESRD PPS bundle," *id.* at 49-50.  In construing the Complaint liberally, plaintiffs' use of the plural form "determinations" cannot be taken to limit its challenge to only decisions made reliant on the regulation and not the regulation itself, as defendants assert.  *See* Defs.' Reply MTD at 3-4.  Consequently, *both* the XPHOZAH Letter-Decision and the regulation designating certain oral-only drugs as "renal dialysis services" are evaluated to determine whether these agency actions are covered by the statutory authority in definitional subparagraph (B) and thus fall within the jurisdictional bar provided in preclusion subparagraph (G).

### B.    Definitional Subparagraph (B)

Having determined that application of the preclusion subparagraph (G) depends on the scope of the agency's authority under definitional subparagraph (B), the first step in this analysis is to focus on the latter provision's description of "renal dialysis services" and then to assess whether the two challenged agency actions fall within the scope of authorized activity.  This analysis does not defer to the agency's interpretation of any of the statute's provisions, even if ambiguity were found, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024), but

rather determines the "best reading" of the statute "after applying all relevant interpretive tools" and considering, "with due respect[,] . . . the views of the Executive Branch." *Id.* at 2266-67.

Plaintiffs raise two principal challenges to CMS's exercise of statutory authority: (1) that oral-only drugs are excluded by definitional subparagraph (B), Pls.' Mem. PI at 20-21 (citing 42 U.S.C. § 1395rr(b)(14)(B)); and (2) that XPHOZAH, aside from being an oral-only drug, should be excluded because this drug is not "furnished . . . for the treatment of end stage renal disease," 42 U.S.C. § 1395rr(b)(14)(B)(iii). Pls.' Mem. PI at 30-31. These challenges are addressed *seriatim*, and both fail.

### 1. *Subparagraph B's Inclusion of Certain Oral-only Drugs*

The proper starting point for statutory interpretation is "careful consideration of the text." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 667 (2021). That entails both examination of "the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). "[I]f possible," courts "construe a statute so as to give effect to every clause and word." *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022).

The text and structure of definitional subparagraph (B) make clear that this provision does not purport to provide an exhaustive universe or offer a comprehensive set of "renal dialysis services." *See* 42 U.S.C. § 1395rr(b)(14)(B). This provision has four subparts describing four separate categories of "items and services," "erythropoiesis stimulating agents," "other drugs and biologicals," and "diagnostic laboratory tests and other items and services" that are covered, and all introduced with the term "includes." *Id.* ("For purposes of this paragraph, the term 'renal dialysis services' *includes*—"). The word "includes" indicates that the enumerated categories are not exhaustive and others are not foreclosed. *Id.* Congress could have written "means" or "constitutes" but chose "includes." *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095,

1114-15 (D.C. Cir. 2009) (distinguishing between "means" and "includes" in statutory definitions). Subparagraph (B) then states explicitly what is *excluded*, concluding with the line: "Such term does not include vaccines." 42 U.S.C. § 1395rr(b)(14)(B). No oral-only drugs are excluded.

Moreover, "renal dialysis services" was plainly intended to cover drugs designed to be taken orally by ESRD patients since two subparts of definitional subparagraph (B) expressly cover "any oral form of such [erythropoiesis stimulating or ES] agents," *id*. § 1395rr(b)(14)(B)(ii), and "any oral equivalent form of such drug or biological," *id*. § 1395rr(b)(14)(B)(iii). Subparagraph (B)(iii) most directly incorporates into "renal dialysis services" oral-only drugs by covering "drugs and biologicals," other than ESAs, that were previously reimbursed separately from the bundle. *Id*. The simplest interpretation of the plain language indicates that oral-only drugs currently separately reimbursed are included in the definition of "renal dialysis services."

Plaintiffs insist that definitional subparagraph (B) only includes those oral drugs with "equivalent" non-oral versions. Pls.' Mem. PI at 23. As support for this construction, plaintiffs point to the language, in subpart (B)(ii), referring to "any oral form," *id*. § 1395rr(b)(14)(B)(ii), and, in subpart (B)(iii), referring to "oral equivalent form," as suggesting a requirement that the only oral drugs to qualify under subparagraph (B) are those with alternative non-oral forms, reasoning that if Congress had intended to include all oral drugs, the reference to oral *form* or *equivalent* would not have been necessary, Pls.' Mem. PI at 25; Pls.' Opp'n MTD at 31, and indeed would be superfluous, Pls.' Reply Supp. Mot. PI or Expedited Summ. J. ("Pls.' Reply PI") at 9, ECF No. 20.

