# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ARDELYX, INC., *et al.*,<br><br>                      Plaintiffs,<br><br>          v.<br><br>BECERRA, *et al.*,<br><br>                      Defendants. | Civil Action No. 24-cv-2095 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiffs—a biopharmaceutical company, Ardelyx, Inc.; a nonprofit organization representing kidney patients, the American Association of Kidney Patients; and a nonprofit healthcare research group, the National Minority Quality Forum (collectively "plaintiffs")— commenced this lawsuit on July 17, 2024. *See* Compl., ECF No. 1. In response, defendants, Department of Health and Human Services and Centers for Medicare and Medicaid Services ("CMS"), moved to dismiss for lack of jurisdiction, due to the operation of 42 U.S.C. § 1395rr(b)(14)(G) ("subparagraph (G)"), which precludes judicial review of CMS's identification of renal dialysis services to be included in the bundled reimbursement payment system under Medicare Part B. Defs.' Mot. Dismiss ("Defs.' MTD"), ECF No. 11. Plaintiffs shortly thereafter, on September 19, 2024, moved for a preliminary injunction, or expedited summary judgment, to prevent from taking effect on January 1, 2025, a regulation and determination by CMS that "oral-only drugs," including Ardelyx's drug, XPHOZAH, are "renal dialysis services" subject to the bundled reimbursement system. Pls.' Mot. for & Mem. in Supp. of Prelim. Inj. or Expedited Summ. J. ("Pls.' Mem. PI"), ECF No. 14. Briefing was completed on both motions in one month, in accord with the schedule proposed by the parties, *see* Joint Proposed Schedule for Further Proceedings, ECF No. 15, and three weeks later, on November 8,

2024, the Court granted defendants' motion to dismiss for lack of jurisdiction, holding that CMS's regulation and determination that oral-only drugs, including XPHOZAH, were "renal dialysis services" were precluded by subparagraph (G). *Ardelyx, Inc. v. Becerra*, No. 24-cv-2095 (BAH), 2024 WL 4723068 (D.D.C. Nov. 8, 2024) ("November 2024 Decision"); Order Grant'g Defs.' MTD and Denying Pls.' Mot. PI as Moot ("Nov. 2024 Order"), ECF No. 21. Plaintiffs' request for a preliminary injunction, or expedited summary judgment, was then denied as moot. *See* Nov. 2024 Order.

On November 20, 2024, plaintiffs moved to alter that judgment, pursuant to Federal Rule of Civil Procedure 59(e), and requested, in the alternative, an injunction pending appeal. Pls.' Mot. to Alter Judgt. & Mem. in Supp. ("Pls.' Mem."), ECF No. 23. In the ensuing dispute over briefing deadlines, plaintiffs urged adherence to an expedited schedule that would allow plaintiffs to seek appellate review of any reconsideration decision issued by this Court prior to oral-only drugs entering the bundled reimbursement package on January 1, 2025. *See* Defs.' Mot. for Extension of Time, ECF No. 24; Pls.' Response to Defs.' Mot., ECF No. 25. Pursuant to the Court's briefing deadlines, *see* Min. Order (Nov. 26, 2024) (granting in part defendants' request for an extension), defendants filed an opposition on December 10, 2024, *see* Defs.' Opp'n to Pls.' Mot. to Alter Judgt. ("Defs.' Opp'n"), ECF No. 26, and plaintiffs replied on December 13, 2024, *see* Pls.' Reply in Supp. Mot. to Alter Judgt. ("Pls.' Reply"), ECF No. 27.

For the reasons set forth below, plaintiffs' motion for alteration of judgment, or in the alternative, for an injunction pending appeal, is denied.

## I.    BACKGROUND

The statutory, regulatory, and factual background for this case is set out in detail in the prior decision granting the defendants' motion to dismiss. *See Ardelyx*, 2024 WL 4723068, at *1-6. A brief overview, as pertinent to the disposition of the pending motion, is below.

### A.    Factual Background

Ardelyx manufactures a drug, tenapanor, branded as XPHOZAH, that treats hyperphosphatemia—a condition of having too much phosphate in the blood—which is highly common in patients with end-stage renal disease ("ESRD"). Compl. ¶¶ 24, 26, 150. The FDA approved XPHOZAH in 2023 for adults with chronic kidney disease. *Id.* ¶ 27; Williams Decl., Ex. 1, XPHOZAH Prescribing Information at 1, ECF No. 14-4. The drug exists only in an oral form—a pill taken twice a day. *Id.* ¶ 28. Currently, XPHOZAH is reimbursed under Medicare Part D, which provides a traditional prescription drug insurance plan for enrollees. *Id.* ¶ 170; 42 U.S.C. § 1395w-101.

Since the 1980s, renal dialysis services have been subject to a separate Medicare coverage scheme. The original "composite rate system" included some renal dialysis services under a fixed, prospective payment system (determined by the number of treatments administered) and others under a fee-for-service plan, all under Medicare Part B. Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, ch.3, sec. 2145(a)(7), § 1881(b), 95 Stat. 357 (codified as amended at 42 U.S.C. § 1395rr); Compl. ¶ 64. The current regime, adopted in 2008, with enactment of the Medicare Improvements for Patient Providers Act of 2008 ("MIPPA"), moved all renal dialysis services, as defined in 42 U.S.C. § 1395rr(14)(B) ("subparagraph (B)"), starting in 2011, into a bundled payment system under Medicare Part B. Pub. L. No. 110-275, sec. 153, § 1881(b)(12)(G), 122 Stat. 2553 (codified as amended at 42 U.S.C. § 1395rr(b)(14)); 42 U.S.C. § 1395rr(b)(14)(A)(i) ("[F]or services furnished on or after

January 1, 2011, the secretary shall implement a payment system under which a single payment is made under this title to a provider of services or a renal dialysis facility for renal dialysis services (as defined in subparagraph (B)) in lieu of any other payment . . . .").  Subparagraph (B) states, in full:

> For purposes of this paragraph, the term "renal dialysis services" includes—
>
> (i) items and services included in the composite rate for renal dialysis services as of December 31, 2010;
> (ii) erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of end stage renal disease;
> (iii) other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological; and
> (iv) diagnostic laboratory tests and other items and services not described in clause (i) that are furnished to individuals for the treatment of end stage renal disease.
>
> Such term does not include vaccines.

MIPPA also limited judicial review of items included in the bundled system by expressly stating, in subparagraph (G), in pertinent part, that:

> There shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise of the determination of payment amounts under subparagraph (A), the establishment of an appropriate unit of payment under subparagraph (C), [or] the identification of renal dialysis services included in the bundled payment . . . .

