APPEAL,CLOSED,TYPE−E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:24−cv−02095−BAH
### *Internal Use Only*

ARDELYX, INC. et al v. BECERRA et al

Assigned to: Judge Beryl A. Howell

Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 07/17/2024

Date Terminated: 11/12/2024

Jury Demand: None

Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**ARDELYX, INC.**      represented by    **Alexander G. Siemers**
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004−1304
202−637−2200
Email: alex.siemers@lw.com
*ATTORNEY TO BE NOTICED*

**Christine Casey Smith**
LATHAM & WATKINS
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004−1304
202−637−2282
Email: christine.smith@lw.com
*ATTORNEY TO BE NOTICED*

**Delia Tasky**
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004−1304
202−637−2200
Fax: 202−637−2201
Email: delia.tasky@lw.com
*ATTORNEY TO BE NOTICED*

**Nicholas L Schlossman**
LATHAM & WATKINS
300 Colorado Street
Suite 2400
Austin, TX 78701
737−910−7300
Fax: 737−910−7301

Email: nicholas.schlossman@lw.com
*ATTORNEY TO BE NOTICED*

**Michael E. Bern**
LATHAM & WATKINS LLP
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
(202) 637−2200
Email: michael.bern@lw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMERICAN ASSOCIATION OF KIDNEY PATIENTS**    represented by    **Alexander G. Siemers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine Casey Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Delia Tasky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas L Schlossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E. Bern**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL MINORITY QUALITY FORUM**    represented by    **Amit Kumar Sharma**
MCCOLLUM & ASSOCIATES, LLC
7309 Baltimore Avenue
Suite 117
College Park, MD 20741
(301) 864−6070
Fax: (301) 864−4351
Email: asharma@jmlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James E. McCollum , Jr.**
MCCOLLUM & ASSOCIATES, LLC
7309 Baltimore Avenue
Suite 117
College Park, MD 20740
(301) 864−6070, X203

Fax: (301) 864−4351
Email: jmccollum@jmlaw.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander G. Siemers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine Casey Smith**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Delia Tasky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas L Schlossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael E. Bern**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**XAVIER BECERRA**                      represented by   **John Bardo**
*Secretary of Health and Human Services*                 DOJ−USAO
                                                         601 D Street NW
                                                         Washington, DC 20530
                                                         (202) 870−6770
                                                         Email: john.bardo@usdoj.gov
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**U.S. DEPARTMENT OF HEALTH**           represented by   **John Bardo**
**AND HUMAN SERVICES**                                   (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**CHIQUITA BROOKS−LASURE**              represented by   **John Bardo**
*Administrator of Centers for Medicare*                  (See above for address)
*and Medicaid Services*                                  *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**CENTERS FOR MEDICARE AND**
**MEDICAID SERVICES**

represented by  **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/17/2024 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11033242) filed by ARDELYX, INC., NATIONAL MINORITY QUALITY FORUM, AMERICAN ASSOCIATION OF KIDNEY PATIENTS. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet, # 4 Summons to Xavier Becerra, # 5 Summons to U.S. Department of Health and Human Services, # 6 Summons to Chiquita Brooks−LaSure, # 7 Summons to Centers for Medicare and Medicaid Services, # 8 Summons to U.S. Attorney General, # 9 Summons to U.S. Attorney for D.C.)(Bern, Michael) (Entered: 07/17/2024) |
| 07/17/2024 | 2 | NOTICE of Appearance by Nicholas L Schlossman on behalf of All Plaintiffs (Schlossman, Nicholas) (Entered: 07/17/2024) |
| 07/17/2024 | 3 | NOTICE of Appearance by Alexander George Siemers on behalf of All Plaintiffs (Siemers, Alexander) (Entered: 07/17/2024) |
| 07/17/2024 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ARDELYX, INC. (Bern, Michael) (Entered: 07/17/2024) |
| 07/18/2024 | 5 | NOTICE of Appearance by Delia Tasky on behalf of All Plaintiffs (Tasky, Delia) (Entered: 07/18/2024) |
| 07/18/2024 |  | Case Assigned to Judge Beryl A. Howell. (znmw) (Entered: 07/18/2024) |
| 07/18/2024 | 6 | SUMMONS (6) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 07/18/2024) |
| 07/23/2024 | 7 | STANDING ORDER. Signed by Judge Beryl A. Howell on July 23, 2024. (lcbah4) (Entered: 07/23/2024) |
| 08/05/2024 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 7/19/2024. Answer due for ALL FEDERAL DEFENDANTS by 9/17/2024. (Bern, Michael) (Entered: 08/05/2024) |
| 08/05/2024 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 07/25/2024. (Bern, Michael) (Entered: 08/05/2024) |
| 08/05/2024 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. XAVIER BECERRA served on 7/24/2024; CHIQUITA BROOKS−LASURE served on 8/5/2024; CENTERS FOR MEDICARE AND MEDICAID SERVICES served on 8/5/2024; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES served on 7/24/2024 (Bern, Michael) (Entered: 08/05/2024) |
| 09/17/2024 | 11 | MOTION to Dismiss by XAVIER BECERRA, CHIQUITA BROOKS−LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Bardo, John) (Entered: 09/17/2024) |

| 09/19/2024 | 12 | NOTICE of Appearance by James E. McCollum, Jr on behalf of NATIONAL MINORITY QUALITY FORUM (McCollum, James) (Main Document 12 replaced on 9/19/2024) (zdp) (Entered: 09/19/2024) |
|---|---|---|
| 09/19/2024 | 13 | NOTICE of Appearance by Amit Kumar Sharma on behalf of NATIONAL MINORITY QUALITY FORUM (Sharma, Amit) (Main Document 13 replaced on 9/19/2024) (zdp). (Entered: 09/19/2024) |
| 09/19/2024 | 14 | MOTION for Preliminary Injunction *or, in the Alternative, for Expedited Summary Judgment* by AMERICAN ASSOCIATION OF KIDNEY PATIENTS, ARDELYX, INC., NATIONAL MINORITY QUALITY FORUM. (Attachments: # 1 Declaration of Diana Clynes, # 2 Declaration of Dr. Gary Puckrein, # 3 Declaration of Laura Williams, # 4 Exhibit 1 to Williams Declaration, # 5 Exhibit 2 to Williams Declaration, # 6 Exhibit 3 to Williams Declaration, # 7 Exhibit 4 to Williams Declaration, # 8 Exhibit 5 to Williams Declaration, # 9 Exhibit 6 to Williams Declaration, # 10 Exhibit 7 to Williams Declaration, # 11 Exhibit 8 to Williams Declaration, # 12 Text of Proposed Order)(Bern, Michael). Added MOTION for Expedited Summary Judgment on 9/20/2024 (mg). (Entered: 09/19/2024) |
| 09/20/2024 | | MINUTE ORDER (paperless), upon consideration of the filing of plaintiffs' 14 Motion for Preliminary Injunction or, in the Alternative, for Expedited Summary Judgment ("PI Motion"), just two days after defendants moved to dismiss for lack of subject matter jurisdiction on the basis that plaintiffs "lack a cause of action under the APA&#8212and this Court has no jurisdiction&#8212because the Medicare statute explicitly precludes judicial review of their claims," Defs.' Mem. Supp. Mot. to Dismiss ("Defs.' Mem."), ECF No. 11−1&#8212thus raising a threshold argument to resolve before reaching the merits of plaintiffs' pending PI Motion and claims&#8212DIRECTING the parties, by Monday, September 23, 2024 at 5:00 PM, to submit a joint proposed briefing schedule regarding plaintiffs' 14 PI Motion, which proposed submission shall address expediting briefing on the jurisdictional argument set forth in defendants' 11 Motion to Dismiss, such that any opposition by plaintiffs to defendants' 11 Motion to Dismiss is due by September 26, 2024, and any reply due by October 3, 2024. Signed by Judge Beryl A. Howell on September 20, 2024. (lcbah4) (Entered: 09/20/2024) |
| 09/20/2024 | | Set/Reset Deadlines: Parties Proposed Briefing Schedule due no later than 5:00PM on 9/23/2024. Opposition To Defendant's Motion To Dismiss due by 9/26/2024. Any Reply due by 10/03/2024. (mac) (Entered: 09/20/2024) |
| 09/23/2024 | 15 | PROPOSED BRIEFING SCHEDULE re Order,,,, *(Joint)* by AMERICAN ASSOCIATION OF KIDNEY PATIENTS, ARDELYX, INC.. (Bern, Michael) (Entered: 09/23/2024) |
| 09/24/2024 | | MINUTE ORDER (paperless) upon consideration of the parties' 15 Joint Proposed Schedule for Further Proceedings ("Jt. Proposed Schedule") regarding defendants' 11 Motion to Dismiss ("Motion to Dismiss"), and plaintiffs' 14 Motion for Preliminary Injunction or, in the Alternative, for Expedited Summary Judgment ("PI Motion"), FINDING that a hearing date later than 21 days from the filing of plaintiff's PI Motion, *i.e.*, after October 10, 2024, "will not prejudice the parties," LCvR 65.1(d), where, setting aside this Court's inherent authority to manage its congested docket, plaintiffs have not shown that "expedition" is "essential," or that a later hearing date or later decision resolving plaintiffs' motion on the papers would "prejudice the parties," LCvR 65.1(d), since as the parties represent, "the challenged agency actions under review will take effect on January 1, 2025," Jt. Proposed Schedule at 2, which date is more than |

three months from the filing date of plaintiffs' motion, and the parties' proposed briefing schedule does not contemplate that briefing will become ripe until October 16, 2024, *i.e.*, 6 days after any expedited hearing on plaintiffs' motion would have to be held per LCvR 65.1(d), *see* Jt. Proposed Schedule at 2; and ISSUING the following SCHEDULING ORDER jointly proposed by the parties to govern the resolution of defendants' 11 Motion to Dismiss and plaintiffs' 14 PI Motion:

1.By October 4, 2024, plaintiffs shall file any opposition to defendants' 11 Motion to Dismiss, and defendants shall file any opposition to plaintiffs' 14 PI Motion;

2.By October 16, 2024, defendants shall file any reply in support of their 11 Motion to Dismiss, and plaintiffs shall file any reply in support of their 14 PI Motion.

Any hearing on the pending motions will be scheduled, only if necessary. *See* LCvR 65.1(d) (noting that motion for a preliminary injunction may be decided on the papers).

Signed by Judge Beryl A. Howell on September 24, 2024. (lcbah4) (Entered: 09/24/2024)

| 09/26/2024 | | Set/Reset Deadlines: Plaintiff Opposition To Defendants' 11 Motion To Dismiss And Defendants Opposition To Plaintiffs' 14 PI Motion due by 10/4/2024. Defendants Reply In Support Of 11 Motion To Dismiss, And Plaintiffs Reply In Support Of 14 PI Motion due by 10/16/2024. (mac) (Entered: 09/26/2024) |
|---|---|---|
| 10/04/2024 | 16 | Memorandum in opposition to re 14 Motion for Preliminary Injunction,,,, Motion for Summary Judgment,,, filed by XAVIER BECERRA, CHIQUITA BROOKS−LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Attachments: # 1 Text of Proposed Order)(Bardo, John) (Entered: 10/04/2024) |
| 10/04/2024 | 17 | RESPONSE re 11 MOTION to Dismiss filed by AMERICAN ASSOCIATION OF KIDNEY PATIENTS, ARDELYX, INC., NATIONAL MINORITY QUALITY FORUM. (Attachments: # 1 Text of Proposed Order)(Bern, Michael) (Entered: 10/04/2024) |
| 10/04/2024 | 18 | NOTICE of Appearance by Christine Casey Smith on behalf of AMERICAN ASSOCIATION OF KIDNEY PATIENTS, ARDELYX, INC., NATIONAL MINORITY QUALITY FORUM (Smith, Christine) (Entered: 10/04/2024) |
| 10/16/2024 | 19 | REPLY to opposition to motion re 11 Motion to Dismiss filed by XAVIER BECERRA, CHIQUITA BROOKS−LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Bardo, John) (Entered: 10/16/2024) |
| 10/16/2024 | 20 | REPLY to opposition to motion re 14 Motion for Preliminary Injunction,,,, Motion for Summary Judgment,,, filed by AMERICAN ASSOCIATION OF KIDNEY PATIENTS, ARDELYX, INC., NATIONAL MINORITY QUALITY FORUM. (Attachments: # 1 Declaration of Laura Williams)(Bern, Michael) (Entered: 10/16/2024) |
| 11/08/2024 | 21 | ORDER GRANTING defendants' 11 Motion to Dismiss; DISMISSING plaintiffs' 1 Complaint; and DENYING as moot plaintiffs' 14 Motion for Preliminary Injunction, or in the Alternative, for Expedited Summary Judgment. See Order for further details. The Clerk of Court is directed to close this case. Signed by Judge Beryl A. Howell on |

| | | |
|---|---|---|
| | | November 8, 2024. (lcbah4) (Entered: 11/08/2024) |
| 11/08/2024 | 22 | MEMORANDUM OPINION regarding defendants' 11 Motion to Dismiss and plaintiffs' 14 Motion for Preliminary Injunction, or in the Alternative, for Expedited Summary Judgment. Signed by Judge Beryl A. Howell on November 8, 2024. (lcbah4) (Entered: 11/08/2024) |
| 11/20/2024 | 23 | MOTION to Alter Judgment , *or in the Alternative, for an Injunction Pending Appeal* by ARDELYX, INC., AMERICAN ASSOCIATION OF KIDNEY PATIENTS, NATIONAL MINORITY QUALITY FORUM. (Attachments: # 1 Text of Proposed Order)(Bern, Michael). Added MOTION for Injunction on 11/21/2024 (mg). (Entered: 11/20/2024) |
| 11/22/2024 | 24 | MOTION for Extension of Time to *File an Opposition to Plaintiff's Motion for Relief from Judgment* by U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, CHIQUITA BROOKS−LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES. (Attachments: # 1 Text of Proposed Order)(Bardo, John) (Entered: 11/22/2024) |
| 11/22/2024 | 25 | RESPONSE re 24 MOTION for Extension of Time to *File an Opposition to Plaintiff's Motion for Relief from Judgment* filed by ARDELYX, INC., AMERICAN ASSOCIATION OF KIDNEY PATIENTS, NATIONAL MINORITY QUALITY FORUM. (Bern, Michael) (Entered: 11/22/2024) |
| 11/26/2024 | | MINUTE ORDER (paperless), upon consideration of defendants' 24 Motion for a Nine−Day Extension of Time to File Opposition Brief and plaintiffs' 25 Opposition, GRANTING IN PART defendants' 24 Motion; and ORDERING defendants to file any opposition to plaintiffs' 23 Motion to Alter Judgment by December 10, 2024; and FURTHER ORDERING plaintiffs to file any reply by December 13, 2024. Signed by Judge Beryl A. Howell on November 26, 2024. (lcbah4) (Entered: 11/26/2024) |
| 11/27/2024 | | Set/Reset Deadlines: Defendants Opposition To Plaintiffs 23 Motion to Alter Judgment due by 12/10/2024. Plaintiffs Reply due by 12/13/2024. (mac) (Entered: 11/27/2024) |
| 12/10/2024 | 26 | Memorandum in opposition to re 23 Motion to Alter Judgment,, Motion for Injunction, filed by XAVIER BECERRA, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, CHIQUITA BROOKS−LASURE, CENTERS FOR MEDICARE AND MEDICAID SERVICES. (Attachments: # 1 Text of Proposed Order)(Bardo, John) (Entered: 12/10/2024) |
| 12/13/2024 | 27 | REPLY to opposition to motion re 23 Motion to Alter Judgment,, Motion for Injunction, filed by ARDELYX, INC., AMERICAN ASSOCIATION OF KIDNEY PATIENTS, NATIONAL MINORITY QUALITY FORUM. (Bern, Michael) (Entered: 12/13/2024) |
| 12/20/2024 | 28 | ORDER DENYING plaintiffs' 23 Motion to Alter Judgment, or in the Alternative, for an Injunction Pending Appeal. See Order for further details. Signed by Judge Beryl A. Howell on December 20, 2024. (lcbah4) (Entered: 12/20/2024) |
| 12/20/2024 | 29 | MEMORANDUM OPINION regarding plaintiffs' 23 Motion to Alter Judgment, or in the Alternative, for an Injunction Pending Appeal. Signed by Judge Beryl A. Howell on December 20, 2024. (lcbah4) (Entered: 12/20/2024) |
| 12/23/2024 | 30 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 28 Order on Motion to Alter Judgment, Order on Motion for Injunction, 21 Order on Motion to Dismiss, by |

| | | ARDELYX, INC., AMERICAN ASSOCIATION OF KIDNEY PATIENTS, NATIONAL MINORITY QUALITY FORUM. Filing fee $ 605, receipt number ADCDC−11374156. Fee Status: Fee Paid. Parties have been notified. (Bern, Michael) (Entered: 12/23/2024) |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARDELYX, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 24-cv-02095 (BAH) |
| BECERRA, *et al.*, | |
| Defendants. | |

## <u>NOTICE OF APPEAL</u>

Plaintiffs Ardelyx, Inc., American Association of Kidney Patients, and National Minority Quality Forum (collectively, "Plaintiffs"), appeal to the United States Court of Appeals for the District of Columbia Circuit from the November 8, 2024 order (ECF No. 21) granting Defendants' Motion to Dismiss, dismissing Plaintiffs' Complaint, and denying as moot Plaintiffs' Motion for Preliminary Injunction, or, in the Alternative, for Expedited Summary Judgment; and from the December 20, 2024 order (ECF No. 28) denying Plaintiffs' Rule 59(e) Motion to Alter or Amend the Judgment, or in the Alternative, for an Injuncting Pending Appeal.