The flaw in plaintiffs' reasoning is that their analysis ignores the first clause of subpart (B)(iii), which refers to "drugs and biologicals . . . for which payment was (before the application of this paragraph) made separately under this subchapter . . . ." *Id.* § 1395rr(b)(14)(B)(iii).[5]  That clause serves to move drugs in all forms that exist under a fee-for-service reimbursement system prior to "application of this paragraph" into the bundle system.  The regulation implementing subpart (B)(iii), 42 C.F.R. § 413.171, does not go into effect with respect to oral-only drugs until January 1, 2025, as all parties agree, so "this paragraph" has not yet been applied to oral-only drugs.[6]  Oral-only drugs that currently exist and are separately reimbursed may thus be moved into the bundle by this first clause.

The first clause of subpart (B)(iii) says nothing, however, about drugs that only come into existence *after* "application of this paragraph," such that "payment was" never "made separately under this subchapter."  That is where the second part of (B)(iii) does work.  The parties agree the second clause of (B)(iii) contemplates that "renal dialysis services" also includes new, subsequently-developed oral versions of drugs, which were extant in a different form at the time (B)(iii) was applied and were moved into the bundle.  Defs.' Opp'n Mot. Prelim. Inj. or Expedited Summ. J. ("Defs.' Opp'n PI") at 34, ECF No. 16; Pls.' Reply PI at 10 n.3.  Without the second clause, as defendants point out, "an oral version of a drug paid by Medicare in its injectable or intravenous version might arguably be excluded from the bundle, if the oral version

---

[5]    42 U.S.C. § 1395rr(b)(14)(B)(iii) reads, in full, as follows:

> (iii) other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological;

[6]    Both parties agree that the paragraph (14) will not be applied to oral-only drugs until January 1, 2025.  Pls.' Mem. PI at 14; Defs.' Opp'n PI at 33.  Defendants further explain that because "Congress has delayed implementation of the Secretary's oral-only drugs policy until January 1, 2025, . . . 'this paragraph' has not yet been applied to oral-only drugs," Defs.' Opp'n PI at 33, and plaintiffs do not specifically contest that interpretation of "before the application of this paragraph," Pls.' Reply PI at 9-10.

becomes available after 'the application of this paragraph.'"  Defs.' Opp'n PI at 34.  Such an oral

version would not previously have been paid for separately, so it would not be covered by the

first clause of (B)(iii).  The text and structure of subpart (B)(iii) thus support the inclusion of

oral-only drugs paid for "separately under this subchapter" prior to subparagraph (B) being

applied, i.e., on January 1, 2025.[7]

The challenged regulation, 42 C.F.R. § 413.171, as pertaining to oral-only drugs is

narrower in scope than this reading of subparagraph (B) and is therefore statutorily authorized.

Section 413.171 defines "renal dialysis services" to be "paid under the ESRD prospective

payment system," or bundle, to include "drugs with only an oral form" for which "payment was

(*prior to January 1, 2011*) made separately" under the statute.  42 C.F.R. § 413.171(3) (emphasis

added).  Any oral-only drug for which payment was made separately prior to January 2011, per

§ 413.171(3), is necessarily one for which payment was made separately "before application of"

the statute's subparagraph (B), (i.e., before January 1, 2025), per 42 U.S.C.

§ 1395rr(b)(14)(B)(iii).  In this way, the regulation falls within the reach of definitional

subparagraph (B).

Plaintiffs misconstrue the scope of the challenged regulation, suggesting that CMS

determined that "any new oral-only drug is a 'renal dialysis service.'"  Compl.  ¶ 215; *see also*

Pls.' Mem. PI at 2 (describing the regulation as "add[ing] oral-only drugs to a bundled payment

system").  This reading ignores the regulation's temporal limit.  42 C.F.R. § 413.171(3)