*Id.* § 1395rr(b)(14)(G) ("subparagraph (G)").

To implement the bundled payment system, CMS in 2010 promulgated a regulation providing a definitional section stating, in pertinent part, that:

> [T]he following items and services are considered 'renal dialysis services' and paid under the ESRD prospective payment system: . . . (3) Other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was (prior to January 1, 2011) made separately under Title XVIII of the Act (including drugs and biologicals with only an oral form) . . . .

42 C.F.R. § 413.171.  Despite its promulgation in 2010, this regulation has not yet gone into effect with respect to oral-only drugs.  CMS first delayed implementation of the regulation for oral-only drugs until 2014, *see* Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System, 75 Fed. Reg. 49,030, 49,032 (Aug. 12, 2010) (codified at 42 C.F.R. § 413.171), and Congress then thrice delayed implementation for oral-only drugs, most recently until January 1, 2025, *see* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, sec. 632(b), § 1881(b), 126 Stat. 2313, 2354 (2013); Protecting Access to Medicare Act of 2014, Pub. L. No. 113-93, sec. 217(a), 128 Stat. 1040, 1061; Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, sec. 204, 128 Stat. 4010, 4065.

In July 2024, CMS issued a letter-decision determining that, pursuant to 42 C.F.R. § 413.171, XPHOZAH is a renal-dialysis service that will be included in the bundled Part B payment as of January 1, 2025.  Compl., Ex. 1, XPHOZAH Letter-Decision at 1, ECF No. 1-1.

### B.    Procedural Background

Plaintiffs challenged defendants' July 2024 letter-decision classifying XPHOZAH as a renal dialysis service and the regulation, 42 C.F.R. § 413.171, which includes oral-only drugs in the bundled payment system, Compl. ¶¶ 199, 208, 215, arguing that (1) oral-only drugs, including XPHOZAH, are not "renal dialysis services" under the statutory definition in subparagraph (B), *id.* ¶¶ 198, 214-15; (2) that XPHOZAH, in particular, is not a "renal dialysis service" because the drug is not "furnished for the treatment of ESRD," as required by subparagraph (B), *id.* ¶¶ 198-99; and (3) that XPHOZAH is not a "renal dialysis service" under CMS's own regulatory definition, codified at 42 C.F.R. § 413.171(5), *id.* ¶¶ 205-08.  Defendants moved to dismiss, under Federal Rule of Civil Procedure 12(b)(1), on the ground that the exercise of subject matter jurisdiction over this case is barred by subparagraph (G), *see* Defs.'

Mem. in Supp. MTD, ECF No. 11-1, with plaintiffs contesting application of subparagraph (G) here, *see* Pls.' Opp'n to Defs.' MTD ("Pls.' Opp'n MTD"), ECF No. 17.

The Court held that subparagraph (G) did apply to the regulation and Letter-Decision, so long as these agency actions properly qualified as "identification[s] of renal dialysis services," based on how Congress defined that term in subparagraph (B). *Ardelyx*, 2024 WL 4723068, at *8. Oral-only drugs were not excluded by Congress's definition of "renal dialysis services," which was broadly inclusive and non-exhaustive. *Id.* at *11. Moreover, oral-only drugs were expressly included by subpart (B)(iii), which incorporates in the bundle "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately . . . ." *Id.* The parenthetical reference to "paragraph"—meaning 42 U.S.C. § 1395rr(b)(14), requiring renal dialysis services to be subject to the bundled payment system—would only apply to oral-only drugs as of January 1, 2025, due to CMS and congressional delays in applying this statutory provision and accompanying implementing regulation to this category of drugs used to treat ESRD, so any existing oral-only drugs counted as drugs for which payment was "made separately" prior to the paragraph's application. *Id.* at *12. Therefore, because oral-only drugs and XPHOZAH qualified as "renal dialysis services" under that definition in subparagraph (B), subparagraph (G) applied to preclude further review. *Id.* at *14, 16. The Court accordingly granted defendants' motion to dismiss and denied as moot plaintiffs' motion for preliminary injunction or expedited summary judgment. *See Order*. That order was a final, appealable judgment. *Id.*

Instead of appealing immediately, however, plaintiffs have expended more time litigating before this Court, requesting reconsideration and alteration of the November 2024 Order,

pursuant to Federal Rule of Civil Procedure 59(e), to avoid "clear error or manifest injustice." *See* Pls.' Mem.  In the alternative, plaintiffs request an injunction pending appeal.  *Id.*  Plaintiffs' main contention is that the Court's interpretation of subparagraph (B) is practically unworkable and inconsistent with CMS practice, *id.* at 3-4, and, based on entirely new lines of argument not previously presented, legally wrong and illogical.  *Id.* at 9-10, 13.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 59(e): Altering or Amending a Judgment

Altering or amending a judgment "after its entry is an extraordinary remedy which should be used sparingly." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (3d ed. 2012)).  "A district court need not grant a Rule 59(e) motion unless there is an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Id.* (quoting *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012)).  Parties may not use a Rule 59(e) motion to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (2d ed. 1995)); *see District of Columbia v. Doe*, 611 F.3d 888, 896 (D.C. Cir. 2010) ("Rule 59(e) motions are aimed at reconsideration, not initial consideration." (quoting *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477 (6th Cir. 2007))); *Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015) (describing the "prohibition on raising new arguments post-judgment" as "strict").  The Rule is a "limited exception to the rule that judgments are to remain final," and whether to grant such a motion is within the Court's discretion. *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 216-17 (D.C. Cir. 2018).

### B.    Federal Rule of Civil Procedure 62(d): Injunction Pending Appeal

Under Rule 62(d), a court may "grant an injunction" "[w]hile an appeal is pending from" a "final judgment" refusing an injunction.  Fed. R. Civ. P. 62(d).  An injunction pending appeal is an "exceptional remedy."  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017).  The test for an injunction pending appeal is substantially similar to that for a preliminary injunction: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); 16A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3954 (5th ed. 2024) (noting that the standard for an appellate court granting an injunction pending appeal is "generally the same" as that for a district court (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987))).  Given the unique posture of an injunction pending appeal, however, courts have held that "[t]he four factors should be balanced," allowing a lesser showing of success on the merits where "the balance of harms tips heavily enough in the" movant's favor.  16A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3954.  A movant, nonetheless, always has an "obligation to demonstrate irreparable harm."  *John Doe Co.*, 849 F.3d at 1134; *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021) ("If the [movants] cannot demonstrate irreparable harm, [the court] need not discuss the other factors.").