Dated: December 23, 2024

Respectfully submitted,

*/s/ Michael E. Bern*
Michael E. Bern  (DC Bar No. 994791)
Christine C. Smith (DC Bar No. 1658087)
Delia Tasky (DC Bar No. 1724285)
Alexander G. Siemers (DC Bar No. 900067465)
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email:   michael.bern@lw.com
         christine.smith@lw.com

         delia.tasky@lw.com
         alex.siemers@lw.com


Nicholas L. Schlossman (DC Bar No. 1029362)
Latham & Watkins LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email:   nicholas.schlossman@lw.com

*Attorneys for Plaintiffs Ardelyx, Inc., American Association of Kidney Patients*

James E. McCollum, Jr. (DC Bar. No. 398117)
Amit K. Sharma (D.C. Bar No. 503604)
The McCollum Firm, LLC
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
Tel: (301) 537-0661
Fax: (301) 864-4351
Email:   jmccollum@jmlaw.net
         asharma@jmlaw.net

*Attorneys for Plaintiff National Minority Quality Forum*

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ARDELYX, INC., *et al.*, |
| Plaintiffs, |
| v. |
| BECERRA, *et al.*, |
| Defendants. |

Civil Action No. 24-cv-02095 (BAH)

Judge Beryl A. Howell

**ORDER**

Upon consideration of plaintiffs' Motion to Alter Judgment, or in the Alternative, for an Injunction Pending Appeal, ECF No. 23, the legal memoranda in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby--

**ORDERED** that plaintiffs' Motion to Alter Judgment, or in the Alternative, for an Injunction Pending Appeal, ECF No. 23 is **DENIED**.

**SO ORDERED**.

Date:  December 20, 2024

*This is a final and appealable order.*

_____
**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ARDELYX, INC., *et al.*, |
| Plaintiffs, |
| v. |
| BECERRA, *et al.*, |
| Defendants. |

Civil Action No. 24-cv-2095 (BAH)

Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

Plaintiffs—a biopharmaceutical company, Ardelyx, Inc.; a nonprofit organization representing kidney patients, the American Association of Kidney Patients; and a nonprofit healthcare research group, the National Minority Quality Forum (collectively "plaintiffs")—commenced this lawsuit on July 17, 2024. *See* Compl., ECF No. 1. In response, defendants, Department of Health and Human Services and Centers for Medicare and Medicaid Services ("CMS"), moved to dismiss for lack of jurisdiction, due to the operation of 42 U.S.C. § 1395rr(b)(14)(G) ("subparagraph (G)"), which precludes judicial review of CMS's identification of renal dialysis services to be included in the bundled reimbursement payment system under Medicare Part B. Defs.' Mot. Dismiss ("Defs.' MTD"), ECF No. 11. Plaintiffs shortly thereafter, on September 19, 2024, moved for a preliminary injunction, or expedited summary judgment, to prevent from taking effect on January 1, 2025, a regulation and determination by CMS that "oral-only drugs," including Ardelyx's drug, XPHOZAH, are "renal dialysis services" subject to the bundled reimbursement system. Pls.' Mot. for & Mem. in Supp. of Prelim. Inj. or Expedited Summ. J. ("Pls.' Mem. PI"), ECF No. 14. Briefing was completed on both motions in one month, in accord with the schedule proposed by the parties, *see* Joint Proposed Schedule for Further Proceedings, ECF No. 15, and three weeks later, on November 8,

1

2024, the Court granted defendants' motion to dismiss for lack of jurisdiction, holding that CMS's regulation and determination that oral-only drugs, including XPHOZAH, were "renal dialysis services" were precluded by subparagraph (G). *Ardelyx, Inc. v. Becerra*, No. 24-cv-2095 (BAH), 2024 WL 4723068 (D.D.C. Nov. 8, 2024) ("November 2024 Decision"); Order Grant'g Defs.' MTD and Denying Pls.' Mot. PI as Moot ("Nov. 2024 Order"), ECF No. 21. Plaintiffs' request for a preliminary injunction, or expedited summary judgment, was then denied as moot. *See* Nov. 2024 Order.

On November 20, 2024, plaintiffs moved to alter that judgment, pursuant to Federal Rule of Civil Procedure 59(e), and requested, in the alternative, an injunction pending appeal. Pls.' Mot. to Alter Judgt. & Mem. in Supp. ("Pls.' Mem."), ECF No. 23. In the ensuing dispute over briefing deadlines, plaintiffs urged adherence to an expedited schedule that would allow plaintiffs to seek appellate review of any reconsideration decision issued by this Court prior to oral-only drugs entering the bundled reimbursement package on January 1, 2025. *See* Defs.' Mot. for Extension of Time, ECF No. 24; Pls.' Response to Defs.' Mot., ECF No. 25. Pursuant to the Court's briefing deadlines, *see* Min. Order (Nov. 26, 2024) (granting in part defendants' request for an extension), defendants filed an opposition on December 10, 2024, *see* Defs.' Opp'n to Pls.' Mot. to Alter Judgt. ("Defs.' Opp'n"), ECF No. 26, and plaintiffs replied on December 13, 2024, *see* Pls.' Reply in Supp. Mot. to Alter Judgt. ("Pls.' Reply"), ECF No. 27.

For the reasons set forth below, plaintiffs' motion for alteration of judgment, or in the alternative, for an injunction pending appeal, is denied.

## I.    BACKGROUND

The statutory, regulatory, and factual background for this case is set out in detail in the prior decision granting the defendants' motion to dismiss. *See Ardelyx*, 2024 WL 4723068, at *1-6. A brief overview, as pertinent to the disposition of the pending motion, is below.

### A.    Factual Background

Ardelyx manufactures a drug, tenapanor, branded as XPHOZAH, that treats hyperphosphatemia—a condition of having too much phosphate in the blood—which is highly common in patients with end-stage renal disease ("ESRD"). Compl. ¶¶ 24, 26, 150. The FDA approved XPHOZAH in 2023 for adults with chronic kidney disease. *Id.* ¶ 27; Williams Decl., Ex. 1, XPHOZAH Prescribing Information at 1, ECF No. 14-4. The drug exists only in an oral form—a pill taken twice a day. *Id.* ¶ 28. Currently, XPHOZAH is reimbursed under Medicare Part D, which provides a traditional prescription drug insurance plan for enrollees. *Id.* ¶ 170; 42 U.S.C. § 1395w-101.

Since the 1980s, renal dialysis services have been subject to a separate Medicare coverage scheme. The original "composite rate system" included some renal dialysis services under a fixed, prospective payment system (determined by the number of treatments administered) and others under a fee-for-service plan, all under Medicare Part B. Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, ch.3, sec. 2145(a)(7), § 1881(b), 95 Stat. 357 (codified as amended at 42 U.S.C. § 1395rr); Compl. ¶ 64. The current regime, adopted in 2008, with enactment of the Medicare Improvements for Patient Providers Act of 2008 ("MIPPA"), moved all renal dialysis services, as defined in 42 U.S.C. § 1395rr(14)(B) ("subparagraph (B)"), starting in 2011, into a bundled payment system under Medicare Part B. Pub. L. No. 110-275, sec. 153, § 1881(b)(12)(G), 122 Stat. 2553 (codified as amended at 42 U.S.C. § 1395rr(b)(14)); 42 U.S.C. § 1395rr(b)(14)(A)(i) ("[F]or services furnished on or after

January 1, 2011, the secretary shall implement a payment system under which a single payment

is made under this title to a provider of services or a renal dialysis facility for renal dialysis

services (as defined in subparagraph (B)) in lieu of any other payment . . . .").  Subparagraph (B)

states, in full:

> For purposes of this paragraph, the term "renal dialysis services" includes—
>
> (i) items and services included in the composite rate for renal dialysis services as
>     of December 31, 2010;
> (ii) erythropoiesis stimulating agents and any oral form of such agents that are
>     furnished to individuals for the treatment of end stage renal disease;
> (iii) other drugs and biologicals that are furnished to individuals for the treatment
>     of end stage renal disease and for which payment was (before the application
>     of this paragraph) made separately under this subchapter, and any oral
>     equivalent form of such drug or biological; and
> (iv) diagnostic laboratory tests and other items and services not described in
>     clause (i) that are furnished to individuals for the treatment of end stage renal
>     disease.
>
> Such term does not include vaccines.

MIPPA also limited judicial review of items included in the bundled system by expressly

stating, in subparagraph (G), in pertinent part, that:

> There shall be no administrative or judicial review under section 1395ff of this
> title, section 1395*oo* of this title, or otherwise of the determination of payment
> amounts under subparagraph (A), the establishment of an appropriate unit of
> payment under subparagraph (C), [or] the identification of renal dialysis services
> included in the bundled payment . . . .

*Id.* § 1395rr(b)(14)(G) ("subparagraph (G)").

To implement the bundled payment system, CMS in 2010 promulgated a regulation

providing a definitional section stating, in pertinent part, that:

> [T]he following items and services are considered 'renal dialysis services' and
> paid under the ESRD prospective payment system: . . . (3) Other drugs and
> biologicals that are furnished to individuals for the treatment of ESRD and for
> which payment was (prior to January 1, 2011) made separately under Title XVIII
> of the Act (including drugs and biologicals with only an oral form) . . . .

4

42 C.F.R. § 413.171.  Despite its promulgation in 2010, this regulation has not yet gone into effect with respect to oral-only drugs.  CMS first delayed implementation of the regulation for oral-only drugs until 2014, *see* Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System, 75 Fed. Reg. 49,030, 49,032 (Aug. 12, 2010) (codified at 42 C.F.R. § 413.171), and Congress then thrice delayed implementation for oral-only drugs, most recently until January 1, 2025, *see* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, sec. 632(b), § 1881(b), 126 Stat. 2313, 2354 (2013); Protecting Access to Medicare Act of 2014, Pub. L. No. 113-93, sec. 217(a), 128 Stat. 1040, 1061; Tax Increase Prevention Act of 2014, Pub. L. No. 113-295, sec. 204, 128 Stat. 4010, 4065.

In July 2024, CMS issued a letter-decision determining that, pursuant to 42 C.F.R. § 413.171, XPHOZAH is a renal-dialysis service that will be included in the bundled Part B payment as of January 1, 2025.  Compl., Ex. 1, XPHOZAH Letter-Decision at 1, ECF No. 1-1.

### B.    Procedural Background

Plaintiffs challenged defendants' July 2024 letter-decision classifying XPHOZAH as a renal dialysis service and the regulation, 42 C.F.R. § 413.171, which includes oral-only drugs in the bundled payment system, Compl. ¶¶ 199, 208, 215, arguing that (1) oral-only drugs, including XPHOZAH, are not "renal dialysis services" under the statutory definition in subparagraph (B), *id.* ¶¶ 198, 214-15; (2) that XPHOZAH, in particular, is not a "renal dialysis service" because the drug is not "furnished for the treatment of ESRD," as required by subparagraph (B), *id.* ¶¶ 198-99; and (3) that XPHOZAH is not a "renal dialysis service" under CMS's own regulatory definition, codified at 42 C.F.R. § 413.171(5), *id.* ¶¶ 205-08.  Defendants moved to dismiss, under Federal Rule of Civil Procedure 12(b)(1), on the ground that the exercise of subject matter jurisdiction over this case is barred by subparagraph (G), *see* Defs.'

5

Mem. in Supp. MTD, ECF No. 11-1, with plaintiffs contesting application of subparagraph (G) here, *see* Pls.' Opp'n to Defs.' MTD ("Pls.' Opp'n MTD"), ECF No. 17.

The Court held that subparagraph (G) did apply to the regulation and Letter-Decision, so long as these agency actions properly qualified as "identification[s] of renal dialysis services," based on how Congress defined that term in subparagraph (B). *Ardelyx*, 2024 WL 4723068, at *8. Oral-only drugs were not excluded by Congress's definition of "renal dialysis services," which was broadly inclusive and non-exhaustive. *Id.* at *11. Moreover, oral-only drugs were expressly included by subpart (B)(iii), which incorporates in the bundle "other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately . . . ." *Id.* The parenthetical reference to "paragraph"—meaning 42 U.S.C. § 1395rr(b)(14), requiring renal dialysis services to be subject to the bundled payment system—would only apply to oral-only drugs as of January 1, 2025, due to CMS and congressional delays in applying this statutory provision and accompanying implementing regulation to this category of drugs used to treat ESRD, so any existing oral-only drugs counted as drugs for which payment was "made separately" prior to the paragraph's application. *Id.* at *12. Therefore, because oral-only drugs and XPHOZAH qualified as "renal dialysis services" under that definition in subparagraph (B), subparagraph (G) applied to preclude further review. *Id.* at *14, 16. The Court accordingly granted defendants' motion to dismiss and denied as moot plaintiffs' motion for preliminary injunction or expedited summary judgment. *See Order*. That order was a final, appealable judgment. *Id.*

Instead of appealing immediately, however, plaintiffs have expended more time litigating before this Court, requesting reconsideration and alteration of the November 2024 Order,

pursuant to Federal Rule of Civil Procedure 59(e), to avoid "clear error or manifest injustice." *See* Pls.' Mem.  In the alternative, plaintiffs request an injunction pending appeal.  *Id.*  Plaintiffs' main contention is that the Court's interpretation of subparagraph (B) is practically unworkable and inconsistent with CMS practice, *id.* at 3-4, and, based on entirely new lines of argument not previously presented, legally wrong and illogical.  *Id.* at 9-10, 13.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 59(e): Altering or Amending a Judgment

Altering or amending a judgment "after its entry is an extraordinary remedy which should be used sparingly."  *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (quoting CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (3d ed. 2012)).  "A district court need not grant a Rule 59(e) motion unless there is an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'"  *Id.* (quoting *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012)).  Parties may not use a Rule 59(e) motion to "relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (quoting 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (2d ed. 1995)); *see District of Columbia v. Doe*, 611 F.3d 888, 896 (D.C. Cir. 2010) ("Rule 59(e) motions are aimed at reconsideration, not initial consideration." (quoting *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477 (6th Cir. 2007))); *Cobell v. Jewell*, 802 F.3d 12, 25-26 (D.C. Cir. 2015) (describing the "prohibition on raising new arguments post-judgment" as "strict").  The Rule is a "limited exception to the rule that judgments are to remain final," and whether to grant such a motion is within the Court's discretion.  *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 216-17 (D.C. Cir. 2018).

### B.    Federal Rule of Civil Procedure 62(d): Injunction Pending Appeal

Under Rule 62(d), a court may "grant an injunction" "[w]hile an appeal is pending from" a "final judgment" refusing an injunction. Fed. R. Civ. P. 62(d). An injunction pending appeal is an "exceptional remedy." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017). The test for an injunction pending appeal is substantially similar to that for a preliminary injunction: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); 16A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3954 (5th ed. 2024) (noting that the standard for an appellate court granting an injunction pending appeal is "generally the same" as that for a district court (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987))). Given the unique posture of an injunction pending appeal, however, courts have held that "[t]he four factors should be balanced," allowing a lesser showing of success on the merits where "the balance of harms tips heavily enough in the" movant's favor. 16A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 3954. A movant, nonetheless, always has an "obligation to demonstrate irreparable harm." *John Doe Co.*, 849 F.3d at 1134; *Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 7 (1st Cir. 2021) ("If the [movants] cannot demonstrate irreparable harm, [the court] need not discuss the other factors.").

## III.    DISCUSSION

The requisite showings under Rule 59(e) or Rule 62(d) for relief are not met here. Plaintiffs misread the prior decision in this case to dictate a limited scope of subparagraph (B) and thus create problems with the administration of the statute where none exist. Moreover, at this late juncture, plaintiffs bring new arguments that could have been previously raised, while

rehashing old ones already rejected.  None warrants relief under Rule 59(e).  Further, plaintiffs' request for an injunction pending appeal fails because plaintiffs cannot demonstrate irreparable harm.  Plaintiffs' motion is, consequently, denied.