---

[7]    In its notice of proposed rulemaking, CMS posited that (B)(iv) could also authorize inclusion of oral-only drugs in the bundle.  2009 NPR ESRD PPS, 74 Fed. Reg. at 49,928.  Since subpart (B)(iii), which references "drugs," includes oral-only drugs, there is no need to analyze the vaguer text of "other items and services" in (B)(iv).  Plaintiffs are right that (B)(iv) appears to create some redundancy with (B)(iii), Pls.' Mem. PI at 26-27, in that (B)(iii) includes "other drugs and biologicals" and (B)(iv) includes "services," which CMS has elsewhere defined as including drugs.  42 C.F.R. § 400.202 ("Services means medical care or services and items, such as medical diagnosis and treatment, drugs and biologicals, . . . .").  This redundancy exists, however, regardless of whether "other drugs and biologicals" in subpart (B)(iii) is read to include or exclude oral-only forms, and therefore does not impact the foregoing interpretation of subpart (B)(iii).

("including drugs and biologicals with only an oral form" "for which payment was (prior to January 1, 2011) made separately under …the Act").[8]  This temporal limitation embedded as a qualifier in the regulation clearly limits its reach to oral-only drugs that were paid separately prior to 2011.  That regulatory language is consistent with the statute, and whether plaintiffs' fictional regulation—reaching all new oral-only drugs—is consistent is a question the Court need not reach.[9]

The statute's history and purpose further inform the proper construction of the text.  *See Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024).  Prior to MIPPA, many renal dialysis services were already included in a prospective lump-sum payment.  2009 NPR ESRD PPS, 74 Fed. Reg. at 49,924.  MIPPA thus did not create the bundle anew, but rather expanded this system to eliminate "any other payment" for "renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(A)(i) ("a payment system under which a single payment is made under this subchapter to a provider of services or a renal dialysis facility for renal dialysis services (as defined in subparagraph (B)) in lieu of any other payment").  Plaintiffs point out that oral drugs have never *previously* been part of the prospective payment system, Pls.' Mem. PI at 8, 23, but such past practice is irrelevant.  MIPPA was intended to make a change, which supports reading definitional subparagraph (B) expansively.

Plaintiffs double down on this past practice—that oral-only drugs always have been excluded from the bundle payment system—to argue that including them makes no sense because such drugs are neither prescribed nor administered in any form by renal dialysis

---

[8]    Defendants also do not point out this temporal limitation.

[9]    Plaintiffs do not argue that the XPHOZAH Letter-Decision is inconsistent with 42 C.F.R. § 413.171 because XPHOZAH was not paid for separately prior to 2011, given that the drug did not exist at that time.  Even if this argument had been presented, the Letter-Decision is consistent with definitional subparagraph (B) of the statute, so this Court lacks jurisdiction to examine the decision's compliance with the regulation, for the reasons explained below.

facilities in conjunction with dialysis.  Pls.' Mem. PI at 8, 23, 33; Pls.' Opp'n MTD at 29-30.

Looking backwards into past practice is, again, not helpful. Congress intended to bring more

services under the fold of renal dialysis facilities by expanding the MIPPA bundle.  Although

oral-only drugs do not *need* to be administered by dialysis facilities, advantages do exist in

having those facilities do so.  For instance, including oral-only drugs in the bundle will put them

on an even playing field with alternative modes of treatment already in the bundle.  Even if

alternative drugs are not a one-to-one match (like injectable and oral equivalents), there may be

alternative treatments in the bundle for some oral-only drugs that would achieve the same goal,

and keeping oral-only drugs out of the bundle could create a perverse incentive.  If the dialysis

facility encouraged patients to have their nephrologists prescribe an outside-the-bundle oral-only

drug that is more costly than the in-bundle alternative, that would unnecessarily burden

Medicare; and if the facility encouraged the use of an outside-the-bundle oral-only drug that is

less effective, that could adversely affect the patient.  Plaintiffs assume that outside-the-bundle

oral-only drugs are both more expensive and more effective than those in the bundle.  While that

may be the case for XPHOZAH, this is not necessarily true as to every such oral-only drug.

Moreover, inclusion in the bundle will create broader access to oral-only drugs, given that 21%

of ESRD patients do not have Medicare Part D.  *See* 2024 NPR ESRD PPS, 89 Fed. Reg. at

55,761.

The legislative history also lends some support to this understanding of Congress's

expansive purpose.  Both parties leverage post-enactment developments to bolster their

positions.  Defendants, for their part, emphasize that Congress explicitly recognized the inclusion

of oral-only drugs when enacting subsequent legislation delaying their addition to the bundle.