## III.    DISCUSSION

The requisite showings under Rule 59(e) or Rule 62(d) for relief are not met here.  Plaintiffs misread the prior decision in this case to dictate a limited scope of subparagraph (B) and thus create problems with the administration of the statute where none exist.  Moreover, at this late juncture, plaintiffs bring new arguments that could have been previously raised, while

rehashing old ones already rejected.  None warrants relief under Rule 59(e).  Further, plaintiffs'

request for an injunction pending appeal fails because plaintiffs cannot demonstrate irreparable

harm.  Plaintiffs' motion is, consequently, denied.

### A.    Plaintiffs Cannot Demonstrate Clear Error or Manifest Injustice.

Plaintiffs contend that "reconsideration is necessary to correct a clear error or prevent

manifest injustice."  Pls.' Mem. at 2.  "'Clear error' should conform to a 'very exacting

standard.'"  *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 422 (D.D.C. 2005) (quoting

*Piper v. Dep't of Justice*, 312 F. Supp. 2d 17, 21 (D.D.C. 2004)).  "A final judgment must be

'dead wrong' to constitute clear error."  *Id.* (quoting *Parts & Elecs. Motors, Inc. v. Sterling Elec.*,

*Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).  A decision may "result in manifest injustice" if it

"upset[s] settled expectations—expectations on which a party may reasonably place reliance."

*Leidos, Inc.*, 881 F.3d at 217 (second passage quoting *Qwest Servs. Corp. v. FCC*, 509 F.3d 531,

540 (D.C. Cir. 2007)).  "'[M]anifest injustice' requires 'at least (1) a clear and certain prejudice

to the moving party that is (2) fundamentally unfair in light of governing law.'"  *Id.* (alteration in

original) (quoting *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 78 (D.D.C.

2013), *aff'd*, 782 F.3d 9).  Plaintiffs cannot demonstrate either clear error or manifest injustice.

### 1.    *Plaintiffs Incorrectly Read the November 2024 Decision's Interpretation of Subparagraph (B).*

First, plaintiffs grossly overread the November 2024 Decision, mistakenly understanding

this ruling as defining the outer bounds of "renal dialysis services" under subparagraph (B).

Predicated on this flawed reading, plaintiffs go on to argue that such a reading of this

subparagraph would create a "patchwork quilt" of what is included and excluded in the renal

dialysis services bundle, and that this "patchwork" is inconsistent with CMS's interpretation and

is illogical.  Pls.' Mem. at 3-4.  According to plaintiffs, such a reading of subpart (B)(iii) would

not permit the inclusion of certain categories of drugs in the bundle, citing examples of: (1)

intravenous and injectable drugs and biologicals approved by the FDA after 2011, because those

drugs were not paid for separately prior to 2011, when § 1395rr(b)(14) first applied to

intravenous and injectable drugs; (2) new oral-only drugs created after January 2025, because

they are neither "oral equivalents" nor drugs paid for separately prior to January 1, 2025, when

subparagraph (B) will be first applied to oral-only drugs; and (3) oral equivalents of injectable or

other drugs that were approved after 2011, because they are not drugs or biologicals paid for

separately prior to 2011 nor oral equivalents of such drugs.  Pls.' Mem. at 3-7; Pls.' Reply at 4.

Plaintiffs' reading is fundamentally flawed because the November 2024 Decision does

not opine whatsoever on what is *excluded* from the bundle.  As an initial matter, rather than

interpreting subparagraph (B) as exclusive and exhaustive in defining what CMS may consider

to be a "renal dialysis service" subject to the bundled payment system in Medicare Part B, as

plaintiffs describe, the November 2024 Decision held the opposite, stating expressly that

subparagraph (B) is *inclusive* and *non-exhaustive*.  *Ardelyx*, 2024 WL 4723068, at *11 ("The text

and structure of definitional subparagraph (B) make clear that this provision does not purport to

provide an exhaustive universe or offer a comprehensive set of 'renal dialysis services.'").  This

is clear from the statutory text, which begins the definition of "the term 'renal dialysis services'"

using the word "includes"—not a more restrictive word, like "means," 42 U.S.C.

§ 1395rr(b)(14)(B).  *See, e.g.*, *Burgess v. United States*, 553 U.S. 124, 129-30 (2008) (making

clear that "[a]s a rule, [a] definition which declares what a term 'means' . . . excludes any

meaning that is not stated," and that the statute in that case "defines the precise phrase used" in

determining whether to apply a sentencing enhancement (alteration in original) (quoting *Colautti

v. Franklin*, 439 U.S. 379, 392-93 & n.10 (1979))); *United States v. Winstead*, 890 F.3d 1082,

1091-92 (D.C. Cir. 2018) (same); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1114-15 (D.C. Cir. 2009) (distinguishing between "means" and "includes" in statutory definitions and noting that "the use of the word 'includes' indicates that [the statutory list] is non-exhaustive"). Congress used the word "means" to define terms elsewhere in the same statute, demonstrating that the more restrictive word would have been used in subparagraph (B) if Congress so intended. *Compare* 42 U.S.C. § 1395rr(b)(8) ("[T]he term 'home dialysis supplies and equipment' *means* medically necessary supplies and equipment . . . required by an individual suffering from end stage renal disease in connection with renal dialysis carried out in his home . . . ." (emphasis added)); *id.* § (b)(9) ("[T]he term 'self-care home dialysis support services,' to the extent permitted in regulation, *means*— . . . ." (emphasis added)); *and id.* § (b)(10) ("[T]he term 'self-care dialysis unit' *means* a renal dialysis facility or distinct part of such facility . . . ." (emphasis added)), *with id.* § 1395rr(e)(3) ("[T]he term 'supportive equipment' *includes* blood bumps, heparin pumps, bubble doctors, other alarm systems, and such other items as the Secretary may determine are medically necessary." (emphasis added)); *and id.* § 1395rr(b)(14)(B) ("[T]he term 'renal dialysis services' *includes*— . . . ." (emphasis added)).[1]