**A.    Plaintiffs Cannot Demonstrate Clear Error or Manifest Injustice.**

Plaintiffs contend that "reconsideration is necessary to correct a clear error or prevent manifest injustice."  Pls.' Mem. at 2.  "'Clear error' should conform to a 'very exacting standard.'"  *Lightfoot v. District of Columbia*, 355 F. Supp. 2d 414, 422 (D.D.C. 2005) (quoting *Piper v. Dep't of Justice*, 312 F. Supp. 2d 17, 21 (D.D.C. 2004)).  "A final judgment must be 'dead wrong' to constitute clear error."  *Id.* (quoting *Parts & Elecs. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)).  A decision may "result in manifest injustice" if it "upset[s] settled expectations—expectations on which a party may reasonably place reliance." *Leidos, Inc.*, 881 F.3d at 217 (second passage quoting *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007)).  "'[M]anifest injustice' requires 'at least (1) a clear and certain prejudice to the moving party that is (2) fundamentally unfair in light of governing law.'"  *Id.* (alteration in original) (quoting *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 78 (D.D.C. 2013), *aff'd*, 782 F.3d 9).  Plaintiffs cannot demonstrate either clear error or manifest injustice.

**1.    *Plaintiffs Incorrectly Read the November 2024 Decision's Interpretation of Subparagraph (B).***

First, plaintiffs grossly overread the November 2024 Decision, mistakenly understanding this ruling as defining the outer bounds of "renal dialysis services" under subparagraph (B). Predicated on this flawed reading, plaintiffs go on to argue that such a reading of this subparagraph would create a "patchwork quilt" of what is included and excluded in the renal dialysis services bundle, and that this "patchwork" is inconsistent with CMS's interpretation and is illogical.  Pls.' Mem. at 3-4.  According to plaintiffs, such a reading of subpart (B)(iii) would

9

not permit the inclusion of certain categories of drugs in the bundle, citing examples of: (1) intravenous and injectable drugs and biologicals approved by the FDA after 2011, because those drugs were not paid for separately prior to 2011, when § 1395rr(b)(14) first applied to intravenous and injectable drugs; (2) new oral-only drugs created after January 2025, because they are neither "oral equivalents" nor drugs paid for separately prior to January 1, 2025, when subparagraph (B) will be first applied to oral-only drugs; and (3) oral equivalents of injectable or other drugs that were approved after 2011, because they are not drugs or biologicals paid for separately prior to 2011 nor oral equivalents of such drugs.  Pls.' Mem. at 3-7; Pls.' Reply at 4.

Plaintiffs' reading is fundamentally flawed because the November 2024 Decision does not opine whatsoever on what is *excluded* from the bundle.  As an initial matter, rather than interpreting subparagraph (B) as exclusive and exhaustive in defining what CMS may consider to be a "renal dialysis service" subject to the bundled payment system in Medicare Part B, as plaintiffs describe, the November 2024 Decision held the opposite, stating expressly that subparagraph (B) is *inclusive* and *non-exhaustive*.  *Ardelyx*, 2024 WL 4723068, at *11 ("The text and structure of definitional subparagraph (B) make clear that this provision does not purport to provide an exhaustive universe or offer a comprehensive set of 'renal dialysis services.'").  This is clear from the statutory text, which begins the definition of "the term 'renal dialysis services'" using the word "includes"—not a more restrictive word, like "means," 42 U.S.C. § 1395rr(b)(14)(B).  *See, e.g.*, *Burgess v. United States*, 553 U.S. 124, 129-30 (2008) (making clear that "[a]s a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated," and that the statute in that case "defines the precise phrase used" in determining whether to apply a sentencing enhancement (alteration in original) (quoting *Colautti v. Franklin*, 439 U.S. 379, 392-93 & n.10 (1979))); *United States v. Winstead*, 890 F.3d 1082,

10

1091-92 (D.C. Cir. 2018) (same); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1114-15 (D.C. Cir. 2009) (distinguishing between "means" and "includes" in statutory definitions and noting that "the use of the word 'includes' indicates that [the statutory list] is non-exhaustive"). Congress used the word "means" to define terms elsewhere in the same statute, demonstrating that the more restrictive word would have been used in subparagraph (B) if Congress so intended. *Compare* 42 U.S.C. § 1395rr(b)(8) ("[T]he term 'home dialysis supplies and equipment' *means* medically necessary supplies and equipment . . . required by an individual suffering from end stage renal disease in connection with renal dialysis carried out in his home . . . ." (emphasis added)); *id.* § (b)(9) ("[T]he term 'self-care home dialysis support services,' to the extent permitted in regulation, *means*— . . . ." (emphasis added)); *and id.* § (b)(10) ("[T]he term 'self-care dialysis unit' *means* a renal dialysis facility or distinct part of such facility . . . ." (emphasis added)), *with id.* § 1395rr(e)(3) ("[T]he term 'supportive equipment' *includes* blood bumps, heparin pumps, bubble doctors, other alarm systems, and such other items as the Secretary may determine are medically necessary." (emphasis added)); *and id.* § 1395rr(b)(14)(B) ("[T]he term 'renal dialysis services' *includes*— . . . ." (emphasis added)).[1]

---

[1]    Plaintiffs previously argued that "Congress's use of 'includes' does not leave a gap for the agency to fill when, as here, Congress 'explicitly and comprehensively defined the term by including only three'—or here, four—'discrete definitions.'" Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' Reply PI") at 2, ECF No. 20 (quoting *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009)). Plaintiffs' reliance on *Carcieri* is unpersuasive, however, since the definition at issue in that case is distinguishable from subparagraph (B) here in at least two ways. First, the statute there, now codified at 25 U.S.C. § 5129, defining "Indian" under the Indian Reorganization Act ("IRA"), used "shall include" and listed three discrete categories that were quite specific: "members of any recognized Indian tribe now under Federal jurisdiction," "all persons who are descendants of such members . . ." and "all other persons of one-half or more Indian blood." *Carcieri*, 555 U.S. at 391-92. In contrast, the items listed in subparagraph (B), *e.g.*, "items and services" and "other drugs and biologicals," are generally described, as necessary, given the evolving nature of medical treatment, thereby requiring more interpretive gloss from the agency. Importantly, subparagraph (B) is part of a statute that instructs the Secretary of HHS to establish and implement the bundled payment system, for "renal dialysis services (as defined in subparagraph (B))," acknowledging CMS's role in further defining the contours of "renal dialysis services." 42 U.S.C. § 1395rr(b)(14)(A)(i). Second, with respect to the IRA, the Supreme Court found that Congress meant the "Indian" definition to be exclusive, as indicated by subsequent enactments of additional code provisions to broaden this definition, a fact the Court relied on in interpreting the meaning of "shall include." *Carcieri*, 555 U.S. at 392. Here, by contrast, Congress did not alter or add to the definitions in subparagraph (B) when giving additional instructions to CMS to exercise its existing discretion in subparagraph (B) (in particular, in subpart (B)(iii)) to include in the bundle certain items, *see* Protecting Access to

11

As the Supreme Court has explained, "[w]here the definition of a term . . . was intended to be all inclusive, it is introduced by the phrase 'to mean' rather than 'to include.'" *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 169 n.15 (1977).

Subparagraph (B) then sets out in four subparts general categories of items to be included in the bundle, *i.e.*, those described in subparts (B)(i)-(iv), and a general category of items that cannot be in the bundle, *i.e.*, vaccines, leaving up to agency discretion both the specifics of the general categories of items or services covered within the terms of subparts (B)(i)-(iv), as well as other items or services not generally described in subparagraph (B) at all, since the subparts are prefaced by the word "includes." *Id.* § 1395rr(b)(14)(B). Subparagraph (H) both confirms the non-exhaustive breadth of subparagraph (B) and helps ensure that the scope of subparagraph (B) is restricted by expressly limiting the inclusion of "[e]rythropoiesis stimulating agents and other drugs and biologicals" in the bundled payment system under Medicare Part B to those that "are furnished to an individual for the treatment of end stage renal disease." *Id.* § 1395rr(b)(14)(H). Based on this interpretation of subparagraph (B), the November 2024 Decision then held that oral-only drugs and XPHOZAH fall within the scope of subparagraph (B) because they are not excluded by that paragraph and are, in fact, incorporated by subpart (B)(iii) as "drugs . . . for which payment was (before the application of this paragraph) made separately" from the bundle. 42 U.S.C. § 1395rr(b)(14)(B)(iii). *Ardelyx*, 2024 WL 4723068, at *11.

To address plaintiffs' argument that the second clause of subpart (B)(iii), "and any oral equivalent form," impliedly excludes oral-only drugs from (B)(iii) because that second clause

_____

Medicare Act of 2014, Pub. L. No. 113-93, sec. 217(c), 128 Stat. 1040, 1062 (codified at 42 U.S.C. § 1395rr NOTE) ("2014 Note") (The Secretary of HHS shall "establish a process for—(1) determining when a product is no longer an oral-only drug; and (2) including new injectable and intravenous products into the bundled payment."); *see also infra* note 3. In the end, the particular language and context of each statute is important in interpreting the meaning and, notably, courts have interpreted other statutes with the exact same language as *Carcieri*—"shall include"—to be "not exhaustive." *See Cyrus v. Univ. of Toledo*, No. 20-3913 2022 WL 985819, at *8 (6th Cir. 2022) (citing *United States ex rel. Felton v. William Beaumont Hosp.*, 993 F.3d 428, 434 (6th Cir. 2021)).

would be superfluous if oral drugs were included as "drugs and biologicals" in the first clause, Pls.' Mem. PI at 25; Pls.' Opp'n MTD at 31; Pls.' Reply in Supp. Mot. for PI ("Pls.' Reply PI") at 9, ECF No. 20, the Court pointed out that the first clause was subject to the parenthetical "(before the application of this paragraph)" modifier, such that the two clauses reached groups of drugs that were not coextensive. *Ardelyx*, 2024 WL 4723068, at *11-12. Plaintiffs offered no discernable argument about the meaning of that modifier in its original briefing. *See Ardelyx*, 2024 WL 4723068, at *12 n.6; Pls.' Reply PI at 9-10. As the November 2024 Decision explained, a later-created oral equivalent to a drug to which the paragraph had already applied—*i.e.*, a drug already in the bundle—would be included by the second subpart but not the first, because it would not have been a drug "for which payment was . . . [ever] made separately." *Ardelyx*, 2024 WL 4723068, at *12. That explanation says nothing about what drugs are *excluded*, only what drugs the statute says must be *included*. In other words, that explanation ensured that oral-only drugs are not impliedly *excluded* and said nothing about whether any other drugs are or are not.

At most, therefore, the November 2024 Decision suggests that the categories of drugs plaintiffs insist the Court excluded from the bundle might not be *required* to be in the bundle by subpart (B)(iii) and rather are left within CMS's discretion to include or exclude.[2] In that sense, plaintiffs' "patchwork" diagram showing what categories of drugs were supposedly included and excluded by the holding in the November 2024 Decision, *see* Pls.' Mem. at 4, was wrong to label

---

[2] As previously listed, those categories identified by plaintiffs are: (1) intravenous and injectable drugs and biologicals approved by the FDA after 2011, because those drugs were not paid for separately prior to 2011, when § 1395rr(b)(14) first applied to intravenous and injectable drugs; (2) new oral-only drugs created after January 2025, because they are neither "oral equivalents" nor drugs paid for separately prior to January 1, 2025, when subparagraph (B) will be first applied to oral-only drugs; and (3) oral equivalents of injectable or other drugs that were approved after 2011, because they are not drugs or biologicals paid for separately prior to 2011 nor oral equivalents of such drugs. Pls.' Mem. at 3-7; Pls.' Reply at 4.

any category "no, not in the bundle."  More accurately, that diagram should instead label such categories with "Court did not reach"—or, "maybe could be in bundle."

As a result, given that the November 2024 Decision did not exclude any items from the bundle, plaintiffs' parade of horribles—the supposed basis for "manifest injustice"—will not occur.  Plaintiffs contend that CMS will need to change its approach to what goes in the bundle and that CMS will need to remove existing drugs.  *See* Pls.' Mem. at 4-7.  Neither is true.  For example, a drug added to the bundle immediately upon approval—and thus never "paid for separately" prior to application of the paragraph—would not fall within the first clause of subpart (B)(iii) necessarily, but the November 2024 Decision in no way held that it could not be included in the bundle.  Plaintiffs point in particular to Parsabiv and Korsuva, injectable drugs first approved in 2017 and 2021, respectively.  *See* Pl.'s Mem. at 4-5.  Under plaintiffs' misreading of the November 2024 Decision, such drugs created after 2011 were not "drugs" paid for separately "before the application of" § 1395rr(b)(14) to injectable drugs, because that paragraph was applied to injectable drugs in 2011 and such drugs only came into existence after that date.  *Id.*  The November 2024 Decision did not, however, discuss injectable drugs or identify the applicable time of the application of § 1395rr(b)(14) to Parsabiv or Korsuva.  Regardless, even if such drugs would not fall within the precise language of the first clause of subpart (B)(iii), they are not excluded, and CMS has discretion under subparagraph (B) to add them to the bundle.[3]

---

[3]    Defendants also point out, to dispel this parade of horribles, that Congress has elsewhere indicated that new injectable and intravenous products are included in the bundle as "renal dialysis services."  *See* Defs.' Opp'n at 5. As mentioned, a note to § 1395rr, Pub. L. No. 113-93, section 217(c), provides that the Secretary of HHS shall "establish a process for—(1) determining when a product is no longer an oral-only drug; and (2) including new injectable and intravenous products into the bundled payment."  2014 Note; *see supra* note 1.  Plaintiffs respond that the 2014 Note instead proves the Court misconstrued subparagraph (B) by excluding "new injectable and intravenous products," because this new legislative instruction did not change the underlying definition in § 1395rr(b)(14)(B).  *See* Pls.' Reply at 5-6.  To the contrary, the 2014 Note indicates that Congress recognized that subparagraph (B) left the inclusion of such items up to CMS, and Congress provided instruction for CMS to exercise that discretion already extant in subparagraph (B) to ensure that such new injectable and intravenous drugs were

14

Likewise, plaintiffs insist that the November 2024 Decision held that Sensipar, a drug developed in oral form in 2004 and injectable form in 2017, cannot be in the bundle, because the Decision read the second clause of subpart (B)(iii) to "reach[] only 'new, *subsequently-developed* oral versions of drugs, *which were extant in a different form at the time (B)(iii) was applied and were moved into the bundle*." Pls.' Mem. at 6 (emphasis added by plaintiffs) (quoting *Ardelyx*, 2024 WL 4723068, at *12). Plaintiffs are wrong that the Decision held that the second clause reaches those drugs and *only* those drugs; the Decision merely held that those drugs were one set reached by the second clause of subpart (B)(iii) that did not fall within the first clause, such that the second clause is not superfluous if subpart (B)(iii) is read to include oral-only drugs. *See Ardelyx*, 2024 WL 4723068, at *12. The Decision certainly did not preclude all other oral drugs from being added to the bundle. Plaintiffs further argue that, under the November 2024 Decision, newly developed oral-only drugs could not be included in the bundle because they would not be "paid for separately" prior to application of the paragraph to oral-only drugs in January 2025. Pls.' Mem. at 6-7, 12. Again, the Decision did not say that newly developed oral-only drugs for ESRD treatment were required to be in the bundle, but also did not foreclose their inclusion.

In holding that subject matter jurisdiction was lacking, the November 2024 Decision held only that "CMS did not violate the bounds of its statutory authority" by promulgating 42 C.F.R. § 413.171, which includes "oral-only drugs paid for separately prior to 2011" in the bundle as of January 1, 2025, nor by issuing the Letter-Decision, which includes the oral-only drug XPHOZAH in the bundle as of that same date, because subparagraph (B)'s definition of "renal dialysis services" was non-exhaustive and incorporated oral-only drugs in subpart (B)(iii).

---

included in the bundle. The November 2024 Decision in fact recognized that subparagraph (B) provides CMS with such discretion, consistent with the congressional instruction reflected in the 2014 Note.

*Ardelyx*, 2024 WL 4723068 at *11-12, 14, 16.  That holding—that subparagraph (B)'s definition of renal dialysis services was non-exhaustive and incorporated oral-only drugs in subpart (B)(iii), such that CMS did not violate its statutory authority in including oral-only drugs in the bundle— is not in any tension with CMS's practice of adding new drugs to the bundle nor with the inclusion of any categories of drugs, identified by plaintiff, currently in the bundle.  Even if there were such a tension, plaintiffs' concern, Pls.' Mem. at 4-5, 10 n.8; Pls.' Reply at 12, would be misplaced.  Under *Loper Bright v. Raimondo*, 144 S. Ct. 2244, 2266, 2273 (2024), CMS's interpretation of the statute is owed no deference, and thus the Court's reading could not constitute clear error or manifest injustice.