*See* Defs.' Opp'n PI at 29; Pub. L. 112-240, sec. 632, 126 Stat. at 2354 ("Two-Year Delay of

Implementation of Oral-Only ESRD-Related Drugs in the ESRD Prospective Payment System");
*see also* Pub. L. 113-93, sec. 217(a), 128 Stat. at 1061; Pub. L. 113-295, sec. 204, 128 Stat. at
4065 (extending the delay until 2025).  In that same statute, Congress also requested that HHS
"monitor the bone and mineral metabolism of individuals with end stage renal disease," "with
respect to the implementation of oral-only ESRD-related drugs in the ESRD prospective
payment system," demonstrating an understanding of, and—at least, at that time—no wide
opposition to CMS's decision.  Pub. L. 112-240, sec. 632, 126 Stat. at 2354.  These enactments
indeed suggest Congress understood MIPPA to be consistent with the inclusion of oral-only
drugs, including XPHOZAH (a "bone and mineral metabolism" drug).  *See* Compl. ¶¶ 75, 150;
*Women Involved in Farm Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994, 1003 (D.C. Cir. 1989)
(noting Congress's "explicit recognition of the Secretary's regulations is entitled to some
weight"); *cf. District of Columbia v Heller*, 554 U.S. 570, 605 (2008) (distinguishing between
"postenactment legislative history," which is not worth any weight, and "examination of" legal
sources that shed light on the public understanding of a legal text in the period after its
enactment, which is "critical").

　　　　Plaintiffs, on the other hand, emphasize that shortly after CMS passed the challenged
regulation, § 413.171, a bill was introduced in the House of Representatives that would have
amended the definition of "renal dialysis services," under definitional subparagraph (B)(iii), to
explicitly include oral-only drugs.  H.R. 13200, 11th Cong. § 1232 (2009); Pls.' Mem. PI at 25-
26.  From this instance of an introduced bill, plaintiffs leap to the conclusion that Congress
rejected the inclusion of oral-only drugs, Pls.' Mem. PI at 25-26, but this is a leap too far.  An
equally permissible inference is that Congress saw the amendment as unnecessary because the
statute already broadly authorized CMS to include oral-only drugs in "renal dialysis services."

Alternatively, Congress may not have wanted to codify CMS's rulemaking and rather wanted to stick with the broad statutory language to give CMS greater latitude. Without knowing which possibility is accurate, courts "can infer nothing from the Congress's consideration and rejection of a differently worded provision in a separate piece of legislation." *Knapp Med. Ctr.*, 875 F.3d at 1130 (discussing the same proposed bill); *see also Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 241-42 (2011) (describing "post-enactment legislative history" as "not a legitimate tool of statutory interpretation"); *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022) (applying *Bruesewitz*'s admonition to the use of subsequent bills to shed light on Congress's earlier intent).

In short, the best reading of definitional subparagraph (B), based on the text and structure, and confirmed by MIPPA's history and purpose, is that "renal dialysis services" includes oral-only drugs paid for separately before 2025, like XPHOZAH. Thus, CMS did not violate the bounds of its statutory authority, in identifying such oral-only drugs (including XPHOZAH) as "renal dialysis services." Consequently, the preclusion subparagraph (G) applies and precludes this Court from exercising jurisdiction to review plaintiffs' challenge to the regulation 42 C.F.R. § 413.171(3). *See Am. Hosp. Ass'n*, 964 F.3d at 1245.

### 2.    *Identification of XPHOZAH as Treating ESRD*

CMS's XPHOZAH Letter-Decision is also authorized by definitional subparagraph (B) insofar as this currently separately reimbursed oral-only drug is identified as a "renal dialysis service" and, as a consequence, judicial review of this determination is precluded by preclusion subparagraph (G). Plaintiffs' second challenge to the XPHOZAH Letter-Decision is that the decision to include XPHOZAH in the bundle violates subparagraph (B) because XPHOZAH is not "furnished to individuals for the treatment of end stage renal disease."