---

[1]    Plaintiffs previously argued that "Congress's use of 'includes' does not leave a gap for the agency to fill when, as here, Congress 'explicitly and comprehensively defined the term by including only three'—or here, four—'discrete definitions.'" Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' Reply PI") at 2, ECF No. 20 (quoting *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009)). Plaintiffs' reliance on *Carcieri* is unpersuasive, however, since the definition at issue in that case is distinguishable from subparagraph (B) here in at least two ways. First, the statute there, now codified at 25 U.S.C. § 5129, defining "Indian" under the Indian Reorganization Act ("IRA"), used "shall include" and listed three discrete categories that were quite specific: "members of any recognized Indian tribe now under Federal jurisdiction," "all persons who are descendants of such members . . ." and "all other persons of one-half or more Indian blood." *Carcieri*, 555 U.S. at 391-92. In contrast, the items listed in subparagraph (B), *e.g.*, "items and services" and "other drugs and biologicals," are generally described, as necessary, given the evolving nature of medical treatment, thereby requiring more interpretive gloss from the agency. Importantly, subparagraph (B) is part of a statute that instructs the Secretary of HHS to establish and implement the bundled payment system, for "renal dialysis services (as defined in subparagraph (B))," acknowledging CMS's role in further defining the contours of "renal dialysis services." 42 U.S.C. § 1395rr(b)(14)(A)(i). Second, with respect to the IRA, the Supreme Court found that Congress meant the "Indian" definition to be exclusive, as indicated by subsequent enactments of additional code provisions to broaden this definition, a fact the Court relied on in interpreting the meaning of "shall include." *Carcieri*, 555 U.S. at 392. Here, by contrast, Congress did not alter or add to the definitions in subparagraph (B) when giving additional instructions to CMS to exercise its existing discretion in subparagraph (B) (in particular, in subpart (B)(iii)) to include in the bundle certain items, *see* Protecting Access to

As the Supreme Court has explained, "[w]here the definition of a term . . . was intended to be all inclusive, it is introduced by the phrase 'to mean' rather than 'to include.'" *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 169 n.15 (1977).

Subparagraph (B) then sets out in four subparts general categories of items to be included in the bundle, *i.e.*, those described in subparts (B)(i)-(iv), and a general category of items that cannot be in the bundle, *i.e.*, vaccines, leaving up to agency discretion both the specifics of the general categories of items or services covered within the terms of subparts (B)(i)-(iv), as well as other items or services not generally described in subparagraph (B) at all, since the subparts are prefaced by the word "includes." *Id.* § 1395rr(b)(14)(B). Subparagraph (H) both confirms the non-exhaustive breadth of subparagraph (B) and helps ensure that the scope of subparagraph (B) is restricted by expressly limiting the inclusion of "[e]rythropoiesis stimulating agents and other drugs and biologicals" in the bundled payment system under Medicare Part B to those that "are furnished to an individual for the treatment of end stage renal disease." *Id.* § 1395rr(b)(14)(H). Based on this interpretation of subparagraph (B), the November 2024 Decision then held that oral-only drugs and XPHOZAH fall within the scope of subparagraph (B) because they are not excluded by that paragraph and are, in fact, incorporated by subpart (B)(iii) as "drugs . . . for which payment was (before the application of this paragraph) made separately" from the bundle. 42 U.S.C. § 1395rr(b)(14)(B)(iii). *Ardelyx*, 2024 WL 4723068, at *11.

To address plaintiffs' argument that the second clause of subpart (B)(iii), "and any oral equivalent form," impliedly excludes oral-only drugs from (B)(iii) because that second clause

---

Medicare Act of 2014, Pub. L. No. 113-93, sec. 217(c), 128 Stat. 1040, 1062 (codified at 42 U.S.C. § 1395rr NOTE) ("2014 Note") (The Secretary of HHS shall "establish a process for—(1) determining when a product is no longer an oral-only drug; and (2) including new injectable and intravenous products into the bundled payment."); *see also infra* note 3. In the end, the particular language and context of each statute is important in interpreting the meaning and, notably, courts have interpreted other statutes with the exact same language as *Carcieri*—"shall include"—to be "not exhaustive." *See Cyrus v. Univ. of Toledo*, No. 20-3913 2022 WL 985819, at *8 (6th Cir. 2022) (citing *United States ex rel. Felton v. William Beaumont Hosp.*, 993 F.3d 428, 434 (6th Cir. 2021)).

would be superfluous if oral drugs were included as "drugs and biologicals" in the first clause, Pls.' Mem. PI at 25; Pls.' Opp'n MTD at 31; Pls.' Reply in Supp. Mot. for PI ("Pls.' Reply PI") at 9, ECF No. 20, the Court pointed out that the first clause was subject to the parenthetical "(before the application of this paragraph)" modifier, such that the two clauses reached groups of drugs that were not coextensive. *Ardelyx*, 2024 WL 4723068, at *11-12. Plaintiffs offered no discernable argument about the meaning of that modifier in its original briefing. *See Ardelyx*, 2024 WL 4723068, at *12 n.6; Pls.' Reply PI at 9-10. As the November 2024 Decision explained, a later-created oral equivalent to a drug to which the paragraph had already applied— *i.e.*, a drug already in the bundle—would be included by the second subpart but not the first, because it would not have been a drug "for which payment was . . . [ever] made separately." *Ardelyx*, 2024 WL 4723068, at *12. That explanation says nothing about what drugs are *excluded*, only what drugs the statute says must be *included*. In other words, that explanation ensured that oral-only drugs are not impliedly *excluded* and said nothing about whether any other drugs are or are not.

At most, therefore, the November 2024 Decision suggests that the categories of drugs plaintiffs insist the Court excluded from the bundle might not be *required* to be in the bundle by subpart (B)(iii) and rather are left within CMS's discretion to include or exclude.[2] In that sense, plaintiffs' "patchwork" diagram showing what categories of drugs were supposedly included and excluded by the holding in the November 2024 Decision, *see* Pls.' Mem. at 4, was wrong to label

---

[2] As previously listed, those categories identified by plaintiffs are: (1) intravenous and injectable drugs and biologicals approved by the FDA after 2011, because those drugs were not paid for separately prior to 2011, when § 1395rr(b)(14) first applied to intravenous and injectable drugs; (2) new oral-only drugs created after January 2025, because they are neither "oral equivalents" nor drugs paid for separately prior to January 1, 2025, when subparagraph (B) will be first applied to oral-only drugs; and (3) oral equivalents of injectable or other drugs that were approved after 2011, because they are not drugs or biologicals paid for separately prior to 2011 nor oral equivalents of such drugs. Pls.' Mem. at 3-7; Pls.' Reply at 4.

any category "no, not in the bundle."  More accurately, that diagram should instead label such categories with "Court did not reach"—or, "maybe could be in bundle."