Plaintiffs ultimately resist the November 2024 Decision's non-exhaustive reading of subparagraph (B).  By delineating what is included in the definition, Congress, according to plaintiffs, impliedly excluded everything outside of the enumerated categories.  Pls.' Reply at 8-9.  Plaintiffs cannot accept that Congress would establish specific rules on what is *required* to be included in the bundle while allowing CMS also to include additional things.  *See id.*  Not only was this argument already rejected, making reconsideration improper here, *see Exxon Shipping*, 554 U.S. at 485 n.5 ("Rule 59(e) . . . 'may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment.'" (quoting 11 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1); Pls.' Reply PI at 2, 6-8 (previously making the same argument), but also nothing is strange about a statutory structure that leaves an agency discretion as to the specific items to qualify for coverage under a statute.  Congress may logically set out certain items to be *included* (*i.e.*, drugs and biologicals paid for separately before the application of this paragraph and their oral equivalents, as well as the items in subparts (B)(i), (ii), and (iv)), and certain items to be *excluded* (*i.e.*, vaccines), while leaving the rest to CMS's

discretion.  Particularly with respect to subpart (B)(iii), Congress seemed to move into the bundle, at its inception, a certain set of existing drugs, leaving CMS to add more drugs as the agency implements and maintains the bundle over time.  That approach does not render meaningless subparagraph (B), *cf.* Pls.' Reply at 8-9, because the subparagraph still requires the agency to include certain items, setting the minima or floor for "renal dialysis services."  CMS does not, for instance, have discretion to *exclude* an injectable drug that treats ESRD and was paid for separately from its genesis in 2010.  CMS just has discretion to determine *which* additional drugs "furnished to an individual for the treatment of end stage renal disease," 42 U.S.C. § 1395rr(b)(14)(H)(i), are added and *when*.

That Congress intended to grant discretion to CMS in implementing the bundle payment system is clear from the statute as a whole.  The statute specifically instructs the Secretary of HHS to establish and execute the bundled payment system.  *See* 42 U.S.C. § 1395rr(b)(14)(A)(i) ("[T]he Secretary shall implement a payment system in which a single payment is made under this subchapter to a provider of services or a renal dialysis facility for renal dialysis services (as defined in subparagraph (B)) . . . ."); *see also* Protecting Access to Medicare Act of 2014, Pub. L. No. 113-93, sec. 217(c), 128 Stat. 1040, 1062 (codified at 42 U.S.C. § 1395rr NOTE) (instructing the Secretary to "establish a process for—(2) including new injectable and intravenous products into the bundled payment").  As part of this process, the statute contemplates that the Secretary will consider and determine the specific "items and services," "erythropoiesis stimulating agents and any oral form of such agents," "other drugs and biologicals," and "diagnostic laboratory tests and other items" that are "furnished . . . for the treatment of [ESRD]" to include in subparagraph (B).  42 U.S.C. § 1395rr(b)(14)(B).

Congress's decision to preclude judicial review over what is a "renal dialysis service," in 42 U.S.C. § 1395rr(b)(14)(G), further demonstrates its intent to confer authority to the agency to make important policy judgments in developing the renal dialysis bundle scheme.  In fact, in several instances throughout § 1395rr, Congress precluded review to grant CMS maximum discretion over certain areas without any judicial or administrative interference.  *See id.* § 1395rr(b)(12)(H) (precluding review of components of the reimbursement calculations); *id.* § 1395rr(g)(3) (precluding review of approval of dialysis facilities); *id.* § 1395rr(h)(5) (precluding review of payment reductions and performance measures); *id.* § 1395rr(b)(14)(G) (in addition to "identification of renal dialysis services included in the bundled payment," precluding review over "the determination of payment amounts," "the establishment of an appropriate unit of payment," "adjustments" to the payment, "the application of the phase-in payment mechanism, and "the establishment of the market basket percentage increase factors").  That identification of renal dialysis services is one of these subjects in which Congress barred review plainly indicates that subparagraph (B) was not intended to facilitate judicially imposed restraints on the agency exercise of discretion.

In short, the November 2024 Decision did not hold that anything must be excluded from the bundle, other than "vaccines," which are expressly statutorily excluded in subparagraph (B). *Ardelyx*, 2024 WL 4723068, at *11-14.  Plaintiffs' "patchwork" reading of that decision's interpretation of subparagraph (B) is a fiction.

### 2.    *Plaintiffs' Arguments Against the November 2024 Decision's Interpretation of Subpart (B)(iii) Fail.*

Plaintiffs make several other arguments as to why subpart (B)(iii) must be read impliedly to exclude oral-only drugs, or at least XPHOZAH.  None succeed.  As an initial matter, plaintiffs argue that the first clause of subpart (B)(iii) containing the parenthetical phrase "(before the

application of this paragraph)" can only refer to the time period prior to the year 2011, when MIPPA took effect.  Pls.' Mem. at 9-10.  Plaintiffs insist that phrase cannot be interpreted as referring to January 1, 2025, the date on which the statute is applying to oral-only drugs by CMS's rulemaking, because Congress did not leave up to CMS when the statute would become operative.  *Id.* at 10.  Based on this predicate construction, plaintiffs then reason that the first clause of subpart (B)(iii)—*i.e.*, "for which payment was (before the application of this paragraph) made separately under this subchapter"— refers only to drugs that were reimbursed as fee-for-service as part of the renal dialysis composite rate system under Medicare Part B prior to MIPPA's effective date in 2011.  *Id.* at 12-13.  Put more simply, plaintiffs interpret the first clause of subpart (B)(iii) as authorizing incorporation into the bundle payment system only drugs reimbursed separately from the lump-sum payment program but still within the pre-MIPPA renal dialysis reimbursement system.  *Id.* at 13.  That provision does not, according to plaintiffs, include drugs that were reimbursed outside of the renal dialysis system altogether, through Medicare Part D, as oral-only drugs were.  *See id.* at 12-13.

These arguments are, at least in part, belated, and ultimately, unpersuasive.  With respect to the meaning of the modifier "(before the application of this subparagraph)," plaintiffs could have asserted that argument in their original briefing but did not.  Defendants argued that the modifier "(before the application of this paragraph)" referred to January 1, 2025, for oral-only drugs, Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. or Expedited Summ. J. ("Defs.' Opp'n PI") at 33-34, ECF No. 16, and as mentioned previously, plaintiffs made no discernable argument to the contrary and instead largely ignored this statutory parenthetical phrase, *see* Pls.' Reply PI at 9-10.  *See Ardelyx*, 2024 WL 4723068, at *12 n.6; *see also Exxon Shipping*, 554 U.S. at 485 n.5 ("Rule 59(e) . . . 'may not be used to . . . raise arguments or present evidence that could have

been raised prior to the entry of judgment.'" (quoting 11 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2810.1).[4]  Nor did plaintiffs explain why the rest of the first clause of subpart (B)(iii), stating "for which payment was (. . .) made separately under this subchapter," would not encompass drugs reimbursed separately through any reimbursement program, given that "this subchapter" refers to all Parts of Medicare, as defendants argued, Defs.' Opp'n PI 33-34. Plaintiffs responded merely that the "better reading" would be that the first clause of subpart (B)(iii) referred only to drugs previously administered by renal dialysis facilities.  Pls.' Reply PI at 9-10.

In any case, plaintiffs cannot justify why the modifier "(before the application of this paragraph)" cannot and should not refer to the application of MIPPA to a particular drug or class of drugs pursuant to CMS's rulemaking.  See Pls.' Reply at 11-12.  Plaintiffs assert that a regulation cannot alone delay the implementation of a statute, Pls.' Mem. at 10, but they do not contest that a regulation could do so if Congress so allowed, and here, Congress delegated the establishment and implementation of the bundled payment system to CMS, as previously discussed.[5]

---

[4]      In fact, plaintiffs inexplicably seemed to avoid discussing the timing-related clauses of the relevant provisions in this case altogether.  At times, their briefing omitted, via ellipses, the parenthetical phrase "(before application of this paragraph)" from the statutory definition, see, e.g., Pls.' Opp'n to MTD at 9, 31.  Despite arguing that the agency improperly applied its own regulation, 42 C.F.R. § 413.171, to include XPHOZAH as a "renal dialysis service," Compl. ¶¶ 205-08; Pls.' Mem. PI at 35, plaintiffs also never leveraged the fact that this rule only incorporates "drugs . . . for which payment was (prior to January 1, 2011) made separately," and XPHOZAH was only approved in 2023, Compl. ¶ 27.  The November 2024 Decision did not, though, consider whether the inclusion of XPHOZAH in the bundle was consistent with CMS's own rulemaking because the Court lacked subject matter jurisdiction to do so under subparagraph (G).  Ardelyx, 2024 WL 4723068, at *16.  Consequently, the Decision could only evaluate whether CMS's actions were statutorily authorized.  Id.

[5]      Plaintiffs' argument would have more force if CMS were indefinitely delaying the application of this statute to a category of drugs without any congressional authorization.  That is not what has occurred here.  Though the first delay was implemented by CMS, Congress has since endorsed the delay of adding oral-only drugs to the bundle and thus lent tacit support to the interpretation of "before the application of this paragraph" being dependent on CMS rulemaking, at least for oral-only drugs.  See Pub. L. No. 112-240, sec. 632(b), § 1881(b), 126 Stat. at 2354; Pub. L. No. 113-93, sec. 217(a), 128 Stat. at 1061; Pub. L. No. 113-295, sec. 204, 128 Stat. at 4065.

Congress's specific use of the term "application" also makes clear that Congress did not intend merely to refer to the time before the paragraph "took effect" or before the paragraph "was enacted," as plaintiffs argue. The word "application" means the "act of putting something to use." *Application*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/application (last visited Dec. 19, 2024). While § 1395rr(b)(14) has been implemented with respect to some drugs, that paragraph has not yet been "put to use" or "applied" with respect to oral-only drugs. *See* Pub. L. No. 112-240, sec. 632(b), § 1881(b), 126 Stat. at 2354 (instructing CMS not to "implement" the policy incorporating oral-only drugs in the bundle). The statute's clear intent to grant maximum discretion to the agency in developing the bundled payment system, ultimately aimed at increasing the efficiency of renal dialysis care, strongly weighs in favor of this narrower reading. Plaintiffs offer no argument as to why Congress would have chosen the precise phrasing used in the parenthetical, "(before the application of this paragraph)," if it simply meant to say "before 2011." *See* Pls.' Reply at 11-12.[6]

Regardless, adopting plaintiffs' interpretation of the modifier "(before application of this paragraph)" to mean "before 2011" would not, alone, change any conclusion in this case because that modifier—whatever its precise meaning—would still give the two clauses in subpart (B)(iii) independent effect, without needing to read the subpart as impliedly excluding oral-only drugs. *See Ardelyx*, 2024 WL 4723068, at *12; *supra* section III.A.1. Consequently, CMS's regulation and the Letter-Decision would still qualify as "identification[s] of renal dialysis services" under the non-exhaustive subparagraph (B), thus invoking the preclusion subparagraph (G).

---

[6]    The fact that CMS interpreted Congress to mean "before 2011" and not before MIPPA's application to any category of drug, as plaintiffs argue, Pls.' Reply at 12, is, again, irrelevant under *Loper Bright*, 144 S. Ct. at 2266 because deference to the agency's interpretation is not required.

21

Further, plaintiffs offer no persuasive reason why the first clause of subpart (B)(iii) describing "other drugs and biologicals that are furnished to individuals for the treatment of [ESRD] and for which payment was (before the application of this paragraph) made separately under this subchapter" should be read so narrowly as to only contemplate drugs previously reimbursed through the renal dialysis composite rate system.  Plaintiffs make arguments based on the purpose and history of MIPPA, Pls.' Mem. at 11-13, but the plain text of the statute is clear.  This "subchapter" refers to Subchapter XVIII, which includes Medicare Parts A, B, C, *and* D, so "separately under this subchapter" includes all drugs paid separately under any reimbursement system.  *See* 42 U.S.C. §§ 1395c-1395i-6 (Part A); *id.* §§ 1395j-1395w-6 (Part B); *id.* §§ 1395w-21-1395w-28 (Part C); *id.* §§ 1395w-101-1395w-154 (Part D).  Even if plaintiffs' reading was one plausible alternative, the November 2024 Decision's interpretation cannot be "dead wrong," *Lightfoot*, 355 F. Supp. 2d at 422 (quoting *Parts & Electrics Motors, Inc.*, 866 F.2d at 233), or "fundamentally unfair in light of governing law," *Leidos, Inc.*, 881 F.3d at 217 (quoting *Mohammadi*, 947 F. Supp. 2d at 78), given the language that clearly incorporates all of Medicare and thus all drugs previously reimbursed apart from any lump sum payment.

Finally, plaintiffs urge that the November 2024 Decision's reading of subpart (B)(iii) is clear error because, under that reading, the first part of subpart (B)(iii) integrates oral-only drugs paid for separately prior to January 1, 2025, which is "before the application of this paragraph," and the second part includes oral-equivalents of those drugs—that is, oral equivalents of oral-only drugs, which makes "no sense."  Pls.' Mem. at 13.  To be sure, subparagraph (B) has some overlapping aspects in its subparts, and thus, even under plaintiffs' reading of subpart (B)(iii), these subparts are not perfectly aligned.  For instance, subparts (B)(i) and (iv) reference "services," which is defined elsewhere to mean "medical care or services and items, such as

medical diagnosis and treatment[] [and] drugs and biologicals . . . ."  42 C.F.R. § 400.202.

"Drugs" are also included, however, in subpart (B)(iii).  That there exists a similar redundancy

within subpart (B)(iii) itself—a reference to oral equivalents of oral-only drugs—is not fatal.

Moreover, the statute uses the word "*any*" to precede "oral equivalent form," recognizing that

not all drugs in the first clause of subpart (B)(iii) have, or are capable of having, an oral form.

Some of those drugs may be ones only susceptible to injectable administration.  Likewise, some

may be oral-only drugs that therefore do not have an *oral equivalent*.  In any case, the November

2024 Decision's reading of subpart (B)(iii) does not render any words "altogether redundant,"

*Mercy Hospital, Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018), and any awkward phrasing

in subpart (B)(iii) cannot render the decision's conclusions "dead wrong," *Lightfoot*, 355 F.

Supp. 2d at 422 (quoting *Parts & Electrics Motors, Inc.*, 866 F.2d at 233).

*     *     *

Plaintiffs reasonably disagree with the conclusions reached in the November 2024

Decision, but their supposed manifest injustice is manufactured, and their arguments about the

meaning of subpart (B)(iii) do not demonstrate clear error.  Alteration of judgment is not

warranted.

### B.    Plaintiffs Have Not Demonstrated Likelihood of Success or Irreparable Harm for an Injunction Pending Appeal.

In the alternative, plaintiffs request an injunction pending appeal.  Defendants argue that

such relief is not possible because no appeal is pending.  Defs.' Opp'n at 15.  In response,

plaintiffs cite authority for the grant of stays prior to the actual filing of an appeal.  Pls.' Reply at

14 (citing 11 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2904 ("When there is

reason to believe that an appeal will be taken, there is no reason why the district court should not

make an order preserving the status quo during the expected appeal."), and *In re Grand Jury*

23

*Subpoena No. 7409*, No. 18-cv-41 (BAH), 2018 WL 8334866, at *3 (D.D.C. Oct. 5, 2018)).  The relevant question here, however, is not about granting a stay of the Court's judgment but rather about imposing a new injunction pending appeal when injunctive relief was otherwise denied. Even assuming, that an injunction could also be granted pending a yet-unnoticed appeal, plaintiffs have not shown such relief would be proper here.

For the reasons explained in this opinion and the November 2024 Decision, plaintiffs are unlikely to prevail on the merits.  Regardless, even if a lesser showing of likelihood of success on the merits suffices where the other factors strongly militate in favor of relief, *see Republican National Committee v. Pelosi*, No. 22-659 (TJK), 2022 WL 1604670, at *3 (D.D.C. May 20, 2022) ("'[I]n rare cases, the threat of irreparable harm may be so grave and the balance of the equities may favor' the movant 'so decisively that an injunction pending appeal . . . may be proper,' even without a likelihood of success on the merits, so long as the movant establishes a 'serious legal question' on the merits and shows that 'the other three factors tip sharply' in its favor." (alterations in original) (quoting *Medinatura, Inc. v. FDA*, No. 20-2066 (RDM), 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021))), plaintiffs cannot make the requisite showing of irreparable harm.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").

The kind of injury warranting injunctive relief "must be both certain and great; it must be actual and not theoretical."  *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  "The moving party must show '[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable

24

harm," and "the injury must be beyond remediation." *Id.* (alterations in original) (first passage quoting *Wis. Gas Co.*, 758 F.2d at 674). "Speculative injury is not sufficient," so a preliminary injunction will not issue "simply to prevent the possibility of some remote future injury." 11A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1. Further, "[i]t is 'well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.'" *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) (quoting *Lee v. Christian Coal.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001)). "[P]laintiffs who decline the opportunity to avail themselves of a regulatory scheme to avoid the very harm for which they seek injunctive relief have been denied the relief." *Id.*

Plaintiffs allege two primary injuries in their preliminary injunction briefing: harm to patients with respect to their health outcomes, and harm to Ardelyx, the corporation. First, with respect to patients, plaintiffs allege that if oral-only drugs, including XPHOZAH, are reimbursed through the bundled payment, renal dialysis facilities will effectively be insufficiently reimbursed for such drugs, which will strain patient access. Pls.' Mem. PI at 37-43. The facilities will be less inclined to prescribe XPHZOAH, so plaintiffs will receive inferior treatment, resulting in worse health outcomes, plaintiffs contend. *Id.* at 37-42. Second, with respect to Ardelyx, plaintiffs allege that they will lose market share and suffer financially due to the severe restriction of access to their drug, *id.* at 43, and that such economic harm cannot be remediated due to CMS's sovereign immunity, Pls.' Reply PI at 24.