XPHOZAH treats hyperphosphatemia, the state of having too much phosphate in the blood, which differs from renal disease. Compl. ¶¶ 24-25. Not all individuals with renal disease suffer from hyperphosphatemia, and not all people with hyperphosphatemia have ESRD. Williams Decl. ¶ 18; Compl. ¶ 150; Pls.' Mem. PI at 15 & n.17. Both parties recognize that they are separate conditions, describing hyperphosphatemia as a "comorbidity" of renal disease. Pls.' Opp'n MTD at 38; Defs.' Mem. MTD at 2. Nevertheless, the two conditions of ESRD and hyperphosphatemia are closely related, with a high rate of overlap: 80% of ESRD patients on dialysis have hyperphosphatemia. Williams Decl. ¶ 18; *id.*, Ex. 2 ("Ardelyx: Management of Hyperphosphatemia and Implications of ESRD PPS") at 5, ECF No. 14-5 (Ardelyx's own presentation describing hyperphosphatemia as "nearly universal" among patients receiving maintenance dialysis). Furthermore, the incidence is not purely correlational. Hyperphosphatemia is most commonly *caused* by advanced chronic kidney disease because phosphate is normally excreted by functioning kidneys. *See Hyperphosphatemia*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/24293-hyperphosphatemia (last visited Nov. 7, 2024).[10] The FDA indication for XPHOZAH illustrates this: XPHOZAH is only approved to treat hyperphosphatemia in individuals with chronic kidney disease on dialysis. XPHOZAH Prescr. Info. at 1. XPHOZAH thus treats a symptom of and problem caused by kidney failure, and CMS reasonably considered this drug as part of the treatment for ESRD.

This understanding fits well within the plain meaning of subparagraph (B)(iii). Just because a drug does not directly target renal function but rather a harmful and common side-effect of renal disease does not mean the drug is not being "furnished to individuals for the

---

[10]    "A federal court may take judicial notice of a fact that is not subject to reasonable dispute if it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (alterations in original) (quotation marks and citation omitted).

treatment of [ESRD]." 42 U.S.C. § 1395rr(b)(14)(B)(iii).  Much like dialysis, which would certainly be considered "treatment," XPHOZAH is reducing toxins in the bloodstream to replace the function of the kidneys.  *See* Compl. ¶ 5.  In fact, because dialysis achieves the same goal, Ardelyx has recognized increased frequency of dialysis as one—albeit impractical—way of treating hyperphosphatemia.  Ardelyx: Management of Hyperphosphatemia and Implications of ESRD PPS at 9.  For chronic diseases like ESRD without a cure, *see* Compl. ¶ 5 ("Kidney failure cannot be reversed."), a drug that mitigates the symptoms of the disease by replacing a lost function is "treatment" for the disease, even though the drug does not address the underlying cause of the failed organ.  *See Treatment*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/treatment (last visited Nov. 7, 2024) (defining "treatment" as "the use of drugs, exercises, etc. to *improve the condition of* an ill or injured person, *or* to cure a disease" (emphasis added)).

Definitional subparagraph (B) uses the broad phrase "furnished . . . for the treatment of end stage renal disease" in three of its four subparts defining "renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(B).  Subpart (ii) of this subparagraph, including as "renal dialysis services" "erythropoiesis stimulating agents . . . that are furnished to individuals for the treatment of end stage renal disease," is instructive.  *Id.* § 1395rr(b)(14)(B)(ii).  ESAs treat anemia, which like hyperphosphatemia, is often caused by renal disease.  *See* Compl. ¶ 66; Pls.' Reply PI at 15-16.  Where ESAs are used to help people with renal disease, they are "furnished . . . for the treatment of end stage renal disease" and included as renal dialysis services.  42 U.S.C. § 1395rr(b)(14)(B)(ii).  XPHOZAH is no different.  This drug may only be prescribed to help people with renal disease on dialysis, XPHOZAH Prescr. Info. at 1, and thus plainly qualifies as

"other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease." *Id.* § 1395rr(b)(14)(B)(iii).

Plaintiffs urge a narrower meaning of subparagraph (B)(iii) as requiring direct treatment of the kidney disease, not the disease's complications, by stressing the statutory language "for treatment of [ESRD]," Pls.' Mem. PI at 30-32. This ignores the fact that both subparts (B)(ii) and (iii) use the same phrase—"furnished to individuals for the treatment of end stage renal disease"—and such a narrow reading would make no sense for ESAs in subparagraph (B)(ii). Instead, the two subparts must be read harmoniously. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) (describing the "presumption that a given term is used to mean the same thing throughout a statute").