As a result, given that the November 2024 Decision did not exclude any items from the bundle, plaintiffs' parade of horribles—the supposed basis for "manifest injustice"—will not occur.  Plaintiffs contend that CMS will need to change its approach to what goes in the bundle and that CMS will need to remove existing drugs.  *See* Pls.' Mem. at 4-7.  Neither is true.  For example, a drug added to the bundle immediately upon approval—and thus never "paid for separately" prior to application of the paragraph—would not fall within the first clause of subpart (B)(iii) necessarily, but the November 2024 Decision in no way held that it could not be included in the bundle.  Plaintiffs point in particular to Parsabiv and Korsuva, injectable drugs first approved in 2017 and 2021, respectively.  *See* Pl.'s Mem. at 4-5.  Under plaintiffs' misreading of the November 2024 Decision, such drugs created after 2011 were not "drugs" paid for separately "before the application of" § 1395rr(b)(14) to injectable drugs, because that paragraph was applied to injectable drugs in 2011 and such drugs only came into existence after that date.  *Id.* The November 2024 Decision did not, however, discuss injectable drugs or identify the applicable time of the application of § 1395rr(b)(14) to Parsabiv or Korsuva.  Regardless, even if such drugs would not fall within the precise language of the first clause of subpart (B)(iii), they are not excluded, and CMS has discretion under subparagraph (B) to add them to the bundle.[3]

---

[3]    Defendants also point out, to dispel this parade of horribles, that Congress has elsewhere indicated that new injectable and intravenous products are included in the bundle as "renal dialysis services."  *See* Defs.' Opp'n at 5. As mentioned, a note to § 1395rr, Pub. L. No. 113-93, section 217(c), provides that the Secretary of HHS shall "establish a process for—(1) determining when a product is no longer an oral-only drug; and (2) including new injectable and intravenous products into the bundled payment."  2014 Note; *see supra* note 1.  Plaintiffs respond that the 2014 Note instead proves the Court misconstrued subparagraph (B) by excluding "new injectable and intravenous products," because this new legislative instruction did not change the underlying definition in § 1395rr(b)(14)(B).  *See* Pls.' Reply at 5-6.  To the contrary, the 2014 Note indicates that Congress recognized that subparagraph (B) left the inclusion of such items up to CMS, and Congress provided instruction for CMS to exercise that discretion already extant in subparagraph (B) to ensure that such new injectable and intravenous drugs were

Likewise, plaintiffs insist that the November 2024 Decision held that Sensipar, a drug developed in oral form in 2004 and injectable form in 2017, cannot be in the bundle, because the Decision read the second clause of subpart (B)(iii) to "reach[] only 'new, *subsequently-developed* oral versions of drugs, *which were extant in a different form at the time (B)(iii) was applied and were moved into the bundle*." Pls.' Mem. at 6 (emphasis added by plaintiffs) (quoting *Ardelyx*, 2024 WL 4723068, at *12). Plaintiffs are wrong that the Decision held that the second clause reaches those drugs and *only* those drugs; the Decision merely held that those drugs were one set reached by the second clause of subpart (B)(iii) that did not fall within the first clause, such that the second clause is not superfluous if subpart (B)(iii) is read to include oral-only drugs. *See Ardelyx*, 2024 WL 4723068, at *12. The Decision certainly did not preclude all other oral drugs from being added to the bundle. Plaintiffs further argue that, under the November 2024 Decision, newly developed oral-only drugs could not be included in the bundle because they would not be "paid for separately" prior to application of the paragraph to oral-only drugs in January 2025. Pls.' Mem. at 6-7, 12. Again, the Decision did not say that newly developed oral-only drugs for ESRD treatment were required to be in the bundle, but also did not foreclose their inclusion.

In holding that subject matter jurisdiction was lacking, the November 2024 Decision held only that "CMS did not violate the bounds of its statutory authority" by promulgating 42 C.F.R. § 413.171, which includes "oral-only drugs paid for separately prior to 2011" in the bundle as of January 1, 2025, nor by issuing the Letter-Decision, which includes the oral-only drug XPHOZAH in the bundle as of that same date, because subparagraph (B)'s definition of "renal dialysis services" was non-exhaustive and incorporated oral-only drugs in subpart (B)(iii).

---

included in the bundle. The November 2024 Decision in fact recognized that subparagraph (B) provides CMS with such discretion, consistent with the congressional instruction reflected in the 2014 Note.

*Ardelyx*, 2024 WL 4723068 at *11-12, 14, 16.  That holding—that subparagraph (B)'s definition of renal dialysis services was non-exhaustive and incorporated oral-only drugs in subpart (B)(iii), such that CMS did not violate its statutory authority in including oral-only drugs in the bundle— is not in any tension with CMS's practice of adding new drugs to the bundle nor with the inclusion of any categories of drugs, identified by plaintiff, currently in the bundle.  Even if there were such a tension, plaintiffs' concern, Pls.' Mem. at 4-5, 10 n.8; Pls.' Reply at 12, would be misplaced.  Under *Loper Bright v. Raimondo*, 144 S. Ct. 2244, 2266, 2273 (2024), CMS's interpretation of the statute is owed no deference, and thus the Court's reading could not constitute clear error or manifest injustice.

Plaintiffs ultimately resist the November 2024 Decision's non-exhaustive reading of subparagraph (B).  By delineating what is included in the definition, Congress, according to plaintiffs, impliedly excluded everything outside of the enumerated categories.  Pls.' Reply at 8-9.  Plaintiffs cannot accept that Congress would establish specific rules on what is *required* to be included in the bundle while allowing CMS also to include additional things.  *See id.*  Not only was this argument already rejected, making reconsideration improper here, *see Exxon Shipping*, 554 U.S. at 485 n.5 ("Rule 59(e) . . . 'may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment.'" (quoting 11 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1); Pls.' Reply PI at 2, 6-8 (previously making the same argument), but also nothing is strange about a statutory structure that leaves an agency discretion as to the specific items to qualify for coverage under a statute.  Congress may logically set out certain items to be *included* (*i.e.*, drugs and biologicals paid for separately before the application of this paragraph and their oral equivalents, as well as the items in subparts (B)(i), (ii), and (iv)), and certain items to be *excluded* (*i.e.*, vaccines), while leaving the rest to CMS's

discretion.  Particularly with respect to subpart (B)(iii), Congress seemed to move into the

bundle, at its inception, a certain set of existing drugs, leaving CMS to add more drugs as the

agency implements and maintains the bundle over time.  That approach does not render

meaningless subparagraph (B), *cf.* Pls.' Reply at 8-9, because the subparagraph still requires the

agency to include certain items, setting the minima or floor for "renal dialysis services."  CMS

does not, for instance, have discretion to *exclude* an injectable drug that treats ESRD and was

paid for separately from its genesis in 2010.  CMS just has discretion to determine *which*

additional drugs "furnished to an individual for the treatment of end stage renal disease," 42

U.S.C. § 1395rr(b)(14)(H)(i), are added and *when*.

 That Congress intended to grant discretion to CMS in implementing the bundle payment

system is clear from the statute as a whole.  The statute specifically instructs the Secretary of

HHS to establish and execute the bundled payment system.  *See* 42 U.S.C. § 1395rr(b)(14)(A)(i)

("[T]he Secretary shall implement a payment system in which a single payment is made under

this subchapter to a provider of services or a renal dialysis facility for renal dialysis services (as

defined in subparagraph (B)) . . . .");  *see also* Protecting Access to Medicare Act of 2014, Pub.