Neither injury satisfies the requirements for injunctive relief. The harm to patients, and consequently Ardelyx, is too speculative and self-inflicted. Plaintiffs do not argue that XPHOZAH's addition to the bundle will cause harm in and of itself. They instead point to a chain of events that will occur that will result in harm to patients and Ardelyx: Patients who are

currently prescribed XPHOZAH by an individual doctor will have to obtain their prescription instead from a renal dialysis facility; the renal dialysis facility will be financially disincentivized to prescribe XPHOZAH, as a more expensive drug, now that paying for that drug will come out of the facility's bundled payment, which is underfunded; the facility will instead provide a cheaper, less effective alternative; the patient's health will decline; and Ardelyx will lose profits and market share. *See* Pls.' Mem. PI at 38-39. Plaintiffs do call out troubling real-world examples where they contend this chain of events has occurred. *See id.* at 40-42. Yet, as defendants explain, whether renal dialysis facilities will actually fail to provide patients the best possible care is far from certain. *See* Defs.' Opp'n PI at 23-24. Renal dialysis facilities have a legal obligation to "provide the necessary care to manage mineral metabolism" and adjust "the patient's plan of care to achieve the specified goals," 42 C.F.R. §§ 494.90(a)(3), (b)(3). *Id.* at 24. They should, therefore, continue prescribing any drugs that are currently working for patients and prescribe the best course of care for patients experiencing new problems. That facilities have, in plaintiffs' view, failed to do so in other situations does not make the potential harm "certain and great" here.

Importantly, Ardelyx also chose not to apply for the "transitional drug add-on payment adjustment" ("TDAPA"), 42 C.F.R. § 413.234(c), a regulatory program designed to "help ESRD facilities to incorporate new drugs and biological products" by giving facilities an add-on to its bundled base rate payment for the use of new drugs just added to the bundle. Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System, 84 Fed. Reg. 60,648, 60,654 (Nov. 8, 2019) (codified at 42 C.F.R. § 413.234(c)); *see* Pls.' Reply PI at 22. Such payments, which are available for an initial two years (and then up to three more), are designed to ease the transition and avoid the financial disincentives that plaintiffs fear. *See* 42

26

C.F.R. § 413.234(c)(1), (3); 84 Fed. Reg. at 60,654.  Ardelyx apparently did not apply for

TDAPA because Ardelyx concluded that TDAPA would not "cover the cost to many . . .

facilities of prescribing XPHOZAH" and therefore would fail to "preserve[] access to

XPHOZAH for even existing patients."  Pls.' Reply PI at 23.  Plaintiffs cannot show, however,

that TDAPA would not at least mitigate the financial and patient harm during this potentially

five-year long period—or delay the impact such that the harm could not be considered both

"great" and "imminent."  Alleged harm that is, even "in part" self-inflicted "by the plaintiff[s']

own inaction," is not irreparable so as to warrant relief.  *Mott Thoroughbred Stables, Inc. v.*

*Rodriguez*, 87 F. Supp. 3d 237, 246 n.11 (D.D.C. 2015).  Plaintiffs therefore have not

demonstrated that an injunction pending appeal is proper here.

## IV.    CONCLUSION

Plaintiffs, once again on an expedited timeframe, have asked this Court to prevent from

taking effect on January 1, 2025, CMS's regulation and Letter-Decision integrating oral-only

drugs into the renal dialysis services bundle.  They cannot, however, demonstrate manifest

injustice or clear error warranting alteration of the prior judgment issued on November 8, 2024,

denying that request, nor can they demonstrate irreparable harm to justify relief pending appeal.

For these reasons, plaintiffs' motion is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  December 20, 2024

_____
**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ARDELYX, INC., *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-02095 (BAH) |
| v. | Judge Beryl A. Howell |
| BECERRA, *et al.*, | |
| Defendants. | |

## <u>ORDER</u>

Upon consideration of defendants' Motion to Dismiss, ECF No. 11, the legal memoranda in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby--

**ORDERED** that defendants' Motion to Dismiss, ECF No. 11, is **GRANTED**; it is further

**ORDERED** that plaintiffs' Complaint, ECF No. 1, is dismissed; it is further

**ORDERED** that plaintiffs' Motion for Preliminary Injunction, or in the Alternative, for Expedited Summary Judgment, ECF No. 14, is denied as moot; and it is further

**ORDERED** that the Clerk of Court is directed to close this case.

**SO ORDERED**.

Date:  November 8, 2024

*This is a final and appealable order.*

_____
**BERYL A. HOWELL**
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ARDELYX, INC., *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>BECERRA, *et al.*,<br><br>                    Defendants. | Civil Action No. 24-cv-02095 (BAH)<br><br>Judge Beryl A. Howell |

**<u>MEMORANDUM OPINION</u>**

Plaintiffs—a biopharmaceutical company, Ardelyx, Inc.; a nonprofit organization that represents kidney patients, the American Association of Kidney Patients; and a nonprofit healthcare research group, the National Minority Quality Forum (collectively "plaintiffs"), Compl. ¶¶ 19, 21, 45-47, ECF No. 1—brought this lawsuit, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to challenge the classification by defendants Department of Health and Human Services ("HHS") and its component Centers for Medicare and Medicaid Services ("CMS") (collectively, "defendants") of oral-only drugs, including the drug XPHOZAH, which is manufactured by Ardelyx, as "renal dialysis services" subject to a bundled reimbursement payment under Medicare Part B.  XPHOZAH treats hyperphosphatemia, a condition characterized by too much phosphate in the blood, occurring in patients with chronic kidney disease on dialysis.  The two regulatory actions by defendants at issue in this lawsuit—the regulation classifying some oral-only drugs as falling within the definition of "renal dialysis services" and the decision to identify XPHOZAH as such a drug—are effective as of January 1, 2025.

Now pending before the Court are defendants' motion, under Federal Rule of Civil Procedure 12(b)(1), to dismiss this case for lack of jurisdiction, due to the operation of 42 U.S.C.

§ 1395rr(b)(14)(G), *see* Defs.' Mot. Dismiss ("Defs.' MTD"), ECF No. 11, and plaintiffs'

motion for a preliminary injunction or, in the alternative, for expedited summary judgment to

prevent the challenged classifications from going into effect, *see* Pls.' Mot for Prelim. Inj. or

Expedited Summ. J. ("Pls.' Mot. PI"), ECF No. 14.

 For the reasons explained below, subparagraph (G) of 42 U.S.C. § 1395rr(b)(14)

precludes the exercise of jurisdiction to review the agency's classification of certain oral-only

drugs as "renal dialysis services" and its decision to identify XPHOZAH as qualifying for such

classification.  Accordingly, defendants' motion is granted, requiring dismissal of this case.

## I. BACKGROUND

 This Court once again returns to the "labyrinthine world" of Medicare reimbursements,

*Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 124 (D.D.C. 2021) (quoting

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 694 (D.C. Cir. 2014)), this time as applied to

oral-only drugs for patients who suffer from severe kidney disease and require dialysis to filter

out the toxins in their bloodstream.

### A. Pertinent Facts

 About 550,000 people in the United States suffer from end-stage renal disease ("ESRD"),

the most severe, fatal form of chronic kidney disease where the kidneys no longer function.

Compl. ¶ 4.  Many ESRD patients require dialysis treatments multiple times a week to filter the

waste and toxins out of their bloodstream.  *Id.* ¶ 5.  ESRD patients often also suffer from

associated conditions, including hyperphosphatemia, the condition of having too much phosphate

in the blood.  *Id.* ¶ 24.  About 70 or 80% of patients with ESRD on dialysis suffer from

hyperphosphatemia, although hyperphosphatemia may occur without ESRD.  Pls.' Mot. PI, Ex.

3, Declaration of Laura Williams, Chief Medical Officer of Ardelyx ("Williams Decl.") ¶ 18,

ECF No. 14-3; Compl. ¶ 150; Pls.' Mem. Supp. for PI or Expedited Summ. J. ("Pls.' Mem. PI")

2

at 15 & n.17, ECF No. 14.  Untreated, hyperphosphatemia can lead to bone disorders.  Compl. ¶ 75.

Traditional hyperphosphatemia drugs bind to phosphate molecules in the gastrointestinal tract.  *Id*. ¶ 25.  Ardelyx manufactures a drug, tenapanor, branded as XPHOZAH, that treats hyperphosphatemia by a different mechanism of reducing the absorption of phosphate through the paracellular pathway.  *Id.* ¶ 26.  The FDA approved XPHOZAH in 2023 to "reduce serum phosphorous in adults with chronic kidney disease (CKD) on dialysis as add-on therapy in patients who have an inadequate response to phosphate binders or who are intolerant of any dose of phosphate binder therapy."  *Id.* ¶ 27; Williams Decl., Ex. 1, XPHOZAH Prescribing Information ("XPHOZAH Prescr. Info.") at 1, ECF No. 14-4.  This drug is administered in the form of a pill that is taken orally twice a day near meals, not in conjunction with dialysis.  *Id.* ¶¶ 28, 30, 31, 163.

### B.    Statutory Framework

Individuals suffering from ESRD requiring dialysis treatment are eligible for Medicare, *see* 42 U.S.C. § 426-1(a), which is a federal health insurance program administered by HHS and CMS, *see id*. §§ 1395 *et seq*.; *id.* § 1395kk.  Medicare consists of four parts, two of which are relevant here: Part B provides insurance for outpatient health services, *id.* § 1395*o*, and Part D provides prescription drug coverage for enrollees as a "fee-for-service" plan, *id.* § 1395w-101.  All ESRD patients are eligible for coverage under Part B; most (around 80%) have additional coverage under Part D.  Notice of Proposed Rule related to Medicare Program; End-Stage Renal Disease Prospective Payment System ("2024 NPR ESRD PPS"), 89 Fed. Reg. 55,760, 55,761 (proposed July 5, 2024) (to be codified at 42 C.F.R. §§ 410, 413, 494, and 512).

In the 1980s, Congress established a "composite rate system" to reimburse dialysis services.  Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, ch.3, sec. 2145(a)(7),

3

§ 1881(b), 95 Stat. 357 (codified as amended at 42 U.S.C. § 1395rr).  Dialysis facilities received a set rate of reimbursement under Part B that was prospectively determined based on the number of dialysis treatments they administer, referred to as a "prospective payment." *Id.*; Compl. ¶ 64. That rate covered dialysis and associated supplies and services.  U.S. Gov't Accountability Off., (GAO-07-77), END-STAGE RENAL DISEASE 1 (2006), gao.gov/assets/gao-07-77.pdf ("GAO 2006 Rep."); Compl. ¶ 64.  The goal of the prospective payment was to "encourage the more efficient delivery of dialysis services," 42 U.S.C. § 1395rr(b)(7), because facilities could retain any amount of the payment that exceeded their costs, GAO 2006 Rep. 22; Notice of Proposed Rule regarding Medicare Programs; End-Stage Renal Disease Prospective Payment System ("2009 NPR ESRD PPS"), 74 Fed. Reg. 49,922, 49,924 (proposed Sep. 29, 2009) (to be codified at 42 C.F.R. § 413).  Other items, making up about 40% of total spending for outpatient dialysis, were reimbursed separately on a fee-for-service basis either under Part B (e.g., for injectable ESRD drugs and certain laboratory tests) or under Part D (e.g., for oral ESRD drugs).  U.S. Gov't Accountability Off., (GAO-11-36), END-STAGE RENAL DISEASE 8 (2011), gao.gov/assets/gao-11-365.pdf; Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System ("2010 Final Rule ESRD PPS"), 75 Fed. Reg. 49,030, 49,032 (Aug. 12, 2010) (codified at 42 C.F.R. § 413.171); Compl. ¶ 64.

Congress became concerned about potential overreliance on services reimbursed via fee-for-service outside of the prospective payment.  GAO 2006 Rep. at 2-3.  One example that garnered attention was Epogen, an erythropoiesis stimulating agent ("ESA") that treats anemia caused by ESRD.  *Id.*  Dialysis facilities had an incentive to rely heavily on such drugs because they were separately reimbursable and thus did not come out of the lump sum payment that they could otherwise retain.  *See id.*  In response, Congress moved toward a single, bundled rate for

4

all ESRD services, asking CMS to report on the design of such a system in 2003.  GAO 2006

Rep. at 3; *see* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.

L. 108-173, sec. 623, 117 Stat. 2066, 2313, 2315-17.  The new regime, still applicable today,

went into effect in 2008.  Medicare Improvements for Patients and Providers Act of 2008

("MIPPA"), Pub. L. 110-275, sec. 153, § 1881(b)(12)(G), 122 Stat. 2553 (codified as amended at

42 U.S.C. § 1395rr(b)(14)).  MIPPA instructs the Secretary of HHS to "implement a payment

system under which a single payment is made under this subchapter to a provider of services or a

renal dialysis facility for renal dialysis services (as defined in subparagraph (B)) in lieu of any

other payment."  42 U.S.C. § 1395rr(14)(A)(i).  The referenced "subparagraph (B)," in turn,

states:

> For purposes of this paragraph, the term "renal dialysis services" includes—
>
> (i) items and services included in the composite rate for renal dialysis services as
>    of December 31, 2010;
> (ii) erythropoiesis stimulating agents and any oral form of such agents that are
>    furnished to individuals for the treatment of end stage renal disease;
> (iii) other drugs and biologicals that are furnished to individuals for the treatment
>    of end stage renal disease and for which payment was (before the application
>    of this paragraph) made separately under this subchapter, and any oral
>    equivalent form of such drug or biological; and
> (iv) diagnostic laboratory tests and other items and services not described in
>    clause (i) that are furnished to individuals for the treatment of end stage renal
>    disease.
>
> Such term does not include vaccines.

42 U.S.C. § 1395rr(b)(14)(B) ("definitional subparagraph (B)").

ESRD drugs that were previously reimbursed separately as fee-for-service became

reimbursable under MIPPA's expanded Part B bundle.  The goal was to remove the incentive for

dialysis facilities to rely more heavily on drugs reimbursed on a fee-for-service basis, as opposed

to ones included in the bundle, and to motivate these facilities to use whatever combination of

treatments would be most effective and economical.

MIPPA also limited judicial review of the bundled system by expressly stating, in subparagraph (G), in pertinent part, that:

> There shall be no administrative or judicial review under section 1395ff of this title, section 1395*oo* of this title, or otherwise of the determination of payment amounts under subparagraph (A), the establishment of an appropriate unit of payment under subparagraph (C), [or] the identification of renal dialysis services included in the bundled payment . . . .

*Id.* § 1395rr(b)(14)(G) ("preclusion subparagraph (G)").

Plaintiffs allege that CMS's actions were not consistent with the definition of "renal dialysis services" in subparagraph (B) with respect to drugs available only in an oral form. Defendants respond that review of that question is precluded by subparagraph (G).

### C.    Relevant Regulations

To implement MIPPA's bundled payment system, CMS elaborated on the statutory definition of "renal dialysis services" by regulation, providing, in pertinent part:

> Renal dialysis services. Effective January 1, 2011, the following items and services are considered "renal dialysis services," and paid under the ESRD prospective payment system under section 1881(b)(14) of the Act:
>
> (1) Items and services included in the composite rate for renal dialysis services as of December 31, 2010;
> (2) Erythropoiesis stimulating agents and any oral form of such agents that are furnished to individuals for the treatment of ESRD;
> (3) Other drugs and biologicals that are furnished to individuals for the treatment of ESRD and for which payment was (prior to January 1, 2011) made separately under Title XVIII of the Act (including drugs and biologicals with only an oral form),
> (4) Diagnostic laboratory tests and other items and services not described in paragraph (1) of this definition that are furnished to individuals for the treatment of ESRD.
> (5) Renal dialysis services do not include those services that are not essential for the delivery of maintenance dialysis.

42 C.F.R. § 413.171.

CMS explained that the bundle is interpreted to include, under subpart (iii) of definitional subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B)(iii), "all drugs and biologicals that were

6

separately billable prior to the implementation of MIPPA" whether under Part B or Part D.  2009 NPR ESRD PPS, 74 Fed. Reg. at 49,928.  While recognizing that "the last part of clause (iii) with respect to the phrase 'and any oral equivalent form of such drug or biological' could be interpreted to limit the scope of the drugs and biologicals included in the bundle to only oral versions of injectables (or other non-oral routes of administration)," CMS rejected that reading as "unduly constrained" and inconsistent with "one of the very purposes of the new system—the inclusion of all renal dialysis services furnished to ESRD patients in a comprehensive payment bundle."  *Id.*  CMS further noted that "the inclusion of [oral-only] drugs and biologicals is supportable under [subparagraph B's] clause (iv)," which was comprehensive enough to include all drugs in the payment bundle.  *Id.*

CMS additionally analyzed which of the separately billable drugs were sufficiently related to ESRD to qualify for the bundle.  *See* 2010 Final Rule ESRD PPS, 75 Fed. Reg. at 49,047.  This analysis categorized "drugs and biologicals on the basis of drug action" and then assessed whether they would be expected to be used for "ESRD-related conditions in a dialysis unit."  *Id.*  Based on this analysis, CMS determined that drugs in the "bone and mineral metabolism" category—defined as "drugs used to prevent/treat bone disease secondary to dialysis"—are part of the ESRD bundle.  *Id.* at 49,050.  The functional category designation process is reflected in the regulation 42 C.F.R. § 413.234(b)(1).