To counter this more harmonious reading of definitional subparagraph (B), plaintiffs contend that ESAs have a different relationship to ESRD than XPHOZAH does, because ESAs treat anemia specifically caused by chronic kidney disease and ESA injections are received at nearly every dialysis treatment. Pls.' Reply PI at 15-16. XPHOZAH, by contrast, treats hyperphosphatemia in people *with* chronic kidney disease on dialysis—not necessarily hyperphosphatemia caused by the disease—and must be taken apart from dialysis. XPHOZAH is not even delivered by dialysis facilities and must be taken with meals, which cannot accompany dialysis. Pls.' Mem. PI at 16-17; Pls.' Reply PI at 16. Plaintiffs strain to make a distinction without a meaningful difference: given that the main cause of hyperphosphatemia is advanced renal disease, XPHOZAH is generally treating hyperphosphatemia *caused by* or at least closely associated with kidney disease, analogous to ESAs. Furthermore, the timing of patients' intake of XPHOZAH is of no matter; by eliminating the fee-for-service component of

the composite payment, MIPPA intended to expand the bundle of "renal dialysis services" beyond that which were already directly administered by dialysis facilities.

This reading of subparagraph (B) is supported by the legislative history previously discussed.  When Congress in 2012 first postponed the implementation of CMS's rule incorporating certain oral-only drugs into the bundle, it referred to them as "oral-only ESRD-related drugs." Pub. L. 112-240, sec. 632, 126 Stat. at 2354.  Congress likewise added a provision about adjustments to reimbursement pricing that explicitly referred to CMS's rule using this language: "other than oral-only ESRD-related drugs, as such term is used in the final rule promulgated by the Secretary in the Federal Register on August 12, 2010 (75 Fed. Reg. 49030)."  42 U.S.C. § 1395rr(b)(14)(I).  Use of "ESRD-related drugs" suggests a flexible understanding of the definitional subparagraph (B) that includes drugs *related* to, rather than only those directly treating, ESRD.  Though Congress has not changed the language in § 1395rr(b)(14)(B), these other enactments discourage a narrow reading that would make inclusion in the bundle turn on the precise mode of treating the amalgamation of problems involved in kidney failure.[11]

CMS's XPHOZAH Letter-Decision including this drug in the bundle is therefore authorized by subparagraph (B)'s definition of the term "renal dialysis services" and thus precluded from review under subparagraph (G).

* * *

Plaintiffs' APA challenges to the XPHOZAH Letter-Decision raise various inconsistencies with CMS's own rulemaking and guidance, contending that this decision is not

---

[11]    To the extent Plaintiffs also challenge the statutory authority of CMS's Federal Register notices describing the relevant inquiry as whether drugs are "ESRD-related," 2010 Final Rule ESRD PPS, 75 Fed. Reg. at 49,047, as opposed to whether drugs are "furnished . . . for the treatment of ESRD," *see* Pls.' Mem. PI at 32, that challenge fails for these same reasons.

consistent with 42 C.F.R. § 413.171(3) because XPHOZAH is not "furnished . . . for the treatment of ESRD," Pls.' PI Mem. at 31-32, nor consistent with § 413.171(5) because XPHOZAH is not "essential for the delivery of maintenance dialysis," *id*. at 18-19.  In addition, plaintiffs argue that the decision is at odds with CMS's Federal Register notices describing renal dialysis services as drugs "utilized for ESRD-related conditions in a dialysis unit."  *Id.* at 33 (quoting 2010 Final Rule ESRD PPS, 75 Fed. Reg. at 49,047).  Whether these arguments have merit may not be considered, however.  The XPHOZAH Letter-Decision does not violate CMS's statutory authority and thus this Court lacks jurisdiction, under 42 U.S.C. § 1395rr(b)(14)(G), to consider those claims.  *See Amgen*, 357 F.3d at 113.

## IV.    CONCLUSION

For the foregoing reasons, 42 U.S.C. § 1395rr(b)(14)(G) precludes review of CMS's regulation, codified at 42 C.F.R. § 413.171(3), that includes in the renal dialysis services bundle oral-only drugs for which payment was made separately prior to 2011, and CMS's determination that the hyperphosphatemia drug XPHOZAH is included in the bundle.  Defendants' motion to dismiss is therefore granted, and plaintiffs' motion for a preliminary injunction or expedited summary judgment is denied as moot.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  November 8, 2024

_____
**BERYL A. HOWELL**
United States District Judge