L. No. 113-93, sec. 217(c), 128 Stat. 1040, 1062 (codified at 42 U.S.C. § 1395rr NOTE)

(instructing the Secretary to "establish a process for—(2) including new injectable and

intravenous products into the bundled payment").  As part of this process, the statute

contemplates that the Secretary will consider and determine the specific "items and services,"

"erythropoiesis stimulating agents and any oral form of such agents," "other drugs and

biologicals," and "diagnostic laboratory tests and other items" that are "furnished . . . for the

treatment of [ESRD]" to include in subparagraph (B).  42 U.S.C. § 1395rr(b)(14)(B).

Congress's decision to preclude judicial review over what is a "renal dialysis service," in 42 U.S.C. § 1395rr(b)(14)(G), further demonstrates its intent to confer authority to the agency to make important policy judgments in developing the renal dialysis bundle scheme.  In fact, in several instances throughout § 1395rr, Congress precluded review to grant CMS maximum discretion over certain areas without any judicial or administrative interference.  *See id.* § 1395rr(b)(12)(H) (precluding review of components of the reimbursement calculations); *id.* § 1395rr(g)(3) (precluding review of approval of dialysis facilities); *id.* § 1395rr(h)(5) (precluding review of payment reductions and performance measures); *id.* § 1395rr(b)(14)(G) (in addition to "identification of renal dialysis services included in the bundled payment," precluding review over "the determination of payment amounts," "the establishment of an appropriate unit of payment," "adjustments" to the payment, "the application of the phase-in payment mechanism, and "the establishment of the market basket percentage increase factors").  That identification of renal dialysis services is one of these subjects in which Congress barred review plainly indicates that subparagraph (B) was not intended to facilitate judicially imposed restraints on the agency exercise of discretion.

In short, the November 2024 Decision did not hold that anything must be excluded from the bundle, other than "vaccines," which are expressly statutorily excluded in subparagraph (B). *Ardelyx*, 2024 WL 4723068, at *11-14.  Plaintiffs' "patchwork" reading of that decision's interpretation of subparagraph (B) is a fiction.

###  2.    *Plaintiffs' Arguments Against the November 2024 Decision's Interpretation of Subpart (B)(iii) Fail.*

Plaintiffs make several other arguments as to why subpart (B)(iii) must be read impliedly to exclude oral-only drugs, or at least XPHOZAH.  None succeed.  As an initial matter, plaintiffs argue that the first clause of subpart (B)(iii) containing the parenthetical phrase "(before the

application of this paragraph)" can only refer to the time period prior to the year 2011, when MIPPA took effect.  Pls.' Mem. at 9-10.  Plaintiffs insist that phrase cannot be interpreted as referring to January 1, 2025, the date on which the statute is applying to oral-only drugs by CMS's rulemaking, because Congress did not leave up to CMS when the statute would become operative.  *Id.* at 10.  Based on this predicate construction, plaintiffs then reason that the first clause of subpart (B)(iii)—*i.e.*, "for which payment was (before the application of this paragraph) made separately under this subchapter"— refers only to drugs that were reimbursed as fee-for-service as part of the renal dialysis composite rate system under Medicare Part B prior to MIPPA's effective date in 2011.  *Id.* at 12-13.  Put more simply, plaintiffs interpret the first clause of subpart (B)(iii) as authorizing incorporation into the bundle payment system only drugs reimbursed separately from the lump-sum payment program but still within the pre-MIPPA renal dialysis reimbursement system.  *Id.* at 13.  That provision does not, according to plaintiffs, include drugs that were reimbursed outside of the renal dialysis system altogether, through Medicare Part D, as oral-only drugs were.  *See id.* at 12-13.

These arguments are, at least in part, belated, and ultimately, unpersuasive.  With respect to the meaning of the modifier "(before the application of this subparagraph)," plaintiffs could have asserted that argument in their original briefing but did not.  Defendants argued that the modifier "(before the application of this paragraph)" referred to January 1, 2025, for oral-only drugs, Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. or Expedited Summ. J. ("Defs.' Opp'n PI") at 33-34, ECF No. 16, and as mentioned previously, plaintiffs made no discernable argument to the contrary and instead largely ignored this statutory parenthetical phrase, *see* Pls.' Reply PI at 9-10.  *See Ardelyx*, 2024 WL 4723068, at *12 n.6; *see also Exxon Shipping*, 554 U.S. at 485 n.5 ("Rule 59(e) . . . 'may not be used to . . . raise arguments or present evidence that could have

been raised prior to the entry of judgment.'" (quoting 11 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1).[4]  Nor did plaintiffs explain why the rest of the first clause of subpart (B)(iii), stating "for which payment was (. . .) made separately under this subchapter," would not encompass drugs reimbursed separately through any reimbursement program, given that "this subchapter" refers to all Parts of Medicare, as defendants argued, Defs.' Opp'n PI 33-34. Plaintiffs responded merely that the "better reading" would be that the first clause of subpart (B)(iii) referred only to drugs previously administered by renal dialysis facilities.  Pls.' Reply PI at 9-10.

In any case, plaintiffs cannot justify why the modifier "(before the application of this paragraph)" cannot and should not refer to the application of MIPPA to a particular drug or class of drugs pursuant to CMS's rulemaking.  *See* Pls.' Reply at 11-12.  Plaintiffs assert that a regulation cannot alone delay the implementation of a statute, Pls.' Mem. at 10, but they do not contest that a regulation could do so if Congress so allowed, and here, Congress delegated the establishment and implementation of the bundled payment system to CMS, as previously discussed.[5]

---

[4]    In fact, plaintiffs inexplicably seemed to avoid discussing the timing-related clauses of the relevant provisions in this case altogether.  At times, their briefing omitted, via ellipses, the parenthetical phrase "(before application of this paragraph)" from the statutory definition, *see, e.g.*, Pls.' Opp'n to MTD at 9, 31.  Despite arguing that the agency improperly applied its own regulation, 42 C.F.R. § 413.171, to include XPHOZAH as a "renal dialysis service," Compl. ¶¶ 205-08; Pls.' Mem. PI at 35, plaintiffs also never leveraged the fact that this rule only incorporates "drugs . . . for which payment was (prior to January 1, 2011) made separately," and XPHOZAH was only approved in 2023, Compl. ¶ 27.  The November 2024 Decision did not, though, consider whether the inclusion of XPHOZAH in the bundle was consistent with CMS's own rulemaking because the Court lacked subject matter jurisdiction to do so under subparagraph (G).  *Ardelyx*, 2024 WL 4723068, at *16.  Consequently, the Decision could only evaluate whether CMS's actions were statutorily authorized.  *Id.*

[5]    Plaintiffs' argument would have more force if CMS were indefinitely delaying the application of this statute to a category of drugs without any congressional authorization.  That is not what has occurred here.  Though the first delay was implemented by CMS, Congress has since endorsed the delay of adding oral-only drugs to the bundle and thus lent tacit support to the interpretation of "before the application of this paragraph" being dependent on CMS rulemaking, at least for oral-only drugs.  *See* Pub. L. No. 112-240, sec. 632(b), § 1881(b), 126 Stat. at 2354; Pub. L. No. 113-93, sec. 217(a), 128 Stat. at 1061; Pub. L. No. 113-295, sec. 204, 128 Stat. at 4065.