To ease the transition of drugs into the bundled payment, CMS made certain new additions eligible for a "transitional drug add-on payment adjustment" ("TDAPA").  *Id.* § 413.234(c).  TDAPA was adopted pursuant to Congress's authorization for adjustments to the bundle payment under certain circumstances.  *See* 42 U.S.C. § 1395rr(b)(14)(D).  Under TDAPA, a facility could receive an add-on to its base rate for new drugs for an initial two years

(and then up to three more).  42 C.F.R. §§ 413.234(c)(1), (3).  TDAPA intended to "help ESRD facilities to incorporate new drug and biological products," "make appropriate changes in their businesses to adopt such products," and "promote competition among drugs and biological products."  Final Rule regarding Medicare Program; End-Stage Renal Disease Prospective Payment System, 84 Fed. Reg. 60,648, 60,654 (Nov. 8, 2019) (codified at 42 C.F.R. § 413.234(c)).

Despite the adoption of CMS's regulation under 42 C.F.R. § 413.171 in 2010, its definition of "renal dialysis services" as incorporating oral-only drugs has not yet gone into effect.  CMS first delayed the adoption of this definition until 2014 in order to "provide sufficient time for ESRD facilities to establish a pharmacy" or "establish arrangements with pharmacies to provide oral-only drugs to their patients" under Part B.  2010 Final Rule ESRD PPS, 75 Fed. Reg. at 49,043.  Congress then thrice delayed implementation of the oral-only drug provision: first until 2016, American Taxpayer Relief Act of 2012, Pub. L. 112-240, sec. 632(b),§ 1881(b), 126 Stat. 2313, 2354 (2013); then until 2024, Protecting Access to Medicare Act of 2014, Pub. L. 113-93, sec. 217(a), 128 Stat. 1040, 1061; and finally, until 2025, Tax Increase Prevention Act of 2014, Pub. L. 113-295, sec. 204, 128 Stat. 4010, 4065.

In doing so, Congress explicitly acknowledged the inclusion of "oral-only ESRD-related drugs in the bundle," Pub L. 112-240, sec. 632(b), 126 Stat. at 2354, and, in fact, ordered HHS to "monitor the bone and mineral metabolism of individuals with end stage renal disease" "with respect to the implementation of oral-only ESRD-related drugs . . . under subsection (b)(14)," *id.* At the same time, Congress did not amend MIPPA to codify CMS's inclusion of oral-only drugs in the bundled prospective payment system, though one bill proposing to do so was introduced. *See* H.R. 3200, 11th Cong. § 1232 (2009).

### D.    Procedural History

Plaintiff Ardelyx's drug, XPHOZAH, like other oral-only drugs, is currently reimbursed through Medicare Part D.  Compl. ¶ 170.  In July 2024, however, CMS issued a letter-decision determining that XPHOZAH is a renal-dialysis service that will be included in the bundled Part B payment as of January 1, 2025, pursuant to 42 C.F.R. § 413.171.  Compl., Ex. 1, XPHOZAH Letter-Decision at 1, ECF No. 1-1.  The letter states, in pertinent part:

> CMS has identified XPHOZAH™ to be a renal dialysis service under 42 CFR 413.171, because it is furnished to individuals to treat a condition associated with ESRD and is essential to the delivery of maintenance dialysis. . . . CMS has also determined that XPHOZAH meets the current regulatory definition of an oral-only drug at section 413.234(a), with no injectable equivalent or non-oral form of administration, and thus is not included in the ESRD PPS bundled payment until January 1, 2025.

*Id.*

Plaintiffs believe inclusion of oral-only drugs in the bundle will discourage the use of innovative and effective, yet expensive, treatments like XPHOZAH, thereby worsening patient outcomes.  Compl. ¶¶ 18, 174, 183.  The bundle, they contend, is severely underfunded, with many facilities experiencing 0% or negative margins for Medicare patients, which leaves them unable fully to meet patient needs.  *Id.* ¶¶ 9, 18, 172-75.  Plaintiffs point to the example of the drug Parsabiv, which treats hyperparathyroidism in ERSD patients and was added to the bundle in 2017.  *Id.* ¶¶ 176-77.  After the temporary TDAPA period ended in 2020, the use of Parsabiv dropped from around 10% of dialysis patients to 1% in three years as patients were switched to an older, less effective drug.  *Id.*  Among the patients who stopped taking Parsabiv, hyperparathyroidism rates increased from 28 to 43%.  *Id.* ¶ 180.  In the same way, plaintiffs predict that once XPHOZAH is part of the bundle, the drug will not be as readily prescribed to hyperphosphatemia patients and their health will deteriorate.  Racial minorities and low-income

9

people in rural areas will be most affected, as they disproportionately suffer from ESRD and are often being treated at more resource-constrained facilities. *Id.* ¶¶ 56, 184-89.[1]

Additionally, plaintiffs allege that pharmaceutical companies are harmed by incorporation of drugs into the bundle because they cannot expect to reap sufficient profits after the initial TDAPA period, resulting in a reduced incentive to innovate. *Id.* ¶ 181 (providing the example of a company halting clinical trials for an oral drug treating pruritis, itchiness of the skin, in ESRD patients after the injectable form was moved into the bundle).[2]

Plaintiffs now challenge defendants' July 2024 letter-decision classifying XPHOZAH as a renal dialysis service and the regulation, 42 C.F.R. § 413.171, which includes oral-only drugs in the bundled payment system. *Id.* ¶¶ 199, 208, 215. Plaintiffs argue (1) that oral-only drugs, including XPHOZAH, are not "renal dialysis services" under the statutory definition codified at 42 U.S.C. § 1395rr(b)(14)(B), *id.* ¶¶ 198, 214-15; (2) that XPHOZAH is not a "renal dialysis service" because this drug is not "furnished for the treatment of ESRD," as required by 42 U.S.C. § 1395rr(b)(14)(B), *id.* ¶¶ 198-99; and (3) that XPHOZAH is not a "renal dialysis service" under CMS's own regulatory definition, codified at 42 C.F.R. § 413.171(5), *id.* ¶¶ 205-08. According to plaintiffs, CMS's actions lack statutory authority and are arbitrary and capricious and an abuse of discretion, in violation of the APA. *See id.* at 46-48. As relief, plaintiffs seek an order

---

[1] Incorporating XPHOZAH into the bundle would, on the other hand, expand access to those who do not have Medicare Part D and thus may currently struggle to get XPHOZAH reimbursed as a fee-for-service. 2024 NPR ESRD PPS, 89 Fed. Reg. at 55,797 ("We anticipate that incorporation of oral-only drugs into the [bundle] will increase access to those drugs for beneficiaries."); *id.* at 55,761; Defs.' Opp'n Mot. Prelim. Inj. or Expedited Summ. J. ("Defs.' Opp'n PI") at 40, ECF No. 16.

[2] Ardelyx did not apply for TDAPA funding, despite CMS's invitation for the company to do so. XPHOZAH Letter-Decision at 2. Plaintiffs express the position that such funding would not have mitigated the harm to Ardelyx and patients. Pls.' Reply Supp. Mot. PI or Expedited Summ. J. ("Pls.' Reply PI") at 22-23, ECF No. 20.

declaring the regulation and XPHOZAH Letter-Decision unlawful, vacating the regulation and Letter-Decision, and enjoining their applications.  *Id.* at 49-50.

Defendants move to dismiss, under Federal Rule of Civil Procedure 12(b)(1), on the ground that subject matter jurisdiction over this case is lacking, pursuant to 42 U.S.C. § 1395rr(b)(14)(G).  Defs.' Mem. Supp. Mot. Dismiss ("Defs'. Mem. MTD"), ECF No. 11-1. Plaintiffs oppose dismissal, contending that preclusion subparagraph (G) does not apply here, Pls.' Opp'n Mot. Dismiss ("Pls.' Opp'n MTD"), ECF No. 17, and separately seek a preliminary injunction, or in the alternative, expedited summary judgment, Pls.' Mem. PI, ECF No. 14. Both motions are now ripe for resolution.

## II.    LEGAL STANDARD

A federal district court has an "obligation" to avoid "exceed[ing] the scope of [its] jurisdiction."  *Broner ex rel. Am. Studies Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)).  A court of "limited subject-matter jurisdiction" has "the power to decide only those cases over which Congress grants jurisdiction," *id.* (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)), and therefore "must consider the barriers to federal adjudication the Congress has erected," *id*.  A court lacking subject matter jurisdiction must dismiss the case.  *See Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1131-32 (D.C. Cir. 2017).

In determining whether to grant a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), a district court "may consider materials outside the pleadings" but "must still 'accept all of the factual allegations in [the] complaint as true,'" *Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (alterations in original) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)), and must construe the complaint

11

liberally, *Zukerman v. USPS*, 961 F.3d 431, 441 (D.C. Cir. 2020).  Plaintiffs bear the burden of establishing jurisdiction.  *Knapp Med. Ctr.*, 875 F.3d at 1128.

## III.    DISCUSSION

The threshold question to resolve is posed in defendants' motion to dismiss, namely whether preclusion subparagraph (G), 42 U.S.C. § 1395rr(b)(14)(G), deprives this Court of authority to exercise jurisdiction over plaintiffs' claims.  As explained in more detail below, despite the presumption of judicial review of agency action, subparagraph (G) precludes judicial review of both the regulatory determination, 42 C.F.R. § 413.171(3), that oral-only renal dialysis drugs for which payment was made separately prior to January 2011 are included in the bundle, and the decision to include XPHOZAH in the bundle, per the XPHOZAH Letter-Decision, because these decisions are "identification[s] of renal dialysis services," 42 U.S.C. § 1395rr(b)(14)(G), that fall within the statutory definitions provided in definitional subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B).  Resultantly, defendants' motion is granted, the case is dismissed, and plaintiffs' motion for preliminary injunctive relief or expedited summary judgment is denied as moot.

### A.    Statutory Preclusion

"There is a 'strong presumption that Congress intends judicial review of administrative action,'" *Amgen, Inc. v. Smith*, 357 F.3d 103, 111-12 (D.C. Cir. 2004) (quoting *Bowen v. Mich. Aca. of Fam. Physicians*, 476 U.S. 667, 670 (1986)), especially "of agency action taken in excess of delegated authority," *id.*  That presumption can "be overcome by a 'clear and convincing evidence' that Congress intended to preclude the suit."  *Id.* at 111 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967)).

12

### 1.    *Preclusion Subparagraph (G)*

Here, Congress explicitly directed, in subparagraph (G), "no judicial review of . . . the identification of renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(G).  This stripping of judicial review jurisdiction could not be clearer.  *See Amgen*, 357 F.3d at 111.  Plaintiffs dispute, however, whether subparagraph (G) applies to the challenged agency actions.

To start, plaintiffs assert that subparagraph (G) precludes judicial review of only CMS's identification "of a particular drug or other service" and does not reach more general regulations, which are "interpretations" or "constructions" rather than specific "identification[s]."  Pls.' Opp'n MTD at 2, 17.  In their view, the challenge to 42 C.F.R. § 413.171 is not precluded as a matter of the plain language of the statute.  Defendants counter that "identification" can refer to denotation of categories and to particular items in categories, § 413.171(3), such that including oral-only drugs in renal dialysis services qualifies as an "identification of renal dialysis services" under preclusion subparagraph (G).  Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply MTD") at 11, ECF No. 19.  In their view, both the challenges to the XPHOZAH Letter-Decision and the regulation, 42 C.F.R. § 413.171(3), fall within this scope.

As an initial matter, the word "identification" does not have the narrow meaning plaintiffs propose.  *See, e.g.*, *Identify*, CAMBRIDGE ENGLISH DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/identify ("to recognize . . . something and say or prove . . . what that . . . thing is") (last visited Nov. 6, 2024).  Thus, the use of this word in, and the plain text of, subparagraph (G) is sufficiently broad to reach both categorical determinations made via regulation and specific determinations of individual items.  Put another way, the preclusion subparagraph (G) does not specify that only identification of "particular" or "specific" drugs is precluded from judicial review.  That does not, however, end the inquiry.

13

### 2.    *Application of Preclusion Subparagraph (G) Is Limited to Authorized Agency Actions*

Preclusion of review of any type of agency action "extends no further than the Secretary's statutory authority to" take the action. *Amgen*, 357 F.3d at 112.  To "determine whether [a] judicial-review bar applies in [any] case," the court "must decide whether the challenged agency action counts as" the specific action for which the bar precludes review. *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020).  "Otherwise, agencies could characterize reviewable or unauthorized action as falling within the scope of no-review provisions whose application to such action Congress did not intend." *Amgen*, 357 F.3d at 113. That inquiry may merge with the merits in cases where "the challenge to the [agency's] action raises the question of the [agency's statutory] authority." *Id.* at 113-14 (quoting *COMSAT Corp. v. FCC*, 114 F.3d 223, 226-27 (D.C. Cir.1997)).  In such cases, the court may "skip to the merits question" of compliance with the statute, *American Hospital Association*, 964 F.3d at 1238-39, while stopping short of "inquir[ing] whether a challenged agency decision is arbitrary, capricious, or procedurally defective" unless sure of its subject matter jurisdiction, *Knapp Med. Ctr.*, 875 F.3d at 1128 (quoting *Amgen*, 357 F.3d at 113).

Judicial review here therefore rests on the answer to the question whether the challenged regulation, 42 C.F.R. § 413.171(3), and the challenged XPHOZAH Letter-Decision, by including certain oral-only drugs and XPHOZAH in the bundle, constitute "identification[s] of renal dialysis services included in the bundled payment," under preclusion subparagraph (G). *See Am. Hosp. Ass'n*, 964 F.3d at 1238.  That answer turns on whether certain oral-only drugs—namely those "for which payment was (prior to January 1, 2011) made separately," 42 C.F.R. § 413.171(3)—and XPHOZAH qualify as "renal dialysis services," as defined by the statutory definitional subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B).  If the certain oral-only drugs as

14

defined in the challenged regulation and XPHOZAH do so qualify, then CMS was acting within its statutory authority in classifying them as such.  The jurisdictional question here thus merges with one of the questions on the merits.  *See id.*; *Amgen*, 357 F.3d at 113-14; *see also COMSAT*, 114 F.3d at 226-27 (determining whether jurisdiction could be exercised by analyzing whether the challenged fee change was properly imposed pursuant to the paragraph for which such fee changes were precluded from review); *cf. E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 124-25 (1977) (determining whether jurisdiction exists by analyzing whether the challenged rule was properly promulgated pursuant to the part of the statute that authorized judicial review).

Defendants dispute any need to consult definitional subparagraph (B), instead reasoning by common sense that the letter determining XPHOZAH is included in the bundle is surely an "identification of a renal dialyses service[] included in the bundle[]."  Defs.' Mem. MTD at 14-15.  Whether such an identification is properly one of a "renal dialysis service," however, cannot turn solely on CMS's say-so.  As plaintiffs correctly complain, under defendants' reading, any determination *purporting* to be an identification of a renal dialysis service would be precluded from review.  Pls.' Opp'n MTD at 20-22.  The D.C. Circuit in *COMSAT* described as "preposterous" such a position—that "the no-review provision . . . could be read to shield from review any [agency] action purportedly taken pursuant to" that provision."  114 F.3d at 227.  CMS could then identify anything, even "all drugs," as renal dialysis services without judicial interference.  Pls.' Opp'n MTD at 20-21.[3]  Congress's definition of "renal dialysis services" in subparagraph (B), 42 U.S.C. § 1395rr(b)(14)(B), would do no work in constraining the agency.

---

[3]    Defendants respond to plaintiffs' "extreme example" by arguing that CMS would not adopt such a rule because the agency takes a "data-driven" approach to designate "functional categor[ies]" for ESRD drugs and noting that Congress has acknowledged after the fact CMS's inclusion of oral-only drugs.  Defs.' Reply MTD at 16-17. Neither one of these observations, however, mean that when drafting the statute *ex ante* Congress would have wanted to give the agency free rein to label any drug a "renal dialysis service."

The statutory scheme does not countenance such a vast conferral of unreviewable discretion. Congress expressly limited the agency's authority to "implement a payment system under which a single payment is made under this chapter to a provider of services or a renal dialysis facility for *renal dialysis services (as defined in subparagraph (B))*." 42 U.S.C. § 1395rr(b)(14)(A)(i) (emphasis added). As a result, CMS can designate for a bundled payment only items that fall within Congress's definition of "renal dialysis services" in subparagraph (B). Whether the challenged regulation and Letter-Decision here are "identification[s] of renal-dialysis services" in the preclusion subparagraph (G) thus turns on how *Congress*, not the *agency*, defines "renal dialysis services" in definitional subparagraph (B).