Congress's specific use of the term "application" also makes clear that Congress did not intend merely to refer to the time before the paragraph "took effect" or before the paragraph "was enacted," as plaintiffs argue.  The word "application" means the "act of putting something to use."  *Application*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/application (last visited Dec. 19, 2024).  While § 1395rr(b)(14) has been implemented with respect to some drugs, that paragraph has not yet been "put to use" or "applied" with respect to oral-only drugs.  *See* Pub. L. No. 112-240, sec. 632(b), § 1881(b), 126 Stat. at 2354 (instructing CMS not to "implement" the policy incorporating oral-only drugs in the bundle).  The statute's clear intent to grant maximum discretion to the agency in developing the bundled payment system, ultimately aimed at increasing the efficiency of renal dialysis care, strongly weighs in favor of this narrower reading.  Plaintiffs offer no argument as to why Congress would have chosen the precise phrasing used in the parenthetical, "(before the application of this paragraph)," if it simply meant to say "before 2011."  *See* Pls.' Reply at 11-12.[6]

Regardless, adopting plaintiffs' interpretation of the modifier "(before application of this paragraph)" to mean "before 2011" would not, alone, change any conclusion in this case because that modifier—whatever its precise meaning—would still give the two clauses in subpart (B)(iii) independent effect, without needing to read the subpart as impliedly excluding oral-only drugs. *See Ardelyx*, 2024 WL 4723068, at *12; *supra* section III.A.1.  Consequently, CMS's regulation and the Letter-Decision would still qualify as "identification[s] of renal dialysis services" under the non-exhaustive subparagraph (B), thus invoking the preclusion subparagraph (G).

---

[6] The fact that CMS interpreted Congress to mean "before 2011" and not before MIPPA's application to any category of drug, as plaintiffs argue, Pls.' Reply at 12, is, again, irrelevant under *Loper Bright*, 144 S. Ct. at 2266 because deference to the agency's interpretation is not required.

Further, plaintiffs offer no persuasive reason why the first clause of subpart (B)(iii) describing "other drugs and biologicals that are furnished to individuals for the treatment of [ESRD] and for which payment was (before the application of this paragraph) made separately under this subchapter" should be read so narrowly as to only contemplate drugs previously reimbursed through the renal dialysis composite rate system.  Plaintiffs make arguments based on the purpose and history of MIPPA, Pls.' Mem. at 11-13, but the plain text of the statute is clear.  This "subchapter" refers to Subchapter XVIII, which includes Medicare Parts A, B, C, *and* D, so "separately under this subchapter" includes all drugs paid separately under any reimbursement system.  *See* 42 U.S.C. §§ 1395c-1395i-6 (Part A); *id.* §§ 1395j-1395w-6 (Part B); *id.* §§ 1395w-21-1395w-28 (Part C); *id.* §§ 1395w-101-1395w-154 (Part D).  Even if plaintiffs' reading was one plausible alternative, the November 2024 Decision's interpretation cannot be "dead wrong," *Lightfoot*, 355 F. Supp. 2d at 422 (quoting *Parts & Electrics Motors, Inc.*, 866 F.2d at 233), or "fundamentally unfair in light of governing law," *Leidos, Inc.*, 881 F.3d at 217 (quoting *Mohammadi*, 947 F. Supp. 2d at 78), given the language that clearly incorporates all of Medicare and thus all drugs previously reimbursed apart from any lump sum payment.

Finally, plaintiffs urge that the November 2024 Decision's reading of subpart (B)(iii) is clear error because, under that reading, the first part of subpart (B)(iii) integrates oral-only drugs paid for separately prior to January 1, 2025, which is "before the application of this paragraph," and the second part includes oral-equivalents of those drugs—that is, oral equivalents of oral-only drugs, which makes "no sense."  Pls.' Mem. at 13.  To be sure, subparagraph (B) has some overlapping aspects in its subparts, and thus, even under plaintiffs' reading of subpart (B)(iii), these subparts are not perfectly aligned.  For instance, subparts (B)(i) and (iv) reference "services," which is defined elsewhere to mean "medical care or services and items, such as

22

medical diagnosis and treatment[] [and] drugs and biologicals . . . ."  42 C.F.R. § 400.202.

"Drugs" are also included, however, in subpart (B)(iii).  That there exists a similar redundancy

within subpart (B)(iii) itself—a reference to oral equivalents of oral-only drugs—is not fatal.

Moreover, the statute uses the word "*any*" to precede "oral equivalent form," recognizing that

not all drugs in the first clause of subpart (B)(iii) have, or are capable of having, an oral form.

Some of those drugs may be ones only susceptible to injectable administration.  Likewise, some

may be oral-only drugs that therefore do not have an *oral equivalent*.  In any case, the November

2024 Decision's reading of subpart (B)(iii) does not render any words "altogether redundant,"

*Mercy Hospital, Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018), and any awkward phrasing

in subpart (B)(iii) cannot render the decision's conclusions "dead wrong," *Lightfoot*, 355 F.

Supp. 2d at 422 (quoting *Parts & Electrics Motors, Inc.*, 866 F.2d at 233).

*    *    *

Plaintiffs reasonably disagree with the conclusions reached in the November 2024

Decision, but their supposed manifest injustice is manufactured, and their arguments about the

meaning of subpart (B)(iii) do not demonstrate clear error.  Alteration of judgment is not

warranted.

**B.    Plaintiffs Have Not Demonstrated Likelihood of Success or Irreparable Harm for an Injunction Pending Appeal.**

In the alternative, plaintiffs request an injunction pending appeal.  Defendants argue that

such relief is not possible because no appeal is pending.  Defs.' Opp'n at 15.  In response,

plaintiffs cite authority for the grant of stays prior to the actual filing of an appeal.  Pls.' Reply at

14 (citing 11 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2904 ("When there is

reason to believe that an appeal will be taken, there is no reason why the district court should not

make an order preserving the status quo during the expected appeal."), and *In re Grand Jury*

*Subpoena No. 7409*, No. 18-cv-41 (BAH), 2018 WL 8334866, at *3 (D.D.C. Oct. 5, 2018)).  The

relevant question here, however, is not about granting a stay of the Court's judgment but rather

about imposing a new injunction pending appeal when injunctive relief was otherwise denied.