The D.C. Circuit's opinions in *Amgen* and *American Hospital Association* similarly require that the preclusion provision be tethered to the part of the statute defining the scope of agency authority. "In light of the presumption that Congress rarely intends to foreclose review of action exceeding agency authority," the D.C. Circuit in *Amgen* construed a different section of the Medicare Act, 42 U.S.C. § 1395*l*(t)(12)(A)—which precluded review of "other adjustments"—to "prevent review only of the 'other adjustments' that the Medicare Act authorize[d] the Secretary to make" in neighboring § 1395*l*(t)(2)(E). *Amgen*, 357 F.3d at 112-13. Likewise, in *American Hospital Association*, the D.C. Circuit again examined the same preclusion provision at issue in *Amgen* and determined whether the part of this provision precluding review of "establishment of methods described in paragraph 2(F)," applied based on whether the challenged action complied with paragraph 2(F). *See* 964 F.3d at 1238. In both cases, HHS's claim that the challenged actions were, practically speaking, "other adjustments" or the "establishment of methods," within the meaning of the preclusion provision, was insufficient

16

for that provision to apply without also showing that the actions fell within the applicable definitional section of the statute.

In an effort to distinguish *Amgen* and *American Hospital Association*, defendants point out that the preclusion provision at issue in both those cases explicitly referenced the definitional clause constraining the scope of agency authority, Defs.' Reply MTD at 9-10, as follows:

> There shall be no administrative or judicial review . . . of—
> (A)      the development of the [prospective payment] classification system *under paragraph (2)*, including the establishment of groups and relative payment weights for covered OPD services, of wage adjustment factors, other adjustments, and methods described *in paragraph (2)(F)*.

42 U.S.C. § 1395*l*(t)(12) (emphasis added). *Amgen* involved "other adjustments," 357 F.3d at 111-12, and *American Hospital Association* involved "methods described in paragraph (2)(F)," 964 F.3d at 1237-38. The preclusion subparagraph (A) explicitly references paragraph 2, which contained the definitional clauses referenced in *Amgen* (i.e., 42 U.S.C. § 1395*l*(t)(2)(E)) and in *American Hospital Association* (i.e., 42 U.S.C. § 1395*l*(t)(2)(F)). Defendants contrast that with preclusion subparagraph (G) here, which does not explicitly reference definitional subparagraph (B) when referring to "identification of renal dialysis services," despite explicitly referencing other subparagraphs for the other issues precluded for review. *See, e.g.*, *id.* § 1395rr(b)(14)(G) ("the establishment of an appropriate unit of payment under subparagraph (C)").

Although true that the preclusion provision in *American Hospital* and *Amgen*, § 1395*l*(t)(12)(A), explicitly references the definitional subparagraph, § 1395*l*(t)(2)(F), at issue in *American Hospital*, *Amgen* is more similar to this case than defendants admit. The definitional subparagraph at issue in *Amgen*, § 1395*l*(t)(2)(E), defining "other adjustments" is absent from the preclusion subparagraph, § 1395*l*(t)(12)(A). That preclusion subparagraph does reference paragraph (2), but does so only generally at the start of the list, preceding the "including" phrase that incorporates "other adjustments." *Id.* § 1395*l*(t)(12)(A). The preclusion subparagraph lacks

17

any explicit link between "other adjustments" and the specific subsection of paragraph (2) defining it, despite that more precise link existing between § 1395*l*(t)(2)(F) and "methods."  *Id.* The Court in *Amgen* nonetheless held that the subsection of the definitional subparagraph, § 1395*l*(t)(2)(E), was implicitly linked to the relevant provision of the preclusion subparagraph and analyzed whether HHS's action was an "other adjustment" under § 1395*l*(t)(2)(E) to determine if review was precluded.  *See* 357 F.3d at 112-13.  The same conclusion is appropriate here.

Just as in *Amgen*, the definitional subparagraph (B) is absent from the preclusion subparagraph (G), but the link is sufficiently implied.  Subparagraph (B) makes clear that the definition of "renal dialysis services" applies to all uses in paragraph (14) of § 1395rr(b), *see id.* § 1395rr(b)(14)(B) ("For purposes of this paragraph, the term 'renal dialysis services' includes— . . . "), obviating a need for an additional express link in preclusion subparagraph (G) in the same paragraph (14).  In any case, it would be reductive to conclude from subparagraph (G)'s absence of three words, "under subparagraph (B)," that Congress intended for its definition of "renal dialysis services" to be unenforceable, especially in light of the presumption of judicial review.[4]

Defendants further argue that evaluation of definitional subparagraph (B) nullifies the preclusion provision by requiring resolution of the merits question of the agency's compliance with the statutory definition even if the ultimate conclusion is that judicial review is precluded.

---

[4]    Plaintiffs nowhere request *ultra vires* review—the "Hail Mary pass" that "permits, in certain limited circumstances, judicial review of agency action for alleged statutory violations even when a statute precludes review."  *Am. Hosp. Ass'n*, 964 F.3d at 1238 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d at 445, 449 (D.C. Cir. 2009).  Rather, they insist preclusion subparagraph (G) does not preclude review.  Pls.' Opp'n MTD at 22 n.7.  Regardless, *ultra vires* review is not available where the source for statutory preclusion is express, as it is here.  *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (describing the narrow circumstances allowing ultra vires review, which has three prerequisites, including that "the statutory preclusion of review is implied rather than express" (quoting *Nyunt*, 589 F.3d at 449)).  Consequently, *ultra vires* review would not be available as a backstop in case CMS enacted a regulation that clearly flouted Congress's definition of "renal dialysis services" in subparagraph (B) and is yet another reason to reject defendants' request to interpret preclusion subparagraph (G) without any reference to definitional subparagraph (B).

18

Defs.' Reply MTD at 5.  The short-cut urged by defendants, however, amounts simply to accepting the agency's say-so as to the scope of preclusion and, for this reason, the D.C. Circuit has endorsed the alternative approach set out in *American Hospital* and *Amgen*, to confirm that the agency's action is statutorily authorized.  Contrary to defendants' argument, doing so does not deprive the preclusion provision of all force.  The preclusion provision still precludes all forms of judicial review except that of the agency's statutory authority.  *See Amgen*, 357 F.3d at 113-14 (noting that the "inquir[y] whether a challenged agency decision is arbitrary, capricious, or procedurally defective" is barred by a no-review provision).  If the court finds that the agency complied with the statute, the preclusion provision applies to bar the exercise of jurisdiction, and the case must be dismissed without further judicial review of the claims asserted.  *See id.* Conversely, if "the court 'find[s] that [the agency] has acted outside the scope of its statutory mandate,'" jurisdiction may be exercised to hold unlawful and set aside the challenged actions on that ground alone.  *Am. Hosp. Ass'n*, 964 F.3d at 1238 (alterations in original) (quoting *COMSAT*, 114 F.3d at 227); *Amgen*, 357 F.3d at 114.

### 3.    *Scope of Plaintiffs' Challenge*

Finally, defendants argue that plaintiffs' complaint does not actually challenge the regulation, 42 C.F.R. § 413.171(3), and contend that plaintiffs' challenge to CMS's identification and classification of XPHOZAH—which they view as clearly barred by preclusion subparagraph (G)—cannot be refashioned into a challenge to a regulation to "evade a jurisdictional bar." Defs.' Reply MTD at 12-13 (citing cases including *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 508 (D.C. Cir. 2019) and *Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*, 830 F.3d 515, 519 (D.C. Cir. 2016)).  This argument also fails.

Plaintiffs' complaint sufficiently alleges a challenge to the regulation itself, apart from the XPHOZAH Letter-Decision.  In reviewing a motion to dismiss for lack of jurisdiction under

Rule 12(b)(1), the Court must "construe [the complaint] liberally, granting [plaintiff] 'the benefit of all inferences that can be derived from the facts alleged." *Zukerman*, 961 F.3d at 441 (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).  Although Ardelyx's participation in this lawsuit may largely be motivated by the July 2024 XPHOZAH Letter-Decision, the complaint contains ample allegations as to why the challenged regulation, 42 C.F.R. § 413.171(3), is inconsistent with the statute, *see, e.g.,* Compl. ¶¶ 87-108.  The Third Claim for Relief makes this challenge directly, *id.* ¶¶ 212-15, and the Prayer for Relief requests an order "vacating and setting aside Defendants' determinations, *see* 42 C.F.R. § 413.171(3), that oral-only drugs are a 'renal dialysis service' subject to inclusion in the ESRD PPS bundle," *id.* at 49-50.  In construing the Complaint liberally, plaintiffs' use of the plural form "determinations" cannot be taken to limit its challenge to only decisions made reliant on the regulation and not the regulation itself, as defendants assert.  *See* Defs.' Reply MTD at 3-4.  Consequently, *both* the XPHOZAH Letter-Decision and the regulation designating certain oral-only drugs as "renal dialysis services" are evaluated to determine whether these agency actions are covered by the statutory authority in definitional subparagraph (B) and thus fall within the jurisdictional bar provided in preclusion subparagraph (G).

### B.    Definitional Subparagraph (B)

Having determined that application of the preclusion subparagraph (G) depends on the scope of the agency's authority under definitional subparagraph (B), the first step in this analysis is to focus on the latter provision's description of "renal dialysis services" and then to assess whether the two challenged agency actions fall within the scope of authorized activity.  This analysis does not defer to the agency's interpretation of any of the statute's provisions, even if ambiguity were found, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024), but

rather determines the "best reading" of the statute "after applying all relevant interpretive tools" and considering, "with due respect[,] . . . the views of the Executive Branch." *Id.* at 2266-67.

Plaintiffs raise two principal challenges to CMS's exercise of statutory authority: (1) that oral-only drugs are excluded by definitional subparagraph (B), Pls.' Mem. PI at 20-21 (citing 42 U.S.C. § 1395rr(b)(14)(B)); and (2) that XPHOZAH, aside from being an oral-only drug, should be excluded because this drug is not "furnished . . . for the treatment of end stage renal disease," 42 U.S.C. § 1395rr(b)(14)(B)(iii). Pls.' Mem. PI at 30-31. These challenges are addressed *seriatim*, and both fail.

### 1.    *Subparagraph B's Inclusion of Certain Oral-only Drugs*

The proper starting point for statutory interpretation is "careful consideration of the text." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 667 (2021). That entails both examination of "the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). "[I]f possible," courts "construe a statute so as to give effect to every clause and word." *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022).

The text and structure of definitional subparagraph (B) make clear that this provision does not purport to provide an exhaustive universe or offer a comprehensive set of "renal dialysis services." *See* 42 U.S.C. § 1395rr(b)(14)(B). This provision has four subparts describing four separate categories of "items and services," "erythropoiesis stimulating agents," "other drugs and biologicals," and "diagnostic laboratory tests and other items and services" that are covered, and all introduced with the term "includes." *Id.* ("For purposes of this paragraph, the term 'renal dialysis services' *includes*—"). The word "includes" indicates that the enumerated categories are not exhaustive and others are not foreclosed. *Id.* Congress could have written "means" or "constitutes" but chose "includes." *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095,

1114-15 (D.C. Cir. 2009) (distinguishing between "means" and "includes" in statutory definitions).  Subparagraph (B) then states explicitly what is *excluded*, concluding with the line: "Such term does not include vaccines."  42 U.S.C. § 1395rr(b)(14)(B).  No oral-only drugs are excluded.

Moreover, "renal dialysis services" was plainly intended to cover drugs designed to be taken orally by ESRD patients since two subparts of definitional subparagraph (B) expressly cover "any oral form of such [erythropoiesis stimulating or ES] agents," *id*. § 1395rr(b)(14)(B)(ii), and "any oral equivalent form of such drug or biological," *id*. § 1395rr(b)(14)(B)(iii).  Subparagraph (B)(iii) most directly incorporates into "renal dialysis services" oral-only drugs by covering "drugs and biologicals," other than ESAs, that were previously reimbursed separately from the bundle.  *Id*.  The simplest interpretation of the plain language indicates that oral-only drugs currently separately reimbursed are included in the definition of "renal dialysis services."

Plaintiffs insist that definitional subparagraph (B) only includes those oral drugs with "equivalent" non-oral versions.  Pls.' Mem. PI at 23.  As support for this construction, plaintiffs point to the language, in subpart (B)(ii), referring to "any oral form," *id.* § 1395rr(b)(14)(B)(ii), and, in subpart (B)(iii), referring to "oral equivalent form," as suggesting a requirement that the only oral drugs to qualify under subparagraph (B) are those with alternative non-oral forms, reasoning that if Congress had intended to include all oral drugs, the reference to oral *form* or *equivalent* would not have been necessary, Pls.' Mem. PI at 25; Pls.' Opp'n MTD at 31, and indeed would be superfluous, Pls.' Reply Supp. Mot. PI or Expedited Summ. J. ("Pls.' Reply PI") at 9, ECF No. 20.

22

The flaw in plaintiffs' reasoning is that their analysis ignores the first clause of subpart (B)(iii), which refers to "drugs and biologicals . . . for which payment was (before the application of this paragraph) made separately under this subchapter . . . ." *Id.* § 1395rr(b)(14)(B)(iii).[5]  That clause serves to move drugs in all forms that exist under a fee-for-service reimbursement system prior to "application of this paragraph" into the bundle system.  The regulation implementing subpart (B)(iii), 42 C.F.R. § 413.171, does not go into effect with respect to oral-only drugs until January 1, 2025, as all parties agree, so "this paragraph" has not yet been applied to oral-only drugs.[6]  Oral-only drugs that currently exist and are separately reimbursed may thus be moved into the bundle by this first clause.

The first clause of subpart (B)(iii) says nothing, however, about drugs that only come into existence *after* "application of this paragraph," such that "payment was" never "made separately under this subchapter."  That is where the second part of (B)(iii) does work.  The parties agree the second clause of (B)(iii) contemplates that "renal dialysis services" also includes new, subsequently-developed oral versions of drugs, which were extant in a different form at the time (B)(iii) was applied and were moved into the bundle.  Defs.' Opp'n Mot. Prelim. Inj. or Expedited Summ. J. ("Defs.' Opp'n PI") at 34, ECF No. 16; Pls.' Reply PI at 10 n.3.  Without the second clause, as defendants point out, "an oral version of a drug paid by Medicare in its injectable or intravenous version might arguably be excluded from the bundle, if the oral version

---

[5]    42 U.S.C. § 1395rr(b)(14)(B)(iii) reads, in full, as follows:

    (iii) other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease and for which payment was (before the application of this paragraph) made separately under this subchapter, and any oral equivalent form of such drug or biological;

[6]    Both parties agree that the paragraph (14) will not be applied to oral-only drugs until January 1, 2025.  Pls.' Mem. PI at 14; Defs.' Opp'n PI at 33.  Defendants further explain that because "Congress has delayed implementation of the Secretary's oral-only drugs policy until January 1, 2025, . . . 'this paragraph' has not yet been applied to oral-only drugs," Defs.' Opp'n PI at 33, and plaintiffs do not specifically contest that interpretation of "before the application of this paragraph," Pls.' Reply PI at 9-10.

becomes available after 'the application of this paragraph.'"  Defs.' Opp'n PI at 34.  Such an oral version would not previously have been paid for separately, so it would not be covered by the first clause of (B)(iii).  The text and structure of subpart (B)(iii) thus support the inclusion of oral-only drugs paid for "separately under this subchapter" prior to subparagraph (B) being applied, i.e., on January 1, 2025.[7]

The challenged regulation, 42 C.F.R. § 413.171, as pertaining to oral-only drugs is narrower in scope than this reading of subparagraph (B) and is therefore statutorily authorized. Section 413.171 defines "renal dialysis services" to be "paid under the ESRD prospective payment system," or bundle, to include "drugs with only an oral form" for which "payment was (*prior to January 1, 2011*) made separately" under the statute.  42 C.F.R. § 413.171(3) (emphasis added).  Any oral-only drug for which payment was made separately prior to January 2011, per § 413.171(3), is necessarily one for which payment was made separately "before application of" the statute's subparagraph (B), (i.e., before January 1, 2025), per 42 U.S.C. § 1395rr(b)(14)(B)(iii).  In this way, the regulation falls within the reach of definitional subparagraph (B).

Plaintiffs misconstrue the scope of the challenged regulation, suggesting that CMS determined that "any new oral-only drug is a 'renal dialysis service.'"  Compl.  ¶ 215; *see also* Pls.' Mem. PI at 2 (describing the regulation as "add[ing] oral-only drugs to a bundled payment system").  This reading ignores the regulation's temporal limit.  42 C.F.R. § 413.171(3)

---

[7]    In its notice of proposed rulemaking, CMS posited that (B)(iv) could also authorize inclusion of oral-only drugs in the bundle.  2009 NPR ESRD PPS, 74 Fed. Reg. at 49,928.  Since subpart (B)(iii), which references "drugs," includes oral-only drugs, there is no need to analyze the vaguer text of "other items and services" in (B)(iv).  Plaintiffs are right that (B)(iv) appears to create some redundancy with (B)(iii), Pls.' Mem. PI at 26-27, in that (B)(iii) includes "other drugs and biologicals" and (B)(iv) includes "services," which CMS has elsewhere defined as including drugs.  42 C.F.R. § 400.202 ("Services means medical care or services and items, such as medical diagnosis and treatment, drugs and biologicals, . . . .").  This redundancy exists, however, regardless of whether "other drugs and biologicals" in subpart (B)(iii) is read to include or exclude oral-only forms, and therefore does not impact the foregoing interpretation of subpart (B)(iii).