Even assuming, that an injunction could also be granted pending a yet-unnoticed appeal,

plaintiffs have not shown such relief would be proper here.

For the reasons explained in this opinion and the November 2024 Decision, plaintiffs are

unlikely to prevail on the merits.  Regardless, even if a lesser showing of likelihood of success

on the merits suffices where the other factors strongly militate in favor of relief, *see Republican*

*National Committee v. Pelosi*, No. 22-659 (TJK), 2022 WL 1604670, at *3 (D.D.C. May 20,

2022) ("'[I]n rare cases, the threat of irreparable harm may be so grave and the balance of the

equities may favor' the movant 'so decisively that an injunction pending appeal . . . may be

proper,' even without a likelihood of success on the merits, so long as the movant establishes a

'serious legal question' on the merits and shows that 'the other three factors tip sharply' in its

favor." (alterations in original) (quoting *Medinatura, Inc. v. FDA*, No. 20-2066 (RDM), 2021

WL 1025835, at *6 (D.D.C. Mar. 16, 2021))), plaintiffs cannot make the requisite showing of

irreparable harm.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for

refusing to issue a preliminary injunction, even if the other three factors entering the calculus

merit such relief.").

The kind of injury warranting injunctive relief "must be both certain and great; it must be

actual and not theoretical."  *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.

1985) (per curiam)).  "The moving party must show '[t]he injury complained of is of such

*imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable

24

harm," and "the injury must be beyond remediation." *Id.* (alterations in original) (first passage quoting *Wis. Gas Co.*, 758 F.2d at 674). "Speculative injury is not sufficient," so a preliminary injunction will not issue "simply to prevent the possibility of some remote future injury." 11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1. Further, "[i]t is 'well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.'" *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quoting *Lee v. Christian Coal.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001)). "[P]laintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the relief." *Id.*

Plaintiffs allege two primary injuries in their preliminary injunction briefing: harm to patients with respect to their health outcomes, and harm to Ardelyx, the corporation. First, with respect to patients, plaintiffs allege that if oral-only drugs, including XPHOZAH, are reimbursed through the bundled payment, renal dialysis facilities will effectively be insufficiently reimbursed for such drugs, which will strain patient access. Pls.' Mem. PI at 37-43. The facilities will be less inclined to prescribe XPHZOAH, so plaintiffs will receive inferior treatment, resulting in worse health outcomes, plaintiffs contend. *Id.* at 37-42. Second, with respect to Ardelyx, plaintiffs allege that they will lose market share and suffer financially due to the severe restriction of access to their drug, *id.* at 43, and that such economic harm cannot be remediated due to CMS's sovereign immunity, Pls.' Reply PI at 24.

Neither injury satisfies the requirements for injunctive relief. The harm to patients, and consequently Ardelyx, is too speculative and self-inflicted. Plaintiffs do not argue that XPHOZAH's addition to the bundle will cause harm in and of itself. They instead point to a chain of events that will occur that will result in harm to patients and Ardelyx: Patients who are

currently prescribed XPHOZAH by an individual doctor will have to obtain their prescription instead from a renal dialysis facility; the renal dialysis facility will be financially disincentivized to prescribe XPHOZAH, as a more expensive drug, now that paying for that drug will come out of the facility's bundled payment, which is underfunded; the facility will instead provide a cheaper, less effective alternative; the patient's health will decline; and Ardelyx will lose profits and market share.  *See* Pls.' Mem. PI at 38-39.  Plaintiffs do call out troubling real-world examples where they contend this chain of events has occurred.  *See id.* at 40-42.  Yet, as defendants explain, whether renal dialysis facilities will actually fail to provide patients the best possible care is far from certain.  *See* Defs.' Opp'n PI at 23-24.  Renal dialysis facilities have a legal obligation to "provide the necessary care to manage mineral metabolism" and adjust "the patient's plan of care to achieve the specified goals," 42 C.F.R. §§ 494.90(a)(3), (b)(3).  *Id.* at 24. They should, therefore, continue prescribing any drugs that are currently working for patients and prescribe the best course of care for patients experiencing new problems.  That facilities have, in plaintiffs' view, failed to do so in other situations does not make the potential harm "certain and great" here.

Importantly, Ardelyx also chose not to apply for the "transitional drug add-on payment adjustment" ("TDAPA"), 42 C.F.R. § 413.234(c), a regulatory program designed to "help ESRD facilities to incorporate new drugs and biological products" by giving facilities an add-on to its bundled base rate payment for the use of new drugs just added to the bundle.  Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System, 84 Fed. Reg. 60,648, 60,654 (Nov. 8, 2019) (codified at 42 C.F.R. § 413.234(c)); *see* Pls.' Reply PI at 22.  Such payments, which are available for an initial two years (and then up to three more), are designed to ease the transition and avoid the financial disincentives that plaintiffs fear.  *See* 42

C.F.R. § 413.234(c)(1), (3); 84 Fed. Reg. at 60,654.  Ardelyx apparently did not apply for

TDAPA because Ardelyx concluded that TDAPA would not "cover the cost to many . . .

facilities of prescribing XPHOZAH" and therefore would fail to "preserve[] access to

XPHOZAH for even existing patients."  Pls.' Reply PI at 23.  Plaintiffs cannot show, however,

that TDAPA would not at least mitigate the financial and patient harm during this potentially

five-year long period—or delay the impact such that the harm could not be considered both

"great" and "imminent."  Alleged harm that is, even "in part" self-inflicted "by the plaintiff[s']

own inaction," is not irreparable so as to warrant relief.  *Mott Thoroughbred Stables, Inc. v.

Rodriguez*, 87 F. Supp. 3d 237, 246 n.11 (D.D.C. 2015).  Plaintiffs therefore have not

demonstrated that an injunction pending appeal is proper here.

## IV.    CONCLUSION

Plaintiffs, once again on an expedited timeframe, have asked this Court to prevent from

taking effect on January 1, 2025, CMS's regulation and Letter-Decision integrating oral-only

drugs into the renal dialysis services bundle.  They cannot, however, demonstrate manifest

injustice or clear error warranting alteration of the prior judgment issued on November 8, 2024,

denying that request, nor can they demonstrate irreparable harm to justify relief pending appeal.

For these reasons, plaintiffs' motion is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  December 20, 2024

_____
**BERYL A. HOWELL**
United States District Judge