("including drugs and biologicals with only an oral form" "for which payment was (prior to January 1, 2011) made separately under …the Act").[8]  This temporal limitation embedded as a qualifier in the regulation clearly limits its reach to oral-only drugs that were paid separately prior to 2011.  That regulatory language is consistent with the statute, and whether plaintiffs' fictional regulation—reaching all new oral-only drugs—is consistent is a question the Court need not reach.[9]

The statute's history and purpose further inform the proper construction of the text.  *See Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024).  Prior to MIPPA, many renal dialysis services were already included in a prospective lump-sum payment.  2009 NPR ESRD PPS, 74 Fed. Reg. at 49,924.  MIPPA thus did not create the bundle anew, but rather expanded this system to eliminate "any other payment" for "renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(A)(i) ("a payment system under which a single payment is made under this subchapter to a provider of services or a renal dialysis facility for renal dialysis services (as defined in subparagraph (B)) in lieu of any other payment").  Plaintiffs point out that oral drugs have never *previously* been part of the prospective payment system, Pls.' Mem. PI at 8, 23, but such past practice is irrelevant.  MIPPA was intended to make a change, which supports reading definitional subparagraph (B) expansively.

Plaintiffs double down on this past practice—that oral-only drugs always have been excluded from the bundle payment system—to argue that including them makes no sense because such drugs are neither prescribed nor administered in any form by renal dialysis

---

[8]  Defendants also do not point out this temporal limitation.

[9]  Plaintiffs do not argue that the XPHOZAH Letter-Decision is inconsistent with 42 C.F.R. § 413.171 because XPHOZAH was not paid for separately prior to 2011, given that the drug did not exist at that time.  Even if this argument had been presented, the Letter-Decision is consistent with definitional subparagraph (B) of the statute, so this Court lacks jurisdiction to examine the decision's compliance with the regulation, for the reasons explained below.

facilities in conjunction with dialysis.  Pls.' Mem. PI at 8, 23, 33; Pls.' Opp'n MTD at 29-30.

Looking backwards into past practice is, again, not helpful.  Congress intended to bring more

services under the fold of renal dialysis facilities by expanding the MIPPA bundle.  Although

oral-only drugs do not *need* to be administered by dialysis facilities, advantages do exist in

having those facilities do so.  For instance, including oral-only drugs in the bundle will put them

on an even playing field with alternative modes of treatment already in the bundle.  Even if

alternative drugs are not a one-to-one match (like injectable and oral equivalents), there may be

alternative treatments in the bundle for some oral-only drugs that would achieve the same goal,

and keeping oral-only drugs out of the bundle could create a perverse incentive.  If the dialysis

facility encouraged patients to have their nephrologists prescribe an outside-the-bundle oral-only

drug that is more costly than the in-bundle alternative, that would unnecessarily burden

Medicare; and if the facility encouraged the use of an outside-the-bundle oral-only drug that is

less effective, that could adversely affect the patient.  Plaintiffs assume that outside-the-bundle

oral-only drugs are both more expensive and more effective than those in the bundle.  While that

may be the case for XPHOZAH, this is not necessarily true as to every such oral-only drug.

Moreover, inclusion in the bundle will create broader access to oral-only drugs, given that 21%

of ESRD patients do not have Medicare Part D.  *See* 2024 NPR ESRD PPS, 89 Fed. Reg. at

55,761.

The legislative history also lends some support to this understanding of Congress's

expansive purpose.  Both parties leverage post-enactment developments to bolster their

positions.  Defendants, for their part, emphasize that Congress explicitly recognized the inclusion

of oral-only drugs when enacting subsequent legislation delaying their addition to the bundle.

*See* Defs.' Opp'n PI at 29; Pub. L. 112-240, sec. 632, 126 Stat. at 2354 ("Two-Year Delay of

Implementation of Oral-Only ESRD-Related Drugs in the ESRD Prospective Payment System"); *see also* Pub. L. 113-93, sec. 217(a), 128 Stat. at 1061; Pub. L. 113-295, sec. 204, 128 Stat. at 4065 (extending the delay until 2025். In that same statute, Congress also requested that HHS "monitor the bone and mineral metabolism of individuals with end stage renal disease," "with respect to the implementation of oral-only ESRD-related drugs in the ESRD prospective payment system," demonstrating an understanding of, and—at least, at that time—no wide opposition to CMS's decision.  Pub. L. 112-240, sec. 632, 126 Stat. at 2354.  These enactments indeed suggest Congress understood MIPPA to be consistent with the inclusion of oral-only drugs, including XPHOZAH (a "bone and mineral metabolism" drug).  *See* Compl. ¶¶ 75, 150; *Women Involved in Farm Econ. v. U.S. Dep't of Agric.*, 876 F.2d 994, 1003 (D.C. Cir. 1989) (noting Congress's "explicit recognition of the Secretary's regulations is entitled to some weight"); *cf. District of Columbia v Heller*, 554 U.S. 570, 605 (2008) (distinguishing between "postenactment legislative history," which is not worth any weight, and "examination of" legal sources that shed light on the public understanding of a legal text in the period after its enactment, which is "critical").

Plaintiffs, on the other hand, emphasize that shortly after CMS passed the challenged regulation, § 413.171, a bill was introduced in the House of Representatives that would have amended the definition of "renal dialysis services," under definitional subparagraph (B)(iii), to explicitly include oral-only drugs.  H.R. 13200, 11th Cong. § 1232 (2009); Pls.' Mem. PI at 25-26.  From this instance of an introduced bill, plaintiffs leap to the conclusion that Congress rejected the inclusion of oral-only drugs, Pls.' Mem. PI at 25-26, but this is a leap too far.  An equally permissible inference is that Congress saw the amendment as unnecessary because the statute already broadly authorized CMS to include oral-only drugs in "renal dialysis services."

Alternatively, Congress may not have wanted to codify CMS's rulemaking and rather wanted to stick with the broad statutory language to give CMS greater latitude.  Without knowing which possibility is accurate, courts "can infer nothing from the Congress's consideration and rejection of a differently worded provision in a separate piece of legislation."  *Knapp Med. Ctr.*, 875 F.3d at 1130 (discussing the same proposed bill); *see also Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 241-42 (2011) (describing "post-enactment legislative history" as "not a legitimate tool of statutory interpretation"); *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022) (applying *Bruesewitz*'s admonition to the use of subsequent bills to shed light on Congress's earlier intent).

In short, the best reading of definitional subparagraph (B), based on the text and structure, and confirmed by MIPPA's history and purpose, is that "renal dialysis services" includes oral-only drugs paid for separately before 2025, like XPHOZAH.  Thus, CMS did not violate the bounds of its statutory authority, in identifying such oral-only drugs (including XPHOZAH) as "renal dialysis services."  Consequently, the preclusion subparagraph (G) applies and precludes this Court from exercising jurisdiction to review plaintiffs' challenge to the regulation 42 C.F.R. § 413.171(3).  *See Am. Hosp. Ass'n*, 964 F.3d at 1245.

### 2.    *Identification of XPHOZAH as Treating ESRD*

CMS's XPHOZAH Letter-Decision is also authorized by definitional subparagraph (B) insofar as this currently separately reimbursed oral-only drug is identified as a "renal dialysis service" and, as a consequence, judicial review of this determination is precluded by preclusion subparagraph (G).  Plaintiffs' second challenge to the XPHOZAH Letter-Decision is that the decision to include XPHOZAH in the bundle violates subparagraph (B) because XPHOZAH is not "furnished to individuals for the treatment of end stage renal disease."

28

XPHOZAH treats hyperphosphatemia, the state of having too much phosphate in the blood, which differs from renal disease. Compl. ¶¶ 24-25. Not all individuals with renal disease suffer from hyperphosphatemia, and not all people with hyperphosphatemia have ESRD. Williams Decl. ¶ 18; Compl. ¶ 150; Pls.' Mem. PI at 15 & n.17. Both parties recognize that they are separate conditions, describing hyperphosphatemia as a "comorbidity" of renal disease. Pls.' Opp'n MTD at 38; Defs.' Mem. MTD at 2. Nevertheless, the two conditions of ESRD and hyperphosphatemia are closely related, with a high rate of overlap: 80% of ESRD patients on dialysis have hyperphosphatemia. Williams Decl. ¶ 18; *id.*, Ex. 2 ("Ardelyx: Management of Hyperphosphatemia and Implications of ESRD PPS") at 5, ECF No. 14-5 (Ardelyx's own presentation describing hyperphosphatemia as "nearly universal" among patients receiving maintenance dialysis). Furthermore, the incidence is not purely correlational. Hyperphosphatemia is most commonly *caused* by advanced chronic kidney disease because phosphate is normally excreted by functioning kidneys. *See Hyperphosphatemia*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/24293-hyperphosphatemia (last visited Nov. 7, 2024).[10] The FDA indication for XPHOZAH illustrates this: XPHOZAH is only approved to treat hyperphosphatemia in individuals with chronic kidney disease on dialysis. XPHOZAH Prescr. Info. at 1. XPHOZAH thus treats a symptom of and problem caused by kidney failure, and CMS reasonably considered this drug as part of the treatment for ESRD.

This understanding fits well within the plain meaning of subparagraph (B)(iii). Just because a drug does not directly target renal function but rather a harmful and common side-effect of renal disease does not mean the drug is not being "furnished to individuals for the

---

[10]    "A federal court may take judicial notice of a fact that is not subject to reasonable dispute if it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (alterations in original) (quotation marks and citation omitted).

29

treatment of [ESRD]." 42 U.S.C. § 1395rr(b)(14)(B)(iii).  Much like dialysis, which would certainly be considered "treatment," XPHOZAH is reducing toxins in the bloodstream to replace the function of the kidneys.  *See* Compl. ¶ 5.  In fact, because dialysis achieves the same goal, Ardelyx has recognized increased frequency of dialysis as one—albeit impractical—way of treating hyperphosphatemia.  Ardelyx: Management of Hyperphosphatemia and Implications of ESRD PPS at 9.  For chronic diseases like ESRD without a cure, *see* Compl. ¶ 5 ("Kidney failure cannot be reversed."), a drug that mitigates the symptoms of the disease by replacing a lost function is "treatment" for the disease, even though the drug does not address the underlying cause of the failed organ.  *See Treatment*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/treatment (last visited Nov. 7, 2024) (defining "treatment" as "the use of drugs, exercises, etc. to *improve the condition of* an ill or injured person, *or* to cure a disease" (emphasis added)).

Definitional subparagraph (B) uses the broad phrase "furnished . . . for the treatment of end stage renal disease" in three of its four subparts defining "renal dialysis services."  42 U.S.C. § 1395rr(b)(14)(B).  Subpart (ii) of this subparagraph, including as "renal dialysis services" "erythropoiesis stimulating agents . . . that are furnished to individuals for the treatment of end stage renal disease," is instructive.  *Id.* § 1395rr(b)(14)(B)(ii).  ESAs treat anemia, which like hyperphosphatemia, is often caused by renal disease.  *See* Compl. ¶ 66; Pls.' Reply PI at 15-16.  Where ESAs are used to help people with renal disease, they are "furnished . . . for the treatment of end stage renal disease" and included as renal dialysis services.  42 U.S.C. § 1395rr(b)(14)(B)(ii).  XPHOZAH is no different.  This drug may only be prescribed to help people with renal disease on dialysis, XPHOZAH Prescr. Info. at 1, and thus plainly qualifies as

30

"other drugs and biologicals that are furnished to individuals for the treatment of end stage renal disease." *Id.* § 1395rr(b)(14)(B)(iii).

Plaintiffs urge a narrower meaning of subparagraph (B)(iii) as requiring direct treatment of the kidney disease, not the disease's complications, by stressing the statutory language "for treatment of [ESRD]," Pls.' Mem. PI at 30-32. This ignores the fact that both subparts (B)(ii) and (iii) use the same phrase—"furnished to individuals for the treatment of end stage renal disease"—and such a narrow reading would make no sense for ESAs in subparagraph (B)(ii). Instead, the two subparts must be read harmoniously. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) (describing the "presumption that a given term is used to mean the same thing throughout a statute").

To counter this more harmonious reading of definitional subparagraph (B), plaintiffs contend that ESAs have a different relationship to ESRD than XPHOZAH does, because ESAs treat anemia specifically caused by chronic kidney disease and ESA injections are received at nearly every dialysis treatment. Pls.' Reply PI at 15-16. XPHOZAH, by contrast, treats hyperphosphatemia in people *with* chronic kidney disease on dialysis—not necessarily hyperphosphatemia caused by the disease—and must be taken apart from dialysis. XPHOZAH is not even delivered by dialysis facilities and must be taken with meals, which cannot accompany dialysis. Pls.' Mem. PI at 16-17; Pls.' Reply PI at 16. Plaintiffs strain to make a distinction without a meaningful difference: given that the main cause of hyperphosphatemia is advanced renal disease, XPHOZAH is generally treating hyperphosphatemia *caused by* or at least closely associated with kidney disease, analogous to ESAs. Furthermore, the timing of patients' intake of XPHOZAH is of no matter; by eliminating the fee-for-service component of

31

the composite payment, MIPPA intended to expand the bundle of "renal dialysis services" beyond that which were already directly administered by dialysis facilities.

This reading of subparagraph (B) is supported by the legislative history previously discussed. When Congress in 2012 first postponed the implementation of CMS's rule incorporating certain oral-only drugs into the bundle, it referred to them as "oral-only ESRD-related drugs." Pub. L. 112-240, sec. 632, 126 Stat. at 2354. Congress likewise added a provision about adjustments to reimbursement pricing that explicitly referred to CMS's rule using this language: "other than oral-only ESRD-related drugs, as such term is used in the final rule promulgated by the Secretary in the Federal Register on August 12, 2010 (75 Fed. Reg. 49030)." 42 U.S.C. § 1395rr(b)(14)(I). Use of "ESRD-related drugs" suggests a flexible understanding of the definitional subparagraph (B) that includes drugs *related* to, rather than only those directly treating, ESRD. Though Congress has not changed the language in § 1395rr(b)(14)(B), these other enactments discourage a narrow reading that would make inclusion in the bundle turn on the precise mode of treating the amalgamation of problems involved in kidney failure.[11]

CMS's XPHOZAH Letter-Decision including this drug in the bundle is therefore authorized by subparagraph (B)'s definition of the term "renal dialysis services" and thus precluded from review under subparagraph (G).

*　　*　　*

Plaintiffs' APA challenges to the XPHOZAH Letter-Decision raise various inconsistencies with CMS's own rulemaking and guidance, contending that this decision is not

---

[11] To the extent Plaintiffs also challenge the statutory authority of CMS's Federal Register notices describing the relevant inquiry as whether drugs are "ESRD-related," 2010 Final Rule ESRD PPS, 75 Fed. Reg. at 49,047, as opposed to whether drugs are "furnished . . . for the treatment of ESRD," *see* Pls.' Mem. PI at 32, that challenge fails for these same reasons.

consistent with 42 C.F.R. § 413.171(3) because XPHOZAH is not "furnished . . . for the treatment of ESRD," Pls.' PI Mem. at 31-32, nor consistent with § 413.171(5) because XPHOZAH is not "essential for the delivery of maintenance dialysis," *id*. at 18-19.  In addition, plaintiffs argue that the decision is at odds with CMS's Federal Register notices describing renal dialysis services as drugs "utilized for ESRD-related conditions in a dialysis unit."  *Id.* at 33 (quoting 2010 Final Rule ESRD PPS, 75 Fed. Reg. at 49,047).  Whether these arguments have merit may not be considered, however.  The XPHOZAH Letter-Decision does not violate CMS's statutory authority and thus this Court lacks jurisdiction, under 42 U.S.C. § 1395rr(b)(14)(G), to consider those claims.  *See Amgen*, 357 F.3d at 113.

## IV.    CONCLUSION

For the foregoing reasons, 42 U.S.C. § 1395rr(b)(14)(G) precludes review of CMS's regulation, codified at 42 C.F.R. § 413.171(3), that includes in the renal dialysis services bundle oral-only drugs for which payment was made separately prior to 2011, and CMS's determination that the hyperphosphatemia drug XPHOZAH is included in the bundle.  Defendants' motion to dismiss is therefore granted, and plaintiffs' motion for a preliminary injunction or expedited summary judgment is denied as moot.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  November 8, 2024

*Beryl A. Howell*

**BERYL A. HOWELL**
United States District Judge